UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLYN MIREK,<br><br>   Plaintiff<br><br>v.<br><br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA and BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA,<br><br>   Defendants | Civil Action<br>No. 04-30166-MAP |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNT II IN THE COMPLAINT AND FOR EMERGENCY PROTECTIVE ORDER**

**INTRODUCTION**

The defendant insurers in this disability insurance case have brought a motion that seems to toss in, as the expression goes, "everything but the kitchen sink." In a single motion they seek a hodgepodge of relief: (a) judgment on the pleadings for plaintiff's claim for unfair and deceptive insurance practices under Connecticut law; (b) a protective order for nearly every topic in a 30(b)(6) deposition directed to defendant Berkshire Life Insurance Company of America ("Berkshire"); (c) a protective order for the depositions of two non-party witnesses in Michigan who were used to find the medical "expert" on whom the defendants relied to deny insurance in this case; (d) a protective order concerning documents and information from the so-called expert physician, Dr. Harold Axe; and (e) a protective order for non-party witnesses in Maryland, who serve as general

agents for the defendants on the East Coast and who maintain a website that has represented the defendants' position to the public on insuring individuals with latex allergy – a website from which defendants have tried to distance themselves in this litigation.

Plaintiff willingly dismisses her unfair and deceptive practices claim under Connecticut law because it has become abundantly clear in recent discovery, including documents recently produced by the defendants, a deposition on September 15 of the medical expert on whom they relied in denying the claim, Dr. Harold Axe, and depositions of present and past Berkshire personnel on September 20 and 21, that the far simpler claim to try in this case (and which provides similar relief in the form of punitive damages under Connecticut law) is plaintiff's claim for breach of the implied covenant of good faith and fair dealing. In view of the specific discovery that Plaintiff has gathered on defendants' bad faith conduct, plaintiff is filing a motion simultaneously with the filing of this response to Supplement and Amend the Second Amended Complaint. The purpose is to detail certain of the breaches of the implied covenant of good faith and fair dealing referenced in Count I and to designate breach of the implied covenant of good faith and fair dealing as a separate count of the complaint, rather than combined in Count I.

Plaintiff opposes defendants' other requests for relief for the reasons set forth below.

## I. BACKGROUND

This case arises out of defendants' denial of a claim for disability benefits under an "own occupation" disability policy. During 1993, The Guardian Life Insurance Company of America ("Guardian") issued Carolyn Mirek, a dental hygienist, an

individual policy of disability insurance. The policy was intended to provide income protection in the form of monthly disability benefits if the policyholder – in this case, Carolyn Mirek -- became unable to work in her occupation. In 1999, Ms. Mirek, who had been a full-time dental hygienist for many years, was diagnosed with latex allergy. Her allergist determined that she had been suffering from latex allergy for some time and had latex-allergy related asthma. She continued to work as a dental hygienist for a period of time but eventually, upon the recommendation of her allergist, ceased working as a dental hygienist to minimize her exposure to latex. She then made a claim for benefits under the policy. Her policy provides that she is to receive benefits until "age 65" within the meaning of the policy. She is now 42. She now works selling dental supplies.

On several different occasions in 2002, with the most recent on November 21, 2002, the defendant Berkshire Life Insurance Company of America, a subsidiary of Guardian, denied her claim for disability benefits. Plaintiff has learned that in making its determination, Berkshire relied primarily on the opinion of Dr. Harold Axe, who, as plaintiff has discovered, does not even believe that there is such a condition as "latex allergy." In addition, plaintiff has learned through discovery, Berkshire relied on the opinion of an on-staff physician who had little familiarity with latex allergy and little or no experience diagnosing latex-allergic patients, testing for latex allergy or treating latex-allergic individuals.

Carolyn Mirek brought this lawsuit based on breach of contract, including breach of the implied covenant of good faith and fair dealing, and unfair and deceptive practices

under Connecticut and Massachusetts law. This Court determined that Connecticut, not

Massachusetts law, applied and previously dismissed the Chapter 93A claim.[1]

## II. ARGUMENT

### A. The scope of discovery is broad, and the defendants have failed to meet the heavy burden for a protective order limiting discovery

Rule 26(b)(1) of the Federal Rules of Civil Procedure permits "discovery of any

matter, not privileged, that is relevant to the claim or defense of any party." The Rule

broadly defines relevance to include not only information admissible at trial, but also

information which "appears reasonably calculated to lead to the discovery of admissible

evidence." Id.; see also Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)

(relevance is broadly interpreted "to encompass any matter that bears on, or that

reasonable could lead to other matter that could bear on any issue that is or may be in the

case"). "[R]elevant information includes any matter that is or may become an issue in the

litigation." Multi-Core, Inc. v. Southern Water Treatment Co., 139 F.R.D. 262, 264 n. 2

---

[1] As an initial matter, defendants failed to comply with either Local Rule 7.2(a)(1)(B) or Local Rule 37.1. Local Rule 7.2(a)(1)(B) imposes a "burden …on counsel filing the motion to initiate [a] conference upon giving reasonable notice of the time, place and specific nature of the conference" in an effort to reach agreement on the issues presented by the motion. Local Rule 37.1 imposes an additional requirement for discovery disputes:

> Before filing any discovery motion, including any motion …for a
> protective order, counsel for each of the parties shall confer in good
> faith to narrow the areas of disagreement to the greatest possible extent.

L.R. 37.1(A). When filing a motion for protective order, the moving party, under Local Rule 37.1(B), is supposed to include a "certificate" that Rule 37.1 was complied with, and further state "the time, date, location and duration of the [discovery] conference; who was present for each party; the matters on which the parties reached agreement; and the issues remaining to be decided by the court". L.R. 37.1(B)  The counsel filing the motion  contacted Ms. Mirek's counsel to have a conference about Defendants' motion for judgment on the pleadings as to Count II, and also at some point mentioned an intention to file a motion for protective order regarding the 30(b)(6) deposition, but never discussed any issue regarding a motion for protective order for the depositions of Harold Axe, M.D., Guardian's general agent, Steven Crawford, d/b/a Guardian Disability Insurance Brokerage and the Michigan-based companies that were used to find the expert on whom the defendants primarily relied in denying plaintiff's claim.

(D.Mass.1991).  As demonstrated below, the topics contested by defendants clearly meet the standards for discovery in this case.

A motion for a protective order under may only be granted upon a demonstration of  "good cause." Fed. R. Civ. P. 26(c). "A finding of good cause must be based on a particular factual demonstration of potential harm." Anderson v, Cryovac, Inc., 805 F.2d 1, 7 (1st Cir. 1986). The burden is on the movant "to make specific demonstration of necessity for a protective order." Id., citing General Dynamics Corp. v. Selb Manufacturing Co., 481 F.2d 1204, 1212 (8th Cir. 1973). "Conclusory statements [are] insufficient to support a motion for a protective order." Prozina Shipping Co., Ltd. v. Thirty-Four Automobiles, 179 F.R.D. 41, 48 (D. Mass. 1998). See also In Re Terra International, Inc., 134 F.3d 302, 306 (5th Cir. 1998) ("the burden is on the movant to show the necessity of [a protective order's] issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.");  Merit Industries v. Feuer, 201 F.R.D. 382, 384-385 (E.D. Pa. 2001) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing.").

Defendants have failed, as discussed below, to make  "a factual demonstration of potential harm." Anderson, 805 F.2d, at 7. In fact, nowhere in defendants' motion is there any identification or articulation of the harm that they would suffer by being required to provide discovery responses with respect to the topics for which plaintiffs seek discovery from Berkshire, nor for the other deposition witnesses.

**B.      Defendants' motion for a protective order for the 30(b)(6) deposition of Berkshire should be denied**

Defendants' argument in support of limiting the Rule 30(b)(6) topics rests on a single premise: that the topics are aimed at discovering information relating to a claim under the Connecticut's Unfair Insurance Practices Act.  They are profoundly mistaken.

For example, to the extent the topics seek any information about the defendants' underwriting practices -- and only some of the topics do -- they are designed to gather information about how the defendants rejected knowledge learned through the underwriting department in rejecting plaintiff's claim. Such information bears on defendants' credibility. For example, in denying the plaintiff's claim, defendants took the position that latex allergy poses no workplace risk to someone in her position.  But, plaintiff already has uncovered in the course of discovery – most recently during depositions of certain employees and a former employee on September 20 and 21 -- that the defendants' underwriting  have taken the position for several years that that *they won't issue disability insurance to anyone in the medical field with any hint of a latex allergy because of the defendants' concerns about the individuals becoming disabled from working in their occupation and filing a claim*. The defendants won't even use exclusions or riders for prospective policyholders with evidence of latex allergy -- they won't write such disability policies at all.  This position is completely inconsistent with the position that defendants have taken in denying plaintiff's claim  -- namely that Ms. Mirek and other individuals with latex allergies are perfectly capable of working in dentists' offices as hygienists.

A few of the topics seek information about claims-handling practices.  Once again, defendants' contention that such information is sought to litigate the issue of the

propriety of defendants' claims-handling practices across the board is fundamentally mistaken. Plaintiff only seeks information about what the defendants do generally with respect to the handling of the claims to determine whether, and to what extent, their behavior in this case <u>deviated</u> from such procedures. This subject bears directly on the credibility of the defense position, and also bears on the defendants' lack of good faith in processing the claim. For example, plaintiff seeks to learn whether it is customary for Berkshire to use a non-Board certified physician with little or no experience in treating, diagnosing or testing for latex allergy to evaluate a disability claim based on a latex allergy, as they did in this case. Plaintiff further seeks to discover whether it is standard for the defendants to ignore the opinion of a Board-certified specialist who has treated a claimant for more than a decade – which is what occurred in Ms. Mirek's case. If it is not typical, such evidence would bear directly on defendants' credibility. If they used a different procedure in this case, a jury may well find that such a deviation was motivated by a desire to deny the claim and their credibility would be affected.

In addition, evidence of the handling of latex-allergy related claims is relevant to the issue of whether the defendants breached the implied covenant of good faith and fair dealing. Is it customary for the defendants, in handling latex-allergy-related claims, to ignore the defendants' institutional knowledge about latex allergy in processing a latex-allergy-related claim, as they did here? Is it typical for the defendants to rely on the opinion of a non-Board-certified physician who never examined the claimant and who does not even believe that there is something called "latex allergy"? The answers to such questions would be probative of defendants' credibility and good faith.

Another group of topics relates to the Defendants' use of an affiliated group of Michigan companies – MLS National Medical Evaluation Services, Medicolegal Services Inc. and the former name of MLS, Medicolegal National I.M.E. Services Inc.. These companies were directly involved in the handling of plaintiff's claim since it was through these companies that the defendants hired the non-board certified physician with little latex allergy experience, who does not believe in "latex allergy," to evaluate plaintiff's claim and generate reports. The defendants' financial and business relationship with the companies that chose a physician with unorthodox views of latex allergy, and then arranged to deliver to the defendants reports that purport to find no basis for work limitations for Ms. Mirek, bears on the issue of defendants' credibility in denying the claim and their good faith in relying on the unconventional physician's reports.

Moreover, the bias of potential witnesses is always a relevant inquiry, and the information sought concerning the Michigan companies bears directly on their credibility. See DiBenedetto v. Hall, 272 F.3d 1, 10 (1st Cir. 2001)("Bias is always relevant as discrediting the witness and affecting the weight of his testimony.") The Michigan companies are potential witnesses at trial; indeed, their depositions were scheduled by the plaintiff before this motion for protective order was filed. Their financial relationship with the defendants, and the amount of money that they received from the defendants, bears directly on their potential bias toward the defendants in describing their involvement in the handling of the claim, the selection of Dr. Axe and the manner in which his reports were generated. (citations omitted).

Defendants have also argued that Topics 10 and 11, which involve the treatment of other claimants by the Defendants, are an invasion of privacy to those claimants. This

argument is absurd. The requests clearly ask for testimony about the "occasions" in which Defendants chose to issue or not issue policies to medical professionals with diagnosed latex allergies. It does not ask for the identity of such claimants, and there is no expectation that the 30(b)(6) testimony would contain such information. Because the information requested is relevant, and Defendants have failed to show that it is either burdensome or an invasion of privacy, the motion for a protective order should be denied.

Defendants claim that the topics are "burdensome." But, a discovery request is unduly burdensome on its face only when responding to the challenged request will require the responding party to "engage in mental gymnastics to determine what information may or may not be remotely responsive" to the challenged request. See, e.g., Aikens v. Deluxe Financial Services, Inc., 217 F.R.D. 533, 538 (D. Kan. 2003). When a discovery request is not unduly burdensome on its face, the responding party bears the burden of coming forward with an evidentiary showing that supports that party's objection. See General Electric Capital Corp. v. Lear Corp., 215 F.R.D. 637, 640 (D. Kan. 2003). Consequently, unless the Court finds a topic for which Berkshire is required to designate a witness unduly burdensome on its face, the burden rests with the defendants to put forth evidence establishing an undue burden or expense that outweighs the ordinary presumption of broad discovery disclosures. Id. at 640. Defendants have failed to make such a showing.

Plaintiff's counsel carefully crafted the topics for which Berkshire's testimony is sought.[2] For the Court's convenience, plaintiff briefly describes below, in bold-face type and brackets, the relevance of each of the topics at issue:

---

[2] Individual witnesses of the company already have provided, during depositions on September 20 and 21, considerable insight into many of the topics.

1.     **[Not disputed by Defendants]**;

2.     Guardian's and Berkshire's knowledge of, and the state of Guardian's and Berkshire's knowledge of and any familiarity with, latex allergy in 2000, 2001, 2002, 2003, 2004, 2005 and currently; **[for use in impeachment with respect to positions on latex allergy taken by defendants in this case, i.e., that person with latex allergy faces no risks in working full time in dental office or other medical environment]**

3.     The procedures you used since January 1, 2002 to evaluate disability claims under individual disabilities policies; **[breach of implied covenant of good faith and fair dealing]**

4.     **[Not disputed by Defendants]**;

5.     **[Not disputed by Defendants]**;

6.     The circumstances under which either defendant has, at any time since January 1, 1990, concluded that a claimant under an individual disability policy was totally or partially disabled because of a latex allergy-related disability, including the occupation of the insured, and the basis for such determination; **[state of defendants' knowledge of latex allergy in view of their position, in denying plaintiff's claim, that it poses no danger to her as a dental hygienist in the workplace; relevant to impeachment, credibility of defense position; relevant to claim of breach of covenant of good faith and fair dealing]**;

7.     The period of time, or periods of time, that it has been true that if an applicant for individual disability insurance coverage is an M.D., dentist or medical professional, and has been diagnosed with a latex allergy, disability insurance coverage would most likely be declined by (a) Guardian or (b) Berkshire; **[breach of covenant of good faith and fair dealing; impeachment; credibility of defense denying plaintiff's claim on basis that latex allergy poses no workplace risk while maintaining corporate policy against selling disability policy to anyone with evidence of latex allergy]**

8.     Guardian's and Berkshire's use or non-use of exclusions or riders in individual disability policies for persons with latex allergies; **[same; the defendants are so concerned about medical professionals becoming disabled from latex-allergy related claims that they will not use a rider or exclusion -- they just won't issue any policy to someone with evidence of latex allergy]**

9.      Underwriting practice and procedures of the defendants since 1995 with respect to the use of riders, exclusions, or other deviations from standard individual disability insurance policies; **[same]**

10.     The occasions on which either of the defendants, since January 1, 1998, has declined to issue an individual disability insurance policy to an M.D., dentist or medical professional because the applicant had been diagnosed with a latex allergy, and the circumstances; **[same]**

11.     The occasions on which either of the defendants issued a disability insurance policy to an M.D., dentist or other medical professional since January 1, 1999, when the defendants had knowledge that the applicant had been diagnosed with a latex allergy, including the occupation of such person, and whether, and to what extent, such policy differed from a standard policy; **[same]**

12.     Any procedures, practices, or policies used in the handling of claims submitted to the defendants under "own occupation" or other individual disability policies during the period from January 1, 2000 to the present; **[breach of the implied covenant of good faith and fair dealing; in this case, defendants used a non-Board-certified physician, with little or no experience with latex allergy and who has unconventional medical views, and also used an in-house physician with little or no experience with latex allergy; whether this behavior deviated from typical practice is relevant to defendants' bad faith, dishonesty, bad motives]**

13.     The criteria, standards, and practices used by Guardian or Berkshire at any time from January 1, 2000 to the present in determining whether to pay latex allergy-related claims under "own occupation" or other individual disability policies; **[same as No. 6; impeachment; credibility of defense position concerning latex allergy; breach of covenant of good faith and fair dealing];**

14.     The business and/or contractual arrangement between Guardian and Berkshire concerning Guardian's use of Berkshire in the claims-handling process for disability claims; **[basic area of inquiry on issue of liability of the defendants; Guardian issued the policy – how did Berkshire become involved in denying the claim?]**

15.     Guardian's use of Berkshire in the claims-handling process for disability claims; **[same]**

16.     The treatises, medical journals, articles, manuals, memoranda, directives, guidelines, practices or policies, used by, referred to, consulted, relied upon in any way by Guardian or Berkshire from January 1, 1998 to the present in the processing of claims under individual disability policies where the issue of latex

allergy was asserted to be involved in the insured's alleged disabling condition; **[impeachment; credibility of defense position that latex poses no danger to person in plaintiff's position;  breach of covenant of good faith and fair dealing]**

17.     **[Not disputed by Defendants];**

18.     The data and information, and sources of data and information, used, consulted or relied upon in any by the defendants at any time since January 1, 1998 in determining, assessing, appraising, analyzing or evaluating the risks associated with underwriting disability insurance policies, including "own occupation" disability policies, of M.D.s, dentists, or other medical professionals who have been diagnosed with latex allergy; **[impeachment, credibility of defense position concerning lack of danger posed by latex to person in plaintiff's position; breach of implied covenant of good faith and fair dealing]**

19.     Statistical data of any kind, generated since January 1, 1995 by Guardian or Berkshire, relating to latex allergy-related disability insurance claims; **[same**

20.     The terms of any contracts, agreements or business arrangements between either Berkshire Life or Guardian Life Insurance Company of America and any of the following since January 1, 1990:

        (a)     MLS National Medical Evaluation Services;
        (b)     Medicolegal Services, Inc.; and
        (c)     Medicolegal National I.M.E. Services, Inc.

        **[bias of the companies who selected the non-Board-certified physician inexperienced with latex allergy and who has unorthodox views, to evaluate plaintiff's claim; breach of covenant of good faith and fair dealing]**

21.     The frequency with which, since January 1, 1985, either of the defendants has done business with any of the following and the nature of the service, if any, provided:

        (a)     MLS National Medical Evaluation Services;
        (b)     Medicolegal Services, Inc.; and
        (c)     Medicolegal National I.M.E. Services, Inc.

        **[same]**

22.     The total amount paid, by or on behalf of Berkshire or Guardian, by year or other time period, since January 1, 1995, to:

        (a)     MLS National Medical Evaluation Services;
        (b)     Medicolegal Services, Inc.; and
        (c)     Medicolegal National I.M.E. Services, Inc.

**[same]**

23. The number or percentage or proportion of claims referred to MLS National Medical Evaluation Services, Inc., for any time period since January 1, 1995 by Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company of America that resulted in a recommendation, finding or conclusion contained in a report sent by MLS National Medical Evaluations Services, Inc. to Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company, that the claimant at issue was not disabled or that there was not a supportable basis for the claim; **[same]**

24. The number or percentage or proportion of claims referred to Medicolegal Services, Inc. for any time period since January 1, 1995 by Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company of America that resulted in a recommendation, finding or conclusion contained in a report sent by Medicolegal Services, Inc. to Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company, that the claimant at issue was not disabled or that there was not a supportable basis for the claim; **[same]**

25. The number or percentage or proportion of claims referred to Medicolegal National I.M.E. Services, Inc. for any time period since January 1, 1995 by Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company of America that results in a recommendation, finding or conclusion contained in a report sent by Medicolegal National I.M.E. Services, Inc. to Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company, that the claimant at issue is not disabled or that there is not a supportable basis for the claim; and **[same]**

26. **[Not disputed by Defendants].**

## C.   Defendants' Motion To Quash The Subpoenas of Third Parties Should Be Denied

Defendants have moved for a protective order to limit the depositions of at least part of the subpoenas issued to Medicolegal Services, Inc. and MLS National Medical Evaluation Services, Inc. (collectively "MLS"), Dr. Harold Axe, and possibly Steven L. Crawford and the Keeper of Records of Crawford Associates, Inc.[3]   These motions for

---

[3] Defendants' motion mentions the document subpoenas to Steven L. Crawford and the Keeper of Records of Crawford Associates, Inc., but does not specifically appear to ask the Court for a protective order. Crawford does business as "Guardian Disability Insurance Brokerage," and is a general agent of Defendant The Guardian Life Insurance Company of America. Exhibits 1, 2.  Crawford claims to opperage "the largest

protective order should be denied and plaintiff should be permitted to continue to engage in discovery with these parties.

### D. Defendants' motion for protective order concerning the third parties should be denied for lack of standing

Defendants have no standing to move to quash the subpoenas to any third parties:

> A motion to quash, or for a protective order, should be made by the person from whom the documents or things are requested. Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action unless the party claims some personal right or privilege with regard to the documents sought.

See Wright & Miller, Federal Practice and Procedure: Civil 2d §2459; see also Langford v. Chrysler Motors Corp., 513 F.2d 1121, 1126 (2d Cir.1974) ( "In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness."); Brown v. Braddick, 595 F.2d 961, 967 (5th Cir.1979) (same). Defendants have not made any claim that they have a personal right or privilege with regard to the documents sought by third parties. The motion for protective order should therefore be denied.

### E. Even if defendants have standing, the motion for protective order should be denied because the information sought is relevant and is neither burdensome nor an invasion of privacy

Defendants have moved to limit the MLS subpoena to the extent it inquires into the "general business practice" of the company and not specifically to Plaintiff's insurance claim. MLS' role in the handling of plaintiff's claim is discussed in Section B

---

disability insurance brokerage firm on the east coast for Guardian". His firm operated a website that allowed the public to determine whether, based on their medical condition, Guardian would issue disability insurance to them. In the case of latex allergy, while Defendants were taking the position that latex allergy posed to risk to someone like Carolyn Mirek who worked full-time as a dental hygienist, their general agent was telling the public in a website that Guardian "will decline coverage" of a doctor, dentist or medical professional with a latex allergy. Exhibit 3.

above. The standard proposed by defendants is far narrower than the standard permitted by the Rules of Civil Procedure, and therefore there is no justification for hampering Ms. Mirek's discovery. Even more significant: <u>MLS has made no objection.</u>

Defendants object to Ms. Mirek's requests for "1) all documents that demonstrate contractual arrangements between MLS and the Defendants since 1990; 2) all documents that demonstrate amounts paid to MLS by Berkshire since 1995; 3) all documents that demonstrate amounts paid by MLS to Dr. Axe since 1990; and 4) all documents that demonstrate the number of claims on which MLS referred doctors have opined – since 1995 – that individuals referred by the Defendants were not disabled."

Each of these requests is highly relevant to the motivation of Defendants, MLS, and Dr. Axe. Defendants acknowledge that, in denying Ms. Mirek's claim, they relied upon the opinion of Dr. Axe, a physician who was referred through MLS, and who the Defendants had never previously used nor used again. If it turns out that MLS has received substantial sums of money from the Defendants for providing referrals to doctors who claim that claimants are not disabled, that is information that would be useful to a jury in assessing the credibility of all of them. As discussed above, the bias of potential witnesses is always a relevant inquiry. See <u>DiBenedetto v. Hall</u>, 272 F.3d 1, 10 (1st Cir. 2001) ("Bias is always relevant as discrediting the witness and affecting the weight of his testimony.") (citations omitted). A jury is entitled to learn information that, potentially, calls Dr. Axe's professional judgment into question, such as his relationship with MLS, and MLS' credibility in selecting him.

Defendants have also moved to limit the subpoena to Dr. Axe to the extent they request information regarding Dr. Axe's income, contracts and handling of other matters.

For the same reasons detailed above, namely motivation and bias, this information is highly relevant to this case. As it happens, this area is moot, since he acknowledged at his deposition that he did not withhold documents on this basis.

Defendants also complain that the requests made to Dr. Axe are "unduly burdensome, invade other persons [sic] privacy, and overbroad." It is the moving party's burden to show undue burden. The Defendants have not made any attempt to show why the information requested of Dr. Axe would be burdensome to obtain. They also have not made any explanation as to why they believe the requests would invade anyone's privacy. Ms. Mirek does not have any interest in the names of claimants that Dr. Axe may have opined about, and that information can safely be admitted to preserve anonymity. There is simply no reason to believe otherwise. Defendants have not made any showing of undue burden.

### III. CONCLUSION

For all the reasons above, defendants' motion for a protective order should be denied. Plaintiff voluntarily agrees to dismiss her claim for unfair and deceptive practices under Connecticut law.

CAROLYN MIREK
By her Attorneys,

/s/ Joanne D'Alcomo

_____
Joanne D'Alcomo
BBO #544177
Seth Nesin
BBO #650739
JAGER SMITH, P.C.
One Financial Center
Boston, Massachusetts 02111

16

(617) 951-0500

JS\100372.1