# Exhibit 5

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------- X
CAROL MIREK,              :
      Plaintiff,          :
VS.                       : NO. 04-30166-MAP
GUARDIAN LIFE INS. CO. OF :
AMERICA, ET AL.,          :
      Defendants.         :
------------------------- X

DEPOSITION

THE DEPOSITION OF HAROLD AXE, M.D., taken on behalf of the Plaintiff, before Kevin Lombino, Registered Professional Reporter, Notary Public within the State of Connecticut License Number 00191, on the 16th day of September, 2005 at 12:16 p.m., at the offices of Paul, Hastings, Janofsky & Walker, 1055 Washington Boulevard, 10th Floor, Stamford, Connecticut.

---

APPEARANCES

FOR THE PLAINTIFF:

JAGER SMITH, PC
One Financial Center
Boston, MA 02111

BY: JOANNE D'ALCOMO, ESQ.

FOR THE DEFENDANT:

CREVIER & RYAN, LLP
1500 Main Street, Suite 2020
Springfield, MA 01115-5727

BY: DAVID CREVIER, ESQ.

---

3

HAROLD AXE, M.D., called as a witness, after having been duly sworn, was examined and testified as follows:

MS. D'ALCOMO: The parties have stipulated and agreed that all objections except as to form are reserved until time of trial, and motions to strike are reserved until time of trial. And the witness shall have 30 days to read and sign, and signing need not be in front of a notary.

Would you mark this Exhibit 1.

(Plaintiff's Exhibit 1, Subpoena, marked for identification, as of this date.)

DIRECT EXAMINATION
BY MS. D'ALCOMO:

Q. Dr. Axe, have you been deposed before?
A. Yes.
Q. On how many occasions?
A. Five.
Q. And under what circumstances? What kind of cases?
A. Medical malpractice.
Q. And have you been a -- you were a defendant in one medical malpractice; is that right?
A. Yes.
Q. Any others?

---

4

A. I have not been a defendant in any other medical-malpractice cases.
Q. In those other cases, in what capacity were you -- excuse me, were you testifying at a deposition?
A. An expert witness.
Q. And were you an expert witness for the plaintiff or the defendant?
A. I don't recall.
Q. Was there -- so on four occasions, you were an expert witness in a medical-malpractice case?
A. Yes.
Q. And you don't remember if any of those cases you were representing -- excuse me, you were testifying in a capacity where you were an expert for the plaintiff?
A. Correct.
Q. How long ago were the depositions?
A. A long time ago, maybe 20 years ago.
Q. When was the last time that you were deposed?
A. I don't recall.
Q. Was that about 20 years ago?
A. Yes.
Q. And have you been retained as an expert in any litigation in which you have rendered an opinion in the past 10 years?
A. Yes.

9

Having looked at the Plaintiff's Exhibit 1, it appears to be the accurate deposition --
MS. D'ALCOMO: I'm going to take yours back. If it's inaccurate, I don't want to --
MR. CREVIER: That's fine. The copy I received was inaccurate, but I withdraw the objection because the actual marked exhibit appears to be accurate. Thank you.
Q. What do you mean, Doctor, when you refer to yourself or someone else as an expert in a particular subject matter?
A. I don't think I've ever referred to myself as an expert.
Q. So you do not consider yourself an expert in latex allergy?
A. I don't know what your definition of "an expert" would be to answer that question.
Q. Have you ever used the term "expert" to describe someone's knowledge or familiarity in a field?
A. I don't recall.
Q. So you don't remember whether you ever have referred to someone as he's an expert or she's an expert in such and such an area?
A. Correct.
Q. Do you consider yourself proficient in the area

10

of latex allergy?
A. Again, I'm not sure what you mean as "proficient."
Q. Well, do you know what "proficient" means?
A. I have my understanding of the word.
Q. And how would you describe it?
A. As someone who is good at what they do.
Q. And do you have an understanding of what the term "expertise" is?
A. Well, I think it's used in many different contexts.
Q. Have you ever used the term "expertise"?
A. Rarely.
Q. And when you've used it, what have you meant by it?
A. Knowledge.
Q. And do you consider yourself knowledgeable in latex allergy?
A. Yes.
Q. And do you consider yourself more knowledgeable than many other allergists in latex allergy?
A. No.
Q. Do you treat patients for latex allergy?
A. Latex allergy is not a specific disease that you treat people for.

11

Q. So you have never treated anyone for something called "latex allergy"?
A. I have treated people with disease of which latex sensitivity is a part.
Q. Have you treated someone for -- who had an allergy to anything, any substance?
A. Yes.
Q. And what have you treated people who have an allergy -- strike that.
What allergens were the individuals that you treated allergic to?
A. Pollen, house dust mite, mold, animal dander, cockroach, latex.
Q. You have treated people who have been allergic to latex?
A. Yes.
Q. Is there something about the -- about the line-up of the words latex allergy as opposed to allergy to latex that makes you uncomfortable with the phrase "latex allergy"?
A. There is nothing in the line-up that makes me uncomfortable.
Q. You are comfortable with the phrase "allergy to latex"; is that right?
A. Yes.

12

Q. You have heard that term, that phrase?
A. Yes, yes.
Q. And that's a phrase that you've used?
A. Yes.
Q. If someone is allergic to latex, can it not be fairly said they have a latex allergy?
A. Anything can be said, but it's the implication that makes the difference.
Q. You would say it would be inaccurate to describe someone who had a -- strike that.
You would say it would be inaccurate to describe someone who was allergic to latex as having a latex allergy?
A. I think it would be misleading to imply that the latex allergy represents a specific diagnosis.
Q. Would you say it would be inaccurate to describe someone who is allergic to latex as having a latex allergy?
A. Yes.
Q. And would it be inaccurate to describe someone who had an allergy to cockroaches as having a cockroach allergy?
A. I think it's inaccurate in that the implication is that that is their problem and their disease when in fact it's merely an aspect of the disease.

17

Q. Was it more than one?
A. I'm not sure.
Q. Do you currently see patients on a regular basis?
A. Yes, I do.
Q. How many days a week?
A. Five.
Q. And out of what offices or office do you work?
A. I work out of four different offices.
Q. And where are they?
A. One is at 25 Fifth Avenue in New York, New York; another is at 934 Manhattan Avenue in Brooklyn, New York; the third is at 49 Forest Road in Monroe, New York; and the fourth is at 1303 River Valley Boulevard, Lancaster, Ohio.
Q. And, I'm sorry, what is your current residential address, Dr. Axe?
A. 151 Guinea Road, Stamford, Connecticut.
Q. Do you have privileges at any hospitals currently?
A. Yes.
Q. What hospitals?
A. Beth Israel Medical Center, New York, New York.
Q. And at least as you sit here today, you can't recall whether you've seen more than one patient in the

18

past six months that you believe has latex allergy and treated that person for an allergic reaction to latex; is that fair to say? Actually, that was too long a question. Let me make that a little clearer, Dr. Axe.
    Is it fair to say that as you sit here today, you can't recall whether you treated more than one person in the past six months who you believe has an allergy to latex?
A. Yes.
Q. Have you ever diagnosed someone as being allergic to latex?
A. Yes.
Q. And what have you used to diagnose that person as being allergic or people being allergic to latex?
A. The medical history.
Q. Anything else?
A. Primarily the medical history.
Q. And is it fair to say that taking a history from a patient is a very significant part of making a diagnosis?
    MR. CREVIER: Objection, leading. You can answer.
A. Yes.
Q. And is it fair to say that taking a history is an important part of preparing a plan for treatment of

19

what the patient complains of?
A. Yes.
Q. Have you ever performed any tests on anyone to make a diagnosis that someone was allergic to latex?
A. No.
Q. Have you made independent diagnoses that an individual was allergic to latex without relying on a previous diagnosis?
A. I don't recall.
Q. Is it fair to say that at least with some if not all of the individuals that you treated who you believe are allergic to latex, you've relied on other physicians' diagnoses?
A. No.
Q. Is it correct that you've relied on other physicians' diagnoses that a person was allergic to latex in some cases?
A. I'm not sure what you mean by "relied."
Q. Well, let me ask it a different way, Dr. Axe. As I understand it, you've relied on a patient's medical history in determining whether a patient is allergic to latex; is that right?
A. Yes.
Q. Are there any particular facts in a patient's medical history that you look to in determining whether

20

the person is allergic to latex?
A. The fact that they can correlate a reaction in time and place to exposure to latex is a strong indicator but not a total indicator of the diagnosis of allergy to latex.
Q. It's a common part of medical practice to rely on in formulating a diagnosis a patient's report of things that have occurred outside the physician's office; is that correct?
A. I don't know that that's correct.
Q. Well, when you made diagnoses over the years about a patient's condition, you haven't always used your own observations or test results to do so, have you?
A. Could you please repeat the question.
Q. Sure. When you've diagnosed a patient, in your experience, you haven't always relied on either your own observations in the office and test results to arrive at a diagnosis, correct?
A. No, I don't believe that is correct.
Q. You always just relied on your own observations and test results to reach a diagnosis?
A. The vast majority of the time, yes.
Q. What role does the patient reporting to you symptoms or reactions play in formulating a diagnosis?
A. All of the information that a patient gives me

57

1  Q. Did you not see any medical treatment of Carolyn
2  Mirek in the records that you had from Dr. Bedard after
3  October 22, 1999?
4  A. I don't recall.
5  Q. If you had seen any medical records of
6  Dr. Bedard showing treatment of Carolyn Mirek after
7  October 22, 1999, you would not have referred to the
8  October 22, 1999 document as the most recent, correct?
9      MR. CREVIER: Objection, leading.
10 A. I don't know.
11 Q. Well, if there had been treatment or notes of
12 Dr. Bedard in the materials given to you dated after
13 October 22, 1999, it would be misleading, would it not,
14 to refer to something from October 22, 1999 as the most
15 recent medical report?
16     MR. CREVIER: Objection, leading.
17 A. I don't know.
18 Q. What is it that you don't know?
19 A. The timing.
20 Q. Well, if you had records in the packet given to
21 you of Carolyn Mirek that showed treatment by Dr. Bedard
22 and notes after October 22, 1999, it would have been
23 misleading to refer to something back in October 22, 1999
24 as being the most recent, would it not?
25     MR. CREVIER: Objection, leading.

58

1  A. I'm not sure.
2  Q. Well, is it fair to say that a reasonable
3  reading of this report, Dr. Axe, conveys the impression
4  that the most recent medical record you had concerning
5  Dr. Bedard's treatment of Carolyn Mirek was from October
6  22, 1999?
7      MR. CREVIER: Objection, leading.
8  A. I don't know.
9  Q. Well, as you sit here today reading it as a
10 reader of high education, familiarity with the material,
11 is it fair to say that the phrase "the most recent
12 medical report dated October 22, 1999" can be fairly read
13 to mean that the most recent medical record you saw
14 concerning treatment of Carolyn Mirek was from October
15 1999?
16     MR. CREVIER: Objection, leading.
17 A. Maybe.
18 Q. Certainly in your report, your first report, you
19 don't refer to any medical record or note after October
20 22, 1999, correct?
21 A. Yes.
22 Q. Now, you write in the next paragraph, "Latex
23 allergy is not a distinct disease."
24    Do you see that?
25 A. Yes.

59

1  Q. Did someone suggest to you in asking you to
2  render an opinion in this matter that it was a distinct
3  disease?
4  A. I don't recall.
5  Q. Now, have you ever heard the phrase "allergic
6  disease"?
7  A. Yes.
8  Q. And does that have a meaning to you?
9  A. Yes.
10 Q. What is the meaning to you?
11 A. Disease caused by allergic predisposition.
12 Q. A predisposition?
13 A. Yes.
14 Q. And are you referring to an atopic individual?
15 A. Yes.
16 Q. So allergic disease to you refers to someone who
17 is atopic?
18 A. Yes.
19 Q. Have you ever seen the phrase "allergic disease"
20 used in another context?
21 A. I don't recall.
22 Q. Now, why did you write "Latex allergy is not a
23 distinct disease" on the first page of your report?
24 A. In reviewing the medical material that was sent
25 to me, I think I was under the impression that a claim

60

1  was being made on the basis of, quote-unquote, latex
2  allergy; and I'm trying to in my report, in my
3  impression, explain that latex allergy, quote-unquote, is
4  not a distinct disease for which a medical disability
5  would be appropriate but rather part of a multifactorial
6  medical entity commonly referred to as chronic
7  inflammatory airway disease.
8  Q. Now, have you seen in the literature that you
9  read in peer-review journals articles about latex
10 allergy?
11 A. Yes.
12 Q. And have you seen articles about latex allergy
13 in peer-review journals that don't refer to it as part of
14 a multifactorial medical entity called chronic
15 inflammatory airway disease?
16 A. I don't recall.
17 Q. You have seen articles in peer-review journals
18 that concentrate on the subject of latex allergy, have
19 you not?
20 A. Yes.
21 Q. So is it fair to say that at least some authors
22 in some medical journals over the past 10 years have
23 treated latex allergy as a condition?
24 A. I don't know that for certain.
25 Q. Have you ever read an article in which latex

89

1 18 years of age and over who are currently employed
2 missed 11.8 million workdays due to asthma in the year
3 2002.
4     Do you see that?
5   A. Yes.
6   Q. And is it your view that if they had been
7 properly treated, they wouldn't have missed work due to
8 asthma?
9   A. I think that the figure would have been vastly
10 improved if there was ideal or appropriate medical care
11 for people suffering with asthma.
12   Q. Now, have you ever heard of someone being
13 disabled by asthma?
14   A. Yes.
15   Q. And did you dispute the fact that that person or
16 persons were disabled from asthma?
17   A. On occasion.
18   Q. Is it your position that no one should be
19 disabled because of asthma?
20   A. No.
21   Q. So you do recognize that someone may be disabled
22 from doing certain things because of asthma?
23   A. Rarely.
24   Q. And is it just that the -- strike that.
25     In a situation you disputed it, what was the

90

1 circumstances?
2   A. My high school friend who was a part-time
3 saxophone player got a military deferment because of
4 asthma and played every weekend in a band playing the
5 saxophone. His breathing was excellent.
6   Q. Now, have you heard of occupational asthma?
7   A. Yes.
8   Q. And have you ever diagnosed anyone with
9 occupational asthma?
10   A. Probably, yes.
11   Q. And when you have diagnosed someone with
12 occupational asthma, have you identified a particular
13 allergen?
14   A. Well, I can't recall any particular patient, but
15 I would imagine that whatever they were exposed to in an
16 occupational setting combined with what other things they
17 were allergic to in a complete life situation.
18   Q. What is occupational asthma in your view?
19   A. Well, again, it's a misnomer a specific entity.
20 I think it's the same basic chronic inflammatory airway
21 disease that is exacerbated by factors relevant to the
22 workplace.
23   Q. Do you believe in the diagnosis of occupational
24 asthma as a diagnosis?
25   A. I think for lack of communication, for lack of a

91

1 better communication that that's the term we use. But
2 whether that in and of itself represents a specific
3 entity, I'm not sure.
4   Q. Are you aware that the medical literature has
5 identified certain substances in the workplace as giving
6 rise to a respiratory disease among workers?
7   A. Yes, I am.
8   Q. And you're aware of these certain substances
9 that have been so identified?
10   A. Yes.
11   Q. And can you give me some examples?
12   A. Toluene, diisoccyanide, and that's two I's.
13   Q. Wood dust?
14   A. Wood dust, pine oil, baker's yeast.
15   Q. Latex?
16   A. It's quite a large list including latex.
17   Q. Latex has been identified as a substance that
18 has given rise to a diagnosis of occupational asthma?
19   A. Yes.
20   Q. And have you ever referred to someone as having
21 occupational asthma?
22   A. I don't know.
23   Q. Do you --
24   A. I don't recall.
25   Q. Do you accept the proposition that a physician

92

1 may diagnose someone as having occupational asthma?
2   A. Yes.
3   Q. Do you accept it as a valid recognizable
4 diagnosis?
5   A. No.
6   Q. Now, would you agree that the term "occupational
7 asthma" is widely used among both pulmonary specialists
8 and occupational medicine specialists?
9   A. I believe so.
10   Q. Is it also used among allergists widely?
11   A. Maybe.
12   Q. Would you say you're in the minority in terms of
13 your field in not recognizing occupational asthma as a
14 valid diagnosis?
15   A. I didn't say that.
16   Q. Do you recognize occupational asthma as a
17 legitimate diagnosis?
18   A. I recognize that a person can be troubled by
19 factors in the workplace that will exacerbate their
20 asthma.
21   Q. Do you recognize -- strike that.
22     Do you accept the proposition that substances in
23 the workplace can cause asthma?
24   A. I agree to the proposition that substances in
25 the workplace can bring on asthma symptoms, but I don't

**161**

Q. What exams have you taken?
A. The exam for the American Board of Internal Medicine, and the exam for the American Board of Allergy and immunology.
Q. And you did not get a passing mark?
A. Not a one.
Q. Have you given up taking the exam?
A. Pretty much.
Q. What was the last time you took an exam to become board certified?
A. I think it was in 1971. It's never too late.
   MS. D'ALCOMO: Off the record.
   (Discussion held off the record.)
   MS. D'ALCOMO: I have no further questions.
   MR. CREVIER: I have just maybe one question.

CROSS EXAMINATION
BY MR. CREVIER:
Q. Doctor, today you have been presented with a number of exhibits including Exhibit 5, Exhibit 6, Exhibit 7, Exhibit 8. You've never seen those exhibits before today, do (sic) you?
A. No.
Q. Have you?
A. Correct. I have not seen them before today.

**162**

Q. You don't know whether those documents are what they purport to be, do you?
A. No.
Q. And earlier today, you told us that you did not possess records you once had pertaining to Ms. Mirek; is that correct?
A. Correct.
Q. You really are not sure exactly what or what was not contained within the records that were previously provided to you regarding Ms. Mirek; is that correct?
A. Yes.
   MR. CREVIER: I have no further questions.
   MS. D'ALCOMO: Thank you very much for your time and your patience.
   THE WITNESS: Thank you.
   (Deposition concluded at 5:36 a.m.)

**163**

INDEX

EXAMINATION INDEX

HAROLD AXE, M.D.
    DIRECT BY MS. D'ALCOMO . . . . . . 3
    CROSS BY MR. CREVIER . . . . . . . 161

EXHIBIT INDEX

Plaintiff's                                      MAR
1    Subpoena                                    3
2    Letter dated 6/17/02                        40
3    Letter dated 7/10/02                        46
4    Invoice #181478                             47
5    Asthma Prevalence article                   88
6    The Allergy Report                          133
7    Article                                     134
8    Article                                     135
9    Letter dated 10/21/02                       138
10   Letter dated 10/2/02                        141
11   Letter dated 9/15/02                        141
12   Witness' web site printout                  158
13   Dr. Axe CV                                  159

**164**

STATE OF CONNECTICUT )
                     ) ss: WALLINGFORD
COUNTY OF NEW HAVEN  )

   I, Kevin Lombino, a Registered Professional Reporter and Notary Public within and for the State of Connecticut, do hereby certify that the within deposition of HAROLD AXE, M.D. was held before me on the 16th day of September, 2005.
   I further certify that the witness was first sworn by me to tell the truth, the whole truth and nothing but the truth, and was examined by counsel, and his testimony was recorded stenographically by me, it was reduced to typewriting under my supervision, and I hereby submit that the within contents of said deposition are true and accurate to the best of my ability.
   I further certify that I am not a relative of nor an attorney for any of the parties connected with the aforesaid examination, nor otherwise interested in the testimony of the witness.
   Dated at Wallingford, Connecticut, the 5th day of October, 2005.

_____
Kevin Lombino, License#LSR00191
(My commission expires October 31, 2007.)

# Exhibit 6

# MLS National Medical Evaluation Services

25899 West Twelve Mile Road • Suite 200 • Southfield, MI 48034
Office: 248-352-6747 • Fax: 248-352-2761

October 21, 2002

Mr. Kevin Kvederas
Berkshire Life Insurance Company
700 South Street
Pittsfield, MA. 01201-8285

Re: Ms. Carolyn Mirek
Your Claim/File Number:   G723670

Dear Mr. Kvederas:

Enclosed is the Addendum Report rendered by Dr. Harold Axe,

regarding Ms. Carolyn Mirek, per your request.  If we can be of any further

assistance, please do not hesitate to contact us.

Sincerely,

MLS National Medical Evaluation Services

c:  File

Enclosures



PLAINTIFF'S EXHIBIT
Axe 9
KC 9/16/05

CLAIMS OCT 25 2002

October 11, 2002

Re: Carolyn Mirek –Claim # 391131, (2nd Addendum)

Through your offices, I am in receipt of a copy of a letter from Dr. Robert M. Bedard dated September 15, 2002, regarding his patient, Ms. Carolyn Mirek, and her medical condition that he describes as "Latex Allergy."

I am also in receipt of your memo to me dated October 2, 2002, requesting my review and comments of Dr. Bedard's recent letter.

1) Dr. Bedard's letter of September 15, 2002, does not change my previously stated opinion of Ms. Mirek's medical condition because I do not believe that Dr. Bedard has described anything significantly new in his description of Ms. Carolyn Mirek's medical condition, except to point out that she is "doing well" and that "her asthma as of 5/21/02 was in good control."

2) Dr. Bedard alludes to a cross reactivity of Latex Allergy with Allergy to food proteins found in Kiwi, Banana, and Avocado. Although this phenomenon has been reported in the medical literature, I have no way of knowing, nor can I imagine how it can ever be proven, in which direction this cross reactivity developed in Ms. Mirek. It is just as likely that her Latex Allergy developed from her dietary exposure to Kiwi, Banana, and Avocado as it is that her reactivity to these foods resulted from her exposure to Latex.

3) In previous communications as well as this current letter, Dr. Bedard consistently describes Ms. Mirek as "doing well." He describes the many changes her previous employer made to accommodate her Latex sensitivity in the work place, but he does not explain what environmental changes have been made in Ms. Mirek's home or what medications in addition to FLONASE have been prescribed. He dwells exclusively on the Latex issue, but fails to elucidate the presence of a cat or dog in the Mirek home, Ms. Mirek's smoking history, feather bedding, her Latex exposure *off* the job, etc. Moreover, no mention is made as to what Asthma medications were prescribed to control her Asthma so that she would not feel that she had to change jobs. These are but a few of the very many issues that an Allergist customarily addresses in the care of a person with Ms. Mirek's condition.

4) In the 12th paragraph of his letter dated September 15, 2002, Dr. Bedard states that "it is likely that she will remain with a permanent latex allergy." Yet, in the very next paragraph he states: "The nature of the natural history of latex allergy that has developed in healthcare workers is not yet clear." And further in that same paragraph he even states,"As the healthcare and dental industries moved away from powdered latex gloves; it is likely that the level of sensitization may decline. It is not known whether or not previously sensitive individuals will lose their sensitivity over time."

CLAIMS  OCT 25 2002

CL 34

Carolyn Mirek –Claim # 391131, (2nd Addendum)

Latex-free work environments are being routinely established all over the world to address the Latex problem. Ms. Mirek's former employer is an example of such effort. Safe, effective medication is readily available to adequately control Allergy and Asthma and prevent symptoms. I fail to see how Ms. Carolyn Mirek can be considered permanently disabled or how all her suffering (of which there seems to be very little) can be considered exclusively the result of her exposure to Latex in the workplace.

Harold Axe, M.D.

CLAIMS OCT 25 2002

# Exhibit 7

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLYN MIREK,<br><br>    Plaintiff,<br><br>vs.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA and BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA,<br><br>    Defendants. | CIVIL ACTION NO.: 04-30166-MAP<br><br>DEFENDANT BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S REQUEST FOR PRODUCTION, SET NO. ONE |

PROPOUNDING PARTY:    PLAINTIFF CAROLYN MIREK

RESPONDING PARTY:    DEFENDANT BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA

SET NO.:    ONE (1)

BERKSHIRE to respond thereto in a manner which otherwise exceeds the requirements of the Federal Rules of Civil Procedure.

(6) BERKSHIRE objects to the Request to the extent that it seeks proprietary trade secret, business information, and or other confidential information and/or documents.

(7) BERKSHIRE objects to the Request to the extent that the Request seeks information which is in Plaintiff's possession or which Plaintiff may obtain from a source other than BERKSHIRE and the requested production by such other source would be less burdensome and/or costly to such other sources than the requested production would be to BERKSHIRE.

(8) BERKSHIRE objects to the Request to the extent that it seeks the production of documents not within BERKSHIRE's possession, custody or control.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1

The claims file for the claim of Carolyn Mirek.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1

Subject to and without waiving any of the General Objections, a copy of the requested claim file will be produced.

### REQUEST FOR PRODUCTION NO. 2

The application file of Carolyn Mirek.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 2

Subject to and without waiving any of the General Objections, a copy of the requested underwriting/application file will be produced.

### REQUEST FOR PRODUCTION NO. 3

The policy issued to Carolyn Mirek.

Subject to and without waiving these or any of the General Objections, see BERKSHIRE's Response to Request for Production No. 1.

REQUEST FOR PRODUCTION NO. 67

All documentary materials identifying the total amount paid, by or on behalf of Berkshire or Guardian, by year or other time period, since January 1, 2000, to MLS National Medical Evaluation Services, Inc.

RESPONSE TO REQUEST FOR PRODUCTION NO. 67

BERKSHIRE objects to this request as it is vague, ambiguous, and overly broad. In addition, BERKSHIRE objects to this request as it seeks information that is neither relevant to matters at issue in this lawsuit nor is it reasonably calculated to lead to the discovery of admissible evidence. BERKSHIRE further objects to this Request as it seeks the production of documents that are protected by the attorney work product doctrine and the attorney client privilege. BERKSHIRE further objects to this request to the extent that it seeks proprietary or confidential information. BERKSHIRE further objects to the request as unduly burdensome.

DATED: July 11, 2005

By: _____
Edward K. Kimball, Esq.
Berkshire Life Insurance
Company of America
700 South Street
Pittsfield, MA 01201
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this **11th** day of **July**, 2005, a copy of the within Answers to Interrogatories was mailed first class, postage prepaid, Joanne D'Alcomo, Esq., Jager Smith, P.C., One Financial Center, Boston, MA 02111, Attorney for Plaintiff.

*/s/ Edward K. Kimball*
Edward K. Kimball

Dated: **July 11**, 2005