UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CAROLYN MIREK,       )<br>                      )<br>     Plaintiff    )<br>                      )<br>     v.               )<br>                      )<br>                      )<br>                      )<br>THE GUARDIAN LIFE INSURANCE )<br>COMPANY OF AMERICA and      )<br>BERKSHIRE LIFE INSURANCE    )<br>COMPANY OF AMERICA,         )<br>                      )<br>     Defendants   ) | Civil Action<br>No. 04-30166-MAP |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HER MOTION PURSUANT TO RULE 37(A) AND 37(B) AGAINST DEFENDANT BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA FOR REFUSAL TO PRODUCE WITNESSES**

This Reply Memorandum addresses arguments that were made for the first time in the Opposition of Berkshire Life Insurance Co. ("Berkshire") to Plaintiff's Motion to Compel Berkshire To Produce Witnesses to Testify Pursuant To Plaintiff's Re-notice Of Deposition Under Rule 30(b)(6). In the Opposition, Berkshire claims that Plaintiff's motion "is based upon the false premise that Berkshire has refused to produce witnesses." See Opposition at 1 (Docket #41). That is not a "false premise." At the time that the plaintiff's motion was filed, Berkshire had only agreed to produce witnesses for *four* of the twenty-six deposition topics. See November 22, 2005 letter, attached as Exhibit D to Motion (Docket #38).

Berkshire now indicates that it is willing to produce witnesses for thirteen topics and designate testimony for five more topics. Obviously, plaintiff is encouraged by this change of heart, but the first time plaintiff's counsel ever learned of Berkshire's plan was on the telephone

the day before Berkshire's opposition was filed. Plaintiff's counsel did not learn of the specific topics on which Berkshire is now agreeing to produce witnesses until they received the opposition. And Plaintiff's counsel is still unaware of the specific testimony that Berkshire plans to designate to satisfy the five topics on which it plans to designate testimony.[1]

Berkshire's change in position with regards to fourteen of the designated subjects is welcomed, but its attempt to portray Plaintiff as behaving in bad faith is not. If any party is engaging in bad faith tactics, it is Berkshire, who has forced Plaintiff to file this motion and reply merely to obtain the relief from the Court that was already provided by the earlier denial of Berkshire's Motion for Protective Order.

In any case, even if Berkshire's opposition moots the dispute as to some of the topics, Berkshire still refuses to produce witnesses for eight remaining topics that it characterizes as "in dispute." Plaintiff asks the Court to compel testimony on those subjects.

## I. Berkshire Has Invented Entirely New Arguments In This Opposition

Berkshire's Opposition to the remaining eight topics essentially complains that it is "unable to produce" witnesses on seven topics due to excessive burden and that it "should not be compelled" to produce a deponent on one topic that is "overbroad and vague." Opposition at 10 (Docket #41). Berkshire has included affidavits from two different employees attesting to the number of hours it would take to accumulate the information required to testify. The time to make these arguments has passed.

The arguments involving undue burden should have been made in Berkshire's motion for protective order (Docket #23), or at the very least in its reply in support of its motion for a

---

[1] Plaintiff's counsel was the party that suggested the possibility of designating prior deposition testimony to satisfy or partially satisfy some of the 30(b)(6) topics. This is further evidence of plaintiff's counsel's good faith attempt to resolve these discovery disputes.

protective order (Docket #28). Those papers only vaguely referenced the "burden" that the 30(b)(6) topics would cause generally, and objected to 21 different topics on that basis. Neither the motion nor the reply gave any indication as to how burdensome any specific topic was nor what made it so burdensome.[2] Consequently, such an argument is waived. Neither the plaintiff nor the Court should have to engage in repeated motion practice over the very same discovery issues. When a discovery request is not unduly burdensome on its face, the responding party bears the burden of coming forward with an evidentiary showing that supports that party's objection. See General Electric Capital Corp. v. Lear Corp., 215 F.R.D. 637, 640 (D. Kan. 2003). Berkshire did not do so when seeking its protective order, and it should not be allowed to relitigate the issue using new arguments after losing with its previous arguments.

**II. Berkshire's "Inability" to Produce Witnesses Ignores The Corporate Duty To Produce Witnesses To Speak On Behalf Of The Corporation**

Berkshire argues that it is "unable to produce a witness" to seven of the noticed topics because no corporate employee currently possesses the knowledge to testify as to those subjects. To the extent Berkshire relies on this argument, it must fail. When 30(b)(6) designees "do not possess personal knowledge of the matters set out in the deposition notice, the corporation *is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation*." McLellan Highway Corp. v. U.S., 95 F. Supp. 2d 1, 9 (D. Mass 2000) (quotation omitted and emphasis added). A corporate representative is required to "review all matters known or reasonably available to [her] in preparation for the 30(b)(6) deposition." Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc., 201 F.R.D. 33, 36 (D. Mass. 2001). A corporation "does not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has

---

[2] Apparently most of the topics turned out not to be burdensome at all, as Berkshire has now agreed to produce witnesses to provide testimony about them.

no knowledge or position with respect to a set of facts or area of inquiry within its knowledge or reasonably available." Id. Information that is "reasonably available" is that which is "in a party's control." Id. at 39.

Chief Magistrate Judge Swartwood recently discussed the duties of a 30(b)(6) witness in Briddell v. St. Gobain Abrasives, Inc., No. 04-CV-40146, 2005 WL 3065925 3 (D. Mass Nov. 10, 2005). In that employment discrimination case, the defendant resisted providing a 30(b)(6) witness because, among other reasons, it claimed it was burdensome for the deponent to adequately prepare to testify about subjects for which he had no personal knowledge. Id. at *1. Judge Swartwood rejected the defendant's argument, holding that the burden is on the corporate deponent to "make a conscientious good-faith endeavor to . . . prepare [its designee(s)] in order that they can answer fully, completely, unevasively." Id. at *3 (quotation omitted). The Court held that "*the deponent must use documents, past employees, and other resources in performing this required prep*aration." Id. (emphasis added). The defendant was obligated to prepare its witness (and compile documents related to an associated document request) despite the fact that it would take "175-200 hours." Id. at *4. The Court was unmoved by the defendant's burden because "[c]ourts have been loathe to reward (and possibly encourage) poor record keeping by shielding companies with inefficient recording methods from discovery." Id.

### III. Berkshire's Estimates of The Number of Hours of Preparation Appear to Be Wildy Exaggerated To Suggest A Ridiculous Burden And Are Inconsistent With Prior Discovery In This Case

Berkshire claims it is unable to produce witnesses for 30(b)(6) topics 6, 19, 21, 23, 24 and 25 because it would require a manual search through all of the claims files, which it claims would take 17,550 hours to complete. As an initial matter, this time estimate is based on the assumption that it would take 30 minutes to look at a claims file to determine, for example, whether the claim related to latex allergy. See Affidavit of Peter A. Palleschi at ¶14, attached to

Opposition (Docket #41) as Ex. 6. This estimate seems wildly wrong. In Carolyn Mirek's claim file, the top of the first page has a space for "diagnosis," and in the space is written "latex allergy & carpal tunnel syndrome." <u>See</u> Excerpts from Carolyn Mirek Claim File ("Claim File"), attached as Ex. 1. If all or most of the claims files at issue are similar to Ms. Mirek's file, it far more likely that it would take thirty seconds per file, rather than thirty minutes, to determine if it related to latex allergy.

More importantly, Berkshire's opposition and supporting affidavits ignore far less time-consuming methods by which Berkshire could obtain the same or similar information. In addition to the method described above, Berkshire could survey its claims representatives – all of whom work at its offices in Pittsfield, Massachusetts – for information. Furthermore, the affidavits conflict with information that Berkshire has already provided. The Court should compel testimony on these subjects, despite the outlandish claims of Berkshire regarding burden.

**A.  Topic No. 6**

Berkshire claims that it cannot provide testimony about the following subject without a manual review of over 18,000 claims files:

> 6. The circumstances under which either defendant has, at any time since January 1, 1990, concluded that a claimant under an individual disability policy was totally or partially disabled because of a latex allergy-related disability, including the occupation of the insured, and the basis for such determination

Berkshire's argument is puzzling. It has already produced a list of the seven instances since 1990 where "a compensable claim for individual disability income insurance benefits has been approved by defendants where the stated medical conditions in support of the claim included latex related sensitivity." <u>See</u> Supplemental Responses to Ints. No. 5, Ex. 2. It has also provided medical personnel reports from those seven files. <u>See</u> Letter from Edward K. Kimball to Joanne D'Alcomo (Dec. 12, 2005), Ex. 3; Request for Production ¶ 57, Ex. 4.

Berkshire's 30(b)(6) deponent *would only need to review those seven claims files* to prepare to testify about Topic 6. If it truly requires a manual review of all claims files to find those involving latex, it is unclear how Berkshire managed to respond to the interrogatories and document requests without such a review.[3]

Subject 6 is particularly important to plaintiff because the reports referred to above – which were produced under Court order dated November 28, 2005 -- give incomplete information and raise a number of questions that a 30(b)(6) deponent could elaborate on. For example, there were no reports produced about three of the claimants listed. Plaintiff is interested in learning whether that is because no such reports exist, or because all such reports precede January 1, 2000. A review of those three claims files could allow a deponent to speak to that issue. Plaintiff wants to probe those cases to understand why the decisions were made to grant coverage based in part or in whole on latex.

Furthermore, the reports that were produced are confusing. Although the reports are taken from files in which Berkshire found that claimants were disabled, all but one of the reports state *that the claimants are not disabled from working due to latex allergy*. See Feb. 22, 2005 Garb Report at 4, Ex. 5 ("It should not be difficult for her to avoid latex exposure and continue employment as an RN."); June 22, 2004 Nudelman Report at 1, Ex. 6 ("there is not yet sufficient objective clinical documentation so as to support the claimant's assertion that she has been unable to work on the basis of latex allergy."); Dec. 1, 2004 Boxer Report at 2, Ex. 7 ("she

---

[3] Furthermore, Berkshire may not excuse itself from compliance with the rules by:

> utilizing a system of record-keeping which conceals rather than discloses relevant records, or makes it unduly difficult to identify or locate them, thus rendering the production of the documents an excessively burdensome and costly expedition. To allow a defendant whose business generates massive records to frustrate discovery by creating an inadequate filing system, and then claiming undue burden, would defeat the purposes of the discovery rules.

Kozlowski, PPA v. Sears, Roebuck and Co., 73 F.R.D. 73, 76 (D. Mass. 1976).

should have no difficulty working in a medical office or clinic, where only vinyl gloves are available for the medical staff . . .[m]ost hospitals are well aware of latex allergies and have therefore switched to vinyl gloves, unless sterile procedures are required."); July 11, 2002 Stadtmauer Report at 6, Ex. 8 ("If [claimant] can find work in another clinic where aerosolized latex precautions are in place throughout the suite of offices then she should be able to resume a normal schedule."); May 8, 2004 Nudelman Report at 4, Ex. 9 ("are there no jobs available like the one she advised that she had before, in a latex free environment?"). The one remaining report makes no mention of latex allergy at all. See October 9, 2003 Smachetti Report, Ex. 10. Plaintiff would like the opportunity to depose a 30(b)(6) witness to understand the basis behind Berkshire's response in its interrogatories that the claimants identified are or were disabled due to latex, despite reports from doctors that seem to come to the opposite conclusion.

    **B.  Topic No. 19**

Berkshire claims that it would similarly need to conduct a manual review of over 18,000 claims files to produce a witness as to the following:

> 19 Statistical data of any kind, generated since January 1, 1995 by Guardian or Berkshire, relating to latex allergy-related disability insurance claims.

Berkshire does not explain why statistical data would be contained within the individual claims files, and it hardly seems likely. The topic specifically refers to "statistical data *generated*…" Either the data has been generated or not. If it has been generated, Berkshire fails to explain why it can't produce a witness to testify about it.  Given the fact – according to Berkshire -- that such information would purportedly be so difficult for Berkshire to compile, it is highly implausible that the company would have no knowledge of such data if it existed. . If there has been no such data compiled, a 30(b)(6) deponent could merely attest to that fact there is no such data.  There is no need to review each individual file.

**C. Topics 21, 23, 24 and 25**

Berkshire claims that it needs to conduct a manual review of 20,000 claims files to produce a 30(b)(6) deponent that is competent to testify to the following topics, all of which involve the relationship between Berkshire and MLS National Medical Evaluation Services:[4]

> 21 The frequency with which, since January 1, 1985, either of the defendants has done business with any of the following and the nature of the service, if any, provided:
> (a)  MLS National Medical Evaluation Services;
> (b)  Medicolegal Services, Inc.; and
> (c)  Medicolegal National I.M.E. Services, Inc.
>
> 23. The number or percentage or proportion of claims referred to MLS National Medical Evaluation Services, Inc., for any time period since January 1, 1995 by Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company of America that resulted in a recommendation, finding or conclusion contained in a report sent by MLS National Medical Evaluations Services, Inc. to Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company, that the claimant at issue was not disabled or that there was not a supportable basis for the claim;
>
> 24. The number or percentage or proportion of claims referred to Medicolegal Services, Inc. for any time period since January 1, 1995 by Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company of America that resulted in a recommendation, finding or conclusion contained in a report sent by Medicolegal Services, Inc. to Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company, that the claimant at issue was not disabled or that there was not a supportable basis for the claim;
>
> 25. The number or percentage or proportion of claims referred to Medicolegal National I.M.E. Services, Inc. for any time period since January 1, 1995 by Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company of America that results in a recommendation, finding or conclusion contained in a report sent by Medicolegal National I.M.E. Services, Inc. to Berkshire Life Insurance Company of America and/or Guardian Life Insurance Company, that the claimant at issue is not disabled or that there is not a supportable basis for the claim;

---

[4] MLS National Medical Evaluation Services, Medicolegal Services, Inc.; and Medicolegal National I.M.E. Services, Inc. are related entities.

Once again, Berkshire is not credible in asserting that the only manner by which it can competently testify to these subjects is by conducting a manual review of all the claim files. Berkshire has not indicated why it would be impossible, for example, to use billing records to identify the number of times that Berkshire used MLS and its related entities. Carolyn Mirek's claim file contains a copy of an automated check written from Guardian to Medicolegal Services, Inc. The check clearly identifies that it is being made for a "Review of Carolyn Mirek Claim 391131." See Claim File, Ex. 1. Presumably, these payment records are kept in an organized fashion for tax purposes. It should be a relatively simple task to identify the number of payments made to the three related entities listed above. Depending upon the volume of such payments, it may also be a simple task for Berkshire to retrieve the relevant claims files to examine the result of the claim.

Plaintiff currently has no information about whether Berkshire used MLS and its related entities one time or 10,000 times. Berkshire surely has information that could shed light on that question, but has not made a good faith effort to provide it. It is a dereliction of Berkshire's duty under the Federal Rules to shrug its collective shoulders and say it just doesn't know.

**D. Topic No. 10**

Berkshire similarly claims that it would take thousands of hours of preparation for a witness to be competent to testify about the following subject:

> 10. The occasions on which either of the defendants, since January 1, 1998, has declined to issue an individual disability insurance policy to an M.D., dentist or medical professional because the applicant had been diagnosed with a latex allergy, and the circumstances;

Once again, the plaintiff has no idea whether there is one such instance or 10,000. If it is truly impossible for Berkshire to find each specific instance of such a denial, the corporation has an obligation to give the best possible answer it can. The individual underwriters that work for

Berkshire surely would have some recollection as to the frequency with which medical professionals with latex allergies are denied insurance. If the best that Berkshire can do is produce a witness capable of making an educated estimate as to the number of such instances, it has an obligation to conduct such an inquiry and prepare a witness.

### E.  Topic No. 2

The last topic for which Berkshire objects to providing a witness is:

2. Guardian's and Berkshire's knowledge of, and the state of Guardian's and Berkshire's knowledge of and any familiarity with, latex allergy in 2000, 2001, 2002, 2003, 2004, 2005 and currently;

Unlike the topics discussed above, Berkshire does not claim that it is unable to provide such a witness, only that it should not be compelled to do so because the topic "falsely presumes that either Guardian or Berkshire has some sort of monolithic knowledge regarding Latex Allergy." Opposition at 12 (Docket #41). Despite Berkshire's protestations, that is *exactly* the purpose of a 30(b)(6) deposition.

The duties of a Rule 30(b)(6) deponent are designed to prevent the litigation strategy of "bandying," whereby a series of witnesses all disclaim knowledge of facts that are clearly known to other persons in the organization, thereby depriving the opposing party of information that the corporation knows. See Alexander v. F.B.I., 186 F.R.D. 148, 152 (D.D.C. 1999) (citing Fed. R. Civ. Proc. 30(b)(6) Advisory Committee Notes, 1970 Amendment). As one frequently-cited District Court opinion notes, these duties similarly prevent a party from "sandbagging" the other party by failing to prepare witnesses for deposition, but preparing them vigorously for trial. See United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996). If these duties were not imposed, a corporation could choose at trial amongst the positions of any number of deposition witnesses and "[t]ruth would suffer." Id. at 361. The testimony of a 30(b)(6) deponent "*represents the*

*knowledge of the organization . . . not of the individual deponents*." McLellan Highway Corp., 915 F. Supp. at 9 (emphasis added).

Berkshire has an obligation to prepare a witness that can testify as to what the entire corporation knew about latex during the relevant years. Plaintiff should not be forced into a position of guessing which witness's knowledge represents the corporate position.

### IV. Plaintiff's Notice of Depositions In Sturbridge Represents A Reasonable Compromise

Lastly, Berkshire objects to the fact that the 30(b)(6) depositions have been noticed for Sturbridge, Massachusetts. Although a 30(b)(6) deposition of a corporation is often taken at its principal place of business, that is by no means the only place such a deposition can take place. For example, a very similar situation faced the court in Turner v. Prudential Insurance Company of America, 119 F.R.D. 381 (M.D.N.C. 1988). In that case, just like this one, a plaintiff sued an insurance company for failure to provide benefits for a claim. Id. at 382. The insurance company was based in Florida, but the district court held that it had to provide a corporate deponent in North Carolina because "plaintiff's request to depose defendant concerning the policy in the state where the policy issued is both reasonable and expected." Id. at 384.

In this case, the policy was issued in Connecticut, and Plaintiff has chosen a deposition forum that is between her home in Connecticut, her attorneys in Boston, and the defendants in Pittsfield, Massachusetts. Plaintiff has already taken several depositions in Pittsfield to accommodate Berkshire, and there is no reason that she should be forced to do so again. It is not excessively burdensome for Berkshire's corporate deponents to travel 80 miles for depositions.

### V. Conclusion

For the reasons stated above, Plaintiff's motion should be granted.

CAROLYN MIREK

By her attorneys,

/s/ Seth Nesin
_____
Joanne D'Alcomo, Esq.
BBO #544177
Seth Nesin, Esq.
BBO #650739
Jager Smith, P.C.
One Financial Center
Boston, MA 02111-2621
Phone: (617) 951-0500
Fax: (617) 951-2414