# Exhibit 5

# Case Review

▬▬▬▬▬▬

Policy # ▬▬▬▬▬▬▬▬

February 22, 2005

James R. Garb, M.D.

▬▬▬▬▬▬

 

Page 1

## Introduction

This report is based on a review of the medical records furnished to me on ▇▇▇ as requested by ▇▇▇ of Berkshire Life Insurance Company of America.

The purpose of this report is to assist in the understanding of ▇▇▇ medical condition and any current basis for occupational impairment as a result of this condition. The report addresses five specific questions posed by ▇▇▇

## Case Summary

▇▇▇ is a 48 year old registered nurse who formerly worked for seventeen years in the labor and delivery unit at ▇▇▇ Following an initial apparent allergic reaction in 1990, she was subsequently diagnosed with latex allergy, occupational asthma and multiple chemical sensitivity and has not worked since April 1995, despite improvement in her clinical condition.

## Questions Posed by ▇▇▇

**1. Do the medical records support impairment? Please explain.**

It is important to recognize in this case that the medical records span a period of nearly 15 years, and ▇▇▇ condition has changed over the course of time. An initial serious allergic reaction occurred in 1990, as documented by ▇▇▇ in a letter to ▇▇▇ dated 6/9/95. This reaction occurred at work, while wearing latex gloves, and involved a rash, rhinitis, angioedema of her eyes and chest constriction. It was treated with epinephrine and intravenous benadryl and corticosteroids. This episode was eventually ascribed to latex allergy, presumably on the strength of a latex RAST test which I was unable to locate in the medical record. She went on to experience similar, but less severe symptoms at work, following a GYN exam, and in various other settings. Subsequently, a latex RAST was conducted in 2002 which was in the very low positive range.

While plausible by history, the etiology of her initial allergic reaction has not been explained with absolute certainty. There are certain features of her history that raise questions about the diagnosis of latex allergy and of its role in her symptom complex. For example, it seems unusual to me that her initial severe reaction was never followed by other equally severe reactions during her continuing exposure to latex over the next several years. She relates being able to handle some rubber products (e.g. sneakers), but also relates an episode of shortness of breath and shaking when present in the cafeteria where a worker was putting pieces of pizza on a shelf while wearing gloves allegedly made of latex. This latter episode does not seem plausibly related to latex allergy, and suggest more of an anxiety reaction.




Page 2

Apparently, her unit was moved into a latex free building in 1994, and it was in 1995 that she went out of work due to her symptoms, raising further questions about the relationship of a possible latex allergy to her ongoing symptoms.

There is an incidence of false positive results on latex RAST testing that is variously reported as 10% or higher.[1] Latex skin prick testing, the acknowledged "gold standard" in diagnosing latex allergy, was not performed on this patient. I would have to say that ▇▇▇▇ has probably latex allergy, but that this diagnosis does not preclude her from work in the medical field, as will be discussed in more detail later in this report.

I do not believe the medical records support the diagnosis of occupational asthma. There is little objective evidence of clinically significant bronchospasm. Her clinical exam repeatedly demonstrates clear lungs, her care for this condition has been minimal, she self-reports wheezing in non-work settings, and her methacholine challenge test was negative. The methacholine challenge test is a measure of nonspecific bronchial hyperresponsiveness, a characteristic feature of occupational asthma. Because it correlates well with clinical status, the degree of nonspecific bronchial hyperresponsivness is an important component in determining the presence of impairment or disability in a patient with possible occupational asthma.[2] I see no indication in the records provided to me that ▇▇▇▇ has clinically significant asthma, or any support for the diagnosis of occupational asthma. She may have very mild asthma that could be aggravated by exposures in and out of the workplace, however this would not be a cause of impairment in this case.

▇▇▇▇ carried a diagnosis of multiple chemical sensitivity (MCS) for many years. This particular diagnosis (also known as idiopatihic environmental intolerance or IEI) is surrounded with considerable controversy. The pathophysiologic and/or psychologic mechanisms that may contribute to the development and maintenance of this disorder have still not been definitively elucidated. Evidence does not yet exist to define MCS as a distinct entity. No consensus has yet been reached for a case definition. Many, but not all, studies suggest an excess of symptoms of psychological distress consistent with anxiety and depression. Some evidence supports excessive premorbid somatic complaints and a role for conditioned response. Problems with interpreting MCS research include over-reliance on surveys and self-reported symptoms, selection bias, lack of blinding, and inconsistent quality assurance of laboratory determinations.[3]

However, regardless of where one stands on the nature of MCS, it is clear from ▇▇▇▇ medical record that the symptoms attributed to this condition have significantly diminished over time. In fact, ▇▇▇▇ had predicted this outcome in September 1998, when she wrote that there may be a slow lessening of her symptoms over years. On July 17, 2003, ▇▇▇▇ indicated the following: "Resolved night sweats totally. All skin rashes resolved. Latex reactions continue... no hives x 1 year. Energy great. Sleeps fine. No asthmatic sx. Not reacting to wide array of chemicals now... Assessment – resolved MCS, occupational asthma. Latex allergy continues." In the last progress note provided to me, dated 11/2/04, ▇▇▇▇ wrote: "chemical sensitivity stable... continue avoidance of chemicals and latex.



Page 3

Permanently disabled as RN due to latex sensitivity". It appears that any symptoms that may have been attributed to chemical sensitivity have either resolved (7/03) or are stable (11/04).

In my opinion, whatever the etiology of ████ symptoms over several years, from November 2003, there does not appear to be any current impairment related to chemical sensitivity.

*2. Are the restrictions and/or limitations asserted by the claimant and/or AP supported by the evidence in the medical records? Please explain.*

As explained above, given the probability (although not conclusively proven) that ████ does have an allergy to latex, I would support the restriction that she avoid direct contact with latex products and that she avoid working in an environment where co-workers wear powdered latex gloves that have high residual latex protein levels.

████ has been able to engage in a wide variety of activities where exposure to chemical odors and fragrances would have occurred, including extensive travel to India for five weeks, travel to the southwest of the United States, and the pursuit of additional education. It is not plausible to me that her medical condition would allow her to pursue all of the above activities but not to work as a registered nurse.

*3. If the restrictions and/or limitations are supported, how do they impact on the claimant's ability to perform his/her occupation?*

Assuming ████ is indeed allergic to latex, this does not necessarily preclude her from performing the duties of a registered nurse. In fact, most healthcare workers with latex allergy are able to continue working in their jobs if certain modifications to the work environment are made. Since most occupational latex exposure in healthcare results from the use of powdered latex gloves, the two key interventions are providing the latex allergic healthcare worker with non-latex gloves (nitrile) and having co-workers wear powder-free latex gloves with a low residual latex protein content or non-latex gloves. This is known as a "latex safe" environment, and is now commonly provided in healthcare settings. Some hospitals have gone to a latex free environment, where latex gloves are not used at all and other products are made of latex alternatives, thereby eliminating the potential exposure to latex.

Latex allergic healthcare workers can safely work in a "latex safe" environment. As reported by Fett Ahmed et al, in 36 latex-sensitive workers with well documented occupational asthma who reduced or avoided latex exposure, significant lessening of asthma and decreased bronchial hyperreactivity were noted after a median follow-up of 56 months. Latex specific IgE levels decreased in six of seven healthcare workers who avoided use of powdered latex gloves for 12 months. Twenty-six latex sensitized anesthesiologists who avoided uses of latex gloves for 10 to 15 months became asymptomatic, and 16 of them had decreased levels of latex specific IgE.[4]





Page 4

Similarly, Ranta and Ownby, in a review of natural rubber latex allergy in healthcare workers concluded that an individual with type I or type IV hypersensitivity to latex should be able to continue to work in the workplace with careful evaluation and reasonable accommodations, consisting of the creation of a latex safe environment, with the use of low allergen non-powdered latex gloves by other staff members and the use of non-latex gloves by the affected individual. Products made of dry, molded or extruded rubber, such as wheelchair tires, tool handles, rubber seals, vial stoppers and syringe plungers do not need to be removed because they contain much less allergen than do items that were manufactured with the "dipping" method (e.g. gloves, condoms, balloons). Healthcare workers with latex sensitivity are not at increased risk when incidentally exposed to dry, molded or extruded rubber products in the health care environment; however, if direct contact with such objects is routine, direct exposure should be minimized by covering the object or exposed body part.[5]

At this time, most US hospitals have become latex safe. Some are latex free. In other healthcare settings, such as outpatient clinics of private offices, the potential for latex exposure is easier to control. Finally, there are work opportunities for nurses where there is no potential for latex exposure, such as working for a nurse call line.

**4. What is the prognosis of the claimant's condition? Has the claimant reached maximum medical improvement?**

In light of ▓▓▓▓▓ clinical progress and improvement over the last few years, I believe her prognosis is very good. It should not be difficult for her to avoid latex exposure and continue employment as a RN. I believe she has reached maximum medical improvement.

**5. What is the expected time frame for recovery?**

▓▓▓▓▓ will probably remain allergic to latex. Desensitization techniques for patients with latex allergy have been described, however experience is limited and further work would have to be done before this approach can be recommended. As indicated above, I believe she has reached MMI and should do well with routine measures to minimize exposure to latex in her work and personal life.

_____  
James R. Garb, M.D.

2/22/05  
February 22, 2005

FAX

## References

1. Hamiltion RG et al, Clinical and laboratory-based methods in the diagnosis of natural rubber latex allergy, J Allergy Clin Immunol; 110(2):S47-S56, August 2002.

2. Chan-Yeung M et al, Assessment of Asthma in the Workplace, AACP Consensus Statement, Chest; 108:1084-1117, 1995.

3. American College of Occupational & Environmental Medicine Position Statement; Multiple Chemical Sensitivities: Idiopathic Environmental Intolerance, April 1999.

4. Fett Ahmed DD et al, Occupational allergies caused by latex, Immunology and Allergy Clinics of North America, 32(2): May 2003

5. Ranta PM, Ownby DR, A Review of Natural-Rubber Latex Allergy in Health Care Workers, Clinical Infectious Disease, 38:252-256, January 2004.

CLAIMS FEB 23 2005