**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

| | |
|---|---|
| CAROLYN MIREK | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE GUARDIAN LIFE INSURANCE | ) |
| COMPANY OF AMERICA and BERKSHIRE | ) |
| LIFE INSURANCE COMPANY OF | ) |
| AMERICA, | ) |
| Defendants. | ) |

04-30166-MAP

_____)

**DEFENDANTS' PRETRIAL MEMORANDUM**

Pursuant to the Court's Procedural Order dated February 9, 2005, the Defendants, the

Guardian Life Insurance Company of America and Berkshire Life Insurance Company of

America file this separate pretrial memorandum.

**I.     STATEMENT OF EVIDENCE**

The evidence will demonstrate that Defendant, The Guardian Insurance Company of

America ("Guardian") issued Plaintiff a disability insurance policy.  This policy entitles Plaintiff

to monthly total disability and waiver of premium benefits if she can prove that she could not

perform the major duties of her occupation of a dental hygienist on December 27, 2001.  The

evidence will demonstrate that Plaintiff made numerous misrepresentations to Guardian in

connection with procuring the Policy.  The evidence will demonstrate that Plaintiff claimed to be

totally disabled from being a dental hygienist on two grounds: carpal tunnel syndrome and latex

allergy even though she knew her doctors deemed her cured from carpal tunnel syndrome.  The

evidence will demonstrate that Plaintiff is not totally disabled by her latex allergy as:  1) she was

able to work for a number of years after her latex allergy was diagnosed without missing any

work due to latex allergy; 2) The performance of her duties as a dental hygienist was not

inhibited be a latex allergy; 3) she -- not her doctor, deemed herself disabled by latex allergy on December 27, 2001; 4) there are latex-safe dental offices in which Plaintiff can continue to work as a dental hygienist, including one at which she rejected a job; 5) since the onset of her "alleged disability" Plaintiff has successfully worked as a dental supply sales representative through which she has regular latex exposure; and 6) Plaintiff earns more money as a dental supply sales representative than she did as a dental hygienist.  Accordingly, the evidence will demonstrate that Plaintiff is not, nor has she ever been disabled by latex allergy.

## II.    STATEMENT OF FACTS

Defendants provided the Plaintiff with numerous facts as part of the parties obligation to confer.  Plaintiff has stipulated to Paragraph 1 only.

1.    Plaintiff was born on September 21, 1963.  Plaintiff lives in South Windsor Connecticut with her husband and two children.

2.    On or about February 15, 1993 Plaintiff signed and submitted and application for individual disability income insurance to The Guardian.

3.    In her application Plaintiff indicated that her occupation was that of a Dental Hygienist and that her duties were scaling, root planing, prophylaxis, dental charting, exposing radiographs, patient education and documentation.

4.    On March 19, 1993, The Guardian issued to plaintiff Policy No. G723670 ("Policy").

5.    The Policy originally provided a monthly indemnity benefit in the amount of $2,500. The Policy also provided a Residual Disability Benefit, Cost of Living Adjustment Benefit, Future Increase Option, and an Automatic Increase Rider.

6.    The Policy provides that "Total Disability means that, because of sickness or injury, you are not able to perform the major duties of Your Occupation. Your Occupation means the

     regular occupation (or occupations, if more than one) in which you are engaged at the time you become disabled."

7.    Under the Policy, Residual Disability means that you are at work and are not totally disabled under the terms of the policy; but, because of sickness or injury, you are not able to earn at a rate of at least 80% of your prior income.

8.    In 1983 Plaintiff became a registered dental hygienist and she continued to work as a dental hygienist for various dentists until December 27, 2001 when she stopped working for Dr. Robert N. Burstein ("Dr. Burstein").

9.    As of December 27, 2001, Plaintiff was an hourly employee who earned $33/hour working as a dental hygienist in the dental offices of Dr. Burstein.

10.    Prior to ceasing work as a dental hygienist in December 2001, Plaintiff worked 36-40 hours per week in Dr. Burstein's office.

11.    According to Plaintiff, the Major duties of a dental hygienist are Scaling & root planing, prophylaxis (polishing), exposing & processing X-rays, providing homecare instructions & education, diagnosis and dental charting (recording documents).

12.    On or about February 20, 2002, Plaintiff submitted initial claims forms to Berkshire. These claims forms reveal Plaintiff claimed to be totally disabled under the Policy due to: A. Bilateral Carpal Tunnel Syndrome; and B. Life Threatening Latex Allergy. Plaintiff claimed that she was totally unable to work in her occupation due to disability since December 27, 2001 when she stopped working for Dr. Burstein. ("Claim").

13.    Part of the documentation submitted in support of Plaintiff's Claim was an Employer's Statement signed by Dr. Burstein's office manager. The Employer's Statement does not refer to latex allergy at all. In fact, the Employer's Statement indicates that Plaintiff's

absences from work were related to hand surgery for carpal tunnel and that the circumstances surrounding Plaintiff's termination of employment were that Plaintiff voluntarily resigned.

14. Plaintiff subsequently admitted that she was not totally disabled from carpal tunnel syndrome at the time of the Claim and that in fact the only reason why she stopped working for Dr. Burstein was related to latex allergy.

15. According to Dr. Burstein, Plaintiff did not miss work due to latex allergy and latex allergy never affected Plaintiff's ability to perform her job effectively up until December 27, 2001 when Plaintiff ceased working for Dr. Burstein.

16. From June 1999, when her latex allergy was first diagnosed, through December 27, 2001, when she deemed herself disabled from working as a dental hygienist, Plaintiff did not take any absences from work in Dr. Burstein's office that were attributable to her latex allergy.

17. In support of her Claim Plaintiff stated that her occupation was that of a Registered Dental Hygienist and that her Occupational Duties consisted of Scaling & root planing, prophylaxis (polishing), exposing & processing X-rays, providing homecare instructions & education, diagnosis and dental charting (recording documents).

18. As part of her Claim, Plaintiff stated that "I decided it was medically necessary that I leave" my dental hygienist position on December 27, 2001.

19. Plaintiff's Claim was supported by an Attending Physician Statement of her treating allergist, Dr. Robert Bedard.

20.    Dr. Bedard admits that Plaintiff could have continued to work as a dental hygienist beyond December 27, 2001 and the reason that Dr. Bedard stated that December 27, 2001 was Plaintiff's disability date is that "[t]hat was the last date the she had worked."

21.    In 2001 her last year working as a dental hygienist fro Dr. Burstein, Plaintiff earned approximately $4700/month, which equals $56,400 annualized.

22.    Plaintiff's Claim was evaluated and denied in 2002.

23.    In January 2002, Plaintiff began working as a sales representative for Barton-Cyker selling dental supplies to dentists and spending approximately one third of her time visiting various dental offices as part of her job selling dental supplies.

24.    In June 2002 Plaintiff stopped working for Barton-Cyker and began working for Benco Dental selling dental supplies and equipment.  Plaintiff has continued in that capacity since 2002 and in that capacity she continues to spend between 25% to 33% of her time visiting dental offices as part of performing her job selling dental supplies and equipment.

25.    In 2004 Plaintiff earned approximately $62,000 selling dental supplies for Benco.

26.    According to Plaintiff, the only thing that renders her disabled from being a registered dental hygienist is the possibility of being exposed to latex and that but for that risk of potential latex exposure, Plaintiff is not otherwise unable to perform the major duties of a dental hygienist.

27.    In her current occupation as a dental supply sales representative, Plaintiff works up to 14 hours per week in various dental office environments where it is possible that latex gloves are being used and where powered latex gloves are being used and Plaintiff is doing great.

28. Plaintiff is able to go into areas containing latex, including powdered latex and still be doing great. Plaintiff is able to tolerate exposure to latex.

29. It is possible to significantly reduce the amount of latex being used in a dental office if the doctor who is running the office decides to significantly reduce the amount of latex being used in that dental office.

30. Plaintiff is not sure if she is disabled from working in other latex safe offices.

31. If Plaintiff could control her workplace environment and herself within that environment then she could perform the major duties of a dental hygienist.

32. Plaintiff admits that she could have continued to function as a registered dental hygienist in a latex safe dental office, which she defined as one where "They don't use latex gloves, and they have a lot of latex free alternatives."

33. Plaintiff identified one dentist, Dr. Randall Wing, whose office is located in Plaintiff's hometown of South Windsor, Connecticut, that has a latex safe office. Plaintiff admits that she may be able to work in Dr. Wing's dental office as a registered dental hygienist, but that she had never inquired as to any open positions in that office.

34. Dr. Bedard admits that Plaintiff can work as a dental hygienist if the dental office in which she is working could control her latex exposure in that environment.

35. Dr. Bedard admits that Plaintiff is able to tolerate some level of latex exposure.

36. Dr. Daniel Segal is self-employed as a dentist in his office in South Windsor, Connecticut. Approximately 8 years ago, Dr. Segal was diagnosed as having a latex allergy.

37.     For approximately 7-8 years, Dr. Segal attempted to limit latex exposure in his office. During this period of time, Dr. Segal has not suffered any latex allergy symptoms by taking precautions in his office.

38.     In September and October of 2001, there were no latex gloves being used in Dr. Segal's dental office. Rather, Dr. Segal utilized Neo Pro Non Latex-Chloropene Gloves. Since that time, Dr. Segal has not used latex gloves in his office.

39.     In September and October of 2001, latex prophy angles were not used in Dr. Segal's office. Rather, they were utilizing Oral Latex Free Prophy Angles. Since that time, Dr. Segal's office has not used latex prophy angles in Dr. Segal's office.

40.     In September and October of 2001, latex face masks were not used in Dr. Segal's dental office. Rather, they were using Crosstex – Isolite face masks. Since that time, they have not used latex face masks in Dr. Segal's office.

41.     In addition to the fact that Dr. Segal has a latex allergy, he employs a clinical dental hygienist named Deborah Arslan who also has been diagnosed as having a latex allergy. Ms. Arslan previously had a severe reaction to fruits and vegetables requiring hospitalization. Ms. Arslan currently will break out in rashes and hives upon contacting latex. Despite her latex allergy, Ms. Arslan is able to work in Dr. Segal's latex free office without suffering latex allergy symptoms given the precautions that Dr. Segal has taken.

42.     On September 24, 2001, Dr. Segal received the resume of Carolyn Mirek, in which Ms. Mirek indicated that she was seeking to "Obtain a rewarding career in clinical dental hygiene." At that time, Dr. Segal was in the process of seeking to hire a clinical dental hygienist.

43.  During late September/early October 2001, Dr. Segal interviewed Plaintiff with respect to the open clinical hygienist position.

44.  Plaintiff was a very strong candidate for the open clinical hygienist position. Dr. Segal would have offered her the position, but at the interview she informed Dr. Segal of her salary demands which were more than he was paying the other hygienists in my office.

45.  Had Ms. Mirek not informed Dr. Segal of her salary demands, he would have offered her the dental hygienist position at a rate of $29.15/hr.

46.  On numerous previous occasions, Plaintiff has admitted that she had interviewed with Dr. Segal and did not pursue the job solely because of the salary being offered.

47.  In 1986 Plaintiff began to experience reactions while wearing gloves while working as a dental hygienist.

48.  In 1986 Plaintiff was having a lot of varied problems with her health, general allergic symptoms, runny, watery eyes, sneezing, coughing, nasal congestion, difficulty breathing, tightness in her chest and wheezing. Plaintiff also had developed a chronic condition or rash on the top sides her hands and between her fingers that would not go away. This rash was similar to a reaction to poison ivy and was characterized by swelling, sacs of fluid, very itchy and oozing pustules, this rash kept spreading and it was very painful to Plaintiff. On a scale of 1 to 10 plaintiff would describe the hand pain she experienced as a 10. As a result of these severe symptoms, plaintiff consulted with Dr. Greenberg, a dermatologist in the spring of 1986. Dr. Greenberg examined Plaintiff's hands, diagnosed contact dermatitis and prescribed a cream to apply to her hands and told her to use the cream and then wear cotton glove liners underneath the latex gloves that

Plaintiff wore when she performed her duties as a dental hygienist. Plaintiff followed Dr. Greenberg's instructions and her symptoms were alleviated.

49.     In approximately 1986, Plaintiff began receiving treatment from an allergist named Dr. Prasad Srinivasan. Dr. Srinivasan had Plaintiff tested for at least 10 different allergies and Plaintiff tested positive for every allergy that was tested for.

50.     Dr. Srinivasan prescribed diprolene cream for Plaintiff's hands and recommended that Plaintiff come in for allergy shots 2-3 times per week. This immunotherapy treatment regime continued for at least a year and possibly 2 years. Nevertheless physical symptoms worsened.

51.     While under the care of Dr. Srinivasan between 1986 and 1992, Plaintiff experienced asthmatic attacks and was diagnosed with allergy-induced asthma. Dr. Srinivasan had tested Plaintiff for asthma on multiple occasions and prescribed inhalers for her to use to treat her asthmatic attacks. During this period of time, Plaintiff had asthmatic attacks in Dr. Srinivasan's office, at home and at work. Plaintiff treated these attacks by using inhalers that Dr. Srinivasan prescribed for her.

52.     In 1992, Plaintiff stopped treating with Dr. Srinivasan and began treating with Dr. Bedard.

53.     Dr. Bedard prescribed various prescription and over the counter medications for Plaintiff including nasal sprays, inhalers, allergy medications. Under the care and treatment Plaintiff was able to successfully manage her allergies except for a few isolated incidents relating to Plaintiff's ingestion of food at an amusement park and a restaurant.

54.     Plaintiff had two separate successful surgical procedures to treat bilateral carpal tunnel syndrome.

55.     In 1989 Plaintiff applied for and purchased an individual disability income insurance policy from Berkshire Life Insurance Company.  In her application for that insurance policy, plaintiff's answers on the application contain numerous false and/or incomplete statements as to Plaintiff's medical history, symptoms and treatment.

56.     In 1991 Plaintiff applied for and purchased an individual disability income insurance policy from State Mutual Life Insurance Company of America. In her application for that policy, plaintiff's answers on the application contain numerous false and/or incomplete statements as to Plaintiff's medical history, symptoms and treatment.

57.     In 1993, Plaintiff applied for and purchased the Policy at issue in this case from Guardian.  In her application for that policy, Plaintiff failed to disclose her medical doctors including her allergy specialists Dr. Srinivasan and Dr. Bedard.  Additionally, In her application for that policy, plaintiff's answers on the application contain numerous false and/or incomplete statements as to Plaintiff's medical history, symptoms and treatment.

## III.     CONTESTED ISSUES OF FACT

1.     Whether Plaintiff is totally disabled due to latex allergy from performing the major duties of a dental hygienist.

2.     Whether Plaintiff was totally disabled by latex allergy on December 27, 2001, the date she ceased working as a dental hygienist.

## IV.     JURISDICTIONAL QUESTIONS

None

## V.        QUESTIONS RAISED BY PENDING MOTIONS

1.        Plaintiff has a pending Motion Pursuant to Rule 37(a) and 37(b) Against
Defendant Berkshire Life Insurance Company of America for Refusal to Produce
Witnesses after Motion for Protective Order Was Denied; Berkshire filed an
Opposition to Motion Pursuant to Rule 37(a) and 37(b) Against Defendant
Berkshire Life Insurance Company of America for Refusal to Produce Witnesses
after Motion for Protective Order Was Denied.

2.        Plaintiff has a pending Motion for Leave to File Reply Memorandum in Support
of Motion to Compel Berkshire To Produce Witnesses to Testify Pursuant to
Renotice of Deposition Under Rule 30(b)(6).

3.        Plaintiff has a pending Motion to Schedule Initial Scheduling Conference in Civil
Action No. 05-30246 On the Same Day As, Or Before, the Pre-trial Conference in
Civil Action No. 04-30166; Defendants filed an Opposition to Motion to
Scheduling Conference in Civil Action No. 05-30246 On the Same Day As, Or
Before, the Pre-trial Conference in Civil Action No. 04-30166.

4.        Defendants have a pending Motion to Compel the Testimony of Dr. Christine
Oliver.

## VI.        ISSUES OF LAW AND EVIDENTIARY QUESTIONS

1.        <u>Berkshire is an Improper Party</u>

It is undisputed that under Connecticut law "an insured has no right of action against a
reinsurance company and can only sue in the event that there is something in the contract
between the insuring company and the reinsuring company which gives policy holders such a
right."  <u>Brogan v. Macklin</u>, 9 A.2d 499, 501 (Conn. 1939); <u>see also United States Fidelity and</u>

Guaranty Company v. S.B. Phillips Company, Inc., 359 F.Supp.2d 189, 198 (D.Conn. 2005).

Berkshire Life Insurance Company of America ("Berkshire") is an improper party to this suit and

is entitled to summary judgment because: 1) Berkshire, as a reinsurer of Guardian, is not in

privity with Plaintiff; and 2) there is no legal basis that would permit Plaintiff to assert a breach

of contract claim against Berkshire.  Defendants will file a Motion for Summary Judgment to this

effect.

       2.      <u>Evidence of Other Claims and/or Berkshire's Underwriting Practices are<br>Inadmissible</u>

Defendants will submit a Motion in Limine seeking to bar the admissibility of evidence

regarding other disability insurance claims and evidence of Berkshires' underwriting practices.

Plaintiff has obtained discovery with respect to seven other claimants who sought and received

disability benefits due to latex allergies and discovery with respect to Berkshire's underwriting

practices as they relate to the non-issuance of disability policies to medical professionals with

known latex allergies.  Defendants request that this Court bar Plaintiff from admitting the

evidence of other disability claims and said underwriting practices as evidence in this case

because such evidence is irrelevant to Plaintiff's claim and even if it were relevant, such

evidence would be significantly more prejudicial than probative.

This trial will involve a single breach of contract claim.  The ultimate question presented

for the jury is following consideration of evidence as to this Plaintiff's claim for benefits,

whether or not this Plaintiff satisfies the definition of total disability under the policy?  In other

words, has this Plaintiff been rendered unable to perform the major duties of a dental hygienist

due to sickness or injury?

Defendants concede that if it was their position in this case that latex allergy is not a

distinct illness, Plaintiff would be entitled to present evidence to rebut their position.  However,

it is not Defendants' contention that latex allergy is not a distinct disease; it is their position that Plaintiff's latex allergy did not disable her from her occupation.  Neither is it Defendant's position that people who experience a latex allergy cannot ever be disabled.  Consequently, the claims of the seven other claimants and the Defendants' underwriting practices are irrelevant to Plaintiff's breach of contract claim and the Court must preclude evidence of such.

**VII.      REQUESTED AMENDMENTS TO THE PLEADINGS**

None

**VIII.     ADDITIONAL MATTERS TO AID IN DISPOSITION OF THE CASE**

None

**IX.      LENGTH OF TRIAL**

Defendants estimate a three day trial.

**X.      LIST OF WITNESSES**

1.      Ms. Carolyn Mirek
        48 Sele Drive
        South Windsor, CT 06074

Purpose: Ms. Mirek will testify regarding her ability to tolerate latex as a dental hygienist, her job search and job history and her continuing to subject herself to latex.

2.      Robert M. Bedard, M.D.
        Connecticut Asthma & Allergy Center LLC
        836 Farmington Avenue, Suite 207
        West Hartford, CT 06119-1551

Purpose:  Dr. Bedard will testify regarding his treatment of Plaintiff.

3.      Ms. Sandra O'Connor
        Connecticut Asthma & Allergy Center LLC
        836 Farmington Avenue, Suite 207
        West Hartford, CT 06119-1551

Purpose:  Ms. O'Connor will testify regarding aspects of Plaintiff's employment in the dental office of Dr. Burstein including her attendance.

4.      Robert Burstein, D.D.S.
        479 Buckland Road
        South Windsor, CT 06074-3739

Purpose:  Dr. Burstein will testify regarding Plaintiff's work in his dental office, the accommodations made for Plaintiff and the accommodations that he offered to Plaintiff.

5.      Srima Nissanka, LCSW
        281 Hartford Turnpike, Suite 501
        Vernon, CT 06066

Purpose:  Ms. Nissanka will testify regarding the mental health counseling she has provided to Plaintiff.

6.      Daniel Segal, D.D.S
        1040 Sullivan Avenue
        South Windsor, CT 06074

Purpose:  Dr. Segal will testify regarding his latex-safe office and Plaintiff's seeking work in his office.

7.      Mr. Jonathan Horn
        Benco Dental Company
        1486 Highland Road, Building 2
        Cheshire, CT 06410

Purpose:  Mr. Horn will testify regarding Plaintiff's work for Benco Dental Company subsequent to the onset of her alleged disability.

8.      Mr. Frederick Cyker
        15 Cobtail Way
        Simsbury, CT  06070

Purpose:  Mr. Cyker will testify regarding Plaintiff's work for Barton-Cyker Dental Supply Company subsequent to the onset of her alleged disability and Plaintiff's seeking work with Barton-Cyker.

9.      James Garb, M.D.
        Baystate Medical Center
        Porter Building, 5th Floor
        759 Chestnut Street
        Springfield, MA 01199

Purpose:  Dr. Garb will provide expert opinion on accommodating latex-allergic employees in general and dental hygienists in particular and opine that Plaintiff is not disabled from being a dental hygienist.

14

10.     Steven Jay Weiss, M.D.
        209 South Livingston Avenue
        Livingston, New Jersey 07039

Purpose:  Dr. Weiss, an allergist, will testify regarding latex allergy in general and Plaintiff's latex allergy in particular and opine that Plaintiff is not disabled from being a dental hygienist.

## XI.     LIST OF PROPOSED EXHIBITS

Defendants may offer the following exhibits.  Plaintiff has indicated that she will not object to Exhibits 4, 10 and 17 if they are offered.  Plaintiff refused to meet in person with Defendants to view each other's exhibits despite Defendants invitation to do so.

1.     The Guardian Life Insurance Company of America Policy No. G-723670
2.     Dr. Bedard's medical notes
3.     Plaintiff's medical records from Dr. Bedard
4.     Insurance application (marked as Exhibit 5 at Plaintiff's deposition)-No Objection
5.     Facsimile dated February 19, 2002 from Plaintiff to Berkshire with claim form attached
6.     Correspondence dated October 22, 1999 from Dr. Bedard to Dr. Guardino
7.     Correspondence from Plaintiff to Monique Rubb (marked as Exhibit 9 at Plaintiff's deposition)
8.     Plaintiff's resume indicating that her career objective is to obtain a dental hygiene position  (marked as Exhibit 10 at Plaintiff's deposition)
9.     Plaintiff's resume indicating that her career objective is to obtain a position in Dental Sales
10.    Correspondence dated April 24, 2001 from Plaintiff to the Recruiting Manager at Patterson Dental (marked as Exhibit 18 at Dr. Bedard's deposition)
11.    Correspondence dated May 31, 2002 from Plaintiff to Mr. Jonathan Horn
12.    Correspondence dated June 5, 2002 from Plaintiff to Michael Nalls
13.    Plaintiff's Responses to Interrogatories in Mirek v. Aero-Med, et al.
14.    Plaintiff's Responses to Interrogatories Propounded by Berkshire
15.    Plaintiff's deposition transcript in Mirek v. Berkshire, et al.
16.    Plaintiff's deposition transcript in Mirek v. Robert Burstein and Fireman's Fund Insurance Company
17.    Plaintiff's deposition transcript in Mirek v. Aero-Med, et al.
18.    Dr. Burstein's deposition transcript in Mirek v. Aero-Med, et al.
19.    Plaintiff's medical records from Srima Nissanka, LCSW
20.    Benco Dental Company Sales Catalog
21.    Benco Dental Company Performance Appraisal dated January 30, 2004 (marked as Exhibit 3 at Jonathan Horn's deposition)

22. Benco Dental Company Performance Appraisal dated January 11, 2005(marked as Exhibit 4 at Jonathan Horn's deposition)

23. The Predictive Index Organization Survey Checklist Prepared At Benco Dental Supply

24. Application for Employment at Benco Dental Company

25. Group 1-2-2 Final Examination completed by Plaintiff at Benco.

26. Plaintiff's Expense Report from Benco Dental Company dated February 28, 2005

27. Plaintiff's Expense Report from Benco Dental Company dated March 31, 2005

28. Plaintiff's Expense Report from Benco Dental Company dated April 30, 2005

29. Plaintiff's Expense Report from Benco Dental Company period end date May 31, 2005

30. Plaintiff's Account List from Benco Dental Company

31. Plaintiff's Schedule from Benco Dental Company (marked as Exhibit 2 at Jonathan Horn's deposition)

32. Latex in the Hospital Environment (marked as Exhibit 9 at Dr. Bedard's deposition)

33. The Journal of Allergy and Clinical Immunology "Natural Rubber Latex Sensitivity Volume 110, No. 2, August 2002 (marked as Exhibit 12 at Dr. Bedard's deposition)

34. Dr. Bedard's Latex Allergy documentation (marked as Exhibit 11 at Dr. Bedard's deposition)

35. Dr. Bedard's 2005 Physician Fee (marked as Exhibit 5 at Dr. Bedard's deposition)

36. Correspondence dated June 24, 1999 form Dr. Bedard to Dr. Guardino (marked as Exhibit 3 at Dr. Burstein's deposition)

37. Fireman's Fund Wage Statement (marked as Exhibit 4 at Dr. Burstein's deposition)

38. Plaintiff's 1997 Tax Return

39. Plaintiff's 1998 Tax Return

40. Plaintiff's 1999 Tax Return

41. Plaintiff's 2000 Tax Return

42. Plaintiff's 2001 Tax Return

43. Plaintiff's 2002 Tax Return

44. Plaintiff's 1998, 2000 & 2001 W-2 (marked as Exhibit 6 at Dr. Burstein's deposition)

45. Plaintiff's 1999 W-2

46. Plaintiff's 2002 W-2

47. Plaintiff's 2003 W-2

48. Plaintiff's 2004 W-2

49. Plaintiff's Application for a 1991 State Mutual Life Insurance  Company of America  Disability Insurance disability income insurance policy

50. Plaintiff's Application for a 1989 Berkshire Life Insurance Company disability income insurance policy.

51. Plaintiff medical records from Prasad Srinivasan, M.D.

Respectfully Submitted,

Defendants The Guardian Life Insurance
Company of America and Berkshire Life
Insurance Company of America

By their attorneys,

CREVIER & RYAN, LLP.


/s/David B. Crevier
David B. Crevier, BBO #
Katherine R. Parsons, BBO #
Crevier & Ryan, LLP
1500 Main Street, Suite 2020
Springfield, MA 01115
Tel:  (413) 787-2400
(413) 781-8235 (fax)
Email:  dcrevier@crevierandryan.com
            kparsons@crevierandryan.com


/s/Edward Kimball
Edward Kimball, Esq.
700 South Street
Pittsfield, MA 01201
Tel:  413-499-4321


## CERTIFICATE OF SERVICE

I certify that I served a true copy of the foregoing on all counsel of record said service having taken place this 20th day of January 2006.

/s/David B. Crevier

17