UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLYN MIREK,<br><br>  Plaintiff<br><br>v.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA and BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA,<br><br>  Defendants | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action<br>) No. 04-30166-MAP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE DEFENDANTS' PROFFERED EXPERT JAMES R. GARB, M.D. FROM TESTIFYING AS TO THE SUPPOSED PREVALENCE OF LATEX-FREE DENTAL OFFICES**

I. INTRODUCTION

Plaintiff seeks to preclude the testimony and report of defendants' proffered expert, James R. Garb, M.D., concerning the prevalence of so-called latex-free or "latex-safe" dental practices in geographic areas he describes as "northern Connecticut" and "south western Massachusetts." See Report of James R. Garb, M.D. (Dec. 14, 2005) ("Garb Report #2"), Exhibit 1, at 3. The entire section of Dr. Garb's report that contains the conclusions that are the subject of this motion is reprinted below:

> 2) There are dentists practicing in the northern Connecticut and south western Massachusetts area who have latex-free offices. This list includes the following dental practices, but is not intended to be all-inclusive:
>
> Mark Haselkorn DMD 103 Van Deene Ave, West Springfield, MA
>
>> Dr. Haselkorn is using no latex products in his practice. Everything is non-latex. He himself is allergic to latex, as is one of his staff. He would have no trouble accommodating a latex-allergic employee.
>
> David Segal, DMD 1050 Sullivan Ave, South Windsor, CT

1

> Dr. Segal's office has stopped using latex and is latex-free. They use all non-latex gloves. All other equipment is latex-free as well. He would have no trouble accommodating a latex-allergic employee.

> Robert Bird, DMD 60 Church St, Canaan, CT

> > Dr. Bird stopped using latex several years ago. He assumes every patient is allergic to latex and would have no trouble accommodating a latex-allergic employee.

> Pediatric Dentistry Associates LLC 991 State Street, New Haven, CT

> > This practice is latex-free. They use all non-latex products. They would have no trouble accommodating a latex-allergic employee.

> Raymond Wise, DMD 31 Park Plaza, Lee MA

> > They use only nitrile or vinyl gloves and all dental equipment is latex-free. They have patients with latex allergies who travel from long distances to be seen there. They could easily accommodate a latex-allergic employee.

Garb Report #2, Ex. 1, at 3-4. Dr. Garb should be precluded from testifying as to these opinions and conclusions because, among other reasons:

- His conclusions are based entirely on rank hearsay, specifically phone conversations with dentists and others working in dental offices, and is not subject to any hearsay exception;
- His opinion does not meet the criteria for the "scientific survey" hearsay exception due to, among many other reasons, the facts that:
  a. He chose to contact dental practices across a scattered and undefined area with the intent of finding those he "thought would have the highest likelihood of being latex-free." He made no pretense of being fair and objective. Deposition transcript of James R. Garb, M.D. (1/27/06) ("Garb Dep.") at 30-31, Ex. 2.
  b. Dr. Garb acknowledges he made no attempt to take a representative survey sample. Garb Dep. at 70-71, Ex. 2.
  c. Dr. Garb admits that he has no scientific data from which to draw conclusions about the prevalence of latex-free dental practices in Connecticut or Massachusetts. Garb Dep. at 112-113, Ex. 2.
  d. When asked about "statistical significance" of his survey, Dr. Garb acknowledged that it was "not a scientific survey." Garb Dep. at 72, Ex. 2.
  e. Dr. Garb's survey was biased by the fact that all the dental offices he contacted were either provided to him on a special list by defense counsel or were dentists he knew personally. Garb Dep. at 14-15, 35-37, Ex. 2.

2

      f.  Dr. Garb's data-gathering methods are unreliable because he did not keep track of what he asked, who he talked to, or what was said. Garb Dep. at 44, 48, 50-52, 55, 59-60, 64, 66-67, 69-70, Ex. 2.

- Dr. Garb's conclusions are irrelevant because, even were they admissible and reliable, they would only show the existence of five so-called "latex-free" or "latex-safe" dental practices within a scattered, undefined geographic area in which there are thousands of dentists. It is unknown whether someone of Plaintiff's skills could even work in those offices. Such an admittedly statistically insignificant result has no bearing on whether the Plaintiff is disabled under her insurance contract from working as a dental hygienist because of her latex allergy.

Dr. Garb is not a professional survey-taker, and there is no evidence that he ever conducted a survey or methodically conducted any interviews before. Hearsay testimony is not permissible merely because the proponent of that hearsay is designated as an expert and has graduated medical school. As documented below, Garb's "survey" was so haphazard, unmethodical, unscientific, flawed, biased, undocumented, unverifiable and unreliable that it cannot properly form the basis of any admissible opinion. Dr. Garb should therefore be precluded from testifying as to this subject.

II. JAMES R. GARB'S PROFFERED TESTIMONY, WHICH IS BASED ON HIS "SURVEY", FAILS TO MEET THE STANDARD FOR ADMISSIBILITY

*A. Dr. Garb's Proffered Testimony About The Supposed Prevalence of Latex-Free Dental Offices in Northern Connecticut and South Western Massachusetts Is Hearsay And Therefore is Only Admissible If It Falls Within The Exception For Scientifically Valid Survey Evidence*

Dr. Garb concludes in his report and at his deposition that there are five latex-free dental offices in "northern Connecticut and south western Massachusetts." Dr. Garb has no personal knowledge of whether these particular dentist offices are "latex free." He did not visit these offices to ascertain whether they used latex products or whether there was ambient latex in the air. Dr. Garb learned about each of these five dental offices through telephone conversations with either a dentist or employee of that dental office.

3

Because the statements of these dental employees are being offered into evidence to prove that the offices are latex-free, they are hearsay. See Fed. R. Evid. 801(c). Hearsay is inadmissible unless it falls within one of the hearsay exceptions articulated in the Federal Rules of Evidence or in some other source of law. See Fed. R. Evid. 802. There is no specific exception for statements made in response to a survey, and none of the articulated exceptions apply to the hearsay statements made by the dentists and hygienists that Dr. Garb spoke with. See Kosilek v. Maloney, 221 F.Supp.2d 156, 172 n.9 (D. Mass. 2002) (holding that "survey" about the way prisons deal with inmates with gender identity disorder was inadmissible for the purpose of proving the truth of the information therein, because it was insufficiently trustworthy). Nonetheless, survey responses may occasionally be admissible if they are sufficiently trustworthy. Toys "R" Us, Inc. v. Carnasie Kiddie Shop, Inc., 559 F. Supp 1189 (E.D.N.Y. 1983).

### B. There is a Stringent Legal Standard For The Admissibility of Expert Survey Evidence

A district court must perform its gatekeeping function under Daubert v. Merrill Dow Pharmaceuticals, Inc. 509 U.S. 579 (1993) "by preliminarily assessing whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." Seahorse Marine Supplies v. Puerto Rico Sun Oil Co., 295 F. 3d 68, 80 (1st Cir. 2002) (internal citation omitted). Several factors assist the Court in making this determination under Daubert: "whether the theory/technique can be and has been tested; whether it has been subjected to peer review and publication; the known or potential rate of error; and the level of the theory/technique's acceptance within the relevant scientific community." Id.

4

With respect to survey evidence, courts have repeatedly relied on the leading case Toys "R" Us, Inc. v. Carnasie Kiddie Shop, Inc., 559 F. Supp 1189 (E.D.N.Y. 1983), to determine admissibility. See, e.g, Guckenberger v. Boston Univ., 974 F. Supp. 106, 139 n.29 (D. Mass. 1997) (discussing Toys "R" Us). Under the standards of Toys "R" Us, the trustworthiness of surveys depends upon foundation evidence that:

1. "the 'universe' was properly defined";
2. "a representative sample of that universe was selected";
3. "the questions to be asked of interviewees were framed in a clear, precise and non-leading manner";
4. "sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted";
5. "the data gathered was accurately reported";
6. "the data was analyzed in accordance with accepted statistical principles"; and
7. "objectivity of the entire process was assured."

Toys "R" Us, Inc., 559 F. Supp. at 1205.

The First Circuit has similarly subjected survey data to rigorous standards. "[A]n expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with the standards of the expert's profession." SMS Sys. Mfg. Servs., Inc. v. Digital Equip. Corp., 188 F.3d 11, 25 (1st Cir. 1999) (discounting expert's report based on market share survey where the expert, inter alia, "failed to explain whether the information-gathering technique used in the…documents [upon which he relied] was valid, whether the data was sufficiently representative to permit him to draw any relevant conclusions, and whether the sampling methodology used to compile these documents corresponded to methods that might be considered legitimate in his discipline."). "When scientists (including social scientists) testify in court, they must bring the same intellectual rigor to the task that is required of them in other professional settings." Wessmann v. Gittens, 160 F.3d 790, 805 (1st Cir. 1998)

5

(citing Daubert). "An expert witness can only deviate from accepted methods of scientific inquiry in ways that are consistent with the practices and usages of the scientific community." Id.

### C. Dr. Garb's proffered testimony falls short of the standards for admissible survey evidence.

**1. Dr. Garb's information is untrustworthy**

**a) Dr. Garb was given instructions and objectives by defense counsel; he was given lists of dentists to contact; he knew the purpose of the survey and had already arrived at his conclusions before the survey was conducted**

Under the Toys "R" Us criteria for admissibility, the interviewers in a survey must have "no knowledge of the litigation or the purpose for which the survey was conducted." Toys "R" Us, 559 F. Supp. at 1205. In this case, Dr. Garb – who admits he conducted all of the interviews -- was steeped in information about the existence of the litigation and the purposes of the survey. Dr. Garb has a business relationship with Berkshire-- he is one of a group of approximately 21 or 22 doctors that Berkshire regularly relies upon in evaluating claims. Excerpt from deposition transcript of Brian M. Donnelly, 30(b)(6) witness for Berkshire (4/10/06) at 109-112, Ex. 3. Dr. Garb had previously provided an opinion on Ms. Mirek's claim, which was relied upon by Berkshire to continue denying her benefits. See Report of James R. Garb, M.D. (March 12, 2005) ("Garb Report #1"), Ex. 4. In Dr. Garb's earlier opinion, he had already concluded that Ms. Mirek would be able to work, even if she had a latex allergy, because "latex-free dentistry is not a new concept" and "it is relatively easy to eliminate latex from a dental operatory." Garb Report #1 at 2, Ex. 4. Dr. Garb could not reasonably be characterized as an impartial survey-taker; he knew the purpose of the survey, and the

purpose of the survey was to confirm what Dr. Garb had already written in his previous opinion.

Furthermore, Dr. Garb's "survey" was conducted primarily by calling dental offices that were provided to him on two lists from defense counsel. Garb Dep. at 14-15, Ex. 2 ("I was provided through Attorney Crevier's office with . . . a listing of some dental practices. . . . And I requested another list of dental practices in Connecticut to supplement the list I was given.  I used the Springfield telephone directory and identified some practices in the greater Springfield area.  And I also contacted some dentists who I know personally.")  The dental practices provided to Dr. Garb were hand-picked by a consultant for defense counsel because of her belief that they were either latex-free or latex-safe.  Garb Dep. at 22, Ex. 2.  Rather than calling a random sample of dental offices, Garb called the dental practices that he "thought would have the highest likelihood of being latex-free."  Garb Dep. at 30-31, Ex. 2.  He called a total of thirty dental practices, almost all of which were provided by defense counsel, and obtained information from 23 of them.  Garb Dep. at 33-36, Ex. 2.

> **b) The "universe" encompassed by Dr. Garb's survey was amorphous and deliberately designed to give a misleading impression about the existence and/or prevalence of latex-free dentistry within the geographic area around Ms. Mirek's home.**

According to the Toys "R" Us criteria, the trustworthiness of surveys depends in part on evidence that "the 'universe' was properly defined" and "a representative sample of the universe was selected." Toys "R" Us, 359 F. Supp at 1205.  In this case, the "universe" is entirely unclear.  Dr. Garb was instructed by defense counsel to limit his survey to dental practices "in the general vicinity where Ms. Mirek lives."  Garb Dep. at

13, Ex. 2. Dr. Garb did not use any specific measure of distance to determine the general vicinity where Ms. Mirek lives, but rather relied on his general knowledge of the geographic area. Garb Dep. at 14, Ex. 2. This vague standard is not only completely unscientific, it allowed Dr. Garb to pick a smattering of dentists across a broad area that he thought were most likely to be latex-free. For example, the distance and commuting time from Ms. Mirek's home to the five dental offices Dr. Garb identifies as "latex free" are:

| Dental Practice | Estimated One Way Commuting Time:[1] | Estimated Distance from Ms. Mirek's home[2] |
|---|---|---|
| Haselkorn | 36 minutes | 24.77 miles |
| Segal | 4 minutes | 1.99 miles |
| Bird | 1 hour, 26 minutes | 51.70 miles |
| Pediatric Dentistry | 49 minutes | 44.74 miles |
| Wise | 1 hour, 14 minutes | 64.92 miles |

Furthermore, Dr. Garb made no effort to contact all of the dental offices within a particular geographic area, or even a random sampling. Rather, he only contacted those he "thought would have the highest likelihood of being latex-free" – clearly a demonstrated bias. Garb Dep. at 30-31, Ex. 2. Dr. Garb obtained information from only 23 dental offices. Garb Dep. at 34, Ex. 2. There are over 9,000 licensed dentists in Massachusetts and over 3000 licensed dentists in Connecticut. See Excerpt from Massachusetts Division of Professional Licensure Report, Ex. 6; Excerpt from Connecticut Department of Health Licensure Report ("Connecticut Dentist List"), Ex. 7.

---

[1] See printouts from mapquest.com, Ex. 5.
[2] See printouts from mapquest.com, Ex. 5.

Dr. Garb's survey completely ignored numerous communities close to Ms. Mirek's home to focus on selected communities over an hour away. Even within the distant cities that Dr. Garb surveyed, he made no effort to conduct anything resembling a random sample in that area. For example, New Haven, Connecticut has 73 licensed dentists, but Dr. Garb contacted only one office, which had been provided to him on a list from defense counsel. Connecticut Dentist List, Ex. 7; Garb Dep. at 89-90, Ex. 2. Dr. Garb's survey did not have a "properly defined" universe because it was entirely undefined.

### c) The untrustworthiness and unreliability of Dr. Garb's survey is demonstrated by his admitted failure to take a representative sample or use objective criteria

Two of the Toys "R" Us criteria for admissibility are that the proponent of survey evidence show that the sample chosen to survey was "representative" and that "the data was analyzed in accordance with accepted statistical principles." Toys "R" Us, 559 F. Supp. at 1205. Defendants cannot show that the sampling was representative. In fact, Dr. Garb himself acknowledges that the practices contacted were in no way a representative sample:

> Well, this wasn't a random sample, no. I was provided with a list of some practices. Someone had done some pre-screening essentially. Some of them were random. I picked some names out of the phone book. Some were people I know, so it was a variety of the methods. This isn't in any way a random sample.

Garb Dep. at 70-71, Ex. 2. Defendants also cannot show that objective criteria were used in selecting dental offices. Rather, Dr. Garb testified that he used the subjective criteria of "highest likelihood of being latex-free" in choosing which dental offices to contact. Garb Dep. at 30-31, Ex. 2. "The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself." Johnson & Johnson * Merck Consumer

9

Pharms. Co., v. Smithkline Beecham Corp., 960 F.2d 294, 300 (2d Cir. 1992). No objectivity can be shown here.

Dr. Garb did not even understand his objective to be a determination of the number or proportion of dental practices within a geographic area, rather, his objective was to determine "what proportion of the practices I was able to contact were latex-free." Garb Dep. at 70, Ex. 2. Therefore, even if one could rely on Dr. Garb's data, it would provide no information about the prevalence of latex-free dentistry in any specific location. Dr. Garb acknowledged that his data could not be used for that purpose:

> Q. You do not know how wide spread latex-free dentistry is in Connecticut, do you?
>
> A. No.
>
> Q. And you have no scientifically based data to draw a conclusion as to how wide spread latex-free dentistry is in Connecticut, do you?
>
> A. No.
>
> Q. And you have no knowledge how wide spread latex-free dentistry is in Massachusetts, do you?
>
> A. No.
>
> Q. And you have no scientific data on which to base any opinion on how wide spread latex-free dentistry is in Massachusetts, do you?
>
> A. Only anecdotally.

Garb Dep. at 112-113, Ex. 2 (objections omitted).

### d) Dr. Garb cannot produce any record of the questions asked in the survey

The Toys "R" Us criteria for the admissibility of surveys include requirements that the questions be "framed in a clear, precise and non-leading manner," and "sound interview procedures [are] followed by competent interviewers." Toys "R" Us, 559 F. Supp. at 1205. The unreliability of Dr. Garb's methodology is demonstrated by his failure to show that the questions were framed in a clear and precise manner because Dr.

Garb cannot produce the precise questions asked. For example, Dr. Garb testified that he asked generally whether each dental office could accommodate a hygienist who was allergic to latex, but he could not remember how he defined what he meant by "accommodate" and he made no effort to explain what he meant by "exposure to latex." Garb Dep. at 48, Ex. 2 ("I don't remember the exact words I used [to explain what 'accommodate' meant], but could someone who was allergic to latex work in your practice without exposure to latex. Something to that effect. . . . I didn't further define ['exposure to latex'] for them. I let them answer it just as the question was posed.") He also made no effort to distinguish between a hygienist with a skin allergy to latex rather than other types of latex allergies. Garb Dep. at 66-67, Ex. 2.

      Furthermore, Dr. Garb did not even ask the same questions every call. A survey in which respondents are asked different questions must be inherently unreliable, since the interviewees are responding to different questions. At some point during the course of Dr. Garb's phone calls, he omitted a question he had been asking and included a new question. Garb Dep. at 59-60, Ex. 2 ("I changed it at some point, and I am not sure if I remember why. I added that question about what types of gloves you use, and I took out that question what does that mean to you. I don't really remember why I made the change. . . . I think it was after day one, but I'm not one hundred percent sure."). Depending upon the responses given to some preliminary questions, Dr. Garb often did not even complete his survey. Garb Dep. at 64, Ex. 2 ("Once I got the initial information they weren't really latex-safe or latex-free, I didn't pursue it in that great of detail with any of these."); Garb Dep. at 69-70, Ex. 2 ("I was trying to identify latex-safe practices. When I learned they really weren't, I didn't pursue it.")

Dr. Garb produced what he described as a "check list" that he used when making his phone calls. Dr. Garb Checklist, Ex. 8; Garb Dep. at 21, Ex. 2. The check list does not reflect the wording that Dr. Garb used when he asked questions, rather, it gives a bare bones description of the subjects that Dr. Garb asked about. Dr. Garb Checklist, Ex. 8. Dr. Garb did not keep track of the exact questions asked, and, as explained in the next section, he has only cursory notes of the responses.

### e) Dr. Garb failed to keep coherent, detailed notes of the information he obtained

The trustworthiness of a survey is determined, according to the Toys "R" Us criteria, by showing that the data was reported accurately and that there is "objectivity ..[in] the entire process." Toys "R" Us, 559 F. Supp. at 1205. The defense cannot make these showings because Dr. Garb took scant, randomly written notes on the data reported in his survey. The notes are barely intelligible, not methodically taken and do not provide adequate documentation for the conversations he claims to have had during the course of his survey. See Notes produced by Dr. Garb, Exs. 9 & 10; Garb Dep. at 55, Ex. 2 ("Q. Are the only notes you took on these conversations in the notes that you produced? A. Yes").

### f) Dr. Garb made no effort to ensure that the individuals responding to his questions were knowledgeable

Survey evidence is most commonly used in the trademark context, to gather information about the extent of the public's confusion concerning a particular trademark or symbol. In this case, however, Dr. Garb's survey seeks to report substantive facts about dental offices in Massachusetts and Connecticut. Consequently, to the extent this type of survey may be admissible at all or be the basis of testimony, the reliability of the

12

sources of the information as well as the accuracy of the information supplied are critical. Dr. Garb failed to take even the most basic precautions to ensure that the sources of his information were reliable.

When Dr. Garb called a dental office for purposes of his survey, he asked to speak to "the dentist or one of the hygienists." Garb Dep. at 51, Ex. 2. He generally had a "five to ten minute conversation." Garb Dep. at 55, Ex. 2. He did not always ask who he was speaking with. Garb Dep. at 50-51, Ex. 2. He did not ask hygienists how long they worked at the practice, nor how long they had been hygienists. Garb Dep. at 51, Ex. 2. It is possible that Dr. Garb's sources might have been hygienists that only just started working at that dental office, or had only just started working as a hygienist, and would therefore be an unreliable source of information. Garb Dep. at 51-52, Ex. 2. Dr. Garb did not keep track of the identities of all the individuals he spoke with, so it is impossible to verify which information is reliable. Garb Dep. at 44, Ex. 2.

Dr. Garb's haphazard method of locating knowledgeable persons to survey at dental offices about substantive information cannot form the basis of expert testimony because they are not the "sound interview procedures" that Toys "R" Us describes as a necessary foundation for survey evidence. Toys "R" Us, 559 F. Supp. at 1205. Dr. Garb's failure to note the identities of the individuals to which he spoke makes it impossible to verify the information obtained and reproduce the survey results.

### g) Dr. Garb sometimes relied upon the judgment of the individuals he spoke with and sometimes substituted his own judgment

Dr. Garb's survey relied heavily upon the judgment and knowledge of the individuals with whom he spoke. For example, individuals were asked to make their own

13

determinations as to whether the dental practice could accommodate a hygienist with a latex allergy. Dr. Garb Dep. at 47-48, Ex. 2. But in at least one instance, Dr. Garb decided to substitute his own judgment that a dental practice was "latex-free," despite the fact that the individual he spoke with described the practice as only "latex-safe" and indicated that they occasionally used latex products. Dr. Garb Dep. at 83-84, 88, Ex. 2. It would be impossible to describe Dr. Garb's survey as having "objectivity . . .[in] the entire process," in light of the fact that the Dr. Garb felt free to overrule the answers given by those he surveyed if he did not agree with them. Toys "R" Us, 559 F. Supp. at 1205.

### D.  Even if Dr. Garb's information about latex-free dental practices fell within a hearsay objection, it should be precluded because it is irrelevant

Ms. Mirek's insurance policy provides her with benefits if she is "totally disabled from the major duties of [her] occupation." Excerpts from Policy, Ex. 11. As a matter of law, the interpretation of the definition of "total disability" cannot possibly depend upon whether Ms. Mirek would be able to work at five dental offices out of the thousands of dental offices in Connecticut and Massachusetts. To hold otherwise would mean that an individual could fluctuate from "disabled" to "not disabled" and back again, without any change in condition, depending upon the decisions of a few dentists about their practices.

Nonetheless, to the extent the Court is persuaded by Defendants' contention that such a showing would be probative with respect to the question of whether Ms. Mirek is "totally disabled", Dr. Garb's survey fails to provide any useful information about the subject, and should therefore be excluded.

For example, Dr. Garb did not determine *when* these dental offices became "latex-free." Dr. Garb conducted his survey in December 2005. Garb Dep. at 17-18, Ex. 2.

14

Apart from one dentist who claimed he had been latex-free since the "late nineties," Dr. Garb did not inquire of any other dental offices the period of time for which they were latex-free. Garb Dep. at 82, 92, Ex. 2. Dr. Garb's survey, therefore, is irrelevant for the purpose of determining, for example, the prevalence of latex-free dentistry in 2002, when Ms. Mirek filed her claim, or any period of time other than December 2005.

Dr. Garb also did not limit the distance of dental offices to reasonable commuting times for Ms. Mirek. See Part II.C.1.b, supra. As a result, the survey provides no information about the prevalence and/or existence of latex-free dental offices within Ms. Mirek's geographic region.

Moreover, Dr. Garb did not ask how many dentists or how many hygienists worked in any particular office, nor whether any offices had job openings. Garb Dep. at 80, 82-83, 91, 94-95, Ex. 2. Dental practices are not like large companies with a constant need for employees. It is entirely possible that a dental practice would go many years without hiring any new dental hygienists. Dr. Garb's limited results cannot possibly give an accurate picture of the profession, but rather show a distorted view.

## III. CONCLUSION

For the reasons stated above, the Court should preclude the testimony and report of defendant's claimed expert, James R. Garb, M.D., with respect to his opinion as to the prevalence of so-called "latex-free" or "latex-safe" dental practices in the area he refers to as "northern Connecticut" and "south western" Massachusetts.

>Respectfully submitted,
>
>PLAINTIFF CAROLYN MIREK
>
>By her Attorneys,
>
>/s/ Seth Nesin
>Joanne D'Alcomo
>BBO #544177
>Seth Nesin
>BBO #650739
>JAGER SMITH P.C.
>One Financial Center
>Boston, MA 02111
>(617) 951-0500

Statement Pursuant to Local Rule 37.1(B)

A discovery conference was held by telephone on May 18, 2006. Seth Nesin, representing Carolyn Mirek, and David Crevier, representing the Defendants, participated in the conference. Mr. Nesin was at his office in Boston and Mr. Crevier was at his office in Springfield. The conference, which included discussion of this motion as well as other matters, lasted a total of approximately 20 minutes. The issues not resolved are set forth in this memorandum.

>/s/ Seth Nesin
>Seth Nesin