EXHIBIT 2

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CAROLYN MIREK,                          \*

                Plaintiff  \*

vs.                                     \* No. 04-30166-MAP

                               \*

THE GUARDIAN LIFE INSURANCE             \*

COMPANY OF AMERICA and                  \*

BERKSHIRE LIFE INSURANCE                \*

COMPANY OF AMERICA,                     \*

             Defendants \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF:  JAMES R. GARB, M.D.

CREVIER & RYAN, LLP

1500 Main Street  Suite 2020

Springfield, Massachusetts

January 27, 2006

(12:00 p.m. to 2:40 p.m.)


Tacy A. Malandrinos

Court Reporter

**JAMES R. GARB, M.D.**
**January 27, 2006**

---

Page 2

```
 1  APPEARANCES:
 2  Representing the Plaintiff:
 3  JAGER SMITH P.C.
 4  One Financial Center
 5  Boston, MA 02111
 6  BY: JOANNE D'ALCOMO, ESQ.
 7  (617) 951-0500
 8  fax (617) 951-2414
 9
10  Representing the Defendant:
11  CREVIER & RYAN, LLP
12  1500 Main Street  Suite 2020
13  Springfield, MA 01115-5727
14  BY: DAVID B. CREVIER, ESQ.
15  (413) 787-2400
16  fax (413) 781-8235
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1            INDEX
 2  WITNESS:         JAMES R. GARB, M.D.
 3  EXAMINATION BY:              PAGE:
 4  Ms. D'Alcomo              5
 5
 6
 7  EXHIBITS:              PAGE:
 8  Exhibit 56, Addendum to Report............  4
 9  Exhibit 57, Invoice........................  17
10  Exhibit 58, Letter Dated December 9, 2005   19
11  Exhibit 59, Check List....................  20
12  Exhibit 60, Letter Dated December 8, 2005   28
13  Exhibit 61, Notes..........................  30
14  Exhibit 62, List - Handwritten Notes......  31
15  Exhibit 63, Notes..........................  44
16  Exhibit 64, Notes..........................  79
17  Exhibit 65, List of Nonresponsive Practices 93
18  Exhibit 66, Internet Printout.............  100
19
20
21
22
23
24
```

---

Page 4

```
 1       MS. D'ALCOMO:  We are doing the
 2  same stipulations, right?
 3       MR. CREVIER:  Right.
 4       MS. D'ALCOMO:  The parties
 5  stipulate and agree that all objections
 6  except as to form are reserved until the
 7  time of trial, and motions to strike are
 8  reserved until the time of trial.  The
 9  witness has thirty days to read and sign,
10  and signing need not be in front of a
11  notary.
12       As I said to Attorney Crevier, the
13  Plaintiff will pay for Dr. Garb's time
14  today as the Defendants have agreed to pay
15  for Dr. Oliver's time at her deposition.
16
17
18       JAMES R. GARB, M.D., Deponent, having
19  first been duly sworn, deposes and states as
20  follows:
21
22       MS. D'ALCOMO:  Let's just mark
23  this.
24       (Exhibit 56, Addendum to Report,
```

---

Page 5

```
 1  marked)
 2
 3
 4     EXAMINATION BY MS. D'ALCOMO:
 5
 6    Q.  Let me show you what's been marked
 7  Exhibit 56.  Dr. Garb, is that the addendum to
 8  the report that you most recently did in this
 9  action?
10       MR. CREVIER:  The last pages are a
11  fax cover sheet from us.  You can pull
12  that out.
13       MS. D'ALCOMO:  We agree to remove
14  the last page.
15       THE WITNESS:  Yes, it is.
16    Q.  (By Ms. D'Alcomo)  Does that report
17  contain a statement of all the opinions that you
18  expect to give in this litigation, except for
19  any opinions contained in the earlier report
20  that you wrote?
21    A.  I'm not sure how to answer that.
22  It depends on what I'm going to be asked, so I'm
23  not sure if it contains all the opinions that
24  I'm going to be asked.
```

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 6

1    Q.    By whom?
2    A.    At trial, you are talking about?
3    Q.    Yes.
4    A.    By Counsel.
5    Q.    You do realize you were hired by
6  the Defendant in this matter to testify
7  concerning certain opinions in this case,
8  correct?
9    A.    Yes.
10    Q.    And what I'm asking you is, does
11 the addendum report contain all the opinions
12 that you expect to testify to in this  matter
13 apart from any opinions contained in the
14 earlier report dated March 12, 2005?
15        MR. CREVIER: Objection. Asked and
16    answered. I don't know how he could
17    possibly know.
18        THE WITNESS: If you ask me
19    something that is not contained in this
20    addendum, I will have to answer, correct?
21    So not knowing what you are going to ask
22    me, I don't know how I can answer that
23    question.
24    Q.    (By Ms. D'Alcomo) You are aware

Page 7

1  that you were hired by the Defendant to testify
2  concerning certain opinions in this matter,
3  correct?
4    A.    Yes.
5    Q.    And you have formulated certain
6  opinions in this matter as of December 14, 2005,
7  correct?
8    A.    Correct.
9    Q.    And can you tell me if the addendum
10 to the report dated December 14, 2005 contains
11 all the opinions that you have formulated in
12 this matter, apart from any opinions contained
13 in the report dated March 12, 2005?
14    A.    I'm still having a problem saying
15 yes to that because this addendum was a specific
16 request on certain topics, and it may not cover
17 every opinion I have about this case.
18    Q.    Does it contain all the opinions
19 that you expect to testify about in this matter,
20 except for any opinions contained in the report
21 dated March 12, 2005?
22        MR. CREVIER: Objection again.
23        THE WITNESS: I expect to testify
24    based on the questions I'm asked at

Page 8

1    trial. If they are not included, and if
2    the questions are different than what's
3    included in this report, then I will have
4    to testify based on the questions I'm
5    asked. I don't know how to answer that.
6    Q.    (By Ms. D'Alcomo) Are you aware
7  that one of the reasons under the rules for the
8  preparation of the report --
9        MR. CREVIER: Objection. Leading.
10    Q.    (By Ms. D'Alcomo) -- is that it
11 gives the opposing side the opportunity to
12 understand what the opinions are that an expert
13 witness is going to testify to?
14        MR. CREVIER: Objection. He is not
15    going to testify what the rules are. The
16    Court will enforce the rules.
17        THE WITNESS: I have a vague
18    understanding that that's the process,
19    yes.
20    Q.    (By Ms. D'Alcomo) Have you
21 included in your report dated December 15, 2005
22 all of the opinions that you expect to testify
23 to, apart from any opinions contained in the
24 report dated March 12, 2005?

Page 9

1        MR. CREVIER: Objection. This has
2    been asked three times.
3        THE WITNESS: I can't give a
4    better answer than I gave before. I'm
5    sorry.
6    Q.    (By Ms. D'Alcomo) Are there
7  opinions that you do expect to testify to as you
8  sit here today that are not contained in the
9  report dated December 14, 2005 or the report
10 dated March 12, 2005?
11    A.    Based on the proceedings today, I
12 would say no. Then again, until I'm asked
13 something different at trial.
14    Q.    Now have you included in the report
15 dated December 14, 2005 -- let me back up.
16        Are there opinions of yours
17 contained in the report dated December 14, 2005?
18    A.    Yes, there are.
19    Q.    And are the bases for the opinions
20 that are contained in the report dated December
21 14, 2005 contained in the report?
22    A.    Perhaps not as explicit as they
23 could be. There is information in the report
24 that supports the opinions.

3  (Pages 6 to 9)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 10

1     Q.   Are the reasons for the opinions
2 that are in the December 14, 2005 report
3 contained in the report?
4     A.   The reasons for the opinions?
5     Q.   Yes.
6     A.   There is information in the report
7 that supports the opinions. I'm not sure that
8 everything supporting the opinions is included
9 in that report.
10     Q.   How did you decide what bases to
11 include in the report and what -- strike that.
12       How did you decide what bases for
13 your opinions to include in the December report
14 and what not to?
15     A.   I was asked to comment on two
16 things essentially. One is the availability of
17 latex-free dental supplies and equipment. And
18 the second was to research whether there were
19 dental practices in this area that were
20 latex-safe or latex-free.
21       So in trying to provide that
22 information, I provided a list of non-latex
23 material used in dentistry and a list of five
24 practices identified that were latex-free. So I

Page 11

1 mean, that was the information that I came up
2 with to answer the questions that were asked of
3 me.
4     Q.   Now you said that not all the bases
5 for the opinions in the December report are
6 contained within the report, is that right?
7     A.   I think it's implied in the report.
8 It may not be stated directly. Do you want to
9 be more specific about what opinions you are
10 referring to?
11     Q.   Let's back up.
12       What are the opinions, as best you
13 can recall -- withdraw that.
14 *     What do you consider to be the
15 opinions that you are going to testify about
16 based on the information that's in the report
17 from December 2005?
18       MR. CREVIER: Objection. This
19   report is an addendum to a prior report
20   that also contained information.
21       MS. D'ALCOMO: Can you repeat the
22   question please.
23
24     * (Question read)

Page 12

1       MR. CREVIER: Objection. He is
2   going to testify --
3       MS. D'ALCOMO: I'm going to ask
4   that you not make narrative objections.
5   Just state your objection.
6       THE WITNESS: I suppose one --
7     Q.   (By Ms. D'Alcomo) And you are
8 reading from the report?
9     A.   Yes.
10     Q.   Are you able to testify in your
11 deposition without reading from the report?
12     A.   I am.
13     Q.   I'm going to ask you not to read
14 from the report.
15     A.   Just in the interest of trying to
16 be precise, I was going to read from the report.
17       The opinion that dentists can
18 practice dentistry without using latex products.
19     Q.   Anything else?
20     A.   Not that comes to mind in this
21 addendum.
22     Q.   Now what is the bases -- strike
23 that.
24       What are the bases, let me use

Page 13

1 proper grammar, for your opinion that you are
2 going to testify about based on the December
3 2005 report that dentists can practice dentistry
4 without using latex products?
5     A.   Well, there's literature that
6 describes how that is done, and I have spoken
7 with several dental practices who are practicing
8 without using latex products.
9     Q.   Who was it that gave you your
10 assignment in this matter with respect to the
11 December 14, 2005 report?
12     A.   It was Attorney Crevier.
13     Q.   What were you told to do?
14     A.   As I said before, I was asked to
15 provide information about dental products that
16 were not, that did not contain latex. And to
17 look into whether there were dental practices in
18 the area that were latex-safe or latex-free.
19     Q.   Were you told what area?
20     A.   The understanding was an area in
21 the general vicinity where Ms. Mirek lives.
22     Q.   When you said the understanding,
23 what was the understanding? What do you mean by
24 understanding?

4 (Pages 10 to 13)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 14

1    A.    We had a telephone conversation
2  about this, and I don't remember the exact
3  wording, but she lives in the northern
4  Connecticut area, and something that would be a
5  reasonable commute if she were to work in a
6  practice like that.
7    Q.    Do you know what community she
8  lives in?
9    A.    I think it's one of the Windsors.
10  I forget whether it's Windsor or South Windsor.
11    Q.    Did you use a particular measure of
12  distance from her home in considering the
13  geographic area?
14    A.    I didn't get out a map and map it
15  out. But being from this area myself, I have an
16  understanding of the geography and where things
17  are.
18    Q.    And how did you decide to go about
19  fulfilling your assignment?
20    A.    Well, I was provided through
21  Attorney Crevier's office with a couple of
22  things; a listing of some dental products, and a
23  listing of some dental practices. That was the
24  starting point. I did further research on my

Page 15

1  own on additional dental products.
2          And I requested another list of
3  dental practices in Connecticut to supplement
4  the list I was given. I used the Springfield
5  telephone directory and identified some
6  practices in the greater Springfield area. And
7  I also contacted some dentists who I know
8  personally.
9    Q.    When you say you requested another
10  list, what do you mean?
11    A.    The person who prepared the
12  original list is a dental hygienist and I asked
13  her. She had access to a Connecticut telephone
14  directory which I didn't have at the time, so I
15  asked her to just get more dental practices so I
16  could contact them.
17    Q.    Did you tell her where to get the
18  list from?
19    A.    We said between Hartford and
20  Springfield.
21    Q.    And can you tell me specifically
22  what you told her to do?
23    A.    I asked her just to go through the
24  phone directory and get me a list of additional

Page 16

1  dental practices between Hartford and
2  Springfield that weren't on the original list.
3    Q.    Why did you do that?
4    A.    I just wanted to have a larger pool
5  of practices to get in touch with.
6    Q.    Was the person that you contacted
7  Ms. Wilton?
8    A.    Yes.
9    Q.    When did you first hear of Wendy
10  Wilton?
11    A.    That would have been the first
12  phone call with Attorney Crevier when he asked
13  me to do this addendum to my earlier report.
14    Q.    What did he tell you about Ms.
15  Wilton?
16    A.    That she was a dental hygienist who
17  is allergic to latex and had provided him with
18  some dental practices that she had already
19  looked into in terms of their latex use. And
20  she also provided them with a list of some latex
21  alternatives regarding products used in
22  dentistry.
23          MS. D'ALCOMO: Please mark this.
24

Page 17

1          (Exhibit 57, Invoice, marked)
2
3    Q.    (By Ms. D'Alcomo) Let me show you
4  what has been marked Exhibit 57. And Dr. Garb,
5  does that invoice reflect generally what you did
6  in connection with the addendum report dated
7  December 14, 2005 from 12/9 forward, 12/9/05
8  forward?
9    A.    Well, it reflects that, plus our
10  previous deposition and work I had done
11  preparing for that.
12    Q.    With respect to the report dated
13  December 14, 2005, is it fair to say that the
14  entries from December 9, 2005 and following 12/9
15  2005 reflect the work that you did in connection
16  with the preparation of the report in December?
17    A.    Yes, that's correct.
18    Q.    And is the first time that you did
19  any work of any kind on the report, on the
20  December 2005 report, the phone calls that you
21  had with Attorney Crevier on December 9, 2005?
22    A.    As I recall it was December 5 when
23  he first called me and said he needed this other
24  addendum.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 18

1    Q.    So is it fair to say that the entry
2    of December 5, 2005 and then -- let me ask you.
3    How about the call of 12/7 2005?  Did that have
4    anything to do with the report?
5    A.    Yes.  Everything from 12/5 on was
6    in regard to this addendum.
7    Q.    Did your review of Dr. Bedard's
8    deposition have anything to do with the
9    preparation of your December report?
10    A.    I think we had just talked about
11    the previous deposition.  It came up that I
12    hadn't reviewed Dr. Bedard's deposition, so it
13    wasn't directly related to this.
14    Q.    What occurred in the 12/7 2005
15    phone call that you had with Attorney Crevier?
16    A.    As best I can recall he had
17    originally asked me for this addendum.  And then
18    when I received the material that I referred to
19    earlier, I had some questions about how many
20    practices he wanted me to contact, what the time
21    frame that he needed the report in was, things
22    of that nature, so just to clarify what the
23    assignment involved.
24        MS. D'ALCOMO:  Please mark this.

Page 19

1        (Exhibit 58, Letter Dated
2        December 9, 2005, marked)
3
4    Q.    (By Ms. D'Alcomo)  I want to show
5    you what's been marked as Exhibit 58.  When did
6    you receive this letter dated December 9, 2005
7    from Wendy Wilton?
8    A.    That was emailed, so it would have
9    been December 9.
10    Q.    An email from whom?
11    A.    From Wendy.
12    Q.    Had you spoken with Wendy Wilton
13    before December 9, 2005?
14    A.    No.
15    Q.    Did you speak with her on December
16    9, 2005?
17    A.    Yes, I did.
18    Q.    And how did that conversation come
19    about?
20    A.    Again as best I can recall,
21    Attorney Crevier had told me about Wendy, and
22    that she provided information.  And I just
23    wanted to talk with her and find out a little
24    more about how she went about choosing the

Page 20

1    practices, and what criteria and everything she
2    used to select the ones that appeared on her
3    list.
4        And I just want to say the last
5    page of this was not part of that original
6    December 9 letter.  That came subsequently.
7        MS. D'ALCOMO:  Why don't we take
8    that off.
9        MR. CREVIER:  No objection.
10    Q.    (By Ms. D'Alcomo)  So Exhibit 58
11    as it currently stands is what you received by
12    email from Wendy Wilton on December 9, 2005?
13    A.    That's correct.
14    Q.    Now what did Wendy Wilton tell you
15    on December 9, 2005 about how she did select the
16    practices that are listed in that letter?
17    A.    She told me she had contacted them
18    by phone.  I am frankly not sure how she decided
19    which ones to contact and which ones not to
20    contact.
21        MS. D'ALCOMO:  Please mark this.
22
23        (Exhibit 59, Check List, marked)
24

Page 21

1    Q.    (By Ms. D'Alcomo)  Let me show you
2    what has been marked Exhibit 59.  What is
3    Exhibit 59?
4    A.    That was a little check list I made
5    for myself in participation of making the phone
6    call, just to give them a little structure and
7    uniformity.
8    Q.    Now the list of dental practices
9    that Wendy Wilton gave you was not just a list
10    of dental practices in a geographic area, isn't
11    that right?
12        MR. CREVIER:  Objection.
13        THE WITNESS:  Can you rephrase
14    that?
15    Q.    (By Ms. D'Alcomo)  Sure.
16        The list of dental practices
17    included in Wendy Wilton's letter of December 9,
18    2005 is not simply a list of dental practices
19    that happen to be in a certain geographic area,
20    isn't that right?
21    A.    They are primarily located in that
22    northern Connecticut area.  Some aren't.
23    Q.    It's a list of dental practices
24    that Wendy Wilton determined in her view were

6  (Pages 18 to 21)

**JAMES R. GARB, M.D.**
**January 27, 2006**

---

Page 22

1  latex-free and latex-safe, isn't that right?
2      MR. CREVIER: Objection.
3      THE WITNESS: That's correct. I
4  didn't understand your question.
5      Q.  (By Ms. D'Alcomo) Did you ask her
6  what she meant by latex-safe?
7      A.  I didn't spend a lot of time on
8  that because I wasn't going to rely just on her
9  determination. She was providing me with a
10  list, and I went about contacting them to
11  determine for myself what I thought.
12      Q.  Did you consider any of the
13  information she gave you in her letter of
14  December 9, 2005 in reaching any opinions or
15  conclusions in your report of December 14, 2005?
16      A.  I based my conclusions only on my
17  interviews with the dental practices.
18      Q.  So you didn't use any information
19  at all in the letter of December 9, 2005 in
20  reaching any conclusions in your report of
21  December 14, 2005?
22      MR. CREVIER: Objection. Asked and
23  answered.
24      THE WITNESS: Other than focusing

---

Page 23

1  on which dental practices to contact, no.
2      Q.  (By Ms. D'Alcomo) Did you read her
3  letter that she wrote you dated December 9,
4  2005?
5      A.  Yes, I did.
6      Q.  Did you consider the contents of
7  the letter dated December 9, 2005 in reaching
8  the opinions in your December 2005 report?
9      A.  Are we talking just about the
10  dental practices?
11      Q.  No. The whole letter.
12      A.  No. I did. As far as the rest of
13  the letter in terms of dental equipment and her
14  comments about the anesthetic cartridges, I did.
15      Q.  So apart from the list of dental
16  practices in the December 9, 2005 report, you
17  did use and consider the information in the
18  letter from Wendy Wilton of December 9 in
19  formulating the conclusions in your December
20  2005 report?
21      A.  I considered it, but again, I did
22  further research on these things myself. I
23  didn't just take what she told me and accepted
24  as verified necessarily.

---

Page 24

1      Q.  Now is there a reason why you did
2  not identify her as a person that you had
3  contact with in your report of December 14,
4  2005?
5      A.  I guess the main reason is again,
6  that I didn't rely on her opinions about
7  anything. She was providing some information,
8  but I went ahead and independently confirmed
9  everything. Because I wasn't basing anything on
10  what she was telling me, I didn't feel the need
11  to include her.
12      Q.  Did anyone tell you why Wendy
13  Wilton included in her letter of December 9,
14  2005 information about herself?
15      A.  No.
16      Q.  Did you ask anyone why Wendy
17  Wilton, who you knew had been retained by the
18  Defendant, described information about herself?
19      A.  I did not ask.
20      Q.  Now did you know of a Dr. Wise
21  before you got Wendy Wilton's letter?
22      A.  Yes, I did.
23      Q.  How did you know him?
24      A.  Actually he was, the report about

---

Page 25

1  his practice was one of my references in the
2  original report that I gave. The Mass. Nurses
3  Association had something about his practice in
4  one of their communications.
5      Q.  Did you ever speak with him?
6      A.  I spoke with somebody from his
7  practice. I did not speak to him personally.
8      Q.  When did you speak with somebody
9  from his practice?
10      A.  It was either on the 12th or 13th
11  of December. I forget which day.
12      Q.  In her letter to you she lists a
13  number of products that she considered
14  latex-free or latex-safe. Do you see that on
15  pages three and four?
16      A.  Yes.
17      Q.  What use, if any, did you make of
18  that information?
19      A.  I used that partly to help guide me
20  in terms of looking into products on my own.
21  Some of the things she refers to just, they
22  never did contain latex, like cotton gauze
23  squares for example.
24      So I wasn't sure why all of those

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 26

1   things necessarily were on her list. But it was
2   some help in guiding further investigation.
3      Q.   Did you include any of the items on
4   her list of what she called latex-free and
5   latex-safe products in your list of products in
6   the December 2005 report?
7      A.   I don't believe I did. I believe
8   my listing came from other sources.
9      Q.   You don't remember one way or the
10  other?
11     A.   Without going down and comparing
12  everything on her list with my list, I'm not one
13  hundred percent sure.
14         But there are some things on her
15  list, just general, in terms of Prophy angles,
16  she mentions a specific brand. I don't believe
17  I mentioned that specific brand, but just a
18  type of brand.
19     Q.   Did you look up any of the
20  manufacturers referred by her in her list?
21     A.   Well, Benco was one that she
22  mentioned that I did look up. I believe that's
23  the only one.
24     Q.   How did you, or let me back up.

Page 27

1         As of let's just say December 1,
2   2005, how many dental products manufacturers did
3   you know of?
4      A.   Probably a small number, two or
5   three.
6      Q.   Which ones did you know of?
7      A.   Young, but they are more
8   distributors I think than the products
9   themselves, a supply house for dental products.
10        You are asking about manufacturers?
11     Q.   Yes.
12     A.   I guess I can't name any specific
13  ones.
14     Q.   So as of December 1, 2005 you
15  didn't know the names of any particular dental
16  supply manufacturers?
17     A.   That's true.
18     Q.   And as of December 1, 2005 what
19  dental supply distributors did you know of?
20     A.   Young and Benco. Those are the
21  only ones.
22     Q.   So at some point did you find out
23  the other names of other dental supply
24  distributors?

Page 28

1      A.   I did look into other ones. I
2   don't know that I can name them now without
3   looking at the reference materials.
4      Q.   How did you learn the names of
5   other dental supply distributors?
6      A.   I obtained a monograph on
7   latex-free dentistry, and I researched some of
8   them on the Internet.
9      Q.   And as of today, do you know of any
10  dental supply manufacturers?
11     A.   I really haven't committed these
12  names to memory, so I would have to say no.
13     Q.   As of today, can you recall the
14  names of any dental supply distributors other
15  than Benco and Young?
16     A.   No.
17     Q.   Did you ever read any transcripts
18  of a deposition of Carolyn Mirek?
19     A.   No, I did not.
20        MS. D'ALCOMO: Please mark this.
21
22        (Exhibit 60, Letter Dated December
23        8, 2005, marked)
24

Page 29

1      Q.   (By Ms. D'Alcomo) Let me show you
2   what's been marked Exhibit 60. Is this a letter
3   that you received from Defense Counsel's office
4   dated December 8, 2005 by hand?
5      A.   Yes, it is.
6      Q.   And in the letter you received a
7   copy of Dr. Bedard's deposition transcript, is
8   that correct?
9      A.   That's correct.
10     Q.   And you received the pages from the
11  catalog distributed by Benco Dental Company or
12  certain pages that are attached to this letter?
13     A.   Correct.
14     Q.   And a list of dental practices in
15  the area that Defense Counsel said were
16  latex-free or latex-safe. Do you see that?
17     A.   Correct.
18     Q.   And what, if anything, did you do
19  with that information about dental practices in
20  the area that are latex-free or latex-safe
21  according to Defense Counsel?
22     A.   That's essentially the same list
23  that came from Wendy Wilton. And so I tried to
24  contact as many of the practices as I could to

8 (Pages 26 to 29)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 30

1  find out more about their use or non-use of
2  latex.
3          MS. D'ALCOMO:  Please mark this.
4
5          (Exhibit 61, Notes, marked)
6
7      Q.   (By Ms. D'Alcomo) Let me show you
8  what has been marked as Exhibit 61.  Are these
9  your notes in your handwriting?
10     A.   Yes.
11     Q.   These are notes on the list that
12  was sent to you by Defense Counsel, is that
13  correct?
14     A.   That's correct.
15     Q.   And did you call all the places
16  listed in the list?
17     A.   I didn't call all of them.  It was
18  a matter of time.  I called as many as I could.
19     Q.   How did you decide whom to call and
20  whom not to call?
21     A.   It's hard to answer that.  I relied
22  a little bit on Wendy's comments.  Below each
23  practice she wrote a one line description.
24          I thought I was trying to find

Page 31

1  practices that were latex-free, and so based on
2  her one line description I tried to identify the
3  ones that I thought would have the highest
4  likelihood of being latex-free.
5          Again, I would have called all of
6  them if I had enough time, but there was a time
7  limit on when that work had to be done, and I
8  was doing other things.
9      Q.   When did you first, and if it helps
10  you please look at the invoice, make any calls
11  to dental offices in connection with the
12  December 2005 report?
13     A.   Let me just look at my calendar
14  here for a minute.  They were all made
15  essentially on the 12th and 13th of December
16  2005.
17          MS. D'ALCOMO:  Please mark this.
18
19          (Exhibit 62, List - Handwritten
20          Notes, marked)
21
22     Q.   (By Ms. D'Alcomo) Let me show you
23  what's been marked as Exhibit 62.  Are those
24  your handwritten notes on Exhibit 62?

Page 32

1      A.   Yes.
2      Q.   Did you start with one list and
3  then go to another list, or how did you go about
4  making your calls?
5      A.   I started with the list that's
6  Exhibit 61.  And then again, I just wanted more
7  practices to try to contact, so I asked for more
8  practices and was provided with the list that's
9  Exhibit 62.
10     Q.   When were you provided with the
11  list that's Exhibit 62?
12     A.   I don't remember exactly.  It would
13  have been sometime between the 9th and the 12th
14  or 13th of December.
15     Q.   And was it Wendy Wilton who
16  provided you with that list?
17     A.   Yes.
18     Q.   And did she tell you anything about
19  the places on the second list that's Exhibit 62?
20     A.   Nothing about their practice.  The
21  only thing, they were suppose to be practices in
22  that location, the vicinity of South Windsor.
23     Q.   Why was it that the list that's in
24  Exhibit 61 was a list that you considered to be

Page 33

1  not sufficient?
2      A.   I was just trying to gather as much
3  data as I could.
4      Q.   Now in your report you refer to how
5  many dental practices?
6      A.   In the report itself?
7      Q.   Yes.
8      A.   To five.
9      Q.   How did you decide what dentists to
10  include in the report?
11     A.   I set a very high bar for which
12  ones I would include in the report.  So if the
13  practice said that, you know, they could
14  accommodate a latex allergic patient, but they
15  weren't really latex-free, I didn't include
16  them.  I only included in my opinion that
17  were latex-free practices.
18     Q.   So how many calls -- strike that.
19          From how many dental practices did
20  you obtain information?
21     A.   I made thirty calls.  Not all of
22  them was I able to contact someone.  Some said
23  they would call back and they never did.  So it
24  was somewhere under thirty.  I don't remember

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 34

1   the exact number.
2        MR. CREVIER:  Can we take a short
3   break?
4        MS. D'ALCOMO:  Sure.  Off the
5   record.
6
7        (A break was taken)
8
9        MS. D'ALCOMO:  Back on the record.
10       Q.    (By Ms. D'Alcomo)  How many dental
11  practices were you able to obtain information
12  from doing your report for December 2005?
13       A.    If you give me a minute.  I'm just
14  looking at the report that I generated from the
15  calls.  Just a second.
16       Twenty-three.  Twenty-three
17  practices.
18       Q.    And of those twenty-three dental
19  practices, you found five that you believe were
20  latex-free, is that right?
21       A.    Correct.
22       Q.    You had two lists that contained a
23  total of, is it fair to say, thirty-eight dental
24  practices?

Page 35

1        A.    That's right.
2        Q.    And how many -- strike that.
3        Is it fair to say you called thirty
4   of thirty-eight dental practices?
5        A.    I called some that aren't on this
6   list.
7        Q.    What dental offices did you call
8   that were not on either list?
9        A.    Well, Dr. Haselkorn.  And then Dr.
10  Kotzen, Dr. Kleinman, and Dr. Wohl.  I think
11  there may have been others as well.  Her list
12  was primarily in the Connecticut area.  I called
13  some over the border in Massachusetts.
14       Q.    And you believe you may have called
15  others that aren't on the list other than
16  Doctors Haselkorn, Kotzen, Kleinman and Wohl?
17       A.    I believe there may have been some
18  in Massachusetts that aren't on the list.
19  Some from Longmeadow.  There may have been one
20  or two others.
21       Q.    How did you decide to contact Dr.
22  Haselkorn?
23       A.    He is just someone I happen to
24  know.

Page 36

1        Q.    How do you happen to know him?
2        A.    His wife used to work for me back
3   many years ago.
4        Q.    Did you remain friendly with her or
5   him?
6        A.    No.
7        Q.    When was the last time before this
8   occasion you had any contact with Dr. Haselkorn?
9        A.    I would say ten years.
10       Q.    Why did you contact Dr. Haselkorn,
11  even though he was not on either of the lists?
12       A.    Because I know he is in a
13  geographical area that would be a reasonable
14  distance from South Windsor, Connecticut.  And
15  because it's easier sometimes to get a hold of
16  someone whom you know instead of calling cold
17  someone you don't know.
18       Q.    How did you decide to contact Dr.
19  Kleinman?
20       A.    Dr. Kleinman is again someone I
21  know who has a practice in Northampton.
22       Q.    How did you decide to contact Dr.
23  Wohl?
24       A.    Dr. Wohl is also someone I know who

Page 37

1   has a practice in Northampton.
2        Q.    Are any of those dentists your
3   dentist?
4        A.    No.
5        Q.    Did you contact your dentist?
6        A.    I did.
7        Q.    And I forget his name.  I'm sorry.
8        A.    Dr. Kotzen.
9        Q.    You did not include Dr. Kotzen in
10  your December report.  Why not?
11       A.    Because using the standard that I
12  had set for selecting the practices, I didn't
13  feel he met it.
14       Q.    What was the standard that you set
15  in determining what practices to include in your
16  report?
17       A.    Well, they had to tell me that they
18  didn't use any latex gloves in the practice.
19  And in Dr. Kotzen's case, for example, he
20  personally doesn't use latex gloves, but other
21  practitioners in the practice do.  So that was
22  the first criteria.
23       And the other was that they use
24  non-latex products for all of the commonly used

10  (Pages 34 to 37)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 38

1  things in dentistry.
2      Q.    Now let me back up.
3          In your report in the first
4  paragraph, and you can look at your report, the
5  first page. You say that you were asked for
6  information on dental practices in northern
7  Connecticut and south western Massachusetts that
8  practice latex-free or latex-safe dentistry. Do
9  you see that?
10     A.    I do.
11     Q.    Is it your testimony that you only
12  included practices that practiced latex-free
13  dentistry?
14     A.    Yes.
15     Q.    And is there a reason why you
16  didn't include information on dental practices
17  in northern Connecticut and south western
18  Massachusetts that practice as you say
19  latex-safe dentistry?
20     A.    Like I said, I wanted to set the
21  bar very high and select those practices where I
22  would feel entirely comfortable that someone
23  like Ms. Mirek could work.
24     Q.    Did you discuss what you were going

Page 39

1  to include in your report with Defense Counsel
2  before you put it in your report?
3      A.    No, I did not.
4      Q.    You said a few minutes ago that you
5  identified practices that used latex-free
6  products with respect to those products that are
7  commonly used in dentistry. Isn't that right?
8      A.    That's right.
9      Q.    So is it fair to say that you don't
10  know -- strike that.
11          You didn't try to determine whether
12  the dental practices that you had communicated
13  with used no latex whatsoever in their practice?
14  Is that fair to say?
15      MR. CREVIER: Objection. Leading.
16      THE WITNESS: The practices that I
17      included are very proud of the fact that
18      they are latex-free. They volunteered a
19      lot of information when I spoke with them,
20      and I included some brief summaries in the
21      report of what they said.
22          For example, Dr. Haselkorn, they
23      are using no latex products in his
24      practice. Everything is non-latex. He is

Page 40

1  allergic to latex as well as one of his
2  staff.
3      Q.    (By Ms. D'Alcomo) Can you tell me
4  what you meant when you said you tried to
5  determine whether they are using latex in those
6  products that are commonly used in dentistry or
7  not?
8      A.    Well, I asked them what they were
9  doing as far as using latex products and that's
10  what they told me.
11     Q.    When you included the five dentists
12  that you included, did you determine, based on
13  your conversations with these practices, that
14  they had no latex products at all in their
15  dental office?
16     A.    The first four that is the case.
17  The last one, they said they had a rare item of
18  latex that they did use, but they were very
19  diligent in that particular practice to replace
20  latex items with non-latex alternatives.
21     Q.    Is that Dr. Wise?
22     A.    Yes.
23     Q.    So they told you that they did use
24  a latex product in the practice periodically?

Page 41

1      A.    Rarely.
2      Q.    What was the product or products
3  that they used?
4      A.    I don't recall what it was.
5      Q.    Now what did you mean when you
6  referred in describing Dr. Wise's practice as
7  using "all dental equipment is latex-free"?
8      A.    That would be the equipment that I
9  listed on my check list that I used when I made
10  these calls. The gloves, Prophy cups, angles,
11  bite blocks, bite wings, dental dams and masks.
12  Those are the commonly used things.
13     Q.    So when you say all dental
14  equipment was latex-free with respect to Dr.
15  Wise, you are referring to the particular
16  identified materials on your form?
17     A.    No. Not exclusively. Those are
18  the commonly used things. They said they spent
19  a lot of effort researching all products, always
20  got latex-free products, but there were a couple
21  of infrequently used things that were not
22  latex-free.
23     Q.    Can you tell me how many dentists
24  you spoke with?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

---

Page 42

1    A.   I didn't keep track of every case,
2  and I don't recall in every case.  I would say
3  probably eight or nine dentists and the rest
4  were their staffs.
5    Q.   Now what dentists can you recall
6  speaking to?
7    A.   I spoke with Dr. Haselkorn.  Let me
8  look at my notes.  I know I spoke with Dr.
9  Bird.  I spoke with Dr. Kleinman, Dr. Wohl.
10  Dr. Kotzen.  I spoke with Dr. Fields, Alvin
11  Fields.  Those are the only ones I can be sure
12  about.  Like I said, there might have been
13  others.
14    Q.   Is Dr. Fields on either of the
15  lists?
16    A.   Yes.
17    Q.   Where is he?
18    A.   Alvin Fields?  He is on my notes.
19    Q.   I am going to ask you to refer to
20  I think it's 61.  Did you call Dr. Barron's
21  office?  Number one on 61?
22    A.   No.
23    Q.   Why not?
24    A.   It was a matter of time.  What she

---

Page 43

1  had written was latex-safe, and that wasn't one
2  of the first ones I was going to call.  Again, I
3  was trying to do this in a couple of days with a
4  lot of other things and I didn't get to everyone
5  on the list.
6    Q.   Did you try to contact Dr. Brower's
7  office?
8    A.   Yes.
9    Q.   Did you talk with them?
10    A.   I did talk to them and they asked
11  would I fax them my questions and they would
12  respond.
13    Q.   Did you do that?
14    A.   I faxed them my questions and they
15  did not respond.
16    Q.   Do you have the questions you faxed
17  them?
18    A.   It's the same little check off list
19  I was using.
20    Q.   Did you keep the fax?
21    A.   I don't think I did that.
22    Q.   When you called Dr. Brower's
23  office, how did you identify yourself?
24    A.   I said I was Dr. Garb from Baystate

---

Page 44

1  Medical Center and I was trying to determine how
2  much latex is being used in dental practices in
3  the area.
4    Q.   Did you say anything else?
5    A.   No.
6    Q.   Did you call Baystate Dental
7  Center?
8    A.   Yes.
9    Q.   Whom did you speak with there?
10    A.   Baystate Dental Care.  It was one
11  of the hygienists.  I don't have the name.
12    Q.   Did you keep track of the
13  identities of anyone with whom you spoke in
14  making your calls?
15    A.   In some cases I did, but not in
16  every case.
17    Q.   So on your notes there will be some
18  individual names listed?
19    A.   Yes.
20       MS. D'ALCOMO:  Why don't we mark
21    this the next exhibit.
22
23       (Exhibit 63, Notes, marked)
24

---

Page 45

1    Q.   (By Ms. D'Alcomo) Let me show you
2  what has been marked Exhibit 63.  Does Exhibit
3  63 contain all of your handwriting in addition
4  to the preprocessed form?
5    A.   Yes.
6    Q.   And is the first page of Exhibit 63
7  your notes from your conversation with someone
8  at Baystate Dental Care?
9    A.   Yes.
10    Q.   And there is no person identified
11  as having spoke with you, is that right?
12    A.   Correct.
13    Q.   You checked off for Baystate Dental
14  Care the practice as being latex-safe.  Do you
15  see that?
16    A.   I do.
17    Q.   And your first question is what
18  does that mean to you?  Do you see that?
19    A.   Right.
20    Q.   Did you ask the person with whom
21  you spoke at Baystate Dental Care what that
22  meant to them?
23    A.   I'm not sure I asked what it meant
24  to them.  It came out in the discussion that

---

12 (Pages 42 to 45)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 46

1  they had about fifty percent were using latex
2  gloves, and about fifty percent of the people in
3  the practice were not using latex gloves.
4      Q.    What did they tell you latex-safe
5  meant to them?
6      A.    I don't remember what they told me
7  about it.
8      Q.    Did you ever define latex-safe to
9  anyone in any of the conversations you had with
10  dental offices in connection with the December
11  2005 report?
12     A.    I was asking them to them what
13  their practice was. I wasn't trying to lead
14  them or define for them. I trying to get from
15  them is their practice latex-free or latex-safe?
16  That's just their response. Not necessarily my
17  conclusion.
18     Q.    Wasn't it important for you to know
19  what they meant by latex-safe?
20     A.    That's why we went into further
21  questions.
22     Q.    So after you completed speaking
23  with someone at Baystate Dental Care, what did
24  you conclude their definition was of latex-safe?

Page 47

1      A.    They could provide an environment
2  with no latex gloves for a patient allergic to
3  latex, but routinely only half the people were
4  using non-latex gloves and their equipment that
5  I asked about was latex-free.
6      Q.    So you understood their definition
7  of latex-safe to be that they could provide an
8  environment for a patient to be treated by a
9  person who had non-latex gloves?
10         MR. CREVIER: Objection. Leading.
11         THE WITNESS: Correct.
12     Q.    (By Ms. D'Alcomo) Did you ask them
13  the question could you accommodate a hygienist
14  who was latex allergic?
15     A.    Yes.
16     Q.    What did you mean by accommodate a
17  hygienist who is latex allergic?
18     A.    Provide that hygienist with no
19  exposure to latex.
20     Q.    And what did you -- strike that.
21         Who was it that told you they could
22  accommodate the hygienist who is latex allergic?
23     A.    I believe it was a hygienist I was
24  talking with.

Page 48

1      Q.    Did you explain what you meant by
2  accommodate a hygienist who was latex allergic?
3      A.    I did.
4      Q.    How did you phrase it?
5      A.    I don't remember the exact words I
6  used, but could someone who was allergic to
7  latex work in your practice without exposure to
8  latex. Something to that effect.
9      Q.    And what did you mean by exposure
10  to latex?
11     A.    I didn't further define it for
12  them. I let them answer it just as the question
13  was posed.
14     Q.    Well, you knew after doing the
15  interview with the person at Baystate Dental
16  Care that half the staff was using latex gloves,
17  right?
18     A.    Right.
19     Q.    And in what way did you understand
20  the response to the question -- let me withdraw
21  that.
22         Well, when you asked whether a
23  hygienist could work there without being exposed
24  to latex, what did you mean by exposure?

Page 49

1      A.    Well, generally when they talk
2  about latex-safe they mean not using latex
3  gloves for the staff. And that's sort of the
4  standard definition of latex-safe.
5      Q.    So I guess I'm unclear, Dr. Garb.
6  You said the standard definition of latex-safe
7  is not using latex gloves?
8          MR. CREVIER: Objection. Leading.
9          THE WITNESS: Right.
10     Q.    (By Ms. D'Alcomo) Now in this
11  practice half the staff was using latex gloves,
12  right?
13     A.    Right. Let me stop for a second.
14  My conclusion was this was not a safe
15  environment for someone who is allergic to latex
16  to work in. They are saying they are
17  latex-safe. They can provide a latex-safe
18  environment for a patient. But that was not my
19  conclusion. That's what they are saying.
20         My conclusion was because they use
21  fifty percent latex gloves, I threw this one
22  out. This one is not on my list.
23     Q.    So your conclusion was that
24  Baystate Dental Care was not a safe place for a

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 50

1  dental hygienist to work who had a latex
2  allergy?
3      MR. CREVIER: Objection. Leading.
4      THE WITNESS: Correct.
5      Q.   (By Ms. D'Alcomo) What was the
6  basis of your conclusion?
7      A.   Because they use fifty percent
8  latex gloves.
9      Q.   The next page of your note is
10 doctor -- who is that?
11     A.   Dr. Kinne.
12     Q.   Is that number twelve on Exhibit
13 21?
14     A.   Yes.
15     Q.   Did you speak with Dr. Kinne?
16     A.   I don't recall who I spoke to in
17 that office.
18     Q.   Was the person that you spoke to
19 the office manager?
20     A.   No. They were either the dentist
21 or the hygienist.
22     Q.   When you spoke to -- strike that.
23        Did you ask the individual their
24 name that you were speaking with in these

Page 51

1  various dental offices?
2      A.   In some cases I did and in some
3  cases I didn't.
4      Q.   Did you ask them their
5  qualifications?
6      A.   I asked to either speak to the
7  dentist or one of the hygienists.
8      Q.   If you spoke to a hygienist did you
9  ask the hygienist how long they worked at the
10 practice?
11     A.   No.
12     Q.   When you spoke to a hygienist did
13 you ask the hygienist how long he or she had
14 been a hygienist?
15     A.   No.
16     Q.   So is it fair to say you could have
17 spoken to a hygienist that just worked at the
18 office a few days?
19     MR. CREVIER: Objection. Leading.
20     THE WITNESS: That's possible.
21     Q.   (By Ms. D'Alcomo) Is it fair to
22 say that you could have spoken to a hygienist
23 that just started working as a hygienist?
24     MR. CREVIER: Objection. Leading.

Page 52

1      THE WITNESS: I didn't ask how long
2  they had been with the practice.
3      Q.   (By Ms. D'Alcomo) What steps did
4  you take to insure that the person with whom you
5  spoke had the ability to be able to answer your
6  questions accurately?
7      A.   Well, in some cases it was the
8  dentist and when it wasn't, they generally
9  seemed to direct me to the senior hygienist in
10 the practice as the spokesperson for the
11 dentist.
12     Q.   In what way did you learn that the
13 person was the senior hygienist in the practice?
14     A.   Often the receptionist would say
15 the dentist is busy, but you can talk to our
16 lead hygienist or whatever, some indication.
17     Q.   Now Dr. Kinne's office, you don't
18 recall whether you spoke to a dentist or
19 hygienist, is that right?
20     A.   I believe it was a hygienist,
21 because looking at my notes I wrote the doctor
22 uses latex gloves rather than he uses latex
23 gloves which is what I would have written if I
24 was speaking to him.

Page 53

1      Q.   Can you read me all your notes
2  below comment.
3      A.   "Doctor uses latex gloves. All
4  rest nitrile. For latex allergic patient they
5  wet down the room and use nitrile and they could
6  accommodate staff" meaning who are latex
7  allergic.
8      Q.   For a latex allergic patient they
9  wipe down the room. Is that what it says?
10     A.   Yes.
11     Q.   What did you understand that to
12 mean?
13     A.   Wipe down with probably a damp
14 cloth or paper towel to remove any residual
15 latex.
16     Q.   And did you ask them what residual
17 latex they were concerned about?
18     A.   I did not.
19     Q.   Did you determine that Dr. Kinne's
20 practice was in your view latex-safe?
21     A.   No, I did not.
22     Q.   Why not?
23     A.   Because he uses latex gloves.
24     Q.   Now did any -- strike that.

14 (Pages 50 to 53)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 54

1    Were you told whether any of the
2 staff ever used latex gloves in Dr. Kinne's
3 office?
4    A.    What I was told was he was the only
5 one using latex. The rest were using nitrile.
6    Q.    Now the next note is from Alan
7 David Sampson, is it?
8    A.    Yes.
9    Q.    And where does that come from, that
10 name?
11    A.    That was another one I called from
12 the Springfield phone directory.
13    Q.    Is that someone you had heard of
14 before?
15    A.    Familiar with. I don't know him
16 personally. He is an oral surgeon actually.
17    Q.    Did you speak with Dr. Sampson?
18    A.    No. I spoke with one of his
19 assistants.
20    Q.    Did the assistant have any title?
21    A.    Just dental assistant. I don't
22 know of any other title.
23    Q.    Was the person a dental hygienist,
24 do you know?

Page 55

1    A.    No, I don't believe she was.
2    Q.    Do you know the person's name?
3    A.    No.
4    Q.    How long was the conversation with
5 the person from Dr. Sampson's office?
6    A.    These were generally five to ten
7 minute conversations. I don't recall
8 specifically on that one.
9    Q.    Are the only notes you took on
10 these conversations in the notes that you
11 produced?
12    A.    Yes.
13    Q.    Did you learn from your interview
14 whether Dr. Sampson's office considered itself
15 latex-free or latex-safe?
16    A.    They really didn't indicate. They
17 said they were getting rid of all their latex.
18 Their goal was to become latex-free or
19 latex-safe, but they certainly weren't now.
20    Q.    They said they did use latex
21 gloves?
22    A.    Yes.
23    Q.    Did you make a determination about
24 whether Dr. Sampson's practice was latex-safe or

Page 56

1 latex-free?
2    A.    It's not latex-safe or latex-free
3 in my opinion.
4    Q.    Did you make a determination about
5 whether it would be safe for a dental hygienist
6 who is latex allergic to work there?
7    A.    I wouldn't recommend that, no.
8    Q.    Now Dr. Kotzen is the subject of
9 your notes on the next page, is that right?
10    A.    Yes.
11    Q.    Did you speak to Dr. Kotzen?
12    A.    Yes.
13    Q.    And he told you he used latex
14 gloves in part?
15    A.    Well, he himself does not. He said
16 some of the other dentists, I think a three or
17 four dentist group, so some of the others do
18 but he does not.
19    Q.    Did he tell you whether any of the
20 supplies used in his office had latex in them?
21    A.    He said essentially everything is
22 non-latex now.
23    Q.    And he told you that all the
24 supplies used in his office were not latex?

Page 57

1    A.    Yes.
2    Q.    How did you determine, by the way,
3 that these particular supplies were commonly
4 used in a dental practice?
5    A.    From reading.
6    Q.    Reading what?
7    A.    Well, one was this latex-free
8 dentistry reference. Other references about
9 dental practices. And in talking with Dr.
10 Kotzen. I spoke with him earlier before I did
11 this addendum, and that was very helpful in
12 deciding what kinds of equipment to be asking
13 about.
14    Q.    When did you speak to him about
15 what kinds of equipment to be asking about?
16    A.    That was, I think that was probably
17 about a year ago, because he is my dentist and I
18 have been interested in latex for many years.
19 When I have gone in there to see him we chatted
20 about latex quite a bit too.
21    Q.    Is it your testimony that all the
22 supplies listed in this list under Dr. Kotzen's
23 name are one hundred percent non-latex in his
24 office?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 58

1    A.    Yes.
2    Q.    And those of his colleagues as well
3    in the same practice?
4    A.    That's what he told me.
5    Q.    Now did you determine whether his
6    office was latex-safe?
7    A.    Latex safe. I could not say it was
8    latex-safe because some of the dentists are
9    still using latex gloves.
10   Q.    And you don't believe it would be
11   safe for a dental hygienist with a latex allergy
12   to work there?
13         MR. CREVIER: Objection. Leading.
14         THE WITNESS: Again, in preparing
15   this report I set a very high bar and only
16   selected those practices that I think were
17   safe. I think a lot of people with a
18   latex allergy could work in a lot of these
19   places, but again, I was trying to select
20   the ones I felt very confident about.
21   Q.    (By Ms. D'Alcomo)  Well, do you
22   believe that anyone who is a dental hygienist
23   who has a latex allergy could work at Dr.
24   Kotzen's practice safely?

Page 59

1    A.    I need to know more about how much
2    latex gloves are worn in that practice.
3    Q.    Now what is the next name on the
4    next page?
5    A.    Barbara Honor I believe.
6    Q.    Is that number eleven on the
7    second list of Exhibit 62?
8    A.    That's right.
9    Q.    Who did you speak to at Dr.
10   Honor's office?
11   A.    It was one of the hygienists.
12   Q.    And what did you learn from your
13   conversation with one of the hygienists at Dr.
14   Honor's office?
15   A.    That they are still using latex.
16   Q.    You wrote neither latex-free or
17   latex-safe, is that right?
18   A.    Right.
19   Q.    What did you mean by that?
20   A.    They don't make any claim to be
21   latex-safe or latex-free.
22   Q.    Now on the page that Dr. Honor's
23   comments are written on, the form is a little
24   different than the previous page.

Page 60

1    A.    Correct.
2    Q.    Why is that?
3    A.    I changed it at some point, and I
4    am not sure if I remember why. I added that
5    question about what types of gloves you use, and
6    I took out that question what does that mean to
7    you. I don't really remember why I made the
8    change.
9    Q.    At what point in making calls did
10   you do that?
11   A.    I think it was after day one, but
12   I'm not one hundred percent sure.
13   Q.    Did you conclude whether or not a
14   dental hygienist with a latex allergy could work
15   at Dr. Honor's office?
16   A.    I didn't feel it was even worth
17   pursuing once I got past the original questions.
18   Q.    The next notes are from Dr. Rubin's
19   office?
20   A.    Yes.
21   Q.    And where did you get that name?
22   A.    I think it was on one of the
23   lists.
24   Q.    Is that number twelve on Exhibit

Page 61

1    62?
2    A.    Yes.
3    Q.    And with whom did you speak there?
4    A.    I don't recall.
5    Q.    What does the LF reference mean
6    next to Prophy cups?
7    A.    Latex-free.
8    Q.    And what does the LF next to mask
9    mean?
10   A.    Latex-free.
11   Q.    Did you determine after speaking
12   with Dr. Rubin's office that any latex products
13   were used in that practice?
14   A.    They are still using latex gloves
15   in that practice.
16   Q.    Are the bite blocks used latex?
17   A.    They are plastic.
18         No. We didn't discuss bite blocks.
19   Q.    Why not?
20   A.    Because they use latex gloves, so
21   that's a non-starter.
22   Q.    But you did ask them about bite
23   wings?
24   A.    Yes.

16 (Pages 58 to 61)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 62

1    Q.    And you did ask them about masks?
2    A.    Yes. Right.
3    Q.    And you did ask them about the
4   Prophy cups?
5    A.    Sometimes they volunteer the
6   information. I didn't necessarily ask. They
7   might have said we have latex-free this and that
8   but --
9    Q.    And there is a note at the bottom
10  under comments. What does that say?
11    A.    That two out of the six dentists
12  can't use latex gloves.
13    Q.    What does that mean?
14    A.    I assume they have some reaction to
15  it. Again, I didn't go into a lot of detail
16  because they really aren't a latex-safe
17  practice.
18    Q.    The next one is Gary Grilly. Is
19  that number thirteen in Exhibit 62?
20    A.    Correct.
21    Q.    Who did you speak with there?
22    A.    I don't recall.
23    Q.    What did they tell you?
24    A.    They are not latex-safe or

Page 63

1   latex-free. That was a short conversation.
2    Q.    And the next one is Robert Whitely.
3   Is that number eight on Exhibit 62?
4    A.    Yes.
5    Q.    With whom did you speak with there?
6    A.    I don't recall.
7    Q.    What did you learn from speaking
8   with the person that you spoke with at Dr.
9   Whitely's office?
10    A.    They are still using latex gloves.
11  They are not latex-safe or latex-free.
12    Q.    What did you write under comments
13  on Dr. Whitely's form?
14    A.    Six boxes of latex gloves a day is
15  what they use.
16    Q.    Now the next one is Dr. Fields.
17  Is that number four on your Exhibit 62?
18    A.    Yes.
19    Q.    And what is the name above Dr.
20  Fields?
21    A.    Dr. Furman.
22    Q.    What did you write that name for?
23    A.    I believe they are in practice
24  together. Some names of practices appear on the

Page 64

1   list twice, once under one dentist and once
2   under another.
3    Q.    With whom did you speak with?
4    A.    I did speak with him, with Dr.
5   Fields.
6    Q.    Is that you are just remembering
7   that?
8    A.    I remember because of what he said.
9    Q.    What did he say?
10    A.    He had no interest in giving up
11  latex gloves. He said latex is comfortable. I
12  remember him saying that.
13    Q.    Did he tell you why it was
14  comfortable?
15    A.    No. We didn't go into it.
16    Q.    Did you ask him about what latex
17  products, if any, he used in the practice?
18    A.    Once I got the initial information
19  they weren't really latex-safe or latex-free, I
20  didn't pursue it in that great of detail with
21  any of these.
22    Q.    What did you write next to Prophy
23  cups?
24    A.    Those are latex-free.

Page 65

1    Q.    What did you write next to bite
2   blocks?
3    A.    That's a good question.
4   The second word looks like surgical. Only
5   surgical. I'm not sure what the third word is.
6    Q.    You wrote a yes next to "do you
7   have any staff latex allergic." Right?
8    A.    That's right.
9    Q.    Did you ask Dr. Fields what the
10  nature of the latex allergy was?
11    A.    No, I didn't. Again, once I made
12  my determination, I didn't pursue a lot of these
13  things as much as I could have.
14    Q.    So you don't know whether the
15  person that was latex allergic had a skin
16  allergy?
17    A.    I don't know.
18    Q.    And you don't know whether they had
19  any respiratory symptoms in response to latex
20  exposure?
21    A.    I don't know.
22    Q.    Now you wrote yes next to the
23  question "could you accommodate a hygienist who
24  is latex allergic." Do you see that?

17 (Pages 62 to 65)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 66

1    A.    I do.
2    Q.    What is the basis for your writing
3 yes next to that?
4    A.    That's what they told me, but I put
5 a question mark at the end because I really
6 didn't believe it.
7    Q.    Now you wrote latex is
8 comfortable. Is that right?
9    A.    Right.
10    Q.    What did you write under that
11 phrase?
12    A.    They do have options for patients.
13 They have nitrile gloves if the patient is
14 allergic to latex.
15    Q.    You would agree, Dr. Garb, that
16 there is a difference between having a skin
17 allergy to latex and having a respiratory
18 response to latex exposure?
19    A.    Yes.
20    Q.    There is some people that you are
21 aware of merely have a skin allergy to latex?
22    A.    Yes.
23    Q.    When you asked people if they could
24 accommodate a hygienist who is latex allergic,

Page 67

1 did you distinguish between someone who has a
2 skin allergy to latex versus another kind of
3 allergy to latex?
4    A.    I didn't. I was interested on what
5 their take on it was. Based on the other
6 questions that I asked I feel I could determine
7 which practices would be safe for someone with a
8 respiratory type allergy.
9    Q.    What did it matter to you whether
10 or not the practice considered themselves able
11 to accommodate a hygienist who is latex allergic
12 or not?
13    A.    It was partly just interest to see
14 what their perceptions were about latex allergy
15 and what their response would be. But I
16 certainly didn't base my conclusions on what
17 they were saying in terms of that.
18    Q.    The next name, can you help me on
19 that?
20    A.    Alfonso Mack.
21    Q.    And is that on either of the lists?
22    A.    Yes. Number two on 62.
23    Q.    With whom did you speak there?
24    A.    I am not sure.

Page 68

1    Q.    What did the person with whom you
2 spoke at Dr. Mack's office tell you about the
3 practice?
4    A.    That they weren't latex-free or
5 latex-safe. They never thought of it as a
6 problem. They do have some latex-free gloves
7 and they have someone who is latex sensitive. I
8 didn't go into a lot of detail about that
9 because they clearly aren't a latex-free
10 practice.
11    Q.    Now you wrote next to Prophy cups
12 "never thought of as a problem." What did that
13 mean?
14    A.    I don't think that really refers to
15 Prophy cups. I think I wrote that in general.
16 That refers to latex allergy in general.
17    Q.    Did you determine whether they used
18 bite blocks that had latex in them?
19    A.    I didn't. From what I heard at the
20 onset I didn't ask a lot of additional questions
21 about this particular practice.
22    Q.    The next one is Enfield Family
23 Dentistry?
24    A.    Yes.

Page 69

1    Q.    And is that on one of your lists?
2    A.    Yes. It's number seventeen on 62.
3    Q.    With whom did you speak there?
4    A.    I don't recall.
5    Q.    What were you told about the
6 Enfield Family Dentistry practice?
7    A.    That they mostly use latex gloves
8 and they are not latex-safe or latex-free.
9    Q.    They said they use very little
10 vinyl?
11    A.    Yes.
12    Q.    Did they tell you why?
13    A.    When I heard that I was finished
14 with them. I didn't have time to go into a lot
15 of detail when it obviously wasn't a latex-free
16 practice.
17    Q.    Were you interested in the course
18 of speaking with the dental practices as to why
19 practices used latex gloves as opposed to
20 non-latex gloves?
21    A.    That wasn't my main focus. Some
22 dentists volunteered, like that one that it was
23 comfortable. But I was trying to identify
24 latex-safe practices. When I learned they

18 (Pages 66 to 69)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 70

1  really weren't, I didn't pursue it.
2      Q.    Didn't it interest you to know how
3  likely it was that dental practices that were
4  using latex gloves would be switching over to
5  non-latex gloves?
6      A.    That wasn't primarily what I was
7  looking at. I was looking at what proportion of
8  the practices I was able to contact were
9  latex-free.
10      Q.    So you understood -- strike that.
11          So you considered your objective to
12  be what proportion of the dental practices you
13  were contacting were latex-free?
14          MR. CREVIER: Objection. Leading.
15          THE WITNESS: Yes.
16      Q.    (By Ms. D'Alcomo) And what
17  proportion of the dental practices that you
18  contacted were latex-free?
19      A.    Well, we found five out of
20  twenty-three did I say? So you could do the
21  math. About twenty percent.
22      Q.    And do you believe that the
23  practices you called were randomly selected?
24      A.    Well, this wasn't a random sample,

Page 71

1  no. I was provided with a list of some
2  practices. Someone had done some pre-screening
3  essentially. Some of them were random. I
4  picked some names out of the phone book. Some
5  were people I know, so it was a variety of the
6  methods. This isn't in any way a random sample.
7      Q.    So you don't believe the number
8  that you found of practices that were latex-free
9  is of any statistical significance, do you?
10      A.    Well, I have no reason to doubt
11  that if we chose another twenty-five or thirty
12  practices we wouldn't find the same thing in
13  terms of the percentage.
14      Q.    You don't?
15      A.    No.
16      Q.    Is it your view that the number of
17  practices that you believe you found that were
18  latex-free is statistically significant?
19      A.    What do you mean statistically
20  significant?
21      Q.    Well, you are familiar with polls,
22  are you not?
23      A.    Yes.
24      Q.    And you are familiar with the

Page 72

1  discipline of statistics?
2      A.    Yes.
3      Q.    And you are familiar with testing
4  that is done with a certain population and
5  information being extracted from those numbers
6  and conclusions being drawn because of a belief
7  it has statistical significance?
8          MR. CREVIER: Objection. Leading.
9          THE WITNESS: Right.
10      Q.    (By Ms. D'Alcomo) And is it your
11  belief that you have conducted a survey that has
12  statistical significance?
13      A.    This is not a scientific survey.
14  On the other hand, there were enough random
15  calls that I think it would be a good chance it
16  would be replicated if done with other
17  practices.
18      Q.    By the way, is the list of twenty
19  that you were given, Exhibit 62, all the
20  dentists in the community listed?
21      A.    I don't know that.
22          I didn't ask for all of the
23  practices. I asked for more names and I suspect
24  there is more than that, but I don't really

Page 73

1  know.
2      Q.    For example, do you know if there
3  is more than one dentist in Windsor Locks,
4  Connecticut?
5      A.    I don't know.
6      Q.    Do you know how the single dentist
7  whose name appears on the Exhibit 62 as being
8  from Windsor Locks, Connecticut was selected to
9  be put on the list?
10      A.    I don't.
11      Q.    You don't know, is it fair to say,
12  how any of the dentists were chosen to be on the
13  list that is Exhibit 62?
14      A.    I believe they were just taken from
15  the phone book. I don't know for sure.
16      Q.    Were all dentists from the phone
17  book in those communities listed on Exhibit 62?
18      A.    I don't believe so, but I don't
19  know for sure.
20      Q.    Did you do anything to determine
21  whether all the dentists from the communities
22  listed on Exhibit 62 were included on the list?
23      A.    No.
24      Q.    Now there is a dentist office, by

19 (Pages 70 to 73)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 74

1  the way, listed in New Haven, Connecticut on
2  61. Do you see that? The last name?
3      A.    Yes.
4      Q.    Did you consider that to be in
5  Carolyn Mirek's geographic area?
6      A.    People commute longer distances.
7  It is a little farther than some of the others.
8      Q.    Now another name on the list, the
9  next name in your handwritten notes is Dr.
10 Debrowski(phonetic).
11     A.    Yes.
12     Q.    Is that number ten on Exhibit 62?
13     A.    Yes.
14     Q.    And with whom did you speak with at
15 Dr. Debrowski's office?
16     A.    I don't recall.
17     Q.    What were you told about Dr.
18 Debrowski's practice?
19     A.    That they were neither latex-free
20 nor latex-safe. They have non-latex gloves for
21 staff who are sensitive. They have two staff
22 with latex allergies.
23     Q.    Did you ask them what kind of
24 allergy?

Page 75

1      A.    No.
2      Q.    You concluded that Dr. Debrowski's
3  office was not latex-safe or latex-free?
4      A.    Correct.
5      Q.    And the next name is?
6      A.    Doctors Bearly and Peterson.
7  That's two name.
8      Q.    Is that number five on Exhibit 61?
9      A.    Right.
10     Q.    And did you speak with -- strike
11 that.
12         With whom did you speak with at
13 that office?
14     A.    It was one of the hygienists.
15     Q.    What did you learn -- or strike
16 that.
17         What were you told in that
18 interview?
19     A.    That they are neither latex-free
20 nor latex-safe. This is a larger practice. And
21 all but one of the doctors use latex, but they
22 could accommodate a patient who is allergic to
23 latex.
24     Q.    On Exhibit 61 you were told that

Page 76

1  Dr. Bearly and Dr. Peterson's office was
2  latex-safe. Isn't that right?
3      A.    That's what was written there, yes.
4      Q.    So you determined that information
5  was wrong?
6      A.    I wouldn't call it latex-safe.
7      Q.    Did you ask Wendy Wilton what she
8  meant when she wrote latex-safe?
9      A.    No. We didn't have a chance to
10 discuss any of this.
11     Q.    Now the next name is Doctor?
12     A.    Kramer.
13     Q.    And that is number sixteen on your
14 list of 62?
15     A.    Yes.
16     Q.    What does a check mark mean with a
17 line through it?
18     A.    The check mark means that I called
19 and the line through it means they called back.
20     Q.    With whom did you speak with at
21 Dr. Kramer's office?
22     A.    I don't recall.
23     Q.    What were you told by the person
24 you spoke with at Dr. Kramer's office?

Page 77

1      A.    That they are not latex-safe or
2  latex-free, but they do have non-latex gloves
3  available.
4      Q.    And you spoke with Dr. Comb's
5  office?
6      A.    Yes. Number twenty on 62.
7      Q.    With whom did you speak with there?
8      A.    I don't recall.
9      Q.    And what were you told by the
10 person at Dr. Comb's office?
11     A.    They use all latex.
12     Q.    And what office is the next page?
13     A.    Geri Kleinman. She is not on one
14 of the lists.
15     Q.    Where did you get that name?
16     A.    It's somebody I know.
17     Q.    Is it K-L-E-I-N-M-A-N?
18     A.    Yes.
19     Q.    Is that a female by the way?
20     A.    Yes.
21     Q.    Where is Dr. Kleinman's office?
22     A.    In Northampton, Massachusetts.
23     Q.    You consider that to be within
24 commuting distance from Carolyn Mirek's home?

20  (Pages 74 to 77)

# JAMES R. GARB, M.D.
## January 27, 2006

---

**Page 78**

1    A.    It would be I think, yes.
2    Q.    Is Dr. Kleinman the only dentist in
3  Northampton with whom you spoke?
4    A.    No. I spoke with Dr. Wohl.
5    Q.    Are Dr. Wohl's office and Dr.
6  Kleinman's office the only two dental offices
7  with whom you spoke with in Northampton?
8    A.    Yes.
9    Q.    Are there more than two dental
10 offices in Northampton?
11    A.    Yes.
12    Q.    What did Dr. Kleinman tell you
13 about her practice?
14    A.    She uses latex and nitrile gloves.
15    Q.    And you decided that practice was
16 not latex-safe, correct?
17        MR. CREVIER: Objection. Leading.
18        THE WITNESS: Yes.
19    Q.    (By Ms. D'Alcomo) And Dr. Wohl,
20 did you speak with Dr. Wohl personally?
21    A.    Yes.
22    Q.    What did Dr. Wohl tell you about
23 his practice?
24    A.    They are neither latex-free or

---

**Page 79**

1  latex-safe. They use latex and nitrile.
2    Q.    Did he tell you what products, if
3  any, were latex in his office?
4    A.    I didn't go into detail.
5    Q.    Did Dr. Kleinman tell you what
6  products, if any, were made of latex in her
7  practice?
8    A.    We didn't go into that detail.
9        MS. D'ALCOMO: Off the record.
10
11        (A break was taken)
12
13        MS. D'ALCOMO: Back on the record.
14        Can we mark this please.
15
16        (Exhibit 64, Notes, marked)
17
18    Q.    (By Ms. D'Alcomo) Let me show you
19 what has been marked Exhibit 64. Are these more
20 of your notes from telephone calls that you
21 made?
22    A.    Yes.
23    Q.    And is Dr. Segal on -- is that
24 Daniel Segal that refers to number one?

---

**Page 80**

1    A.    Yes.
2    Q.    And with whom did you speak there?
3    A.    I believe I spoke with him.
4    Q.    Now the list identifies a Daniel
5  Segal, but you wrote David Segal. Is it Daniel
6  or David?
7    A.    I believe that's an error on my
8  part. It's Daniel.
9    Q.    Are these the only notes you took
10 of the conversation with Dr. Segal?
11    A.    Yes.
12    Q.    How many dentists are there in Dr.
13 Segal's practice?
14    A.    I'm not sure.
15    Q.    How many hygienists are there?
16    A.    I don't know.
17    Q.    What did he tell you about his
18 practice?
19    A.    He said they are latex-free.
20 Everything was latex-free. They use all
21 non-latex gloves and masks. They don't
22 currently have anyone that's allergic to latex
23 although they did in the past, and they could
24 accommodate someone who is allergic to latex.

---

**Page 81**

1    Q.    What does the last line say on your
2  notes under comments?
3    A.    They gave it up. That is they gave
4  up using latex.
5    Q.    When was that?
6    A.    I didn't record when.
7    Q.    Do you know if it was before 2004?
8    A.    I don't recall.
9    Q.    What was the nature of the latex
10 allergy that their employee had?
11    A.    I don't know that.
12    Q.    And did they tell you whether or
13 not they had a latex allergic employee now?
14    A.    They do not at the present time.
15    Q.    Did they tell you under what
16 circumstances the employee who was latex
17 allergic stopped working there?
18    A.    No.
19    Q.    Did you ask?
20    A.    I did not.
21    Q.    The second page is marked -- who is
22 that?
23    A.    Haselkorn. He is not on one of the
24 lists.

---

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 82

1    Q.    How did you decide to call him?
2    A.    This is someone that I knew.
3    Q.    That's the person that you knew
4  because his wife had worked for you?
5    A.    Correct.
6    Q.    What did Dr. Haselkorn tell you?
7    A.    They are latex-free. Everything
8  they use is non-latex. He developed a latex
9  allergy a number of years ago, back in the
10  nineties, and so they stopped using latex
11  several years ago.
12        They do have one staff member
13  besides him who is allergic to latex, and they
14  could accommodate someone who is allergic to
15  latex.
16    Q.    Since when has his practice been
17  latex-free?
18    A.    It was the late nineties. I don't
19  remember exactly when. It's been several years.
20    Q.    So he told you that since the late
21  nineties his practice has been latex-free?
22    A.    Yes.
23    Q.    And how many dental hygienists are
24  on his staff?

Page 83

1    A.    I don't know.
2    Q.    Does he practice with any other
3  dentist?
4    A.    I believe he is by himself.
5    Q.    Does he have a dental hygienist on
6  his staff?
7    A.    Yes.
8    Q.    And how do you know that?
9    A.    Because one of them is allergic.
10  He has one staff, a hygienist who is allergic to
11  latex. I don't know how many he has though.
12    Q.    How do you know it's a hygienist
13  that's allergic to latex?
14    A.    I remember him saying that.
15    Q.    The next name is Wise, is that
16  right?
17    A.    Yes.
18    Q.    Are these grouped together for any
19  reason, these particular ones?
20    A.    These are the ones I felt were
21  latex-free environments.
22    Q.    With whom did you speak with at Dr.
23  Wise's office?
24    A.    It was one of the hygienists. I

Page 84

1  believe it was Kelly.
2    Q.    Did you ask the hygienist whether
3  she considered the practice to be latex-free or
4  latex-safe?
5    A.    She said latex-safe.
6    Q.    And what did you write -- is that
7  why you checked latex-safe?
8    A.    Right.
9    Q.    What did you write under
10  latex-safe?
11    A.    I wrote really latex-free.
12    Q.    What is the symbol or indication?
13    A.    Asterisk.
14    Q.    Did you ask her why she didn't
15  identify the practice as latex-free?
16    A.    I didn't ask her that. I think
17  sometimes they are hesitant to say they are
18  latex-free, but it's easier to say that they are
19  latex-safe.
20    Q.    Did you ask her about whether she
21  was hesitant to identify the practice as being
22  latex-free?
23    A.    No, I didn't.
24    Q.    Now did you ask her whether there

Page 85

1  were any products in the dental office that were
2  made of latex?
3    A.    Well, they use all vinyl and
4  nitrile gloves. They really go through all
5  their instruments she said and proceed to see if
6  anything is made of latex. They call the reps
7  to find latex alternatives, so they really put a
8  lot of effort into finding non-latex
9  alternatives.
10    Q.    Next to Prophy cups and angles you
11  wrote LF. Does that mean latex-free?
12    A.    Yes. Right.
13    Q.    You wrote that next to bite wings
14  and masks?
15    A.    Right.
16    Q.    You didn't write latex-free next to
17  bite blocks and dental dams. Do you see that?
18    A.    Yes.
19    Q.    Is that because you determined from
20  talking to her that the bite blocks and dental
21  dams had latex in them?
22    A.    No, it's not. A lot of the
23  practices don't use bite blocks or dental dams.
24  A lot of them don't use those products.

22  (Pages 82 to 85)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 86

1    Q.    Did you determine whether Dr.
2  Wise's office used dental dams or bite blocks?
3    A.    I don't specifically recall
4  discussing it.  But bite blocks and dental dams
5  are easily obtainable in non-latex products, so
6  if they were using them they would have no
7  problem in getting them latex-free.  They really
8  make a studious effort to get things latex-free.
9  But I suspect they don't use them.
10    Q.    But you don't know one way or the
11  other, is that fair to say?
12        MR. CREVIER:  Objection.  Leading.
13        THE WITNESS:  I believe they don't
14    use them.
15    Q.    (By Ms. D'Alcomo)  Did you ask her
16  what the basis was of her description of the
17  practice as latex-safe as opposed to latex-free?
18    A.    No, I didn't.
19    Q.    Now you asked her specifically
20  whether the practice was latex-safe or
21  latex-free, isn't that right?
22    A.    Yes.
23    Q.    Did you think your question was
24  unclear?

Page 87

1    A.    I think they were the practice that
2  she said they have very little use of latex, but
3  there is some, so I think that's why they were
4  hesitant to say totally latex-free.
5    Q.    What does that first reference say
6  under very little?
7    A.    "Go through all instruments for a
8  procedure."  They call the reps, representatives
9  of the company to look for alternatives.  And
10  they have ten patients who are allergic to
11  latex, and people come from far away because
12  they are essentially a latex-free practice.
13    Q.    Why do they call reps looking for
14  alternatives if they already have latex-free
15  products?
16    A.    I think that she was describing the
17  process that they use to become latex-free.  You
18  start out with some latex and you eliminate it
19  by finding alternatives.
20    Q.    What did you mean when you wrote
21  "go through all instruments for a procedure"?
22  That's what you wrote, right?
23    A.    Yes.
24    Q.    What did you mean by that?

Page 88

1    A.    What I understood from her, if you
2  have someone coming in for a root canal you have
3  a certain set of instruments that you use, and
4  if anything has latex in it then they use that
5  as an opportunity to find a latex alternative.
6    Q.    Isn't it fair to say that at least
7  in the time you called Dr. Wise's office they
8  didn't believe that all of the dental items in
9  their office were latex-free?
10        MR. CREVIER:  Objection.  Leading.
11        THE WITNESS:  There were some latex
12    items that were used infrequently in that
13    practice.
14    Q.    (By Ms. D'Alcomo)  And did you
15  determine that Dr. Wise's office was latex-free?
16    A.    I felt for practical purposes it
17  was latex-free.
18    Q.    Even though the practice itself
19  didn't consider itself latex-free?
20    A.    Right.
21    Q.    Now the next one is what practice,
22  Pediatric Dentistry Associates?
23    A.    Yes.
24    Q.    That's in New Haven?

Page 89

1    A.    Correct.
2    Q.    And that's from the list?
3    A.    That's the last one on 61.
4    Q.    And the reason you called Pediatric
5  Dentistry Associates is because it was on Ms.
6  Wilton's list?
7    A.    Correct.
8    Q.    With whom did you speak there?
9    A.    It was one of the hygienists.
10    Q.    What did he or she tell you?
11    A.    She said they are latex-free.
12  Everything is non-latex.  They do not currently
13  have any staff allergic to latex, but they could
14  easily accommodate someone who was.
15    Q.    Did you ask whether they use any
16  dental products that contained latex?
17    A.    Yes.
18    Q.    What did she say?
19    A.    They do not.
20    Q.    Did you call any other dentist in
21  New Haven other than that practice?
22    A.    No.
23    Q.    What percentage of dental practices
24  in New Haven do you believe you called?

23  (Pages 86 to 89)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**JAMES R. GARB, M.D.**
**January 27, 2006**

---

Page 90

1    A.    I don't know.
2    Q.    The next one is Dr. Bird?
3    A.    Yes.
4    Q.    And that's number six on Ms.
5    Wilton's list?
6    A.    On 61, yes.
7    Q.    With whom did you speak with at Dr.
8    Bird's practice?
9    A.    I am pretty sure that was Dr. Bird
10   himself.
11   Q.    Did you ask him the question what
12   did latex-free mean to him?
13   A.    Yes.  And he said they assumed
14   everyone is allergic to latex, so everything in
15   that practice was latex-free.  He is allergic to
16   latex.
17   Q.    Did he tell you what kind of a
18   latex allergy he had?
19   A.    No, he did not.
20   Q.    Did you ask him whether his office
21   could accommodate a hygienist who is latex
22   allergic?
23   A.    Yes.
24   Q.    What did he say?

---

Page 91

1    A.    He said they could.
2    Q.    Did you ask him -- by the way, how
3    many hygienist positions were there in his
4    office?
5    A.    I did not ask.
6    Q.    Do you know how many dentists there
7    are in his office?
8    A.    I do not.
9    Q.    Now the last page of this group is
10   Dr. Burr?
11   A.    Yes.
12   Q.    That's number ten on Exhibit 61?
13   A.    Yes.
14   Q.    You wrote ortho next to her name?
15   A.    Right.  She is actually an
16   orthodontist.
17   Q.    Did you speak with Dr. Burr or
18   someone else from her office?
19   A.    I spoke with one of her staff.
20   Q.    What did the staff person tell you?
21   A.    She said the practice is entirely
22   latex-free.  They don't use any latex products.
23   Q.    Do you know if the staff person
24   was a hygienist or someone else?

---

Page 92

1    A.    I'm not sure.
2    Q.    Do you know how long the practice
3    has been latex-free?
4    A.    I do not know that.
5    Q.    Apart from Dr. Haselkorn's
6    practice, do you know how many years any of the
7    practices that you identified as being
8    latex-free were latex-free?
9    A.    No.
10   Q.    There is a note at the bottom of
11   the Kathleen Burr office note.  Do you see that?
12   Wendy?
13   A.    Right.
14   Q.    Can you read that to me.
15   A.    It says "Wendy.  Ortho."
16   Orthodontists typically have their own
17   assistants.  They could use a hygienist and a
18   hygienist could easily be trained to be an ortho
19   tech.  I wasn't sure if a practice like that
20   would have use for a hygienist.  I didn't ask
21   the practice, but I gave Wendy a call and asked
22   her.
23   Q.    Did you not include Dr. Burr in
24   your report because she was an orthodontist?

---

Page 93

1    A.    That's correct.
2          MS. D'ALCOMO:  Please mark this.
3
4          (Exhibit 65, List of Nonresponsive
5          Practices, Marked)
6
7    Q.    (By Ms. D'Alcomo)  Let me show you
8    what has been marked Exhibit 65.  What is
9    Exhibit 65?
10   A.    Those were two practices that I
11   contacted but didn't hear back from.
12   Q.    If you could turn to your report,
13   and specifically the pages identifying the
14   dentist practices in northern Connecticut and
15   south western Massachusetts area that were
16   latex-free offices.
17         The first person identified is Dr.
18   Haselkorn, correct?
19   A.    Correct.
20   Q.    By the way, is it fair to say that
21   the five dental practices that you identified
22   are the only five dental practices that you
23   found, at least in your opinion that were
24   latex-free apart from the orthodontist Dr. Burr?

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# JAMES R. GARB, M.D.
# January 27, 2006

Page 94

1      A.    That's correct.
2      Q.    Did Dr. Haselkorn tell you anything
3  other than what you included in the information
4  under his name?
5      A.    Well, we did have, you know, a
6  fairly lengthy discussion. That's a summary.
7      Q.    How long did you speak with him?
8      A.    Probably fifteen minutes. He
9  described his latex allergy and how difficult it
10  was until they figured out what it was and that
11  type of thing.
12      Q.    Is it fair to say that most of the
13  conversations you had lasted about five minutes
14  or no more than five minutes?
15           MR. CREVIER: Objection. Leading.
16           THE WITNESS: No. I would say five
17      to ten minutes. Some were a little
18      longer.
19      Q.    (By Ms. D'Alcomo) You don't know
20  how many dental hygienists Dr. Haselkorn has in
21  his practice, is that right?
22      A.    That's correct.
23      Q.    You don't know at least as of the
24  time you spoke to him if he had any openings in

Page 95

1  his office?
2      A.    That's correct.
3      Q.    Do you know if any of the five
4  practices that you listed had openings in their
5  office for a dental hygienist?
6      A.    I did not ask that question.
7      Q.    Do you know how many dental
8  hygienists Dr. Segal has in his office?
9      A.    No.
10      Q.    Did you learn anything from your
11  conversation with the person in Dr. Segal's
12  office, other than what is contained in the
13  description under his name?
14      A.    Again, I would have to refer back
15  to my notes. No. I think that summarizes it.
16      Q.    Can you tell me anything, just
17  getting back to Dr. Haselkorn for a moment,
18  anything you recall about the conversation with
19  Dr. Haselkorn other than what's contained in the
20  description under his name in your report?
21      A.    Again, other than his discussing
22  some of his latex, personal latex allergy
23  problems, no.
24      Q.    What did he describe to you as

Page 96

1  being his personal latex allergy problems?
2      A.    He had, I believe, skin and
3  respiratory symptoms.
4      Q.    Did he describe to you what
5  reaction he would have?
6      A.    I don't remember the details at
7  this point.
8      Q.    Did he tell you about any reactions
9  he had in restaurants or eating food?
10      A.    I don't recall that, no.
11      Q.    Can you tell me anything more
12  specifically about the conversation you had with
13  Dr. Haselkorn other than what's described under
14  his name and what you just recounted?
15      A.    No.
16      Q.    Now Dr. Bird -- strike that.
17           In the interview with Dr. Bird's
18  office -- withdraw that.
19           You refer to Dr. Bird's office as
20  being latex-free?
21      A.    Yes.
22      Q.    Can you tell me anything that you
23  learned in your conversation with Dr. Bird's
24  office other than what is contained in the

Page 97

1  description below his name?
2      A.    No.
3      Q.    Now you listed Pediatric Dentistry
4  Associates as being latex-free. Is it fair to
5  say you didn't speak with a dentist there?
6      A.    That's correct.
7      Q.    Can you tell me anything you
8  learned about Pediatric Dentistry Associates in
9  New Haven other than what you described below
10  the name Pediatric Dentistry Associates in your
11  report?
12      A.    No.
13      Q.    Now you have a description of Dr.
14  Wise's office in Lee. Do you see that?
15      A.    Yes.
16      Q.    Can you tell me anything about what
17  you learned from your conversation with someone
18  at Dr. Wise's office other than what is listed
19  under Dr. Wise's name?
20      A.    As we said earlier, they put a lot
21  of effort into assuring that their practice uses
22  latex-free equipment. They said they had ten
23  patients that came to them because they are
24  latex-free from great distances sometimes.

# CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# JAMES R. GARB, M.D.
# January 27, 2006

Page 98

1    Q.    They didn't describe themselves as
2  latex-free?
3    A.    No.
4    Q.    They didn't use the term
5  latex-free?
6    A.    They described as latex-safe.
7    Q.    Anything else?
8    A.    No.
9    Q.    Now in your listing of your
10  compensation, Dr. Garb, on the last page of your
11  CV. You listed your compensation for case
12  reviews as being $250 an hour and for testimony
13  $500 an hour?
14    A.    Yes.
15    Q.    Can you tell me when before today
16  you earned $500 an hour for testimony?
17    A.    Well, October whenever we did our
18  last deposition. That would be the last time
19  before today.
20    Q.    Did you bill the Defendant in this
21  matter $500 an hour for your testimony?
22    A.    Yes.
23    Q.    And before this case, was there any
24  occasion that you charged $500 an hour?

Page 99

1    A.    Yes.
2    Q.    What case was that?
3    A.    I guess that was the Jeffries Mass.
4  Casualty Insurance in 2004.
5    Q.    What was that case about?
6    A.    I haven't reviewed it recently. As
7  I recall he was a gentleman who had chronic
8  fatigue syndrome which he felt was due to
9  hepatitis B vaccination.
10    Q.    And you don't have a copy of the
11  deposition?
12    A.    I don't.
13    Q.    Apart from the -- strike that.
14          Did you give deposition testimony
15  in that case?
16    A.    Yes.
17    Q.    Any other testimony?
18    A.    No.
19    Q.    For the deposition testimony in
20  that case in 2004 you charged $500 an hour?
21    A.    Yes.
22    Q.    And you charged the insurance
23  company?
24    A.    No. That is a subpoena, so I

Page 100

1  charged the attorney.
2    Q.    So apart from the Jeffries case and
3  this matter, you haven't charged anyone $500 an
4  hour?
5    A.    There was one other deposition
6  several years ago. I forget what my fees --
7  My fees might have been -- I'm trying to think.
8  Maybe 450 an hour. That was a few years ago.
9          MS. D'ALCOMO: Please mark this.
10
11          (Exhibit 66, Internet Printout,
12          marked)
13
14    Q.    (By Ms. D'Alcomo) Let me show you
15  what's been marked Exhibit 66.
16          How did you get Exhibit 66?
17    A.    This was something that I found on
18  the Internet from the Mass. Nurses Association.
19    Q.    And you found it on December 9,
20  2005?
21    A.    No. I had found it previously.
22  This was included in my original report.
23    Q.    Why did you print it out again on
24  December 9, 2005?

Page 101

1    A.    Just to have another copy of it.
2    Q.    Now attached to the first two
3  pages in the Mass. Nursing Association is
4  something from Germafen.com.
5          Do you see that?
6    A.    Yes.
7    Q.    How did you happen to print that
8  up? I take it you printed it off the Internet?
9    A.    Yes.
10    Q.    How did you happen to get that
11  information?
12    A.    I was just looking for latex-free
13  dental products and found a number of things,
14  this being one of them.
15    Q.    Are Germafen products listed in
16  your report?
17    A.    I don't recall. I can look if you
18  want.
19    Q.    What if anything did you do with
20  the information about Germafen dental dams when
21  you printed it out?
22    A.    I might not have referred to it
23  specifically. There were several sources I drew
24  upon for the report. For example, under dental

26 (Pages 98 to 101)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 102

1  dams, there were three others that I came
2  across, so I didn't list this particular one.
3  So it was just further evidence of latex-free
4  dental products.
5      Q.    Let's look at the dental dams
6  listed in your report. How did you come to list
7  the three items that are listed under dental
8  dams in your report?
9      A.    I believe that came from the
10 latex-free dental reference. There were also
11 some that came from the University of North
12 Carolina that has a web site on latex-free
13 dentistry.
14     Q.    Did you print that out, the
15 University of North Carolina?
16     A.    Yes. It's included somewhere in
17 here.
18     Q.    Is that the material attached to
19 the two pages after the dental dams?
20     A.    No. It says UNC on it. It's
21 pretty clear when you come across it. It's
22 probably in that package. It's in the report.
23     Q.    It's in your report?
24     A.    Yes.

Page 103

1      Q.    So under, let's take dental dams.
2  What did you seek to do in listing items under
3  dental dams?
4      A.    What did I seek to do?
5      Q.    What were you attempting to do in
6  listing items under dental dams?
7      A.    I was just attempting to
8  demonstrate that there were several products
9  available that don't contain latex.
10     Q.    Where did you get the name
11 Latex-Free Insti-Dam from Zire Company?
12     A.    That was from this latex-free
13 dentistry book.
14     Q.    That was from the Pacific Northwest
15 Foundation?
16     A.    Correct.
17     Q.    What is the Pacific Northwest
18 Foundation?
19     A.    I'm really not familiar with it
20 other than this publication, but as best I can
21 tell it was started by this nurse with a latex
22 allergy to further latex-free dentistry partly
23 on self-interest on her part.
24     Q.    Did you do anything to verify any

Page 104

1  of the information that you pulled from the
2  Pacific Northwest Foundation publication?
3      A.    I did not.
4      Q.    Are some of the latex -- strike
5  that.
6          Are some products that you identify
7  as latex-free in your report, on pages one and
8  two of your report, actually one, two and three,
9  taken from the Pacific Northwest Foundation
10 publication?
11     A.    Yes.
12     Q.    Are more than ten taken from it?
13     A..   I believe so, yes.
14     Q.    Do you know whether all of the
15 products that you have listed, assuming for the
16 moment they are all latex-free, are sold in
17 northeast Connecticut?
18     A.    I don't really know that. I would
19 assume most of these things are available to
20 anyone that wants to purchase them.
21     Q.    Which of the companies listed in
22 your report are dental suppliers next to
23 products?
24     A.    I am not sure I understand.

Page 105

1      Q.    Let's look under gloves. You
2  identify a glove, N-Dex nitrile glove, BEST
3  Manufacturing. Is N-Dex nitrile glove a brand
4  of glove?
5      A.    Yes.
6      Q.    What is BEST Manufacturing?
7      A.    They manufacture the glove.
8      Q.    Does one purchase the glove through
9  BEST, if you know?
10     A.    I would imagine they are purchased
11 through wholesalers. I don't know for sure.
12     Q.    Now the next product you list is
13 Elastyren copolymer gloves, ECO Medical
14 Technologies. Is ECO Medical Technologies the
15 manufacturer?
16     A.    Yes. Those are all manufacturers.
17     Q.    Is Cardinal Health a manufacturer?
18     A.    Yes.
19     Q.    The next category you list is
20 Amalgam Carriers?
21     A.    Yes.
22     Q.    What is Nulon Tips?
23     A.    That's the name of the product.
24     Q.    The name of the product?

27  (Pages 102 to 105)

**JAMES R. GARB, M.D.**
**January 27, 2006**

Page 106

1    A.    Yes.
2    Q.    What is a Nulon Tip?
3    A.    Well, it's, like I said, it's a
4  name of a product to carry dental amalgam.
5    Q.    What is Arnel, Inc?
6    A.    That's the company that
7  manufactures it.
8    Q.    Under anesthetic cartridges. Where
9  did you get the information about anesthetic
10  cartridges?
11    A.    I think that also came from this
12  reference. Yes. That came from this
13  latex-free dentistry reference.
14    Q.    Under anesthetic and oxygen
15  systems, you list Vital Signs. What is that?
16    A.    That's the company that
17  manufactures that particular product.
18    Q.    What is the product?
19    A.    That's an anesthesia system of
20  latex-free face mask and general anesthesia
21  latex-free system.
22    Q.    It refers to the previous line?
23    A.    Yes.
24    Q.    At the bottom of that section under

Page 107

1  anesthetic and oxygen systems, you list
2  latex-free nasal cannula and Salvin Dental
3  Specialties. What is Salvin Dental Specialties?
4    A.    I believe that is the manufacturer
5  of that product as well.
6    Q.    Are any of the companies listed
7  next to the products in your report suppliers?
8    A.    I believe those are all
9  manufacturers.
10    Q.    Now you discovered in the course
11  of your work on this report that at least one
12  bit of information that Wendy Wilton had given
13  to you about the latex practice of a dentist
14  was incorrect, is that right?
15    MR. CREVIER: Objection. Leading.
16    THE WITNESS: What are you
17    referring to?
18    Q.    (By Ms. D'Alcomo) Do you remember
19  there being a practice, Dr. Bearly and Dr.
20  Peterson, that Wendy Wilton identified as being
21  latex-safe?
22    A.    I have to go back and look at it,
23  but let's see. She indicated that they were
24  latex-safe. I felt I wasn't ready to give them

Page 108

1  that label.
2    Q.    You found that to be inaccurate,
3  isn't that right?
4    MR. CREVIER: Objection. Leading.
5    THE WITNESS: The people can vary
6    somewhat in how they define these terms.
7    I was using a fairly rigorous definition,
8    but a practice that can provide latex-free
9    gloves and not use latex equipment on a
10    particular patient, they may consider that
11    latex-safe.
12    Q.    (By Ms. D'Alcomo) The practice
13  didn't consider itself latex-safe, isn't that
14  right?
15    A.    I think that's right. I would have
16  to look at it again. Right.
17    Q.    So the practice of Dr. Bearly and
18  Dr. Peterson did not consider itself latex-safe,
19  correct?
20    A.    Correct.
21    Q.    And you didn't consider the
22  practice of Dr. Bearly and Dr. Peterson to be
23  latex-safe, correct?
24    A.    Correct.

Page 109

1    Q.    And Wendy Wilton did consider the
2  practice of Dr. Bearly and Dr. Peterson to be
3  latex-safe, right?
4    MR. CREVIER: Objection. Leading.
5    THE WITNESS: Apparently she did.
6    Q.    (By Ms. D'Alcomo) Is it fair to
7  say that people can vary in what their
8  definition of what latex-safe is?
9    A.    I think there is not an absolute
10  definition on that.
11    Q.    There was a difference between you
12  and Wendy Wilton, isn't that right?
13    A.    It appears so. I didn't discuss
14  this with her, so I don't know what she was
15  basing that on.
16    Q.    Did you do anything to determine
17  whether the Pacific Northwest Foundation had
18  made any errors in reporting the latex-free
19  nature of various products referred to in its
20  publication?
21    A.    I did not.
22    Q.    Now understand mixing bowls you
23  list Silicone Mixing Bowls.
24    A.    Yes.

28  (Pages 106 to 109)

# JAMES R. GARB, M.D.
# January 27, 2006

Page 110

1    Q.    What is next to Silicon Mixing
2 Bowls?
3        A.    Pulp Dent.
4        Q.    What is that?
5        A.    That is the manufacturer.
6        Q.    Now under Suction Tips and Saliva
7 Ejectors.
8        A.    Yes.
9        Q.    What is the reference to
10 Flexo-Saliva Ejector?  What does that mean?
11       A.    Again, that's their brand name for
12 their saliva ejector.
13       Q.    Whose brand name?
14       A.    H.J. Bosworth.  That's the product
15 name.
16       Q.    What is coralite plastic?  What
17 does that reference?
18       A.    Let me check on that.
19       Q.    Do you know without looking at the
20 report what the coralite plastic reference is
21 without referring to the Pacific Northwest
22 Foundation report?
23       A.    No.  I would have to check on that.
24 There is a lot of products listed here.  I don't

Page 111

1 remember every one of them by heart.
2        Q.    What was the -- strike that.
3             Is it fair to say that the source
4 of information for the products listed in your
5 report were the Pacific Northwest Foundation,
6 and the printout attached to your report?
7             MR. CREVIER:  Objection.  Leading.
8        Q.    (By Ms. D'Alcomo)  From the
9 Internet and from the ECO dental catalog?
10            MR. CREVIER:  Objection.  Leading.
11            THE WITNESS:  Yes.
12       Q.    (By Ms. D'Alcomo)  Any other
13 sources?
14       A.    No.
15       Q.    Is it fair to say the only
16 portions of the Benco Dental catalog that you
17 saw were the portions given to you by Defense
18 Counsel?
19       A.    Yes.
20       Q.    Did you compare any -- strike that.
21            Did you look at any price
22 information on any of these products?
23       A.    No.
24       Q.    So you didn't do any price

Page 112

1 comparisons between latex products and
2 latex-free products?
3        A.    No.
4        Q.    Did you have any discussions with
5 any dentist about, during the course of doing
6 this report from December of 2005, about the
7 cost of latex-free dental products?
8        A.    No.
9        Q.    Dr. Garb, you do not know how wide
10 spread latex-free dentistry is in Connecticut,
11 do you?
12            MR. CREVIER:  Objection.  Leading.
13            THE WITNESS:  Again, we did not
14       make an attempt to do random samples, but
15       based on the practices we found, I have to
16       assume that there is a fair number of
17       practices out there that are latex-free.
18       Q.    (By Ms. D'Alcomo)  You do not know
19 how wide spread latex-free dentistry is in
20 Connecticut, do you?
21       A.    No.
22       Q.    And you have no scientifically
23 based data to draw a conclusion as to how wide
24 spread latex-free dentistry is in Connecticut,

Page 113

1 do you?
2        A.    No.
3        Q.    And you have no knowledge how wide
4 spread latex-free dentistry is in Massachusetts,
5 do you?
6             MR. CREVIER:  Objection.  Leading.
7             THE WITNESS:  No.
8        Q.    (By Ms. D'Alcomo)  And you have no
9 scientific data on which to base any opinion on
10 how wide spread latex-free dentistry is in
11 Massachusetts, do you?
12            MR. CREVIER:  Objection.  Leading.
13            THE WITNESS:  Only anecdotally.
14            MS. D'ALCOMO:  I have no further
15       questions.  Thank you very much, Dr. Garb.
16            MR. CREVIER:  I have no questions.
17 Thank you.
18
19            (Deposition concluded)
20
21
22
23
24

29  (Pages 110 to 113)

**JAMES R. GARB, M.D.**
**January 27, 2006**

| Page 114 |
|---|

1    I, TACY A. MALANDRINOS, a Notary Public
2  in and for the Commonwealth of Massachusetts, do
3  hereby certify that JAMES R. GARB, M.D. appeared
4  before me and satisfactorily identified himself
5  on January 27, 2006 at the law offices of
6  CREVIER & RYAN, 1500 Main Street, Suite 2020,
7  Springfield, Massachusetts, and was by me duly
8  sworn to testify to the truth and nothing but
9  the truth as to his knowledge touching and
10  concerning the matters in controversy in this
11  cause; that he was thereupon examined upon his
12  oath and said examination reduced to writing by
13  me; and that the statement is a true record of
14  the testimony given by the witness, to the best
15  of my knowledge and ability.
16    I further certify that I am not a relative
17  or employee of counsel/attorney for any of the
18  parties, nor a relative or employee of such
19  parties, nor am I financially interested in the
20  outcome of the action.
21  WITNESS MY HAND this 15th day of February 2006.
22
23  Tacy A. Malandrinos    My Commission expires:
24  Notary Public          June 9, 2006

| Page 115 |
|---|

1  Today's Date:  February 15, 2006
2  To:  David B. Crevier, Esq.
3  Copied to:  Joanne D'Alcomo, Esq.
4  From:  Tacy Malandrinos
5  Deposition of:  JAMES R. GARB, M.D.
6  Taken:  January 27, 2006
7  Action:  CAROLYN MIREK  v.
8      THE GUARDIAN LIFE INSURANCE COMPANY OF
9      AMERICA and BERKSHIRE LIFE INSURANCE
10      COMPANY OF AMERICA
11
12    Enclosed is a copy of the deposition of
13  JAMES R. GARB, M.D.  Pursuant to the Rules of
14  Civil Procedure, Dr. Garb has thirty days to
15  sign the deposition from today's date.
16    Please have Dr. Garb sign the
17  enclosed signature page.  If there are any
18  errors, please have him mark the page, line and
19  error on the enclosed correction sheet.  He
20  should not mark the transcript itself.  The
21  certification and addendum should be forwarded
22  to all interested parties.
23    Thank you for your cooperation in this
24  matter.

| Page 116 |
|---|

1      UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF MASSACHUSETTS
3          04-30166-MAP
4
5  * * * * * * * * * * * * * * * * * *
6  CAROLYN MIREK,                *
7      Plaintiff      *
8  V.                  *
9  THE GUARDIAN LIFE INSURANCE        *
10  COMPANY OF AMERICA and BERKSHIRE  *
11  LIFE INSURANCE COMPANY OF        *
12  AMERICA,            *
13      Defendants   *
14  * * * * * * * * * * * * * * * * * *
15
16    I, JAMES R. GARB, M.D., do hereby certify,
17  under the pains and penalties of perjury, that
18  the foregoing testimony is true and accurate, to
19  the best of my knowledge and belief.
20    WITNESS MY HAND, this   day of      ,
21  2006.
22
23  _____
24    JAMES R. GARB, M.D.

| Page 117 |
|---|

1      CORRECTION SHEET
2  DEPONENT:  JAMES R. GARB, M.D.
3  CASE:  CAROLYN MIREK V. THE GUARDIAN LIFE
4      INSURANCE COMPANY OF AMERICA et al
5  DATE TAKEN:  January 27, 2006
6  ******************************************
7  PAGE / LINE / CHANGE OR CORRECTION AND REASON
8  ******************************************
9  _____/_____/_____
10  _____/_____/_____
11  _____/_____/_____
12  _____/_____/_____
13  _____/_____/_____
14  _____/_____/_____
15  _____/_____/_____
16  _____/_____/_____
17  _____/_____/_____
18  _____/_____/_____
19  _____/_____/_____
20  _____/_____/_____
21  _____/_____/_____
22  _____/_____/_____
23  _____/_____/_____
24  _____/_____/_____

30 (Pages 114 to 117)