# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No.: 04-30166-MAP

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CAROLYN MIREK                          \*

    Plaintiff                       \*

  vs.                                  \*

THE GUARDIAN LIFE INSURANCE            \*

COMPANY OF AMERICA and                 \*

BERKSHIRE LIFE INSURANCE               \*

COMPANY OF AMERICA,                    \*

    Defendants                      \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF: BRIAN M. DONNELLY

BERKSHIRE LIFE INSURANCE

700 South Street

Pittsfield, Massachusetts

April 10, 2006   10:00 A.M.

Kelly M. Bruce

Court Reporter

Page 106

1    A.   Well, then, typically, when a claim
2    results in litigation, it would be our practice
3    to assign the file to a claim consultant.
4    Q.   Was -- on March 3, 2005, was Kevin
5    Kvederas still working for Berkshire?
6        MR. KIMBALL: Objection. Calls
7    for speculation.
8        You may answer, if you know the
9    answer.
10       THE WITNESS: My best
11   recollection is no.
12   Q.   (By Mr. Nesin) If he had been
13   working, would -- the case still would be his
14   responsibility?
15       MR. KIMBALL: Objection to the
16   form of the question. I'm sorry.
17       Go ahead.
18       MR. NESIN: Yeah, if he had --
19       MR. KIMBALL: Objection.
20       MR. NESIN: I'll strike that.
21   Q.   (By Mr. Nesin) If Kevin Kvederas had
22   been working on March 3, 2005, would he have
23   been responsible for Carolyn Mirek's claim?
24       MR. KIMBALL: Objection to the

Page 107

1    form of the question. The phrase "had
2    been working" is vague and ambiguous.
3    Also the question calls for speculation
4    by the witness.
5        THE WITNESS: Not necessarily.
6    Q.   (By Mr. Nesin) What would cause a
7    new claim consultant to be put on a particular
8    claim?
9        MR. KIMBALL: Objection. Calls
10   for speculation.
11       THE WITNESS: Again, it might be
12   driven by the size of a person's
13   caseload. In my case, it's not unusual
14   for me to assign it to somebody new just
15   to have a fresh set of eyes look at the
16   file.
17   Q.   (By Mr. Nesin) Is Samuel Haupt an
18   experienced claim consultant?
19   A.   I cannot remember Sam's start date.
20   Q.   You had mentioned a long time ago in
21   this deposition that there was a -- there were
22   certain matters or certain claims that you would
23   generally prefer to direct towards experienced
24   claims consultants; is that accurate?

Page 108

1    A.   That could be one of the factors,
2    yes.
3    Q.   In March 3, 2005, would you have
4    considered Carolyn Mirek's claim to be of a
5    nature where you would want it to be handled by
6    an experienced claim consultant?
7    A.   I think it would depend on the claim
8    consultant, the progress that person has made as
9    a consultant. These files aren't limited to
10   review by a claim consultant. Sam reported to
11   an experienced team leader who, in turn,
12   reported to me.
13   Q.   Who was the team leader that Samuel
14   Haupt reported to?
15   A.   I believe at that time it Jennifer
16   Windram, W-I-N-D-R-A-M.
17   Q.   Now, the March 3, 2005 letter asks
18   for Dr. Garb to do another paper evaluation of
19   Ms. Mirek's claim; is that correct?
20   A.   Yes.
21   Q.   Why was it necessary or why -- why
22   would Guardian -- or why would Berkshire ask for
23   another doctor to do an evaluation?
24   A.   Again, it's not unusual for us to

Page 109

1    want to take a second look at a file, a fresh
2    set of eyes. In this case, a different
3    physician.
4    Q.   Was there any perception that there
5    was something wrong with Dr. Axe's two reports
6    that would require an additional report?
7    A.   Not to my knowledge.
8    Q.   Was Dr. Garb hired through MLS?
9    A.   No.
10   Q.   Was Dr. Garb hired -- is Dr. Garb a
11   Berkshire employee?
12   A.   No.
13   Q.   Did an outside vendor find Dr. Garb
14   to write this report?
15   A.   No.
16   Q.   How did this matter get referred to
17   Dr. Garb?
18   A.   We have an independent consulting
19   medical director who we rely on to recommend an
20   appropriate physician to review a file.
21   Q.   And is that person Dr. Holbrook?
22   A.   That's correct.
23   Q.   When you say, an independent
24   consultant medical director, is he a Berkshire

Page 110

```
1   employee?
2   A.  No.
3   Q.  Does he get some sort of finders fee
4   for finding a doctor -- for referring a doctor;
5   What is his actual role in the process?
6       MR. KIMBALL: Just to --
7       objection. Just to clarify; we're
8       speaking of?
9       MR. NESIN: Dr. Holbrook.
10      MR. KIMBALL: Dr. Holbrook.
11      Thank you.
12      THE WITNESS: Dr. Holbrook is
13      paid on an hourly basis. He typically
14      comes here on a consulting basis several
15      days a week. He's paid on a 1099 basis.
16      With his assistance, we have put
17      together a panel of physicians of
18      varying specialties. And typically, Dr.
19      Holbrook would suggest to the claim
20      consultant or the team leader the panel
21      member that he felt was most suited for
22      a particular claim.
23  Q.  (By Mr. Nesin) Is Dr. Garb a member
24  of that panel?
```

Page 111

```
1   A.  Yes.
2   Q.  And was he a member on March 3, 2005?
3   A.  I would have to check my records
4   before I could answer that.
5   Q.  Is it a record that would be in the
6   claim file or this is a record that hasn't been
7   produced?
8   A.  It would not be in the claim file.
9   Q.  Have you -- has Berkshire stopped
10  using outside vendors to find doctors as a
11  result of Dr. Holbrook's work?
12      MR. KIMBALL: Objection. You're
13      going to have to define "vendors."
14  Q.  (By Mr. Nesin) Okay. By "vendor" I
15  mean a company like MLS to which -- which would
16  assist in finding a doctor to perform these
17  medical evaluations.
18  A.  We have another vendor in place that
19  we use largely for independent medical
20  examinations and functional capacity
21  examinations. We would probably not go to that
22  vendor for a doctor or a specialist unless we
23  didn't have somebody on our panel who would be
24  appropriate.
```

Page 112

```
1   Q.  Okay. How many doctors are on your
2   panel?
3       MR. KIMBALL: Objection. Vague
4       as to time.
5   Q.  (By Mr. Nesin) Right now, at the
6   current time, how many doctors are on your
7   panel?
8   A.  Best guess, since I haven't looked at
9   the list in a while, is probably 21, 22,
10  somewhere in there.
11  Q.  As best as you can recall, do you
12  know how many doctors were on your panel on
13  March 3, 2005 or thereabouts?
14  A.  No.
15  Q.  Do you think it's -- would it have
16  been approximately the same number or fewer or
17  more?
18  A.  This panel was put together over a
19  period of time, so it would really be total
20  speculation on my part to try to pick a number.
21  Q.  When you say it was "put together
22  over a period of time," when did the panel start
23  getting put together?
24  A.  I would say shortly after we retained
```

Page 113

```
1   Dr. Holbrook.
2   Q.  And when was that?
3   A.  Best estimate would be the latter
4   part of 2004, I believe.
5 * Q.  Is there any reason that Berkshire
6   now uses someone in Dr. Holbrook's capacity and
7   this panel system rather than the system that it
8   seems like they previously used, which was
9   getting doctors through outside vendors?
10      MR. KIMBALL: Objection. I
11      believe the question misstates prior
12      testimony.
13      THE WITNESS: Sorry. I have to
14      ask you to read that back.
15
16      (* question read)
17
18      THE WITNESS: The way that came
19      about was I had looked at the models,
20      let's say, that were being used by our
21      competitors, and I found there was a
22      great variety in the approaches that our
23      competitors took. And I don't tend to
24      remember all of my thought process but,
```