## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLYN MIREK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO.: 04-30166-MAP |
| ) | |
| THE GUARDIAN LIFE INSURANCE ) | |
| COMPANY OF AMERICA and ) | |
| BERKSHIRE LIFE INSURANCE ) | |
| COMPANY OF AMERICA, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## DEFENDANTS' MOTION IN LIMINE
## TO EXCLUDE EXPERT AND FACT WITNESSES

The Defendants, the Guardian Life Insurance Company of America ("Guardian") and Berkshire Life Insurance Company of America ("Berkshire") (collectively referred to as "Defendants"), hereby file this motion in limine seeking an order excluding the testimony of specific expert and fact witnesses.

### INTRODUCTION

As explained below, the Court should bar Plaintiff from introducing: 1) the testimony of Plaintiff's proffered expert, Dr. Christine Oliver, because Dr. Oliver is unqualified to testify to the matters on which she will be asked to opine and her testimony rebutting Dr. Axe's opinions are irrelevant; 2) the testimony of Jolanta Baginski, Eilleen Barile, Diane Chupas, Carol Gustamachio, Brian McAnneny, Ronald Mirek, Kathy Morlock, Mary Beth Norman, Dr. Salvatore Squatrito, Karen Stoker, Janet Streeter, Karen Volechenko, and Sue Weigen because these witnesses will offer duplicative and redundant testimony; and 3) the testimony of Rosanna

Baena and Eilleen Barile because Plaintiff failed to disclose these witnesses until discovery had closed and the justification for Ms. Baena's testimony is based on a false premise.

## ARGUMENT

**A.   THE COURT SHOULD PRECLUDE PLAINTIFF FROM INTRODUCING THE TESTIMONY OF PLAINTIFF'S PROFFERED EXPERT, DR. CHRISTINE OLIVER, BECAUSE DR. OLIVER IS UNQUALIFIED TO TESTIFY TO THE MATTERS ON WHICH SHE WILL BE ASKED TO OPINE.**

Plaintiff has identified two physicians that will testify as to Plaintiff's latex allergy, Ms. Mirek's treating allergist, Dr. Robert Bedard and Dr. Christine Oliver, a doctor of occupational and rehabilitative medicine. Dr. Bedard is being proffered to testify to "his treatment and diagnoses" of Ms. Mirek. Plaintiff's Pretrial Memorandum (Corrected), attached hereto at Exhibit 1, at 12.[1] Dr. Oliver is being proffered to testify:

> Concerning her opinion that Ms. Mirek is disabled from working in her occupation as a dental hygienist because of a latex allergy. She is further expected to testify regarding the reports of Harold Axe, M.D., which defendants purported to rely in denying the claim in 2002, contained statements and analysis that conflicted with widely accepted views of conventional medicine, and further, that other views expressed by Dr. Axe conflict or depart from widely accepted views of conventional medicine.

Plaintiff's Pretrial Memorandum at 11.

"When faced with a proffer of expert testimony, the district court must determine whether the expert witness is qualified and has specialized knowledge that will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" Bogosian v. Mercedes-Benz of North America, 104 F.3d 472, 476 (1st Cir. 1997)(internal citations omitted). The Court must first determine whether the proposed expert is "qualified by 'knowledge, skill, experience, training or education.'" Id. (citation omitted). Second, the Court inquires whether the proffered testimony

---

[1] All Exhibits cited herein are true and accurate copies, as set forth in the Affidavit, attached hereto at Exhibit A.

concerns "scientific, technical or other specialized knowledge." Id. (citation omitted). Finally, the Court performs a gate keeping function, by assessing whether the testimony "is helpful to the trier of fact, i.e. whether it rests on a reliable foundation and is relevant to the facts of the case." Id.

The Court must: (1) preclude Plaintiff from introducing the testimony of Dr. Oliver concerning Plaintiff's ability to perform her occupation as a dental hygienist because she is unqualified to testify to Plaintiff's ability to perform her occupation; and (2) preclude Plaintiff from introducing the testimony of Dr. Oliver regarding Dr. Axe and Dr. Axe's opinions because, as discussed in Section A.1. of Defendants' Motion in Limine to Exclude Irrelevant Evidence, filed herewith, this case is simply a breach of contract claim, not an inquiry into Defendants' claims handling, as such, Dr. Oliver's expected testimony regarding Dr. Axe's opinions during the claim review period is irrelevant.

      **1.**      **Dr. Oliver Is Not Qualified To Testify To Plaintiff's Inability To Perform Her Occupation As A Dental Hygienist.**

Dr. Oliver opines, "*because of her latex allergy and associated health risks, Ms. Mirek is totally and permanently disabled from her work as a dental hygienist.*" Dr. Oliver's November 9, 2005 Expert Report, attached hereto at Exhibit 2, at 7 (italics in the original). Dr. Oliver identifies the bases of her opinion that Plaintiff is unable to work as a dental hygienist because she will necessarily be exposed to latex as follows: (a) latex free dental practices are allegedly rare and rendering a dental office latex free is allegedly difficult and costly; (b) latex containing materials are allegedly numerous in a dental environment and those considered latex safe are not actually latex safe; and (c) the use of powdered latex gloves in one dental office of an improperly ventilated building can result in the distribution of latex to other parts of the building. Dr. Oliver's November 9, 2005 Expert Report, at 7-8.

Plaintiff and Dr. Oliver both admit that the only thing that prevents Plaintiff from performing her occupation as a dental hygienist is the alleged presence of latex in dental offices. In that regard, Plaintiff and Dr. Oliver testified as follows:

> Q. [By Mr. Crevier] So, the only thing that disables you from being a registered dental hygienist is the possibility that in that position, you could have exposure to latex, but for that, you're not disabled from doing your job, correct?
>
> A. [By Plaintiff] Correct.

Plaintiff's Deposition Transcript, relevant pages attached hereto as Exhibit 3, at 262:3-7.

> Q. [By Mr. Crevier] is it your belief that Ms. Mirek could work in a dental office that was truly latex free?
>
> A. [By Dr. Oliver] If it were truly latex free, yes.
>
> Q. Okay. So, the presence of latex is the only thing that disables Ms. Mirek from being able to perform the occupation of a dental hygienist, correct?
>
> A. In my opinion, yes.

Dr. Oliver's Deposition Transcript, relevant pages attached hereto as Exhibit 4, at 138:10-17.

If the only thing that prevents Plaintiff from performing her occupation as a dental hygienist is the presence of latex in a dental office, in order for Dr. Oliver to opine "that Ms. Mirek is disabled from working in her occupation as a dental hygienist because of a latex allergy," Dr. Oliver necessarily must have knowledge regarding the presence of latex in and the potential elimination of latex from dental offices.

As detailed below, Dr. Oliver lacks any general or specialized knowledge regarding dental offices, the presence of latex in dental offices, non-latex dental products and the possibilities of removing latex from a dental office. Accordingly, Dr. Oliver's opinion regarding Plaintiff's inability to perform her occupation as a dental hygienist is lacking a reliable foundation and must be precluded. See Bogosian, 104 F.3d at 477 (The First Circuit upheld the

4

District Court's finding that the expert was not qualified to opine on the issue of a transmission design defect where expert has extensive experience as a mechanic but lacked experience in design or manufacture of automobiles and their components.); See also Silva v. American Airlines, 960 F.Supp. 528 (D.P.R. 1997)(expert excluded because he had not specifically worked with, tested or studied aircraft interior safety hazards and warnings).

      a.    <u>Dr. Oliver Lacks Knowledge Regarding The Difficultly, Costs And Logistics Of Rendering A Dental Office Latex Free And Lacks Knowledge Regarding The Existence Of Latex Free Dental Offices.</u>

Dr. Oliver has been proffered as an expert regarding Plaintiff's inability to work in dental offices due to her allergy to latex. Dr. Oliver is unqualified to testify to this opinion because she has admitted that dental offices can be made latex free, <u>Dr. Oliver's Deposition Transcript</u>, at 118:7-8, yet she does not know anything about the ease/difficulty, costs or logistics of making dental offices latex free. Moreover, Dr. Oliver has no knowledge as to whether or not latex free dental offices exist in which Ms. Mirek could work.

Dr. Oliver's testimony demonstrates that she has no knowledge or experience with latex free dentistry:

> Q. (By Mr. Crevier) Okay. Have you ever had any conversations with anyone regarding latex free dentistry?
> A. [By Dr. Oliver] Not latex free dentistry, latex free health care facility.
> Q. But nothing in particular to dentistry, is that correct?
> A. That's correct.
> Q. Have you ever performed any research regarding latex free dentistry?
> A. No.
> Q. Have you undertaken any investigation to ascertain whether there were any dental offices in Connecticut during the period of 2000 to the present that were latex free?
> A. I did not undertake that investigation.
> Q. Likewise, you didn't undertake any investigation to ascertain whether there were any dental offices in Connecticut in which Ms. Mirek could work during 2000 to the present, did you?
> A. No.

>Q. Have you ever had any experience in assisting persons or advising persons with latex allergy to be able to return to work or work in dental offices?
>Attorney Nesin: Objection.
>A. I have not specifically done that.

Dr. Oliver's Deposition Transcript, at 124:5-125:7.

>Q. [By Mr. Crevier] So, at the time you wrote your report stating that Ms. Mirek was disabled from performing her work as a dental hygienist, you had not undertaken any investigation to ascertain whether there were any dental offices in which she could work, correct?
>
>A. [By Dr. Oliver] That's correct.

Dr. Oliver's Deposition Transcript, at 122: 8-13

Dr. Oliver's testimony further demonstrated that she lacked anything more than superficial knowledge about switching to a latex safe dental practice.

>Q. [By Mr. Crevier] Do you agree that it's relatively easy to switch to a latex safe dental practice?
>A. [By Dr. Oliver] No.
>Q. Why not?
>A. I think – well, several reasons, some of which are contained in this paragraph. I cannot imagine how a rubber dam or a rubber mouth prop can realistically be wrapped in a nitrile glove and tied with floss and used in a practical manner to perform dental work. I would expect – and he talks about local anesthetics as being an example of something that's difficult to do latex free, and based on the reading that I've done, the latex gloves, powdered or nonpowdered, are advantageous in that they permit finer manipulation of the fingers and of tolls that are in the fingers. And it's difficult for dentists to perform dentistry using nonlatex gloves. And he gives one example here of rubber mouth props, but I would imagine that there are a lot of other latex containing items in a dental practice that are hard to get in nonlatex form. And in addition to that, the American College of Occupational Environmental Medicine, in their statement on latex allergy says, in so many words, that switching to a latex free or latex safe environment is a daunting task. The difficulties in switching to a latex free or a latex safe health care environment are discussed in the article by Zak. It is not an easy thing to do.
>Q. Is that it?
>A. Yes.
>Q. Now, let's take them one by one. The American College – what was it?
>A. Of Occupational Medicine.
>Q. Was that talking about dental offices?
>A. It was talking about health care facilities.

> Q. And not in particular dental offices, correct?
> A. That's correct.
> Q. Okay. Now, as to the others, rubber dams. Did you undertake any investigation to determine whether there were latex free substitutes for rubber dams?
> A. No, I was only assuming that if there were latex free rubber mouth props, then Dr. Wise would not have been concerned about wrapping rubber mouth props in a nitrile glove and tying it with floss.
> Q. Do you know when the date of this article was?
> A. 1999.
> Q. Is it fair to say that there's significant development over time of latex free products in medicine?
> A. There has been development over time.

Dr. Oliver's Deposition Transcript, at 128:19-130:21.

Ultimately, Dr. Oliver admitted that her opinion on the difficulty of making dental offices latex free was not based on any specialized training or experience, but rather on "her common sense."

> Q. [By Mr. Crevier] And you don't know whether or not there are any dental offices in Connecticut that are latex free, correct?
> A. [By Dr. Oliver] I don't know that there are. I haven't done a personal inventory, as we have discussed at this deposition. Ms. Mirek obtained the names of two dentists, one of who, himself, does not use latex containing gloves, but others in his office do, so that is not a latex free office. And for reasons that I can't remember without looking at her transcript, the other dentist that ostensibly had latex free practice was not a possible place for her to work.
> Q. Do you remember why?
> A. I can look at her deposition transcript, but I don't remember offhand.
> Q. Okay. But that's the only basis on which you know whether there's any dental offices in Connecticut that are latex free or not, correct, Ms. Mirek's deposition testimony?
> A. That's correct. I have not done an independent investigation.
> Q. And you didn't discuss—in your opinion, you state—page 7, second paragraph to the bottom, the last full paragraph, "Rendering a dental practice latex free is difficult." You didn't talk with anyone about that, did you?
> A. **I used my common sense.** No, I didn't have a specific discussion. I had a specific discussion with my dentist. He uses latex gloves. His office is not latex free.

Dr. Oliver's Deposition Transcript, at 138:18-140:1 (emphasis added).

7

Finally, Dr. Oliver has admitted that she no experience making any dental facility latex safe.

> Q. [By Mr. Crevier] Do you have any experience in consulting to make dental offices latex free?
> A. [By Dr. Oliver] No.
> Q. Do you have any experience in consulting to make dental offices latex safe?
> A. No.
> Q. Do you have any experience in consulting to make medical facilities latex safe?
> A. No.
> Q. Do you have any experience in consulting to make medical facilities latex free?
> A. No.

Dr. Oliver's Deposition Transcript, at 125:15-126:3.

As demonstrated above, Dr. Oliver's lack of knowledge regarding the existence of latex in dental offices and the ease/difficulty, cost and logistics of making a dental office latex free, renders her unqualified to testify to Plaintiff's inability to perform her occupation as a dental hygienist based on her exposure to latex in such an environment.

    b.    <u>Dr. Oliver Lacks Knowledge Regarding Latex, Non-Latex and Latex Safe Dental Supplies</u>.

Dr. Oliver's deposition also revealed that she knows nothing regarding latex, non-latex and latex safe dental supplies in general, or to the specific items with which Plaintiff would work when performing her occupation as a dental hygienist.

> Q. (Mr. Crevier) Did you, in forming your opinion in this case, create a list of latex containing products found in dental offices?
> A. [By Dr. Oliver] No.
> Q. [ ] Have you ever set out to determine which latex containing products in dental offices are available in non-latex form?
> A. Not completely.  I did check prophy cups.
> Q. Anything else?
> A. No.

Dr. Oliver's Deposition Transcript, at 127:11-22.

With respect to prophy cups, the one item Dr. Oliver looked into, she admitted that they are available to dentists in a non-latex form.

> Q. [By Mr. Crevier] Do you know whether there's latex free prophy cups?
> A. [By Dr. Oliver] There are.
> Q. Can dentists purchase them?
> A. Yes.

Dr. Oliver's Deposition Transcript, at 114:2-6.

Dr. Oliver admitted that she lacked knowledge of whether the dental instruments Plaintiff claimed to have used contained latex.

> Q. [By Mr. Crevier] I'll submit to you that this document was a document prepared and submitted by Ms. Mirek in connection with her claim in which she describes the instruments, tools or equipment normally used by her in her occupation. They're listed in number 10 in the description of occupation. Can you take a look there?
> A. [By Dr. Oliver] I see it.
> Q. Do you know whether scalers contain latex?
> A. I don't know.
> Q. Do you know whether curettes contain latex?
> A. No, I don't know.
> Q. Do you know whether an ultrasonic cavitron contains latex?
> A. I don't know.
> Q. Do you know whether a slow handpiece contains latex?
> A. I don't know.
> Q. Do you know whether x-ray equipment contains latex?
> A. No.
> Q. Do you know whether a lead shield contains latex?
> A. I doubt that the lead shield contains latex, although the lead shield, to the extent that it's in an apron, may very well contain latex.
> Q. Do you know whether the lead shield that Ms. Mirek used in the performance of her occupation contains latex?
> A. I don't know the answer to that.
> Q. Did you ever ask her about that?
> A. No, I did not.

Dr. Oliver Deposition Transcript, at 108:1-109:8.

When questioned about the cost differential and availability of non-latex replacements for latex products to which Plaintiff would have been exposed to as a dental hygienist, Dr. Oliver again revealed her lack of knowledge:

> Q. (Mr. Crevier) All right. Isn't it true that there are alternative non-latex products for all the latex products to which Ms. Mirek would have been exposed in performing her duties as a dental hygienist?
> A. [By Dr. Oliver] No, I don't know that that's true at all.
> Q. Do you know that it's not true?
> A. It is possible that it's true.
> Q. Because you have never performed any review of latex alternative products that can be obtained and used in dental offices as substitutions for latex products, have you?
> A. No, I haven't.
> Q. Do you know the cost of latex free dental products relative to their counterparts that contain latex?
> A. No, I don't.
> Q. So, you don't know what the cost differential is?
> A. Well, I believe that nonlatex containing gloves are more expensive than powdered latex gloves, for example. There was some discussion of this in the articles by Hunt, and at the outset – well, with regard to gloves, the nonlatex containing gloves are more expensive. With regard to nonlatex containing – other nonlatex containing items that might be used in a dental practice, I don't know whether the nonlatex products are more expensive than the latex products.
> \* \* \*
> Q. [D]o you know what the cost differential is between latex free gloves and latex containing gloves today?
> A. I don't know what the cost differential is today, no.
> Q. Do you know if there even is one?
> A. Not with certainty.
> Q. Do you know what the cost differential is between any other latex containing dental products versus their latex free counterparts?
> A. I think I just testified to that. No.
> Q. Did you do any research of the cost differential as part of the creation of your opinion in this case?
> A. No.

Dr. Oliver's Deposition Transcript, at 144:8-145:14; 146:2-14.

Finally, although admitting that dentists could use completely latex free vinyl gloves and/or nitrile gloves with negligible latex content, Dr. Oliver admitted almost no knowledge of whether or not dentists did so.

> Q. [By Mr. Crevier] Isn't it possible to have a dental office in which completely latex free vinyl gloves are used?
> A. [By Dr. Oliver] It is possible, yes.
> Q. And isn't it also possible to have a dental office in which they utilize nitrile gloves with negligible allergenic latex proteins?
> A. It is possible.

Dr. Oliver's Deposition Transcript, at 163:2-8.

> Q. [By Mr. Crevier] You conducted no study of dentists as to whether they would be willing to use nonlatex gloves, have you?
> A. [By Dr. Oliver] I have not conducted a study.
> Q. Do you know what percentage of dentist actually now use nonlatex gloves?
> A. No, I don't know that.
> Q. Do you know what percentage of dentist in Connecticut use nitrile gloves?
> A. I don't have the exact knowledge of that. I would expect not many.
> Q. And on what do you base that opinion?
> A. The statement that I just gave, and that is the reluctance of surgeons who do require the same type of precision when they operate as dentists do, when they perform certain tasks in their practice. The testimony of Dr. Burstein; I have no reason to believe that Dr Burstein is atypical. In fact, if anything, I would expect Dr. Burstein would have bent over backwards to accommodate Ms. Mirek. And my conversation with my own dentist.
> Q. I'm going to ask you once again. Do you know what percentage of dentist in Connecticut use nitrile gloves?
> A. I do not know the answer to that.
> Q. Do you know what percentage of dentist in Connecticut use vinyl gloves?
> A. I don't know the answer to that. I don't know that anybody knows the answer to that.
> Q. I'm asking you, and that's all I care about today. Do you know what percentage of dentists in Connecticut use powder free latex gloves?
> A. No.
> Q. Do you know what percentage of dentist in Connecticut use powdered latex gloves?
> A. No, I don't.
> Q. And you didn't conduct any study of that in connection with your preparation of the report in this case, did you?
> A. No, I did not.
> Q. You really don't have any information as to what percentage of dentists in Connecticut use any latex free alternative products at all, do you?
> Mr. Nesin: Objection
> A. No.

Dr. Oliver's Deposition Transcript, at 209:10-211:7.

As demonstrated above, Dr. Oliver's lack of knowledge regarding the use and availability of non-latex products in and available to dental offices, renders her unqualified to testify to

11

Plaintiff's inability to perform her occupation as a dental hygienist based on her exposure to latex in such an environment.

  c. <u>Dr. Oliver Lacks Knowledge Of Improperly Ventilated Buildings That Result In The Distribution Of Latex To Other Parts Of The Building</u>.

Finally, Dr. Oliver's deposition revealed that she lacks appropriate knowledge to testify that Plaintiff is unable to work in a dental environment because it may be located in an improperly ventilated building with other latex utilizing medical facilities that results in the distribution of latex to other parts of the building.

> Q. [By Mr. Crevier] What's the basis for your conclusion that the use of powdered latex gloves in one office in an improperly ventilated building can result in the distribution of latex in other parts of the building?
> A. [By Dr. Oliver] My knowledge of ventilation systems in buildings and the extent to which ventilation systems can be contaminated. There's a statement in Hunt's article, which I provided to you, which talks about the transport of latex containing aeroallergen from an area where latex is being used and to an area where it's not being used. There are one or two other references in the literature that talk about this possibility.
>         * * *
> Q. [Y]ou made a statement that the use of powdered latex gloves in one office in an improperly ventilated building can result in the distribution of latex in other parts of the building, correct?
> A. Yes.
> Q. And I'm asking you, do you have any empirical evidence as to what percentage of dental offices have that problem.
> A. No, I don't.
> Q. So, it's just a possibility, as far as you're concerned, correct?
> A. Well, it depends on the circumstances. Under certain circumstances, it's a probability. Under other circumstances, it's a possibility.
> Q. But you have no idea what percentage of dental offices in Connecticut have such a problem, do you?
> A. No, I don't.
> Q. You didn't conduct any study to figure out whether any, in fact, have that kind of problem, did you?
> A. No, I did not conduct an independent investigation of that issue.

<u>Dr. Oliver's Deposition Transcript</u> at 163:9-20; 165:1-21.

> Q. [By Mr. Crevier] Isn't it true that [ventilation from other sources] could be remedied if you had a latex free dental office that had self-contained ventilation?

12

    A. [By Dr. Oliver] It could be remedied in that way.
    Q. And it could be avoided altogether if it was latex free dental office in a single-use building?
    A. Yes.

Dr. Oliver's Deposition Transcript, at 164:2-8.

Dr. Oliver's lack of knowledge regarding whether any dental offices in which Plaintiff could work are located in improperly ventilated buildings that result in the distribution of latex to other parts of the building, renders her unqualified to testify to Plaintiff's inability to perform her occupation as a dental hygienist based on her exposure to latex in such an environment.

    **2.    Dr. Oliver's Rebuttal Of Dr. Axe's Opinions Is Irrelevant.**

As discussed in Section A of Defendants' Motion in Limine to Exclude Irrelevant Evidence, filed herewith, "the issue in this case on the contract claim is, is your client disabled or isn't she disabled, not whether they're dirty rats." Pretrial Conference Transcript at 13:14-16. As such, evidence of Defendants' claims handling and the opinions given by Dr. Axe during the claim review period are entirely irrelevant to Plaintiff's claim. Accordingly, the Court should preclude any evidence, including Dr. Oliver's expert testimony on this issue.

    According to Dr. Oliver's expert report regarding Dr. Axe, she can be expected to testify largely to Dr. Axe's assertion that latex allergy is "part of a much more multifactorial medical entity commonly referred to today as Chronic Inflammatory Airway Disease." Dr. Oliver's November 10, 2005 Expert Report, attached hereto at Exhibit 5, at 1-3. Defendants are not relying on Dr. Axe in this case, nor are they using him as an expert. Furthermore, any claims having to do with the opinions Dr. Axe gave and Defendants' reliance on those opinions during the claim review process is the subject of a separate and distinct lawsuit. See Carolyn Mirek v. The Guardian Life Insurance Company of America and Berkshire Life Insurance Company of America, Civ. Action No. 05-30246.

This case is limited to whether or not Plaintiff is disabled, not whether Dr. Axe's opinion rendered during the claims process was correct or not. As such, Dr. Oliver's testimony regarding Dr. Axe is entirely irrelevant in this case and should be precluded.

**B.      THE COURT SHOULD PRECLUDE PLAINTIFF FROM INTRODUCING THE TESTIMONY OF PERSONS OFFERING DUPLICATIVE AND REDUNDANT TESTIMONY.**

Plaintiff has identified thirteen (13) witnesses to testify as to Plaintiff's symptoms, her difficulties in leaving her career and the precautions she takes in social settings to avoid latex exposure. As discussed at page 8 of Defendants' Motion in Limine to Exclude Irrelevant Evidence, filed herewith, Defendants' experts have concluded that Plaintiff is allergic to latex and as such, that issue is undisputed. The only issue in this case is whether or not Plaintiff's latex allergy disabled her from her own occupation as a dental hygienist. Consequently, any testimony attempting to establish that Plaintiff has a latex allergy is largely superfluous.

Moreover, both Plaintiff and her treating allergist Dr. Bedard, are capable and knowledgeable to testify as to her symptoms, her difficulties in leaving her career and the precautions she takes in social settings to avoid latex exposure. In her Pretrial Memorandum, Plaintiff stated that she would testify "concerning her purchase of the policy, her development of latex allergy and symptoms, her communications with defendants, her treatment and filing of her claim, and related matters." Plaintiff's Pretrial Memorandum at 11. Moreover, in her Rule 26(a) Disclosures, Plaintiff stated that she had "knowledge of her latex allergy, symptoms, and inability to work as a dental hygienist." Plaintiff's Automatic Discovery Pursuant to Local Rule 26.2 and Federal Rule of Civil Procedure 26(a) ("Plaintiff's Automatic Discovery"), attached hereto as Exhibit 6, at 1.

14

Given that Plaintiff's allergy to latex is undisputed and Dr. Bedard and Plaintiff will both testify to Plaintiff's symptoms, the testimony of these thirteen witnesses will only offer redundant and duplicative testimony that will waste the time and resources of this Court.

The thirteen witnesses and the purpose of their testimony, as identified by Plaintiff in her Pretrial Conference Memorandum are set forth below:

1. Jolanta Baginski - Ms. Baginski is expected to testify concerning Ms. Mirek's manifestations of latex allergies and her difficulties leaving her career. Also Ms. Baginiski is expected to testify concerning precautions taken in social settings to try to avoid latex exposure. Plaintiff's Pretrial Memorandum at 13.

2. Eilleen Barile – Ms. Barile is expected to testify regarding symptoms manifested by Carolyn Mirek in the dental offices setting. Plaintiff's Pretrial Memorandum at 16.[2]

3. Diane Chupas, RDH – Ms. Chupas is expected to testify concerning her observations of Ms. Mirek's latex allergy reactions in the dental setting. Plaintiff's Pretrial Memorandum at 14.

4. Carol Gustamachio – Ms. Gustamachio is expected to testify concerning Ms. Mirek's manifestations of latex allergies and her difficulties leaving her career. Plaintiff's Pretrial Memorandum at 13.

5. Brian McAnneny – Mr. McAnneny is expected to testify concerning precautions Ms. Mirek takes to try to avoid latex exposure, and difficulties she has faced in changing careers because of latex allergy. Plaintiff's Pretrial Memorandum at 14.

6. Kathy Morlock – Ms. Morlock is expected to testify concerning Ms. Mirek's manifestations of latex allergies and her difficulties leaving her career. Also, Ms. Morlock is expected to testify concerning precautions taken by Plaintiff in social settings to try to avoid latex exposure. Plaintiff's Pretrial Memorandum at 13.

7. Ronald Mirek – Mr. Mirek is the Plaintiff's husband, and is expected to testify regarding the symptoms Plaintiff displayed and circumstances concerning the symptoms. Plaintiff's Pretrial Memorandum at 11.

8. Mary Beth Norman – Ms. Norma is expected to testify concerning Ms. Mirek's manifestations of latex allergies and her difficulties leaving her career. Also, Ms.

---

[2] As discussed in Section C below, in addition to being duplicative and redundant, Plaintiff is barred from calling Ms. Barile as a witness because she did not disclose Ms. Barile prior to the Pretrial Conference.

Norman is expected to testify concerning precautions taken in social settings to try to avoid latex allergy.  Plaintiff's Pretrial Memorandum at 13.

9. Salvatore Squatrito, DDS – Dr. Squatrito is expected to testify concerning his observations of Ms. Mirek's reactions.  Plaintiff's Pretrial Memorandum at 15.

10. Karen Stoker – Ms. Stoker is expected to testify concerning precautions Ms. Mirek takes to try to avoid latex exposure, and difficulties she has faced in changing careers because of latex allergy.  Plaintiff's Pretrial Memorandum at 15.

11. Janet Streeter – Ms. Streeter is expected to testify regarding observations of Ms. Mirek's latex allergy reactions and emotional difficulties changing careers.  Plaintiff's Pretrial Memorandum at 13.

12. Karen Volochenko – Ms. Volochenko is expected to testify concerning Ms. Mirek's manifestations of latex allergies and her difficulties leaving her career.  Also, Ms Volochenko is expected to testify concerning precautions taken by Plaintiff in social settings to try to avoid latex exposure.  Plaintiff's Pretrial Memorandum at 14.

13. Sue Weigen – Ms. Weigen is expected to testify concerning Ms. Mirek's manifestations of latex allergies and her difficulties leaving her career.  Also, Ms. Weigen is expected to testify concerning precautions taken by Plaintiff in social settings to try to avoid latex exposure.  Plaintiff's Pretrial Memorandum at 13.

Because their testimony will be duplicative and redundant, Defendants respectfully request that the Court preclude Plaintiff from introducing the testimony of the thirteen persons identified in this section.

**C.  THE COURT SHOULD PRECLUDE PLAINTIFF FROM INTRODUCING THE TESTIMONY OF ROSANNA BAENA AND EILLEEN BARILE AS PLAINTIFF FAILED TO DISCLOSE THESE WITNESSES UNTIL DISCOVERY HAD CLOSED.**

Plaintiff lists Rosanna Banea and Eilleen Barile as witnesses to be called at trial for the first time, subsequent to the close of discovery, in her Pretrial Memorandum.  As discussed below, the Court should preclude Plaintiff from introducing Ms. Baena's and Ms. Barile's testimony because despite at least two requirements to do so, Plaintiff failed to disclose Ms. Baena and Ms. Barile as witnesses.  Moreover, as discussed above in Section B, Ms. Barile's testimony would be redundant, duplicative and a waste of the Court's time and resources and, as

16

discussed below, the justification for Ms. Baena's testimony, as stated in Plaintiff's Pretrial Memorandum, is premised on a false statement.

Plaintiff had the obligation in her Rule 26(a) disclosures to identify all witnesses with knowledge relating to this case. Plaintiff failed to identify Ms. Baena or Ms. Barile in her 26(a) Disclosures. See Plaintiff's Automatic Discovery, attached hereto as Exhibit 6.

Moreover, in its Interrogatories, Defendant specifically asked Plaintiff to identify all witnesses with knowledge of any facts concerning Plaintiff's claim and to further identify whether or not Plaintiff intended to call each of them as fact witnesses. See Defendant's First Set of Interrogatories to Plaintiff, relevant pages attached hereto as Exhibit 7, at 8-9. Although, she listed 27 individuals, Plaintiff failed to identify either Ms. Baena or Ms. Barile in her Answers. Plaintiff's Response to Interrogatories Propounded by Defendant, relevant pages attached hereto as Exhibit 8, at 14-18.

Recognizing her failure to identify Ms. Baena prior to the Pretrial Memorandum, Plaintiff attempts to justify Ms. Baena testimony as rebutting the testimony of Dr. Segal, a witness identified by the Defendants. Plaintiff stated, "to the extent Dr. Segal, listed on Defendants' witness list and disclosed for the first time as a prospective witness, if permitted to testify, Ms. Baena is expected to testify concerning the working conditions at Dr. Segal's office and hiring." Plaintiff's Pre-trial Memorandum at 17.

Plaintiff's justification is incorrect as Dr. Segal was not disclosed for the first time on Defendant's witness list. To the contrary, as required by the Federal Rules of Civil Procedure, Defendants disclosed Dr. Segal as a witness in their Rule 26(a) Disclosures. Defendants' Automatic Discovery Pursuant to Local Rule 26.2 and Federal Rule of Civil Procedure 26(a), a copy of which is attached hereto as Exhibit 9, at 3. Despite Defendants' identification of Dr.

17

Segal as a fact witness, Plaintiff neither deposed Dr. Segal, nor inquired any further as to Dr. Segal via interrogatories. Because Dr. Segal was disclosed to Plaintiff, Plaintiff cannot be allowed to proffer Ms. Baena on the basis that Dr. Segal was not disclosed.

Because Ms. Baena and Ms. Barile were not disclosed until the filing of Plaintiff's Pretrial Memorandum after the close of discovery, the Court should preclude Plaintiff from introducing their testimony.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that this Court preclude: 1) the testimony of Plaintiff's proffered expert, Dr. Christine Oliver; 2) the testimony of Jolanta Baginski, Eilleen Barile, Diane Chupas, Carol Gustamachio, Brian McAnneny, Ronald Mirek, Kathy Morlock, Mary Beth Norman, Dr. Salvatore Squatrito, Karen Stoker, Janet Streeter, Karen Volechenko, and Sue Weigen; and 3) the testimony of Rosanna Baena and Eilleen Barile.

Respectfully Submitted,

Defendants The Guardian Life Insurance Company of America and Berkshire Life Insurance Company of America

By their attorneys,

CREVIER & RYAN, LLP.

/s/David B. Crevier
David B. Crevier, Bar No. 557242
Katherine R. Parsons, Bar No. 657280
1500 Main Street, Suite 2020
Springfield, MA 01115-5727
Tel: 413-787-2400
Facsimile: 413-781-8235
Email: dcrevier@crevierandryan.com
          kparsons@crevierandryan.com

## LOCAL RULE 7.1 CERTIFICATION

  I certify that the attorneys in this case have conferred and attempted in good faith to resolve or narrow the issues contained in this motion.

                   /s/David B. Crevier

## CERTIFICATE OF SERVICE

  I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this19th day of May, 2006.

                   /s/David B. Crevier