# Exhibit 4

Page 1

```
         UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS


CAROLYN MIREK,                 )
       Plaintiff               )    CIVIL ACTION NO.
                               )    04-30166-MAP
VS.                            )
                               )
THE GUARDIAN LIFE INSURANCE    )
COMPANY OF AMERICA and         )
BERKSHIRE LIFE INSURANCE       )    MARCH 24, 2006
COMPANY OF AMERICA,            )
       Defendants              )
                               )


    DEPOSITION OF: L. CHRISTINE OLIVER, M.D., MPH, MS,
    taken before Laurie A. Monaghan, Certified Shorthand
    Reporter, Registered Professional Reporter and
    Notary Public, pursuant to Rule 30 of the Federal
    Rules of Civil Procedure, at the Law Offices of
    Crevier & Ryan, LLP, 1500 Main Street, Suite 2020,
    Springfield, Massachusetts, on March 24, 2006,
    commencing at 10:20 a.m.




APPEARANCES:

  (SEE PAGE 2)




                  Laurie A. Monaghan
              Certified Shorthand Reporter
```

Page 2

APPEARANCES:

JAGER SMITH, P.C., One Financial Center, Boston, Massachusetts, 02111, representing the Plaintiff.
BY: SETH NESIN, ESQUIRE

CREVIER & RYAN, LLP, 1500 Main Street, Suite 2020, Springfield, Massachusetts, 01115-5727, representing the Defendants.
BY: DAVID B. CREVIER, ESQUIRE

Page 3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| L. Christine Oliver, M.D. | 6* | | | |

*By Mr. Crevier

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| Defendant's 1 | Deposition Notice | 8 |
| Defendant's 2 | Curriculum Vitae | 9 |
| Defendant's 3 | Report | 42 |
| Defendant's 4 | Letter | 49 |
| Defendant's 5 | Deposition Transcript | 56 |
| Defendant's 6 | Documentation | 57 |
| Defendant's 7 | Occupation Description | 107 |
| Defendant's 8 | Newsletter | 128 |
| Defendant's 9 | Dental Product List | 146 |
| Defendant's 10 | Journal Article | 148 |
| Defendant's 11 | Article | 157 |
| Defendant's 12 | Article | 162 |
| Defendant's 13 | Benco Catalog Excerpt | 167 |
| Defendant's 14 | Letter | 197 |
| Defendant's 15 | Report of Dr. Garb | 206 |
| Defendant's 16 | Report of Dr. Weiss | 212 |

(Exhibits retained by Counsel)

Page 4

# STIPULATIONS

It is agreed by and between the parties that all objections, except as to the form of the question, are reserved to be raised at the time of trial for the first time.

It is further agreed by and between the parties that all motions to strike unresponsive answers are also reserved to be raised at the time of trial for the first time.

It is also agreed that the deponent will read and sign the deposition, and waive the sealing of the deposition.

It is further agreed by and between the parties that notification to all parties of the receipt of the original deposition transcript is also hereby waived.

******

Page 105

1 dental environment?
2 A. I can't list all of them for you, but they
3 include latex containing gloves, powdered and nonpowdered,
4 so-called hypoallergenic latex containing gloves. There
5 are rubber dams that are used. There are prophy cups of
6 various sorts. The tubing that is used to remove saliva
7 from the mouth during the course of a dental process is
8 latex containing. In some dental offices, there are
9 stethoscopes and sphygmometers that may be latex
10 containing. Today they are less likely to contain latex.
11 Those are the latex containing materials that come to
12 mind.
13 Q. Which of those items is likely to cause a
14 life-threatening anaphylactic reaction?
15 A. The gloves certainly can cause life-threatening
16 anaphylaxis, both powdered, low-powdered, and so-called
17 powder free which, in fact, are not powder free. The
18 latex tubing, any of the items that I mentioned could
19 cause latex related anaphylaxis.
20 Q. Any more items?
21 A. I'm sure there are others. I don't have in my
22 mind a full inventory of items that are contained in
23 dental offices.

Page 106

1 Q. Did you ever take a full inventory of latex
2 items contained in dental offices?
3 A. Not a complete inventory, no.
4 Q. Which of the items that you just listed would a
5 dental hygienist use in the performance of her occupation?
6 A. She might use, or he might use all of them.
7 Q. Did you ever discuss which of these items were
8 used by Ms. Mirek in her performance of her duties as a
9 dental hygienist?
10 A. I know that prophy cups --
11 Q. Excuse me, I asked you, did you discuss with
12 Ms. Mirek; can you simply tell me yes or no, did you
13 discuss with her which of these items she used in the
14 course of her performance of her duties as a dental
15 hygienist?
16 A. I don't recall specifically discussing which of
17 those items she used.
18 Q. Okay. And from your general knowledge, do you
19 know which of those items would generally be used by a
20 dental hygienist in the performance of their duties?
21 A. Yes.
22 Q. What are they?
23 A. They're the items that I just mentioned; prophy

Page 107

1 cups, tubing, rubber dams. The blankets that are used to
2 protect one from x-rays are likely to be latex containing,
3 and the extent to which dental hygienists might use a
4 stethoscope or sphygmometer are probably variable. The
5 dental hygienist in my office does. And while Ms. Mirek
6 eventually -- well, and the gloves.
7 Q. Do you know for a fact whether Ms. Mirek used
8 any of those items in the performance of her duties as a
9 dental hygienist?
10 A. I didn't specifically ask her that question, and
11 I don't recall whether she testified to that at her
12 deposition or not. I don't recall.
13     MR. CREVIER: May I please have this marked
14     as Deposition Exhibit number 7.
15     (Defendant's Exhibit 7, Description of
16     Occupation, is marked for identification).
17     THE WITNESS: I can only say if she -- based
18     on my general experience, it would be my opinion
19     that she likely did use those.
20 Q. (By Mr. Crevier) Dr. Oliver, I've handed you
21 what I've had marked as Deposition Exhibit number 7. Did
22 you ever see this document before?
23 A. I don't think so.

Page 108

1 Q. I'll submit to you that this was a document
2 prepared and submitted by Ms. Mirek in connection with her
3 claim in which she described the instruments, tools, or
4 equipment normally used by her in her occupation. They're
5 listed in number 10 in the description of occupation. Can
6 you take a look there?
7 A. I see it.
8 Q. Do you know whether scalers contain latex?
9 A. I don't know.
10 Q. Do you know whether curettes contain latex?
11 A. No, I don't know.
12 Q. Do you know whether an ultrasonic cavitron
13 contains latex?
14 A. I don't know.
15 Q. Do you know whether a slow handpiece contains
16 latex?
17 A. I don't know.
18 Q. Do you know whether x-ray equipment contains
19 latex?
20 A. No.
21 Q. Do you know whether a lead shield contains
22 latex?
23 A. I doubt that the lead shield contains latex,

Page 109

1 although the lead shield, to the extent that it's in an
2 apron, may very well contain latex.
3     Q. Do you know whether the lead shield that
4 Ms. Mirek used in the performance of her occupation
5 contains latex?
6     A. I don't know the answer to that.
7     Q. Did you ever ask her about that?
8     A. No, I did not.
9     Q. Do you know whether a computer contains latex?
10     A. Some of the connecting cables on computers may
11 contain latex.
12     Q. Did you discuss with Ms. Mirek whether her
13 computer contained latex?
14     A. No, I did not.
15     Q. Is it your opinion that a person with latex
16 allergies such as Ms. Mirek cannot use a computer?
17     A. It depends on the tubing on the connecting
18 cables.
19     Q. If, in fact, an office or a home contains a
20 computer with connecting cables that are made of latex, is
21 that an environment that Ms. Mirek is disabled from
22 entering?
23     A. I would say so, yes.

Page 110

1     Q. You never discussed these tools that were
2 identified by Ms. Mirek as the tools she used with her at
3 any time, did you?
4     A. No, I did not have this discussion with her.
5     Q. Okay. I'm going to draw your attention to item
6 9 on Exhibit number 7, which is Ms. Mirek's identified
7 occupational duties. I'm going to ask you whether you
8 know whether Duty A, scaling and root plating, required
9 Ms. Mirek to use latex products?
10     A. I don't know, because I don't know specifically
11 which tools she used to do that.
12     Q. And I'm going to ask you with respect to Duty B,
13 which is polishing, whether this required Ms. Mirek to use
14 latex products?
15     A. Well, polishing, to the extent that the
16 polishing devices may contain prophy cups, would contain
17 latex.
18     Q. Do you know whether the polishing that Ms. Mirek
19 claimed to be part of her occupational duties required her
20 to be exposed to latex?
21     A. I don't recall testimony that she was using or
22 her dental office was using that type of nonlatex product,
23 so it would seem likely that the answer is yes.

Page 111

1     MR. CREVIER: Can you read back the
2     question, please?
3     (Question was read back).
4     Q. (By Mr. Crevier) And let me just say, the
5 question I asked is whether you know whether the polishing
6 occupational duties that Ms. Mirek performed required her
7 to be exposed to latex?
8     A. My answer would be most likely it did, based on
9 the information I have.
10     Q. Do you know that for a fact?
11     A. I am rendering an opinion with reasonable
12 medical certainty. That's the best I can do.
13     Q. I'm asking you factually, not for your opinion.
14 Do you know whether the polishing that Ms. Mirek did as
15 part of her occupation required her to come into contact
16 with latex?
17     A. My answer is that with reasonable medical
18 certainty, based on the information I have, most likely it
19 did.
20     Q. And that does not include any information that
21 you received from Ms. Mirek regarding what her polishing
22 entailed, is that correct?
23     A. I did not have a specific discussion with her

Page 112

1 about the details of her polishing.
2     Q. Your opinion to a reasonable degree of medical
3 certainty that she necessarily had to contact latex in
4 polishing is in no way based on any communications you had
5 with Ms. Mirek, is that correct?
6     MR. NESIN: Objection.
7     THE WITNESS: It was not based on direct
8     communication with Ms. Mirek.
9     Q. (By Mr. Crevier) What indirect communication
10 with Ms. Mirek was it based on?
11     A. It was based on the information available to me,
12 based upon my review of medical records, deposition
13 testimony of Dr. Burstein, deposition testimony of
14 Ms. Mirek, there was no indication in any of the materials
15 that I reviewed that attention was paid to any latex
16 containing products in Dr. Burstein's office except
17 powdered latex gloves.
18     Q. Okay. What latex containing products would
19 Ms. Mirek possibly have been exposed to by virtue of doing
20 her polishing duty?
21     A. The polishing devices often contain prophy
22 cups. These prophy cups, unless a decision is made to
23 purchase nonlatex materials, are latex containing.

Page 113

1  Q. Do you have any authority that you can point to
2  -- strike that. You have opined that polishing exposed
3  Ms. Mirek to latex, based on the absence of any
4  documentary evidence suggesting that Dr. Burstein's office
5  used latex free prophy cups, correct?
6      MR. NESIN: Objection.
7      THE WITNESS: Based on the materials which I
8      reviewed for this deposition, which I just
9      enumerated.
10 Q. (By Mr. Crevier) Please listen again, because
11 what I was hearing is that you saw nothing in the record
12 to demonstrate that they were using latex free prophy
13 cups, not that you saw something in the record to indicate
14 that they were using latex prophy cups?
15 A. What I saw in the medical record was a
16 discussion of steps that had -- in the medical record and
17 the deposition testimony of Dr. Burstein and of Carolyn
18 Mirek, that the steps that were taken to address her latex
19 allergy and reduce the risk of exposure to latex in
20 Dr. Burstein's office were limited to switching -- to
21 getting rid of powdered latex gloves.
22 Q. But you don't know whether Dr. Burstein
23 purchased latex free prophy cups to begin with, do you?

Page 114

1  A. It is possible that he did.
2  Q. Do you know whether there's latex free prophy
3  cups?
4  A. There are.
5  Q. Can dentists purchase them?
6  A. Yes.
7  Q. Now, the third occupational duty that Ms. Mirek
8  identified was exposing and processing x-rays. Do you
9  know whether that caused her to contact latex materials?
10 A. Well, I don't know exactly what that means,
11 exposing and processing x-rays. I presume exposing means
12 taking the x-rays, which would involve placing what are
13 likely latex containing aprons or protector devices, the
14 coverings over these lead shields, and in terms of
15 processing the x-rays, I can't answer that. I don't know
16 what kind of equipment they were using.
17 Q. Do all lead shields have covers containing
18 latex?
19 A. I don't know if all lead shields have covers
20 containing latex. I believe many of them do, that are
21 used in the health care setting.
22 Q. What's the basis for that opinion?
23 A. My own professional experience working in the

Page 115

1  health care setting and having dental work done.
2  Q. Did you ever discuss with Ms. Mirek whether she
3  contacted latex as a result of her exposing or processing
4  x-rays?
5  A. I did not have that specific discussion with
6  her.
7  Q. Do you know for a fact whether Ms. Mirek had
8  necessarily contacted latex as a result of her performing
9  her occupational duty of exposing and processing x-rays?
10 A. I don't know for a fact that she did or that she
11 didn't.
12 Q. Do you know for a fact that Ms. Mirek came into
13 contact with latex materials by performing her
14 occupational duty of polishing?
15 A. I can't answer that question any better than I
16 already have.
17 Q. So, you don't know for a fact, do you?
18 A. I've answered that question to the best of my
19 ability.
20 Q. But I haven't asked this question yet; do you
21 know for a fact?
22 A. I believe that you did ask me that question, and
23 I've given you the best answer I can.

Page 116

1  Q. If you can give me the answer again, because I
2  don't recall what the answer was?
3  A. Well, I believe we could ask the stenographer to
4  read it back.
5  Q. I think you can answer the question. It's my
6  deposition, and it's not a very difficult question and
7  shouldn't require a great deal of time. Do you know for a
8  fact whether Ms. Mirek's performance of her occupational
9  duty of polishing, for a fact, required her to come into
10 contact with latex?
11     MR. NESIN: Objection.
12     THE WITNESS: As I've testified before,
13     based upon my review of the medical records,
14     based upon my review of Dr. Burstein's
15     deposition, and based upon my review of
16     Ms. Mirek's deposition, it appears to be the
17     case -- it is the case, as stated in the records
18     that I have available for review, that the only
19     steps that were taken to reduce latex in
20     Dr. Burstein's office were to switch from
21     powdered latex gloves to nonpowdered latex
22     gloves.
23     MR. CREVIER: I'm going to move to strike as

### Page 117

1  nonresponsive. Can you repeat back the
2  question, please?
3     (Question was read back).
4  Q. (By Mr. Crevier) That calls for a yes or a no.
5  A. Based upon my review of the information
6  available, it is my opinion, as I previously stated, that
7  it most likely did.
8  Q. Is that opinion "know for a fact"?
9     MR. NESIN: Objection.
10    THE WITNESS: I cannot answer the question
11    in any other way.
12    MR. CREVIER: I move to strike as
13    nonresponsive.
14  Q. (By Mr. Crevier) Dr. Oliver, do you know whether
15  Ms. Mirek's performance of her occupational duty of
16  providing home care instructions and education required
17  her to come into contact with latex?
18  A. I don't know what devices she may have used in
19  home care instruction, so I don't know the answer to that.
20  Q. Did you have any discussion with Ms. Mirek
21  regarding whether she came into contact with latex in her
22  performance of her duty of providing home care instruction
23  and education?

### Page 118

1  A. No.
2  Q. Do you know whether Ms. Mirek's occupational
3  duty of diagnosis, treatment planning, and recording
4  documents required her to come into contact with latex
5  containing materials?
6  A. It would seem unlikely that it did.
7  Q. Can a dental office be made latex free?
8  A. I think it's possible.
9  Q. Are you aware of any dental offices that are
10 latex free?
11 A. No.
12 Q. Are you aware of any dental offices that are
13 latex safe?
14 A. Latex safe for whom?
15 Q. For Ms. Mirek?
16 A. No.
17 Q. Do you know whether Ms. Mirek's house is latex
18 safe for her?
19 A. I believe that it is. She hasn't had reactions
20 in her home. Her medical condition has improved
21 significantly since she left the full-time practice of
22 dental hygiene.
23 Q. Is it your testimony that you believe that

### Page 119

1  Ms. Mirek's house contains no latex containing items at
2  all?
3  A. No, that is not my testimony. There is evidence
4  in the record that she had a reaction to latex in one of
5  her child's sneakers, so it is not my testimony that her
6  home is entirely latex free. It may be, but I don't know
7  that for a fact. It may be right now. She most likely no
8  longer allows her kids to wear latex containing sneakers.
9  Q. On what basis do you state that?
10 A. State what?
11 Q. That it's most likely that she doesn't let her
12 kids wear latex containing sneakers?
13 A. Well, she had a reaction while lacing up one of
14 her child's latex containing sneakers, so I would think
15 that would have been a warning sign to her and that she
16 would wish to prevent such a reaction from occurring.
17 Q. Is it your opinion that Ms. Mirek's house is
18 only latex safe if it contains no latex products?
19 A. Theoretically, yes. However, the fact that she
20 has had significant improvement in her condition, the most
21 significant change being that she left her work as a
22 dental hygienist, would lead me to think that there is
23 nothing in her home that is causing her to have a problem.

### Page 120

1  Q. So, there may be latex in her home, correct?
2  A. It's possible there is. I don't know.
3  Q. So, you don't necessarily know that Ms. Mirek
4  has to be in a place that is completely devoid of latex
5  for it to be safe for her, is that correct?
6  A. I can't answer that, because I don't know the
7  extent to which her home is entirely latex free. I know
8  that for her -- what, fifteen years of work as a dental
9  hygienist, after the introduction of universal
10 precautions, she had health problems almost continuously.
11 There was a brief period of time in 2000 when she appeared
12 to do much better as far as her health was concerned. But
13 with that exception, she had significant health problems
14 on a continual basis from 1986 to December of 2001;
15 actually, December of 2001, when she left her work as a
16 dental hygienist. And since she left, she has stayed in
17 the same home and her condition has improved dramatically.
18 Q. Did you undertake any investigation to determine
19 whether there were any dental offices in Connecticut in
20 which Ms. Mirek could work?
21 A. I didn't undertake independent investigation. I
22 reviewed Ms. Mirek's deposition transcript and -- this may
23 have been contained in Dr. Garb's report, I don't

Page 121

1  remember, but there are two dentists, Dr. Segal, I
2  believe, and Dr. Wing, which appeared to offer a
3  possibility of work, but in neither case was it possible.
4  In one case, I believe it was Dr. Segal, and I believe in
5  the case of Dr. Segal, only he was using powder free --
6  or, nonlatex gloves, and he chose not to hire her. She
7  applied to him for a job, and he chose not to hire her.
8      And Dr. Wing, it's my recollection that she
9  testified that she explored that as a possibility, and for
10 reasons that I don't recall without looking at the
11 transcript, it was not possible. And I also don't know
12 the extent of which Dr. Wing -- I know Dr. Segal's office
13 was not completely latex free, and I don't know about
14 Dr. Wing's office.
15     Q. And all of that information that you just
16 recited was from your reading of Ms. Mirek's transcript,
17 correct?
18     A. Yes.
19     Q. Okay. So, the answer to the question of did you
20 undertake any investigation to ascertain whether there
21 were any dental offices in which Ms. Mirek could work is
22 no, isn't that correct?
23     A. Well, I stated before I discussed her deposition

Page 122

1  transcript that no, I did not take undertake any
2  independent investigation.
3      Q. And at the time you wrote your report, which
4  we've marked as Deposition Exhibit number 3, you had not
5  yet been provided with Ms. Mirek's deposition transcript,
6  correct?
7      A. That's correct.
8      Q. So, at the time you wrote your report stating
9  that Ms. Mirek was disabled from performing her work as a
10 dental hygienist, you had not undertaken any investigation
11 to ascertain whether there were any dental offices in
12 which she could work, correct?
13     A. That's correct.
14     Q. Okay. Have you ever discussed with Ms. Mirek
15 her working as a dental hygienist in a latex safe dental
16 office?
17     A. I don't understand what you're asking me.
18     Q. Have you ever discussed with Ms. Mirek her being
19 able to work as a dental hygienist in a latex safe dental
20 office?
21     A. Well, it's hard to know what a latex safe dental
22 office is. In my opinion, as I testified earlier, latex
23 safe means latex free, because it's not possible for her

Page 123

1  to control her environment. She is a dental hygienist.
2  She is not the dentist. She does not control the dental
3  office. She works under the dentist. It is in the
4  dentist's control.
5      So, unless she is able to find a dentist that
6  either has a latex allergy himself or herself, and for
7  that reason has a latex free dental practice, I don't
8  think it's possible for her to find a latex safe, quote,
9  unquote, dental office to work in.
10     Q. Did you ever discuss that with her?
11     A. Yes.
12     Q. And let me just make sure I understand your
13 testimony. You testified just a second ago that she
14 needed to find a dentist who had, either he or she had
15 latex allergy to have a latex free dental practice, is
16 that completely accurate?
17     A. Or had a strong commitment, a very strong
18 commitment over and above most other dentists to maintain
19 a latex free dental practice. Even Dr. Burstein, who was
20 her employer and with whom she had a good relationship,
21 testified at his deposition that he would continue to use
22 nonpowdered latex gloves until and if a comparable
23 product, nonlatex containing, became available.

Page 124

1       MR. CREVIER: Why don't we take about a
2  five-minute break.
3       MR. NESIN: Sure.
4       (Recess was taken).
5      Q. (By Mr. Crevier) Okay. Have you ever had any
6  conversations with anyone regarding latex free dentistry?
7      A. Not latex free dentistry; latex free health care
8  facility.
9      Q. But nothing in particular to dentistry, is that
10 correct?
11     A. That's correct.
12     Q. Have you ever performed any research regarding
13 latex free dentistry?
14     A. No.
15     Q. Have you undertaken any investigation to
16 ascertain whether there were any dental offices in
17 Connecticut during the period of 2000 to the present that
18 were latex free?
19     A. I did not undertake that investigation.
20     Q. Likewise, you didn't undertake any investigation
21 to ascertain whether there were any dental offices in
22 Connecticut in which Ms. Mirek could work during 2000 to
23 the present, did you?

Page 125

1  A. No.
2  Q. Have you ever had any experience in assisting
3  persons or advising persons with latex allergy to be able
4  to return to work or work in dental offices?
5    MR. NESIN: Objection.
6    THE WITNESS: I have not specifically done
7    that.
8  Q. (By Mr. Crevier) Is Ms. Mirek the first person
9  who's worked in a dental office on whom you have been
10  asked to opine as to their ability to work?
11  A. I believe I testified earlier today, she may
12  be. There may -- one of the other individuals I have seen
13  as a patient may have been a dental hygienist. I don't
14  recall for sure. She may be the first one.
15  Q. Do you have any experience in consulting to make
16  dental offices latex free?
17  A. No.
18  Q. Do you have any experience in consulting to make
19  dental offices latex safe?
20  A. No.
21  Q. Do you have any experience in consulting to make
22  medical facilities latex safe?
23  A. No.

Page 126

1  Q. Do you have any experience in consulting to make
2  medical facilities latex free?
3  A. No.
4  Q. What are the logistics of making a dental office
5  latex free?
6  A. I think the first step is to take an inventory
7  of all latex containing products. The second step is to
8  determine which of those products are available in
9  nonlatex form. And then the third step is to -- I'm
10  sorry, I forgot the specific question.
11  Q. What are the logistics of making --
12  A. Okay. And then the third step would be to
13  decide whether you're going to implement a latex free
14  policy, to decide if it's possible to replace all of your
15  latex containing items with nonlatex containing items.
16  Q. That assumes that you have a dental office to
17  begin with, is that correct?
18  A. Well, if you didn't have a dental office, why
19  would we be having this discussion?
20  Q. You could start -- a new dentist or a dentist
21  moving into an area that wanted to start a dental office
22  wouldn't necessarily have to decide to replace anything,
23  right?

Page 127

1    MR. NESIN: Objection.
2    THE WITNESS: Well, if it's a person that's
3    going into practice and setting up a new dental
4    office, then you would not do an inventory,
5    because there would be nothing to inventory.
6    You would simply -- well, there would be an
7    inventory, I suppose, of the items that you
8    planned to put into your office, and you would
9    look to see where substitution with nonlatex
10    containing materials was possible.
11  Q. (By Mr. Crevier) Did you, in forming your
12  opinion in this case, create a list of latex containing
13  products found in dental offices?
14  A. No.
15  Q. Have you ever attempted to determine which of
16  those products are available in nonlatex form -- strike
17  that. Have you ever set out to determine which latex
18  containing products in dental offices are available in
19  nonlatex form?
20  A. Not completely. I did check prophy cups.
21  Q. Anything else?
22  A. No.
23  Q. In your report you reference an article written

Page 128

1  by El Bain?
2  A. Well, this actually is a newsletter. It seems
3  to be a newsletter more than an article, but I did
4  reference it.
5    MR. CREVIER: Okay. Can we mark that as
6    exhibit.
7    (Defendant's Exhibit 8, Newsletter, is
8    marked for identification).
9  Q. (By Mr. Crevier) Dr. Oliver, I'm handing you
10  what I've had marked as Deposition Exhibit number 8. Is
11  this newsletter, Exhibit number 8 the newsletter that is
12  referenced as reference 5 in your November 9th, 2005
13  report?
14  A. Yes.
15  Q. I'm going to draw your attention to the bottom
16  of the first page, the last half of the paragraph, where
17  it says, "A switch to a latex safe dental practice was
18  relatively easy according to Dr. Wise."
19    Do you agree that it's easy to switch to a latex
20  safe dental practice?
21  A. No.
22  Q. Why not?
23  A. I think -- well, several reasons, some of which

Page 129

are contained in this paragraph. I cannot imagine how a rubber dam or a rubber mouth prop can realistically be wrapped in a nitrile glove and tied with floss and used in a practical manner to perform dental work. I would expect -- and he talks about local anesthetics as being an example of something that's difficult to do latex free, and based on the reading that I've done, the latex gloves, powdered or nonpowdered, are advantageous in that they permit finer manipulation of the fingers and of tools that are in the fingers. And it's difficult for dentists to perform dentistry using nonlatex gloves. And he gives one example here of rubber mouth props, but I would imagine that there are a lot of other latex containing items in a dental practice that are hard to get in nonlatex form.

And in addition to that, the American College of Occupational Environmental Medicine, in their statement on latex allergy says, in so many words, that switching to a latex free or latex safe environment is a daunting task. The difficulties in switching to a latex free or latex safe health care environment are discussed in the article by Zak. It is not an easy thing to do.

Q. Is that it?
A. Yes.

Page 130

Q. Now, let's take them one by one. The American College -- what was it?
A. Of Occupational Environmental Medicine.
Q. Was that talking about dental offices?
A. It was talking about health care facilities.
Q. And not in particular dental offices, is that correct?
A. That's correct.
Q. Okay. Now, as to the others, rubber dams. Did you undertake any investigation to determine whether there were latex free substitutes for rubber dams?
A. No, I was only assuming that if there were latex free rubber mouth props and rubber dams, then Dr. Wise would not have been concerned about wrapping rubber mouth props in a nitrile glove and tying it with floss.
Q. Do you know when the date of this article was?
A. 1999.
Q. Is it fair to say that there's significant development over time of latex free alternative products in medicine?
A. There has been development over time.
Q. So, your basis that it's difficult -- you don't imagine that there's anything that would replace the

Page 131

rubber mouth props based on the 1999 article, is that correct?
A. That wasn't exactly my testimony.
Q. Okay. I asked you why it was that you didn't believe that there were alternatives for rubber dams, and you said because it's contained in this article, where they're trying to find safe alternatives, is that correct?
A. Yes.
Q. Is there anything more that provides the basis for that opinion that there are not, or they're hard to find?
A. Well, my opinion that converting to a latex free dental office is not easy is not based entirely on the fact that Dr. Wise references wrapping rubber mouth props with nitrile gloves. I just think it's not an easy thing to replace every latex containing item in a dental office with a nonlatex product. I think it's not an easy thing to convince other dentists with whom you may work, who may not be particularly committed to adhere to latex free practices. I think there is the issue of entrainment of latex aeroallergen containing air from other medical office space if the dental office happens to be in a medical building.

Page 132

Q. Did you conduct any study, or did you undertake any study during the course of preparing this opinion to come to that conclusion, regarding how many dental offices in Connecticut contain multiple dentists?
A. I did not do that investigation.
Q. Have you ever been aware of a dental office that has one dentist in it?
A. I've never been to a dental office that had one dentist. I'm sure there are dental offices that have one dentist.
Q. Do you know what the average number of dentists are in a dental office?
A. No, I don't know.
Q. So, your conclusion that it would be hard for multiple dentists to commit to this is not based on any empirical evidence as to how many dentists there are in dental offices, is that correct?
A. No, I don't know the average number of dentists in a dental office.
Q. And you don't know what percentage of dentists in Connecticut are single-dentist dental offices, do you?
A. I don't know that percentage.
Q. And you've never tried to attempt to figure that

Page 137

1 standing right next to the dentist who is administering a
2 local anesthetic using a latex containing delivery device,
3 then she might be exposed to latex allergen.
4   Q. Do you know whether Ms. Mirek, in the
5 performance of her duties, had to do so?
6   A. I don't know one way or the other.
7   Q. Okay. Did you ever try to contact Dr. Wise to
8 question him as to how easy it was to make a latex safe
9 dental practice?
10   A. No, I didn't.
11   Q. Did you notice that Dr. Wise lived in Lee,
12 Massachusetts?
13   A. I seem to recall that, and I guess it's here,
14 but I don't see it.
15   Q. Did you ever consider calling him?
16   A. No, I didn't, because a dental hygienist works
17 at the behest of the dentist. The dentist, at the end of
18 the day, has control of the office. If Ms. Mirek were
19 fortunate enough to find a dentist that operated a truly
20 latex free environment and needed a dental hygienist, it
21 is my belief, and she testified to this, that she would go
22 to work for that dentist. She was not able to find any
23 such dentist.

Page 138

1   She also testified, I believe in answer to a
2 question that you posed to her, that if she could set up
3 an office and practice dental hygiene in that office and
4 have control over that office, she would do that in a
5 heartbeat, but she testified that it was illegal for her
6 to do that in the state of Connecticut.
7       MR. CREVIER: Can you just read back the
8       answer to that question?
9       (Answer was read back).
10   Q. (By Mr. Crevier) Is it your belief that
11 Ms. Mirek could work in a dental office that was truly
12 latex free?
13   A. If it were truly latex free, yes.
14   Q. Okay. So, the presence of latex is the only
15 thing that disables Ms. Mirek from being able to perform
16 the occupation of a dental hygienist, correct?
17   A. In my opinion, yes.
18   Q. And you don't know whether or not there are any
19 dental offices in Connecticut that are latex free,
20 correct?
21   A. I don't know that there are. I haven't done a
22 personal inventory, as we have discussed at this
23 deposition. Ms. Mirek obtained the names of two dentists,

Page 139

1 one of whom, himself, does not use latex containing
2 gloves, but others in his office do, so that is not a
3 latex free office. And for reasons that I can't remember
4 without looking at her transcript, the other dentist that
5 ostensibly had a latex free practice was not a possible
6 place for her to work.
7   Q. Do you remember why?
8   A. I can look at her deposition transcript, but I
9 don't remember offhand.
10   Q. Okay. But that's the only basis on which you
11 know whether there's any dental offices in Connecticut
12 that are latex free or not, correct, Ms. Mirek's
13 deposition testimony?
14   A. That's correct. I have not done an independent
15 investigation.
16   Q. And you didn't discuss -- in your opinion, you
17 state -- page 7, second paragraph to the bottom, the last
18 full paragraph, "Rendering a dental practice latex free is
19 difficult." You didn't talk with anyone about that, did
20 you?
21   A. I used my common sense. No, I didn't have a
22 specific discussion. I had a specific discussion with my
23 dentist. He uses latex gloves. His office is not latex

Page 140

1 free.
2   Q. So, that's the basis for that conclusion?
3   A. Well, that's not the only basis for that
4 conclusion. There is discussion in the literature with
5 regard to health care facilities and the difficulty in
6 rendering health care facilities latex free. Now, I
7 understand that a dental office is only one form of health
8 care facility, but it is a type of health care facility,
9 so this is not just my opinion, and it's not just my
10 opinion based on a single conversation with my own
11 dentist. It's based in part on Dr. Burstein's deposition,
12 and it's based on the statements in the medical literature
13 regarding health care facilities generally.
14   Q. You also state that, "It is not realistic to
15 expect that a practice will make itself latex free for a
16 single employee." What's that basis for --
17   A. I believe that's true. The basis for that is
18 twenty years plus of practicing the specialty of
19 occupational and environmental medicine. Employers don't
20 go out of their way, in my experience, to make significant
21 modifications in the workplace for a single employee who
22 is dispensable.
23   Q. Isn't that the key, though, the employee is

Page 141

1  dispensable?
2  A. I don't understand what you're saying.
3     MR. NESIN: Objection.
4  Q. (By Mr. Crevier) You just said that they don't
5  go out of their way to make modifications for an employee
6  who's dispensable, correct?
7  A. They don't go out of their way to make a
8  modification generally for a single employee, especially
9  if that employee is dispensable, not only if that employee
10 is dispensable. If it was a single -- well, if it were a
11 single employee who was absolutely indispensable to the
12 business, then perhaps they would. Otherwise, in my
13 experience, they don't.
14 Q. Isn't it your experience that people make
15 modifications based on a factor of cost and what they can
16 lose in the absence of making such a modification?
17    MR. NESIN: Objection.
18    THE WITNESS: I think those are factors.
19 Q. (By Mr. Crevier) Pretty big ones, aren't they?
20    MR. NESIN: Objection.
21    THE WITNESS: I'm not really an expert in
22    this area generally.
23 Q. (By Mr. Crevier) Well, you seem to be, because

Page 142

1  you're opining that it's not realistic that the practice
2  will make itself latex free for a single employee?
3  A. I think it's not realistic to expect that that
4  will happen. Well, it certainly didn't happen in the case
5  of Dr. Burstein's practice, and as I testified earlier,
6  and as her deposition testimony and his deposition
7  testimony indicate, they had a good relationship. She was
8  a good employee, and he wasn't willing to make that
9  change.
10 Q. Did you talk to any other dentists regarding
11 that?
12 A. No, I didn't, but I don't have to talk to other
13 dentists to render that opinion. As I said, it's based on
14 years of work in the field of occupational environmental
15 health.
16 Q. Well, Mr. Nesin will have the opportunity to ask
17 you questions at the end of the deposition. I would ask
18 that you only answer the questions I ask you, yes or no,
19 and he can follow up, because I know at some point you're
20 going to want to get out of here, and it could take quite
21 some time if you don't answer the questions in the way
22 that they're framed. Did you talk to any dentists at all
23 in formulating your November 9th, 2005 report?

Page 143

1  A. No. Well, my dentist.
2  Q. One dentist?
3  A. Yes.
4  Q. What's his name?
5  A. Dr. Gary Goldstein.
6  Q. Did you reference Dr. Goldstein in the report?
7  A. No.
8  Q. So, did your opinion in any way rely on your
9  discussion with Dr. Goldstein?
10 A. No.
11 Q. How many individuals would it take to
12 realistically expect a practice to make itself latex free?
13    MR. NESIN: Objection.
14    THE WITNESS: I think it's not the number of
15    individuals. It's the proportion of the number
16    in the practice, and I can't answer that. It
17    depends on the dentist who is managing the
18    office.
19 Q. (By Mr. Crevier) Did you read the rest of the
20 article pertaining to Dr. Wise? Did you read the entirety
21 of it?
22 A. I did.
23 Q. Doesn't Dr. Wise indicate that he's able to

Page 144

1  obtain a significant number of patients by making his
2  dental office latex safe?
3  A. Where are you?
4     MR. CREVIER: Can you repeat the question?
5     (Question was read back).
6     THE WITNESS: I don't see here that he says
7     that. I don't see it here.
8  Q. (By Mr. Crevier) All right. Isn't it true that
9  there are alternative nonlatex products for all the latex
10 products to which Ms. Mirek would have been exposed in
11 performing her duties as a dental hygienist?
12    MR. NESIN: Objection.
13    THE WITNESS: No, I don't know that that's
14    true at all.
15 Q. (By Mr. Crevier) Do you know that it's not true?
16 A. It's possible that it's true.
17 Q. Because you've never performed any review of
18 latex alternative products that can be obtained and used
19 in dental offices as substitutions for latex products,
20 have you?
21    MR. NESIN: Objection.
22    THE WITNESS: No, I haven't.
23 Q. (By Mr. Crevier) Do you know the cost of latex

Page 145

1 free dental products relative to their counterparts that
2 contain latex?
3     A. No, I don't.
4     Q. So, you don't know what the cost differential
5 is?
6     A. Well, I believe that nonlatex containing gloves
7 are more expensive than powdered latex gloves, for
8 example. There was some discussion of this in the
9 articles by Hunt, and at the outset -- well, with regard
10 to gloves, the nonlatex containing gloves are more
11 expensive. With regard to nonlatex containing -- other
12 nonlatex containing items that might be used in a dental
13 practice, I don't know whether the nonlatex products are
14 more expensive than the latex products.
15     Q. So, the answer to the question is you think that
16 latex free gloves may be more expensive, and that's all
17 you know?
18     A. Well, it's not just that I think. There is
19 evidence in the literature that nonlatex containing gloves
20 are more expensive.
21     Q. What was the time frame in which that literature
22 was published, do you know?
23     A. The late 1900s -- I mean, the late 1990s.

Page 146

1     Q. So, do you have any information on which you can
2 -- do you know what the cost differential is between
3 latex free gloves and latex containing gloves today?
4     A. I don't know what the cost differential is
5 today, no.
6     Q. Do you know if there even is one?
7     A. Not with certainty.
8     Q. Do you know what the cost differential is
9 between any other latex containing dental products versus
10 their latex free counterparts?
11     A. I think I just testified to that. No.
12     Q. Did you do any research of the cost differential
13 as part of the creation of your opinion in this case?
14     A. No.
15        MR. CREVIER: Can I please have this marked
16     as Deposition Exhibit number 9.
17        (Defendant's Exhibit 9, Dental Product
18     List, is marked for identification).
19     Q. (By Mr. Crevier) Dr. Oliver, I'm handing you
20 what I've had marked as Deposition Exhibit number 9.
21 You've never seen this document before, have you?
22     A. No.
23     Q. I'll submit to you that it's a printout from the

Page 147

1 website of the American Latex Allergy Association. Are
2 you familiar with the American Latex Allergy Association?
3     A. No.
4     Q. Therein they have a latex free dental product
5 list. Have you ever attempted to determine whether any of
6 the products on Deposition Exhibit number 9 are available
7 for purchase by dentists in Connecticut?
8     A. No, I haven't.
9     Q. I'll draw your attention to the top of the
10 second page, where it talks about dental dams. It lists
11 two nonlatex dental dams. Did you ever conduct any
12 investigation to determine whether there were any nonlatex
13 dental dams?
14     A. I believe I testified to that earlier in this
15 deposition. No.
16     Q. Do you have any reason to believe that these
17 latex free dental products are, in fact, not latex free?
18     A. No.
19     Q. Do you know what the cost differential is
20 between these latex free dental products and latex
21 containing --
22     A. Again, I believe you have asked me that
23 question, and my answer was and is no.

Page 148

1        MR. CREVIER: Can I have this marked as
2     Exhibit 10.
3        (Defendant's Exhibit 10, Journal Article,
4     is marked for identification).
5     Q. (By Mr. Crevier) Dr. Oliver, I'm going to hand
6 you what I've had marked as Deposition Exhibit number 10.
7 Are you familiar with the Journal of Allergy and Clinical
8 Immunology?
9     A. Yes.
10     Q. Is this periodical authoritative?
11        MR. NESIN: Objection.
12        THE WITNESS: I would say that it is
13     generally. That doesn't mean that I agree with
14     everything that's in it, but yes, generally it
15     is.
16     Q. (By Mr. Crevier) All right. I'm going to draw
17 your attention to page S-131.
18     A. Okay.
19     Q. Drawing your attention to the bottom of the
20 right-hand column, Returning Employees to Work. And
21 therein it states that, "Generally, if the employer is
22 cooperative, almost every employee with a diagnosis of
23 NRL" -- NRL being natural rubber latex sensitivity --

Page 161

1  my report, and he looks specifically at latex protein in
2  powdered gloves, powder free gloves, nitrile gloves, and
3  vinyl gloves, and he found a significant concentration of
4  latex antigen in powder free gloves.
5     Q. Isn't it also true that Mr. Crippa, or
6  Ms. Crippa, as it may be, found that some brand of nitrile
7  gloves have an absolutely negligible latex protein
8  content?
9     A. Some had negligible, some had measurable.
10    Q. Can you answer my question yes or no? Isn't it
11 true that some brands of nitrile gloves, as found by
12 Crippa, had an absolutely negligible latex protein
13 content?
14    A. Some did.
15    Q. Isn't it true that vinyl gloves are completely
16 latex free?
17    A. In that study, yes.
18    Q. Okay. Isn't it true that the total protein
19 content of nitrile gloves examined by Crippa were
20 identical as those declared in the product information
21 sheets?
22        MR. NESIN: Objection.
23        THE WITNESS: I don't remember if he found

Page 162

1  that or not. I just don't recall.
2        MR. CREVIER: Let's mark this as Exhibit
3     12.
4        (Defendant's Exhibit 12, Article, is marked
5     for identification).
6     Q. (By Mr. Crevier) Dr. Oliver, I've handed you
7  what I've had marked as Deposition Exhibit number 12. I'm
8  going to draw your attention to page 30. Specifically,
9  I'm going to draw your attention to the left-hand column,
10 fourth full paragraph up, which begins with the word
11 "it". And isn't it true that in this article, Crippa, et
12 al, found that the total protein contents of each brand of
13 glove examined were nearly the same as those declared in
14 the product information sheets?
15    A. Yes, it says that.
16    Q. So, a person who is using gloves could figure
17 out what the total protein content of those gloves were,
18 correct?
19    A. A person using the gloves could if that person
20 had ready access to the product information sheets.
21    Q. Based on that, isn't it possible to have a
22 dental office in which completely latex free vinyl gloves
23 are used?

Page 163

1     A. What's your question?
2     Q. Isn't it possible to have a dental office in
3  which completely latex free vinyl gloves are used?
4     A. It is possible, yes.
5     Q. And isn't it also possible to have a dental
6  office in which they utilize nitrile gloves with
7  negligible allergenic latex proteins?
8     A. It is possible.
9     Q. What's the basis for your conclusion that the
10 use of powdered latex gloves in one office in an
11 improperly ventilated building can result in the
12 distribution of latex in other parts of the building?
13    A. My knowledge of ventilation systems in buildings
14 and the extent to which ventilation systems can be
15 contaminated. There's a statement in Hunt's article,
16 which I provided to you, which talks about the transport
17 of latex containing aeroallergen from an area where latex
18 is being used and to an area where it's not being used.
19 There are one or two other references in the literature
20 that talk about this possibility.
21    Q. Isn't it true that this could be remedied by a
22 proper ventilation system?
23    A. It could be remedied by a proper HVAC system in

Page 164

1  the building.
2     Q. Isn't it true that it also could be remedied if
3  you had a latex free dental office that had self-contained
4  ventilation?
5     A. It could be remedied in that way.
6     Q. And it could be avoided altogether if it was a
7  latex free dental office in a single-use building?
8     A. Yes.
9     Q. Are you aware of any such buildings in which
10 dental offices exist?
11    A. I'm sorry, you said in a single-use building. I
12 just want to go back to your other question. What do you
13 mean, a single-use building?
14    Q. Just used by the dentist?
15    A. That dentist?
16    Q. That dentist?
17    A. That's what I thought you meant. Yes.
18    Q. So, do you have any empirical evidence of what
19 percentage of dental offices have latex allergens in the
20 air as a result of the dental office being contained in an
21 improperly ventilated building?
22    A. Are you asking me whether the latex aeroallergen
23 in the air is due to -- what are you asking me?

Page 165

1  Q. I'm saying you made a statement that the use of
2  powdered latex gloves in one office in an improperly
3  ventilated building can result in the distribution of
4  latex in other parts of the building, correct?
5  A. Yes.
6  Q. And I'm asking you, do you have any empirical
7  evidence as to what percentage of dental offices have that
8  problem?
9  A. No, I don't.
10 Q. So, it's just a possibility, as far as you're
11 concerned, is that correct?
12 A. Well, it depends on the circumstances. Under
13 certain circumstances, it's a probability. Under other
14 circumstances, it's a possibility.
15 Q. But you have no idea what percentage of dental
16 offices in Connecticut have such a problem, do you?
17 A. No, I don't.
18 Q. You didn't conduct any study to figure out
19 whether any, in fact, have that kind of problem, did you?
20 A. No, I did not conduct an independent
21 investigation of that issue.
22 Q. Can you identify one dental office in
23 Connecticut that has that problem?

Page 166

1  A. No, although Dr. Burstein suggested that it
2  might be a problem for his office.
3  Q. Do you know whether Dr. Burstein had any studies
4  conducted to determine whether there was any aerosolized
5  latex contaminate in his office as a result of other uses
6  in that building?
7  A. I don't know one way or the other.
8  Q. Are you aware that data suggests that working in
9  an environment where there is low level latex exposure
10 improves allergy and asthma symptoms similarly as
11 environments where latex exposure is eliminated?
12     MR. NESIN: Objection.
13     THE WITNESS: No, I'm not aware of studies
14     that show that working in an environment where
15     there is low level latex exposure results in
16     improvement in allergy and asthma symptoms.
17 Q. (By Mr. Crevier) Are you aware of Ms. Mirek's
18 current job?
19 A. Yes.
20 Q. Are you aware that Ms. Mirek sells latex free
21 products in dental offices?
22 A. She sells dental supplies. I wasn't aware that
23 they were -- let me just refer to my records for a

Page 167

1  minute. She works for a dental supply company.
2  Q. Are you aware that she sells latex free products
3  to dental offices?
4  A. No, I was not aware of that.
5  Q. Does that surprise you?
6  A. No.
7  Q. Did you ever have the opportunity to look at the
8  dental catalog from the dental supply company for which
9  Ms. Mirek works?
10 A. No, I did not.
11 Q. Did you happen to see Dr. Garb's report?
12 A. I did.
13 Q. Where he attaches portions of the dental supply
14 catalog from the company where Ms. Mirek worked?
15 A. I didn't know that was the dental supply catalog
16 from the company for which she works.
17     MR. CREVIER: Can we mark this as 13.
18     (Defendant's Exhibit 13, Benco Supply
19     Catalog Excerpt, is marked for identification).
20 Q. (By Mr. Crevier) Dr. Oliver, I'm handing you
21 what I've had marked as Deposition Exhibit 13. Have you
22 ever seen this document before?
23 A. No.

Page 168

1  Q. I'll submit to you that it's a portion of a
2  Benco Dental Supply catalog provided by Ms. Mirek's
3  employer.
4  A. I don't believe this was attached to Dr. Garb's
5  report.
6  Q. Okay. Well, Mr. Nesin can ask you those
7  questions if he so chooses. If you could just answer the
8  questions I ask, I'd appreciate it. You've never seen
9  this document before, have you?
10 A. No.
11 Q. As I said, I'll submit to you that it's a
12 portion of the Benco Dental Supply catalog. You never had
13 the chance to determine whether any of the products that
14 are contained in this catalog are latex free or not, have
15 you?
16 A. No.
17 Q. Do you have any reason to believe that they
18 aren't, in fact, as advertised, latex free?
19 A. Well, Ultra One Microflex is latex powder free.
20 Non-sterile and textured fingertips, that's latex
21 containing. Safe Skin Satin Plus is latex powder free.
22 Q. Where are --
23 A. Silk Care Cranberry is latex powder free --

Page 209

1  MR. NESIN: Objection.
2  THE WITNESS: No, that was not my testimony.
3  Q. (By Mr. Crevier) I think you testified that
4  latex gloves can be eliminated for the staff, but some
5  dentists might not do it?
6  A. I think most dentists might not do it.
7  Q. And that's based on what you've told me,
8  correct?
9  A. Yes.
10  Q. You conducted no study of dentists as to whether
11  they would be willing to use nonlatex gloves, have you?
12  A. I have not conducted a study.
13  Q. Do you know what percentage of dentists actually
14  now use nonlatex gloves?
15  A. No, I don't know that.
16  Q. Do you know what percentage of dentists in
17  Connecticut use nitrile gloves?
18  A. I don't have the exact knowledge of that. I
19  would expect not many.
20  Q. And on what do you base that opinion?
21  A. The statement that I just gave, and that is the
22  reluctance of surgeons who do require the same type of
23  precision when they operate as dentists do, when they

Page 210

1  perform certain tasks in their practice. The testimony of
2  Dr. Burstein; I have no reason to believe that
3  Dr. Burstein is atypical. In fact, if anything, I would
4  expect Dr. Burstein would have bent over backwards to
5  accommodate Ms. Mirek. And my conversation with my own
6  dentist.
7  Q. I'm going to ask you once again. Do you know
8  what percentage of dentists in Connecticut use nitrile
9  gloves?
10  A. I do not know the answer to that.
11  Q. Do you know what percentage of dentists in
12  Connecticut use vinyl gloves?
13  A. I don't know the answer to that. I don't know
14  that anybody knows the answer to that.
15  Q. I'm asking you, and that's all I care about
16  today. Do you know what percentage of dentists in
17  Connecticut use powder free latex gloves?
18  A. No.
19  Q. Do you know what percentage of dentists in
20  Connecticut use powdered latex gloves?
21  A. No, I don't.
22  Q. And you didn't conduct any study of that in
23  connection with your preparation of the report in this

Page 211

1  case, did you?
2  A. No, I did not.
3  Q. You really don't have any information as to what
4  percentage of dentists in Connecticut use any latex free
5  alternative products at all, do you?
6  MR. NESIN: Objection.
7  THE WITNESS: No.
8  Q. (By Mr. Crevier) Are you aware of the fact that
9  Ms. Mirek claims to have never missed a day from work due
10  to her latex allergy?
11  MR. NESIN: Objection.
12  THE WITNESS: I have seen -- I am aware of
13  that statement. It's also my recollection,
14  however, and I was a little confused about this,
15  that she did miss some time related to symptoms
16  that may have been related to her latex
17  allergy. So, I have a recollection of that
18  statement.
19  Q. (By Mr. Crevier) Are you aware that during the
20  last year that Ms. Mirek worked for Dr. Burstein that her
21  attendance records do not show any indication that she
22  missed any work due to any allergy related symptoms?
23  A. I don't have that information, so I'm not aware

Page 212

1  of that, no.
2  Q. Do you recall what you discussed with regard to
3  Dr. Garb's report, with Ms. D'Alcomo?
4  A. Do I remember when?
5  Q. Do you remember what you discussed?
6  A. No, I don't remember specifically. I don't.
7  MR. CREVIER: Let's mark this as 16.
8  (Defendant's Exhibit 16, Report of
9  Dr. Weiss, is marked for identification).
10  Q. (By Mr. Crevier) Dr. Oliver, I've handed you
11  what I've had marked as Deposition Exhibit number 16. Are
12  you familiar with this document?
13  A. Yes.
14  Q. This is Dr. Weiss's report rendered in
15  connection with this case, is it not?
16  A. Yes.
17  Q. You've read it before?
18  A. I have.
19  Q. Did you discuss it with Attorney D'Alcomo at
20  all?
21  A. No.
22  Q. I'm going to draw your attention to the opinions
23  portion of this report, which begins on page 8. I'm going

228

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF HAMPDEN

I, LAURIE A. MONAGHAN, a Notary Public within and for the Commonwealth of Massachusetts, do hereby certify that I took the deposition of L. CHRISTINE OLIVER, MD, MPH, MS, pursuant to Rule 30 of the Federal Rules of Civil Procedure, on March 24, 2006, at the Law Offices of Crevier & Ryan, LLP, 1500 Main Street, Suite 2020, Springfield, Massachusetts.

I further certify that the above named deponent was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth concerning her knowledge in the matter of the case of CAROLYN MIREK vs. THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, et al, now pending in the United States District Court for the District of Massachusetts.

I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of COMPUTER ASSISTED TRANSCRIPTION; and I further certify that said deposition is a true record of the testimony given by said witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand this 5th day of April, 2006.

_____
Laurie A. Monaghan
Notary Public
Certified Shorthand Reporter
Registered Professional Reporter

My commission expires
August 8, 2006

959 MAIN STREET
4TH FLOOR
SPRINGFIELD, MA 01103

PHILBIN & ASSOCIATES, INC.

(413) 733-4078
Pittsfield: (413) 499-2231
FAX: (413) 734-4588

Serving the legal community of Massachusetts since 1947

```
                                                              2

1                    SIGNATURE PAGE - ERRATA SHEET

2    I, the undersigned, L. CHRISTINE OLIVER, MD, MPH, MS, do
     hereby certify that I have read the foregoing transcript
3    of my deposition given in the matter of CAROLYN MIREK vs.
     THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, ET AL, and
4    that to the best of my knowledge said transcript is true
     and accurate, with the exception of the following
5    corrections listed below:

6    Pg #   Ln #      Change from              Change to

7    105     9        "sphygmometers"          "sphygmomanometers"

8    158    17        "nuance"                 "new onset"

9    172    12        "can't even"             "can avoid"

10   [illegible]      [illegible]              [illegible]

11   216     4        "NRC when"               "NRL when"

12   221     3        "protective"             "prospective"

13
...
22   DATE: 05/01/06    SIGNATURE: L. Christine Oliver, MD
23   LAM
```

959 MAIN STREET
4TH FLOOR
SPRINGFIELD, MA 01103

PHILBIN & ASSOCIATES, INC.

(413) 733-4078
Pittsfield: (413) 499-2231
FAX: (413) 734-4588

Serving the legal community of Massachusetts since 1947