# Exhibit 5

*Occupational Health Initiatives*

L. CHRISTINE OLIVER MD, MPH, MS
TEL (617) 232-1704
FAX (617) 232-3280

1101 BEACON STREET
FOUR WEST
BROOKLINE, MASSACHUSETTS 02446

November 10, 2005

Joanne D'Alcomo, Esq.
Jager & Smith PC
Counselors At Law
One Financial Center
Boston, MA   02111

RE: *Carolyn Mirek v. The Guardian Life Insurance Company of America and Berkshire
Life Insurance Company of America, Civil Action* No. 04-30166MAP, US District Court,
District of Massachusetts

Dear Ms. D'Alcomo:

I am writing in follow-up to your letter of October 25, 2005 requesting that I review
a Medical Record Review Report dated June 26, 2002 and an Addendum Report dated
October 11, 2002 by Harold Axe, MD, as well as deposition testimony taken of Dr. Axe
in Stamford, CT on September 16, 2002. Beyond and based upon my review, you have
asked me to provide you with my opinion "concerning the extent to which, if at all, the
statements made and positions taken differ from, or show unfamiliarity with, views
accepted in the medical community."

I have carried out the requested review. My findings and opinions are provided
below. These are based upon my own professional experience and publications in the
medical and scientific literature. A copy of my curriculum vitae has been provided.

In addition, I have relied upon history obtained from Ms. Mirek at the time of my
examination of her in my office at the Massachusetts General Hospital and my own
review of medical records provided to me by your office. These include those from the
offices of Dr. Robert M. Bedard of Connecticut Asthma & Allergy Center LLC in West
Hartford, CT; Drs. Joseph J. Guardino, III in Manchester, CT; Dr. Daniel S. Welling of
Manchester Ob-Gyn Assoc., PC in Manchester, CT; Dr. Robert Greenberg; Dr. Ivelisse
Viruet of South Windsor Internal Medicine in South Windsor, CT; Dr. MDS Nissanka of
Vernon, CT; Dr. H. Kirk Watson of Hartford Orthopedic, Plastic & Hand Surgeons, Inc.;
Manchester Memorial Hospital in Manchester, CT; the South Windsor Ambulatory Care

Center, Inc., in South Windsor, CT; and the Hartford Hospital in Hartford, CT. I have also relied upon deposition testimony of Robert Burstein, DDS on August 19, 2005.

I have not commented on opinions or statements by Dr. Axe with which I may disagree but which are outside of the question put to me.

Statements made and positions taken by Dr. Axe that differ from or show lack of familiarity with views that are generally accepted in the medical community are as follows.

First, in his report of June 26, 2002 and at the time of his deposition, Dr. Axe stated that "Latex allergy is not a specific disease that you treat people for" (p.10, line 24). The American Heritage College Dictionary defines disease as "A pathological condition in an organism resulting from infection or genetic defect, for example, and characterized by identifiable symptoms." Latex allergy is a pathologic condition associated with latex exposure, with well-defined pathophysiologic and immunologic mechanisms and characterized by identifiable symptoms. It has it own ICD-9 code: 989.82. And it is a disease that you treat people for. Principal among the treatment modalities is avoidance of exposure.

Second, Dr. Axe states in his initial report that latex allergy is "part of a much more multifactorial medical entity commonly referred to today as Chronic Inflammatory Airway Disease." In his report and in his deposition he uses this "medical entity" as an umbrella for "allergy, allergic rhinitis, bronchial asthma, etc." Each of these is commonly recognized in the medical community as a distinct clinical entity and treated as such. Although these entities share a common pathophysiologic mechanism in the form of inflammation, they do not necessarily share a common cause. For example, exposure to airborne irritants can cause either rhinitis or asthma or both. It is not an allergy nor does it cause allergic rhinitis. Each of these individual entities has its own ICD-9 code(s). I was not able to find an ICD-9 code for "chronic inflammatory airway disease" nor have I ever used this term in this way or heard it used in this way or read of its use in this way in my years of education, professional experience, and clinical practice.

Third, Dr. Axe states in his June, 2002 report "This inflammatory process is the result of collective allergic reactions to pollens, house dust mites, mold spores, animal dander, and even latex particles in the inspired air." He goes on to testify at his deposition (p. 70) that no single allergen will cause symptoms "unless in outrageous amounts." (He subsequently in his deposition modified "outrageous" to "excessive.") This approach is inconsistent with general medical understanding and practice. It may be the case that a given individual is allergic to multiple antigens, and often is in the case of an atopic individual. And in these cases the inflammatory process may be the result of a collective response to these antigens. But it is often the case, particularly with occupational exposures, that a single agent is responsible. Examples include latex, diisocyanates, flour, hexavalent chromium, and nickel. Because an allergic reaction is an inflammatory reaction to an allergen or sensitizer, very low levels of exposure can cause

reactions and often do. It does not take an "outrageous" or "excessive" exposure to cause a response.

Fourth, at his deposition Dr. Axe testified that he would never have given Ms. Mirek the advice to find a different profession (p.103) and that he does not believe the ideal solution in the case of a work-related illness or disease is to remove the offending substance (p.107). He rather believes that the best way to deal with a case of work-related asthma is "with medication and avoidance of other factors that are more avoidable than workplace factors" (p.109). This approach follows logically from his other opinions as described above. However, it flies in the face of published scientific studies, government guidelines, and accepted medical practice. When the workplace exposure is to a sensitizer and the worker is sensitized to that agent, avoidance is generally accepted as the first line of "treatment". The rationale is based on the attendant risk for anaphylaxis that exists despite the fact that symptoms may be temporarily controlled with medication, and on the dictum that a physician should not treat symptoms to allow a patient's continued exposure to a toxic agent. Not only is there a risk for anaphylaxis, but it is also the case for occupational asthma that the longer the exposure continues after onset of symptoms the greater the physiologic effect and and the less the likelihood of recovery.

That continued exposure to a sensitizer increases the severity of the clinical response is well-demonstrated in the case of Ms. Mirek. She progressed from latex-associated eczema to rhinitis/conjunctivitis to symptoms of asthma to manifestations of anaphylaxis. It is axiomatic that either the offending agent or the patient must be removed from the workplace.

Fifth, Dr. Axe stated in his initial report and testified at this deposition that "chronic inflammatory airway disease" should not be a cause of disability from work. In the context of sensitizer-induced illness/disease, this is not a position that is generally accepted by the medical community and it indicates a lack of familiarity with published medical and scientific literature and accepted clinical practice. The reasons are provided above (p.3, para. 1,2).

Sixth, Dr. Axe in his initial report and in his deposition testimony is somewhat dismissive of skin prick testing as a diagnostic tool. He states "There are inherent flaws in its accuracy. There is no standardization of testing materials, especially latex." Although it is not clear whether this statement refers to skin or serologic testing, or both, in his deposition he refers more specifically to skin prick tests. With regard to testing for sensitivity to latex, it is the case that in the United States standardized reagents for serologic and for skin prick tests have not been readily available – although that situation is changing and there has for a number of years been a reliable laboratory for serologic testing at Johns Hopkins Hospital Medical Center in Baltimore, MD. Standardized reagents for skin prick testing, the more reliable of the two methods, have been available for a decade or more in Canada. And it was with Canadian latex extract that Dr. Robert Bedard tested Ms. Mirek in 1999.

Skin prick and RAST testing are diagnostic tools. It is true that they are only one part of the diagnostic work-up, but they are quite valuable and considered so by the medical community because they direct preventive treatment in the form of removing the offending agent from the environment – whether that environment is the home or the workplace.

Seventh, Dr. Axe testified at his deposition that he does not accept occupational asthma as a "valid recognizable diagnosis" (p.92, lines 3-5). This is not an accepted position within the medical community and demonstrates complete lack of familiarity with the relevant published literature, to which the list of references provided below will attest.

Eighth, Dr. Axe considers "anaphylactic reaction" to be a synonym for "allergic reaction" (p.120, line 13). That he does not recognize the distinction between the two or its importance is inconsistent with commonly accepted medical thinking and published literature. It explains in part his failure to find anything "significantly new" (Addendum Report, October, 2002) in Dr. Bedard's September 15, 2002 description of Ms. Mirek's medical condition. In that letter Dr. Bedard wrote as follows: "In addition, she has had several episodes of food related anaphylaxis which in retrospect likely represented allergic reactions to transferred latex from the gloves used by the food handlers." It was in part on this basis that Dr. Bedard went on to write "it was medically necessary and clearly indicated for her to consider an alternative occupation", a position with which Dr. Axe does not agree.

Ninth, also in his Addendum Report with regard to cross-reactivity between certain foods and latex, Dr. Axe writes "…I have no way of knowing…in which direction this cross reactivity developed in Ms. Mirek. It is just as likely that her latex allergy developed from her dietary exposure to kiwi, banana, and avocado as it is that her reactivity to these foods resulted from her exposure to latex." That eating kiwi, banana, or avocado causes latex allergy is antithetical to the body of published literature on the subject and is not accepted in the medical community.

Tenth, Dr. Axe states in his Addendum Report that "Latex-free work environments are being routinely established all over the world to address the latex problem." This belief is not supported in the medical literature and is not supported by the testimony of Ms. Mirek's former employer. For example, in a survey of general dental practices in the United Kingdom published in 2004, only 38% of general dental practices were aware of health risks associated with treating patients with latex allergy, and even fewer had written protocols for the latex-allergic patient. Dr. Robert Burstein testified at his deposition on August 19, 2005 that he was currently using "powder free" latex gloves in his practice and that it was likely that he would continue to do so because of the tactile sensitivity of latex vs. nonlatex gloves.

Finally, Dr. Axe testified (p.127) that a type I immunologic response is not more serious that a type IV reaction. He testified (p.97) that the use of prednisone over extended periods of time was "rarely, if ever," associated with "significant side effects in

the usual small doses that are necessary to control most cases of asthma"; and with regard to associations between prednisone and osteoporosis, he testified "There is no reliable study that's proven a significant link between osteoporosis and prednisone use." Each of these positions is inconsistent with accepted medical thinking and experience and with the published medical literature.

I believe my comments cover, in general, significant observed discrepancies between the positions of Dr. Axe as expressed in his two reports and deposition testimony and what is accepted by the medical community.

If there are questions, or if I can be of further assistance at this time, please let me know.

Very truly yours,

L. Christine Oliver, MD, MS

References

1. Chan-Yeung M, Malo J-L. Occupational asthma. Current Concepts. NEJM 1995;333:107-112.
2. Clarke A. Safe dental care for latex-allergic patients. Research Summary. Br Dent J 2004;197:749-752.
3. International Classification of Diseases. 9th Revision. Clinical Modification. Sixth Edition. Korea: Practice Management Information Corporation, 2002.
4. Liss GM, Sussman GL, Deal K, Brown S, Cividino M, Siu S, et al. Latex allergy: epidemiological study of 1351 hospital workers. Occup Environ Med 1997;54:335-342.
5. Mapp CE, Boschetto P, Maestrelli P, Fabbri LM. Occupational asthma. State of the Art. Am J Respir Crit Care Med 2005;172:280-235.
6. Nicholson PJ, Cullinan P, Taylor AJ, Burge PS, Boyle C. Evidence based guidelines for the prevention, identification, and management of occupational asthma. Occup Environ Med 2005;62:290-299.
7. OSHA Technical Information Bulletin-Potential for Allergy to Natural Rubber Latex Gloves and other Natural Rubber Products. Information Date: 19990412 (April 12, 1999).
8. Phillips ML, Meagher CC, Johnson DL. What is "powder free"? Characterisation of powder aerosol produced during simulated use of powdered and powder free latex gloves. Occup Environ Med 2001;58:479-481.
9. Tomazic VJ, Shampaine EL, Lamanna A, Withrow TJ, Adkinson NF, Hamilton RG. Cornstarch powder on latex products is an allergen carrier. J Allergy Clin Immunol 1994;93:751-758.
10. Treatment Guidelines. Diagnosis and Initial Treatment of Occupational Asthma. Commonwealth of Massachusetts Department of Industrial Accidents. Guideline #28. October 1, 1998.
11. Vandenplas O, Charous BL, Tarlo S. Latex allergy. In: Bernstein IL, Chan-Yeung M, Malo J-L, Bernstein DI, eds. *Asthma in the Workplace*. New York: Marcel Dekker, Inc., 1999, pp. 425-444.
12. Zak HN, Kaste LM, Schwarzenberger K, Barry MJ, Galbraith GMP. Health-care workers and latex allergy. Arch Environ Health 2000;55:336-346.