# Exhibit 8

Page 1

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


   CAROLYN MIREK,              )
        Plaintiff              )   CIVIL ACTION NO.
                               )   04-30166-MAP
   VS.                         )
                               )
   THE GUARDIAN LIFE INSURANCE )
   COMPANY OF AMERICA and      )
   BERKSHIRE LIFE INSURANCE    )   SEPTEMBER 15, 2005
   COMPANY OF AMERICA,         )
        Defendants             )
```

        DEPOSITION OF:  CAROLYN MIREK, taken before
        Laurie A. Monaghan, certified Shorthand Reporter,
        Registered Professional Reporter and Notary Public,
        pursuant to Rule 30 of the Federal Rules of
        Civil Procedure, at the Law Offices of Crevier &
        Ryan, LLP, 1500 Main Street, Suite 2020,
        Springfield, Massachusetts, on September 15, 2005,
        commencing at 10:00 a.m.

        APPEARANCES:

        (SEE PAGE 2)




                    Laurie A. Monaghan
                Certified Shorthand Reporter

Page 2

APPEARANCES:

JAGER SMITH, P.C., One Financial Center, Boston,
Massachusetts, 02111, representing the Plaintiff.
BY: SETH NESIN, ESQUIRE

CREVIER & RYAN, LLP, 1500 Main Street, Suite 2020,
Springfield, Massachusetts, 01115-5727, representing the
Defendants.
BY: DAVID B. CREVIER, ESQUIRE

BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA,
700 South Street, Pittsfield, Massachusetts, 01201,
representing the Defendants.
BY: EDWARD K. KIMBALL, ESQUIRE

ALSO IN ATTENDANCE
CAROLYN MIREK

Page 3

                          INDEX

WITNESS          DIRECT  CROSS   REDIRECT  RECROSS

Carolyn Mirek     6*    133**,290***  262*   291**


*By Mr. Kimball
**By Mr. Crevier
***By Mr. Nesin

EXHIBITS:        DESCRIPTION              PAGE

Defendant's 1    Guardian Policy           5
Defendant's 2    Interrogatories          67
Defendant's 3    Medical Notes            71
Defendant's 4    Medical Records          84
Defendant's 5    Insurance Application    93
Defendant's 6    Transcript              158
Defendant's 7    Claim Form              160
Defendant's 8    Letter                  205
Defendant's 9    Letter                  234
Defendant's 10   Resume                  236
Defendant's 11   Report                  276

Page 4

                    STIPULATIONS

    It is agreed by and between the parties that all
objections, except as to the form of the question, are
reserved to be raised at the time of trial for the first
time.

    It is further agreed by and between the parties that
all motions to strike unresponsive answers are also
reserved to be raised at the time of trial for the first
time.

    It is also agreed that the deponent will read and
sign the deposition, and waive the sealing of the
deposition.

    It is further agreed by and between the parties that
notification to all parties of the receipt of the original
deposition transcript is also hereby waived.


                        ******

Page 233

1   A. I don't recall.
2   Q. Do you recall any other options that you
3   discussed with Dr. Bedard at that time?
4   A. I don't recall.
5   Q. So, you just told me that one of the options
6   that you discussed with him was leaving the dental hygiene
7   profession, correct?
8   A. Yes.
9   Q. And one was working in an office where there
10  were no latex gloves used, isn't that correct?
11  A. Yeah, or in a latex free office.
12  Q. Latex free or latex safe?
13  A. I don't remember exactly the verbiage that we
14  talked about at that point.
15  Q. Well, what kind of latex free items would there
16  have to be in an office for you to work in there, based on
17  the discussion with Dr. Bedard at that time?
18  A. Latex free gloves -- as many latex free products
19  as could be found.
20  Q. Is this based on your discussion, or is this
21  based on what you think is best for you?
22  A. Like I said, I don't recall exactly the
23  conversation.

Page 234

1   Q. You don't. All right. After that, though, did
2   you begin a job search after the August 27th event?
3   A. Yes, I did.
4       MR. CREVIER: May I please have this marked
5       as Deposition Exhibit number 9.
6       (Defendant's Exhibit 9, Letter, is marked
7       for identification).
8   Q. (By Mr. Crevier) Ms. Mirek, I've handed you what
9   I've had marked as Deposition Exhibit 9. Who is Monique
10  Rubb?
11  A. She was Attorney Al Zabin's -- one of his
12  attorneys that worked with him.
13  Q. Okay. And what I've shown you as Exhibit number
14  9, this is a handwritten document. Was this document
15  prepared by you?
16  A. Yes.
17  Q. Did anyone assist you in preparing this
18  document?
19  A. No.
20  Q. I'm going to draw your attention to the second
21  page of this document. It has Carolyn Mirek's signature,
22  is that your signature?
23  A. Yes.

Page 235

1   Q. Is everything in this document true, to the best
2   of your recollection?
3   A. Yes.
4   Q. Okay. And this describes the job search that
5   you commenced soon after the Newport incident, is that
6   correct?
7   A. Yes, I believe. I can't recall exactly when.
8   Q. And one of the things was that you contacted
9   Dental Works asking the owner, Luanne Israelevitz, to
10  contact you if a full-time registered dental hygienist
11  position opened up, and you received no response, correct?
12  A. Right.
13  Q. Did you tell Ms. Israelevitz that you were
14  looking for a job in a latex free office?
15  A. Yes.
16  Q. Did you discuss that issue with her at all?
17  A. Yes.
18  Q. And what did she say?
19  A. She wasn't aware of any.
20  Q. Okay. Now, it says, "Prior to 12/2001 I had
21  interviewed with Dr. Daniel Segal at 1040 Sullivan Avenue
22  in South Windsor, Connecticut, for a dental hygiene
23  position in his practice."

Page 236

1   A. Mm-hmm.
2   Q. How did you come to learn of the Dr. Segal
3   opening?
4   A. He had an ad in the paper.
5   Q. So, you responded to the ad?
6   A. Yes.
7   Q. And did you send him a resume?
8   A. I think I brought it with me.
9       MR. CREVIER: May I please have this marked
10      as Deposition Exhibit number 10.
11      (Defendant's Exhibit 10, Resume, is marked
12      for identification).
13  Q. (By Mr. Crevier) Ms. Mirek, I'm handing you what
14  I've had marked as Deposition Exhibit number 10. And on
15  the top of the document it has a fax designation, as being
16  sent from Ron Mirek. Is Ron Mirek your husband?
17  A. Yes.
18  Q. Is this the resume that would have been provided
19  to Dr. Segal?
20  A. Yes.
21  Q. Okay. And in this your career objective, as of
22  September 24th, 2001, was to obtain a rewarding career in
23  clinical dental hygiene, is that correct?

Page 237

1  A. Yes.
2  Q. So, as of September 24th, 2001, after the
3  Newport incident and after discussing your options with
4  Dr. Bedard, your career objective was still to have a
5  career in clinical dental hygiene, correct?
6  A. Yes.
7  Q. Okay. Now, what happened with that, with
8  Dr. Segal?
9  A. He said he didn't wear latex gloves, and he
10 wasn't interested in me, with my qualifications. He
11 wanted somebody right out of school. He didn't want to
12 pay for it, and he ended up hiring somebody that I had
13 mentored.
14 Q. So, according to the letter to Monique Rubb,
15 which is marked as Deposition Exhibit number 9, the reason
16 that you didn't get a job in Dr. Segal's office was he
17 told you that he could not pay you the salary, and he
18 hired a dental hygienist right out of school at an entry
19 level wage, correct?
20 A. Yes.
21 Q. Now, but for the fact that Dr. Segal couldn't
22 pay your salary, could you have worked as a dental
23 hygienist in Dr. Segal's office?

Page 238

1  A. No.
2  Q. Why not?
3  A. Everyone else there still used powdered latex
4  gloves.
5  Q. How did you determine that?
6  A. I found out a little later, when I was working
7  in sales. Actually, it may have been even before then. I
8  may have seen that -- I knew that he was the only -- he
9  used latex free gloves, but everyone else used latex
10 gloves.
11 Q. And once again, how did you make that
12 determination?
13 A. The gloves were there.
14 Q. You saw latex gloves when you were in his
15 office?
16 A. Yes.
17 Q. How come you didn't note that in response to the
18 interrogatories in this case and in your letter to Monique
19 Rubb?
20 A. I don't know.
21 Q. You don't know? All you seemed to think was
22 significant at that time was the salary issue?
23 A. Well, he wouldn't have hired me anyway.

Page 239

1  Q. Had he been willing to pay you the salary --
2  what salary were you looking for, by the way?
3  A. I was making -- I can't remember, when I left
4  Dr. Burstein if I was on commission or salary -- or
5  hourly. I was making $33.00 in commissions.
6  Q. So, you were looking for at least $33.00 an
7  hour?
8  A. Yes.
9  Q. And he wasn't willing to pay you the $33.00 an
10 hour, is that correct?
11 A. Right.
12 Q. But for that, though, you still maintain that
13 you would not have been able to work in Dr. Segal's office
14 because other people used latex gloves there, is that
15 correct?
16 A. Yes.
17 Q. What if other people did not use latex gloves
18 there? Would you have been able to take a job in his
19 office, had he met your salary demands?
20 A. Maybe.
21 Q. What would be the determining factor?
22 A. Well, if he could meet my salary demands and if
23 they were -- you know, a latex free office.

Page 240

1  Q. And what do you mean by latex free?
2  A. Having non-latex products, where there were
3  substitutes available.
4  Q. Okay. So, if Dr. Segal's office used latex free
5  gloves -- if everyone in Dr. Segal's office used latex
6  free gloves, used latex free prophy cups, and used latex
7  free masks, would you have been able to work there,
8  assuming that he could have met your salary demands?
9  A. I would have tried.
10 Q. So, you believe that you would have been able to
11 do it?
12 A. Well, I know there would still be other latex,
13 like tubing and things like that, but I would give it a
14 try. It would be better than where I was at.
15 Q. Was that one of the options that you discussed
16 with Dr. Bedard, to work in an office where there were no
17 such latex products?
18 A. I think so
19 Q. Okay. So, Dr. Bedard thought that you could
20 work in an office where there were non-latex gloves and
21 other non-latex objects that you would be working with, is
22 that correct?
23 A. I believe so.

Page 257

significantly reduce the amount of latex that's even being used in the clinical areas? Isn't that true?

A. If the doctor makes that decision.

Q. Correct, but -- so I'm asking you, though, there is the potential to be able to do the job as a registered dental hygienist in an area that's controlled, where the latex use is controlled, correct?

A. If it's latex safe.

Q. If it's latex safe. And you would have been able to continue to function in such an area, correct?

A. Yes, but Dr. Burstein wasn't willing to do that.

Q. I understand that, but you would have been willing to function in a latex safe registered dental hygienist position, correct?

A. Yes.

Q. And because you're able to tolerate latex in your current job, including some powdered latex, we know that there's some degree of toleration that you would have had for latex even in that registered dental hygienist position, correct?

A. Maybe.

Q. Okay. Earlier today you told us about a Dr. Wing who has a latex safe office. What do you mean by

Page 258

latex safe, with respect to Dr. Wing's office?

A. They don't use latex gloves, and they have a lot of latex free alternatives.

Q. Could you work in Dr. Wing's office as a registered dental hygienist?

A. Perhaps.

Q. Is it likely that you could work in Dr. Wing's office if you were offered the job to work there?

A. Maybe.

Q. That's a possibility, correct?

A. That's why I bring my kids there. I feel safe there.

Q. So, you feel that you would be safe working in Dr. Wing's latex safe dental office as a registered dental hygienist, correct?

A. I'm not totally sure.

Q. But you feel like you could?

A. Maybe.

Q. Based on the fact that you can tolerate some latex, and they've really taken steps in his office to reduce latex, correct?

A. Yes, but I don't know about being in an office forty hours a week.

Page 259

Q. Okay. But there's some number of hours a week that you probably could work in Dr. Wing's office, correct, given the cautions that they take with respect to latex, correct?

A. I don't know all the details of his office, so I can't be absolutely certain.

Q. Have you ever inquired about a position in Dr. Wing's office?

A. No.

Q. Has it ever crossed your mind?

A. Yeah, I think it was brought up at one other deposition.

Q. It was?

A. Yes.

Q. You actually did, at one point, inquire of Dr. Wing?

A. No, it was brought up to me, could I work there, and I replied that he already has a hygienist that he's had for several years that travels quite a distance to work for him, and he doesn't need anybody.

Q. But for that, if he had needed somebody, could you take the job there?

A. I'm not sure. Like I said, I don't know all the

Page 260

details about his office. I just feel out of all the dentists that I deal with, that he's the only one I know that doesn't use latex gloves.

Q. Okay. I want to get to this concept again. Right now you're in office space up to fourteen hours a week that there could be powdered latex in the air, occasionally, correct?

A. Yes.

Q. And there's a possibility that you could work as a registered dental hygienist in areas where there's significant -- where there's latex safe alternative products used, like Dr. Wing's office and Dr. Segal's office, so isn't it true that you could probably work in those offices as a registered dental hygienist?

A. Dr. Segal was the only one that -- he was the only practitioner that wore the latex free.

Q. If Dr. Segal's office was such that everyone was using the latex free gloves and latex free masks and latex free prophy cups, could you have worked there?

A. I don't know, because of all the other incidentals in the office.

Q. So, the most you can say is you're not sure?

A. That's right.

Page 261

Q. So, you're not sure whether you're disabled from working in Dr. Segal's office, correct?

A. I know that I am.

Q. How do you know that you are?

A. Because everybody else there uses latex gloves.

Q. Okay. Assuming that Dr. Segal's office is the one where everyone used non-latex gloves, you're not sure whether you're disabled from working there, isn't that correct?

A. Because I don't know everything else about his office.

Q. So, you're not sure?

A. Right.

Q. Okay. And you're not sure whether you're disabled from working in Dr. Wing's office if the opportunity presented itself, correct?

A. Correct.

Q. And you're also not sure of working in any other latex safe dental office if the opportunity presented itself, isn't that correct?

A. I don't know of any other latex safe --

Q. But if there were ones, you're not sure whether you would be disabled from working there, isn't that

Page 262

correct?

A. Right.

Q. So, the only thing that disables you from being a registered dental hygienist is the possibility that in that position, you could have exposure to latex, but for that, you're not disabled from doing the job, correct?

A. Correct.

MR. KIMBALL: Can I just ask a couple of questions?

MR. CREVIER: Sure.

REDIRECT EXAMINATION BY MR. KIMBALL:

Q. Carolyn, we've been talking about this, I think for five or six hours, something like that, and I know that you're a former president of the Connecticut Dental Hygienist Association, isn't that true?

A. The Hartford Dental Hygienist Association.

Q. I'm sorry. And you sell these products now, and you've been doing that since 2002, right?

A. Yes.

Q. And you were a dental hygienist for -- I'm bad at math again, but about seventeen years before you left?

A. Yeah, eighteen.

Page 263

Q. Okay. If you wanted to set up a dental hygienist practice, say, an environmentally safe, eco-friendly practice in your home or in someone's house, and you were to develop your own business of dental hygienists -- and there are dental hygienists that do that, is that true?

A. I wish. You can't.

Q. Well, I think there are?

A. No, it's illegal.

Q. It is?

A. In Connecticut. There's only like two states that I think you can do it. Otherwise I would be doing it.

Q. Is Massachusetts one of them?

A. No.

Q. And you say otherwise you would be doing it. If you could control your environment completely, you probably could function and perform the root plating, and the scaling, and the polishing, the prophylaxis, the major duties that you've discussed, is that a fair statement?

A. Yeah, probably.

Q. Okay. That was my question, thank you.

A. That's called independent practice.

Page 264

Q. Do you know if Massachusetts is one of the places where that's allowed?

A. No.

Q. It's not?

A. No.

Q. Let me ask a couple of follow-ups. If you could control your environment in that way, within the scope of an existing dental practice, then do you feel it would be safe for you to perform the duties of a dental hygienist that we've discussed previously, four or five hours ago, the planing, the prophylaxis, the x-rays, the things that dental hygienists do, you could do that if you could control your environment, correct?

A. Well, the whole environment; not just like my little cubicle with the air flowing over it. You mean the whole practice?

Q. But you don't control the environment where you go to work now?

A. Right, but I can control myself in the environment.

Q. Right, so if you could do that -- take that and do that within the context of a dental hygienist practice, you could perform those functions, the working and the

292

1   COMMONWEALTH OF MASSACHUSETTS
    COUNTY OF HAMPDEN
2

3           I, LAURIE A. MONAGHAN, a Notary Public within
    and for the Commonwealth of Massachusetts, do hereby
4   certify that I took the deposition of CAROLYN MIREK,
    pursuant to Rule 30 of the Federal Rules of Civil
5   Procedure, on September 15, 2005, at the Law Offices of
    Crevier & Ryan, LLP, 1500 Main Street, Suite 2020,
6   Springfield, Massachusetts.

7           I further certify that the above named deponent
    was by me first duly sworn to testify to the truth, the
8   whole truth and nothing but the truth concerning her
    knowledge in the matter of the case of CAROLYN MIREK vs.
9   THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, et al, now
    pending in the United States District Court for the
10  District of Massachusetts.

11          I further certify that the within testimony was
    taken by me stenographically and reduced to typewritten
12  form under my direction by means of COMPUTER ASSISTED
    TRANSCRIPTION; and I further certify that said deposition
13  is a true record of the testimony given by said witness.

14          I further certify that I am neither counsel for,
    related to, nor employed by any of the parties to the
15  action in which this deposition was taken; and further,
    that I am not a relative or employee of any attorney or
16  counsel employed by the parties hereto, nor financially or
    otherwise interested in the outcome of the action.

17
            WITNESS my hand this 27th day of September,
18  2005.

19                    _____
                      Laurie A. Monaghan
20                    Notary Public
                      Certified Shorthand Reporter
21                    Registered Professional Reporter

22
    My commission expires
23  August 8, 2006

959 MAIN STREET                                    (413) 733-4078
4TH FLOOR        PHILBIN & ASSOCIATES, INC.   Pittsfield: (413) 499-2231
SPRINGFIELD, MA 01103                              FAX: (413) 734-4588

Serving the legal community of Massachusetts since 1947