# EXHIBIT A

Case 3:04-cv-30166-RGS   Document 81-2   Filed 06/20/2006   Page 1 of 18

*Allergy, Asthma and Immunology P.A.*

209 SOUTH LIVINGSTON AVENUE
LIVINGSTON, N.J. 07039
(973) 992-4171
TELECOPIER: (973) 992-6325

STEVEN J. WEISS, M.D.
ALAN GOODMAN, M.D.

Diplomates, American Board of Allergy and Immunology

381 CHESTNUT STREET
UNION, N.J. 07083
(908) 688-6200
TELECOPIER: (908) 688-4416

December 8, 2005

Crevier & Ryan, LLP
David B. Crevier, Esq.
Tower Square
1500 Main Street
Suite 2020
Springfield, MA 01115-5727

Re: Mirek v. The Guardian Life Insurance
Company of America, et al

Dear Mr. Crevier:

At the request of your firm, I was asked to write this report regarding the claim of total disability by Carolyn S. Mirek. Mrs. Mirek was employed as a dental hygienist until December of 2001. She claims to be unable to work as a dental hygienist because of her allergy to natural rubber latex (NRL).

I had the opportunity to review several reports, legal documents and medical records on Mrs. Mirek in preparation for this report. These documents are listed in Appendix A, found at the conclusion of this report. I am an allergist, board certified in internal medicine and allergy and immunology. I have been in private practice, and involved in the training of physicians entering the field of allergy and immunology for over 18 years. My report is based on my review of Mrs. Mirek's records, the medical literature, and my professional experience as a specialist in allergy and immunology. My opinions are stated with a reasonable degree of medical certainty.

### History of Complaint

Mrs. Mirek graduated from South Windsor High School in 1981. She attended simultaneously Northeastern University and Forsyth School for Dental Hygienists in Boston Massachusetts. In 1983 she received her associate's degree from Northeastern and a dental hygienist certificate from Forsyth. Mrs. Mirek's first job, initially as a dental assistant, than after she passed her dental hygienist boards as a hygienist, was in Ohio. She remained there approximately from 1983 to 1985. At that time, while working in the dental profession, she did not wear latex gloves.

In 1985 Mrs. Mirek moved back to Connecticut. After 1986 she began to wear gloves as the importance of the concept of "universal precautions" became known. After she started wearing gloves she began to experience itching and rashing of her hands. In March of 1986 she saw a dermatologist, Dr. Greenberg. That note describes a two week

history of an eczematous eruption on her hands, fingers and wrists. A diagnosis of contact dermatitis verse a pemphigoid type of reaction was considered. A steroid cream was prescribed and it was recommended that she wear cotton liners under her latex gloves. She did not return to this physician until 1993 for an unrelated complaint.

According to Mrs. Mirek's depositions she tried several different latex gloves and discovered that the Johnson and Johnson Microtouch latex gloves did not irritate her hands. She continued to wear these gloves without major skin complaints until she was told that she was allergic to NRL in June of 1999.

Soon after Mrs. Mirek moved back to Connecticut, she also began to experience symptoms of allergic rhinoconjunctivitis and some symptoms of chest congestion. These symptoms were described as being present both at work and at home. In 1987 she saw an allergist, Dr. Prasad Srinivasan. Allergy testing revealed numerous positive reactions and allergy immunotherapy was started to pollens, dander and molds. In addition, medications were prescribed including antihistamines, nasal sprays and eventually asthma inhalers. The allergy immunotherapy went on for approximately one year, but was marked by systemic reactions to the injections that at times required emergent breathing treatments. Mrs. Mirek became frustrated at the entire process and stopped immunotherapy and eventually stopped seeing this allergist in 1992.

Mrs. Mirek's first appointment with her current allergist, Dr. Bedard, was in May of 1992. It was noted that she was complaining of nasal congestion, watery and itchy eyes, post nasal drip with cough and occasional chest tightness. Her symptoms were worse in the spring and fall, but symptoms were year round. Mrs. Mirek stated her symptoms were worse outside. The onset of these symptoms was noted to be sometime in her youth but worsening over the last 8 - 9 years. Also noted, at this initial appointment, was that latex caused her to have her hands rash intermittently. Shellfish ("hard shellfish") caused her to become itchy. Avocado's caused nausea and vomiting. Allergy testing demonstrated sensitivities to tree, grass and ragweed pollens and a mold alternaria. A diagnosis of severe seasonal allergic rhinitis with mild asthma was made.

The office visits of Mrs. Mirek with Dr. Bedard were primarily seasonal (fall and spring) and symptoms were consistent with her diagnosis. It also appeared that URI's worsened her chest symptoms. In February of 1994 she experienced a reaction to a cup of soup that she had at work. A definitive cause of this reaction was never found though Mrs. Mirek retrospectively believed that latex powder must have caused the reaction.

The majority of her office visits remained stable and pulmonary function tests were primarily normal. On occasion they were suggestive of mild small air way obstruction with reversibility to the administration of a bronchodilator. There were occasional mentions of a work related incident such as "aggravated by working part time Fridays in under ventilated office, now has been opened up-better otherwise" or "started when working on someone who had a cat at home." Mrs. Mirek did not show cat sensitivity.

3

From 1/25/95 (the above mentioned cat incident) she did not see her allergist again until May of 1996. At that time he believed her to be having a flare of her seasonal allergies and cough variant asthma. She again was not seen for one year. After that visit she was not seen for 15 months.

In 1999 Mrs. Mirek attended a lecture on latex allergy and believed that many of the symptoms that she experienced were consistent with a latex allergy including her allergy to avocados and more recently kiwi. When she later developed an allergic reaction to banana, she informed her allergist that she wanted to be tested for latex allergy. A Canadian latex extract was used and was positive. In addition, an allergy test for banana using fresh banana was positive. A test for the Johnson and Johnson gloves she had continued to wear was negative as was mango and pear. Interestingly, though she was told to use vinyl gloves she was also told that she could continue to wear her latex Microtouch gloves. Mrs. Mirek stopped wearing latex gloves at that point.

Her next office visits were unremarkable and she was considered to be "doing well." In December of 2000 she complained of an allergic reaction to nuts. In July of 2001 she experienced an allergic reaction to a ham sandwich that she believed to have been prepared by someone wearing latex gloves at an amusement park. In August of that year she experienced an allergic reaction to a salad with vinaigrette dressing that, she was later told, was prepared by someone wearing latex gloves. Though these reactions were described as severe by Mrs. Mirek she did not seek urgent care for the conditions when they occurred. In December of 2001 Mrs. Mirek stopped working and filed a claim for disability because of her latex allergy. In addition, she was having problems with a carpal tunnel condition.

Mrs. Mirek currently is working in the dental sales business and spends approximately 1/3 of her work time in dental offices. Though she tries to control her latex exposure in the offices, this can be difficult as she also makes cold calls to dental offices. Mrs. Mirek states that if she starts to experience allergic reactions, she is able to leave the office. She states that her use of allergy and asthma medications are much reduced and she feels well. She needs to always remain on alert for possible latex allergic reactions from food handlers wearing latex gloves as she believes that this has happened on a few occasions even since she left her work as a dental hygienist.

Discussion

Latex allergy is a well recognized condition that has been actively investigated over the past 24 years. The diagnosis of latex allergy is based on the identification of individuals with latex specific IgE and a history consistent with allergic reactivity when exposed to latex antigens. Two primary risk groups for latex allergy exist: patients undergoing multiple surgical procedures, especially at an early age such as children with spina bifida. These individuals have required repeated surgeries or instrumentation at an early age. The second risk group appears to be atopic individuals. Atopic individuals have the genetic predisposition to develop IgE responses to potentially allergenic proteins (antigens) that they are exposed to.

Carolyn Mirek is an atopic individual. This is supported by her history of having allergies in her childhood and then from the mid-eighties to the present. There also is a history of allergic disorders in her family. Mrs. Mirek demonstrated numerous sensitivities to common aeroallergens when she was skin tested, and her medical record from Dr. Bedard was consistent with seasonal allergic rhinitis and seasonal allergic asthma. As she continued to work in the dental office, she had occasional complaints of symptoms of allergy that were present in the office environment. She also developed food allergic reactions to foods that commonly cross react to latex proteins. It was not surprising that she had sensitivity to latex when tested. I believe that she has signs and symptoms consistent with latex allergy, in addition to her other allergic sensitivities.

Based on my experience, the majority of health care workers that develop latex allergy can continue to work in their chosen profession after appropriate treatment and modifications of their environment. This is also supported in the allergy literature. I will enumerate just a sampling:

"Recommendations for avoidance have been popularized and many alternative products developed. Our experience has shown that nearly all patients with NRL allergy who are health care workers do not need to quit their jobs or find new occupations. Appropriate environmental modifications are not only feasible, but effective."
   Mark E Burak, MD
   Mayo Medical School
   Guest Editorial, Annals of Allergy, Asthma & Immunology.2000 Feb;84:175

"In conclusion, these studies suggest that latex allergic health care workers, although they need to use nonlatex glove alternatives for their personal use, can continue to work in their medical environments if their coworkers use either nonpowdered latex gloves, latex gloves with the lowest protein content, or latex gloves of very low allergen content. With these modifications, symptoms from latex aeroallergen exposure are prevented, and new cases of latex allergy are reduced. Allergists are doing health care workers a disservice if they inform patients that they can not return to work or are disabled because they are allergic to latex."
   Loren W. Hunt, MD
   "Management of occupational allergy to natural rubber latex in a medical center"
   Journal of Allergy and Clinical Immunology. 2002 August;110:S105

"Theoretically, remaining in a health care environment where intermittent ambient exposure to NRL allergens persists could raise concern that asthma severity could progress. However, similar to our experience, Vandenplas et al reported that asthma symptoms and histamine $PC_{20}$ improved in a group of health care workers with NRL-induced asthma after NRL exposure was reduced but not eliminated. These outcomes were identical to those achieved in another group of workers in whom complete cessation of exposure to NRL had been instituted."

David I Bernstein, MD et al
"Clinical and occupational outcomes in health care workers with natural rubber latex allergy", Annals of Allergy, Asthma & Immunology. 2003 Feb;90:212

Mrs. Mirek, Dr. Bedard, and in her report Dr. Oliver state that Carolyn Mirek is totally and permanently disabled from her work as a dental hygienist. The definition of total disability is "because of sickness or injury, you are not able to perform the major duties of your occupation." Your occupation refers to "the regular occupation (or occupations) in which you are engaged at the time you became disabled." I do not believe that the medical records that I reviewed suggest that Mrs. Mirek is unable to perform the major duties of her occupation.

From the date of her first visit with her allergist, Dr. Bedard, in May of 1992 until the date of her diagnosis of latex allergy in June of 1999, her records reflect primarily treatment of a seasonal allergy problem (observe that the dates of her office visits are primarily spring and fall) and also occasional asthma flares from URI's. Her pulmonary function tests, at their worst suggest mild small airway obstruction that is reversible with the administration of a bronchodilator. The majority of her pulmonary function tests are normal. There is occasional mention of the possibility of latex allergy in Dr. Bedard's office notes, but I believe that her symptoms were never pronounced enough to warrant further investigation as Mrs. Mirek was clinically stable. It was at Mrs. Mirek's suggestion, after experiencing an allergic reaction to bananas and having a history of allergic reactions to kiwi and avocados, that latex was tested.

After the diagnosis of latex allergy was made the following is an excerpt from the records of Dr. Bedard regarding her status:

6/15/99 "occasional eye redness day/nights after work. Occasional sneezing at work. Occasional hand rash in the past. No nocturnal awakening, cough or wheeze. When blows up ballons at party eyes swollen."
10/7/99 "Good September office powder free."
7/13/00 " seasonal allergic rhinitis, cough, Latex allergy. Doing well. Staff using powder feee latex. She is using Nitrile gloves. No need of metered dose inhaler. Minimal allergy symptoms this spring, easily controlled by Flonase."
12/28/00 "had some nuts yesterday. Nausea, vomiting, diarrhea. Needs tests to nuts."

The most severe note in the 16 months of treatment, after the diagnosis of latex allergy was made, was related to a possible nut allergy, having nothing to do with latex allergies. Her only latex related complaint was blowing up balloons at a party and experiencing swollen eyes and this event had nothing to do with her work environment. Her attendance at work was excellent with very few sick days. There is no evidence of disability secondary to latex allergy.

In July and August of 2001 Mrs. Mirek reported two food related episodes outside of the work environment that she attributed to latex exposure. The first episode occurred at an amusement park when Mrs. Mirek ate a ham sandwich and instantly had her eyes "swell shut" and she felt "very ill". She consumed her own Benadryl and improved. She believes that latex caused this reaction because she believes the workers were wearing latex gloves and she saw a box of latex gloves on the counter. In August, at her husband's company function, she ate a salad and experienced a more severe, but similar reaction. Again, she did not go to an emergency room or use her epi pen. She took Benadryl and later called the kitchen and spoke to "someone" there that stated they wore latex gloves when making salads. The reality of these two situations is that there is no proof that latex was the cause of any of these reactions. The trace amounts of latex that could be passed onto the salad is small and these types of reactions, though theoretically possible are rare, if ever proven. Mrs. Mirek stated in her deposition in January of 2004 for the Aero-Med case that Dr. Bedard admitted that it was rare to have allergic reactions from food prepared by handlers wearing latex gloves. In her case, she believed that she had two episodes within a one month period of time. There are a number of alternative explanations for these episodes from idiopathic (as was presumed to be the case when she ate the soup at work or nuts that she was never proven to be allergic to) to possible food allergy (e.g. melons, avocados, kiwi, bananas) to contamination from an allergic food such as shell fish.

Dr. Oliver believes Mrs. Mirek to be at an increased risk for anaphylaxis with re-exposure to latex, even at low levels. This concept is not supported by the allergy literature, as can be seen with the recent studies done on individuals with latex allergy that continue to have exposure noted on page four of this report. My own clinical experience is that allergic responses in latex allergic health care workers frequently improve over time. Allergic reactions to latex in the workplace, through topical or airborne contact, are no more dangerous than allergic reactions to other indoor allergens. Life threatening anaphylaxis is extremely rare with occupational exposure. From a public health point of view, it is a minor problem compared to anaphylaxis from drug allergy, insect allergy or food allergy.

Dr. Oliver also implies that there is a connection between Mrs. Mirek's presumed glove dermatitis and her type I allergy to NRL, there is not. The most common glove dermatitis reported is an irritant dermatitis. These reactions are not immunogenic, but are due to the effects of repeated hand washing with harsh soaps, exposure to chemical irritants, perspiration into the gloves and friction. An allergic contact dermatitis, also known as a type IV hypersensitivity reaction, is a cell mediated delayed type allergic reaction. This type of "allergic" reaction has little to do with NRL proteins. This dermatitis is caused by sensitization to rubber accelerants and anti-oxidants used in the manufacturing of latex and occasionally synthetic gloves. It is often difficult to differentiate an irritant dermatitis from a contact dermatitis. It is interesting to note that the gloves that Mrs. Mirek initially did the best with, after she developed her glove dermatitis, were latex gloves.

Dr. Bedard in his letter dated September 15, 2002 stated that he believed Mrs. Mirek developed her latex allergy causally due to her environmental exposure. It should also be noted that there is no data that establishes a threshold dose of latex exposure necessary to sensitize susceptible individuals. The level of exposure that results in sensitization is highly individualized and unknown.

In a study of a hospital in Colorado done by the CDC (NIOSH) in 1998, and published in June of 2000 in the Journal of Environmental Medicine, Dr. Elena Page found no relationship between any parameter of latex glove use in the present, or in the past, as a risk factor for NRL sensitization in employees of that hospital. Atopy was the main risk factor for the development of NRL allergy, a trait that Mrs. Mirek has been shown to possess.

Dr. Paige also found very low levels of latex proteins when she sampled the air at various locations in Exempla St. Joseph Hospital in Colorado. As expected NRL levels were higher in clinical areas than non-clinical areas of the hospital, but generally these levels were very low. This hospital did not have a latex safe policy and employees did wear powdered gloves. It is known that glove manufacturers have significantly reduced the protein and allergen levels in gloves in response to heightened awareness to latex. This has decreased the airborne concentration of NRL proteins in environments where latex gloves are used, even powdered gloves. This phenomena was also noted by Dr Gordon L. Sussman in his article "Incidence of latex sensitization among latex glove users" (JACI 1999 Feb;101:171-178). In this study he found that the latex content of the powdered surgical gloves declined at a rate of 296 mcg/year, this finding was highly significant.

The findings discussed in the paragraph above, in addition to the data regarding occupational outcomes in latex allergic patients still exposed to latex, in my opinion negate Dr. Oliver's concerns of latex gloves in one office in an improperly ventilated office distributing latex to other parts of the building causing symptoms. It is my opinion that Mrs. Mirek has more control in a dental office where she wears non-latex gloves and others around her wear either powder free, low latex protein gloves or synthetic gloves than in her current occupation in dental sales. At present she spends one third of her time in environments she has no control over, especially when she makes cold sales calls.

Latex safe environments are generally agreed to be defined as environments that are reasonably free from airborne NRL proteins. Though latex is prevalent in dentistry, 88% of harvested latex is acid coagulated at a pH of 4.5 and subsequently made into dry sheets or crumb latex. Sulfur heat vulcanization of this rubber occurs at extreme temperatures for prolonged times resulting to low to undetectable quantities of allergenic proteins being retained in the finished product. It is the dipped latex products such as condoms and gloves where the majority of IgE reactions have been linked to. It is my belief that the primary issue of creating a latex safe environment for Mrs. Mirek could be addressed with the issue of glove usage.

## Opinions

1) Mrs. Mirek is an atopic individual. She has the genetic predisposition to become sensitized to potentially allergenic proteins. This is confirmed by her past history of seasonal allergies as a child, her history of allergies to shell fish, and her more recent history of seasonal allergies and bronchial asthma.

2) Mrs. Mirek has a NRL allergy. This is illustrated in her clinical history and her positive skin test to a latex extract. She also has demonstrated some of the allergies to cross reacting foods that are commonly seen in individuals with latex allergy (i.e. avocados, kiwi and bananas).

3) Mrs. Mirek was able to work in a dental office as a hygienist with minimal health problems that were directly related to her exposure to latex proteins. Her medical records from her treating allergist most often reported "doing well."

4) Mrs. Mirek may or may have not had a latex contact dermatitis on her hands, it was never proven. She had in the past a hand dermatitis, it easily may have been an irritant dermatitis.

5) The allergy literature supports evidence that the practicing physician has observed over the past several years. That is that the majority of heath care workers that develop latex allergy can continue to work in their chosen profession after appropriate treatment and modifications of the environment. We are doing our patients a disservice by telling them they are disabled by a latex allergy.

6) It is not clear what the precipitating cause was of her two food allergic reactions (at the amusement park and her husband's company function). There are multiple explanations other than latex that would explain these episodes. Severe allergic reactions in individuals consuming foods that were prepared by food handlers wearing latex gloves are rare.

7) Even in environments that are not latex safe, ambient NRL proteins sampled from the air have decreased over the years. This is likely the result of changes in the manufacturing process, the drive to use gloves that are non-latex, non-powdered or low protein/allergen, and increased awareness of NRL allergy. I believe that Mrs. Mirek has a better chance of minimizing her exposure to NRL working in a dental office where she is able to have control over her environment than as an individual working in dental sales requiring visits to numerous offices during a day where she has no control over the environment. The risk of Mrs. Mirek experiencing an anaphylactic reaction, while working as a dental hygienist, in a latex safe environment is negligible.

8) Mrs. Mirek was able to work as a dental hygienist before she left her practice and was rarely absent from work as a result of illness. She does not fit the definition of totally and permanently medically disabled as a result of her NRL allergy.

9

Please feel free to contact me if there are any questions regarding this report. My opinions summarize information outlined in greater depth in my discussion section. I reserve the right to supplement this report should new material become available.

Sincerely,

Steven J. Weiss, M.D.

## Appendix A
**Records, Reports and Legal Documents reviewed by Steven J. Weiss, M.D.**

Deposition transcript of Carolyn Mirek from Mirek Vs Aero-Med dated 1/7/04 and 1/8/04 and exhibits

Medical records from Dr. Guardino

Medical report by Dr. James Garb dated 3/12/05

Medical records from Dr. Ivelisees Viruet

Medical records of Dr. Robert M. Bedard and his associated reports

Medical records of Dr. Greenberg

Deposition transcript of Carolyn Mirek in Mirek vs Robert Burstein DDS dated April 20, 2004

Medical report of Dr. Harold Axe dated June 26 2002 and an addendum report dated October 11, 2002

Medical report of Dr. L. Christine Oliver dated November 9and 10th, 2005

Deposition transcript of Carolyn Mirek from Mirek vs the Guardian Life Insurance Co. dated Sept 15, 2005 and exhibits

Deposition transcript of Robert Burstein, DDS from Mirek vs the Guardian Life Ins Co dated August 19, 2005 and exhibits

Deposition transcripts of James R. Garb, M.D. from Mirek vs the Guardian Life Insurance Co dated October 25, 2005 and exhibits

Deposition transcripts of Robert M. Bedard, M.D. from Mirek vs. the Guardian Life Insurance Co. dated October 12, 2005

Medical records from Dr. Kirk Watson

Medical records from Srima Nissanka, LCSW

Expert disclosure reports in the product liability suit

Carolyn Mirek's response to request for production of documents propounded by Berkshire Life

Carolyn Mirek's response to interrogatories propounded by Berkshire Life

Deposition transcripts of Harold Axe, M.D. from Mirek vs the Guardian Life Insurance Co. dated September 16, 2005

# CURRICULUM VITAE

Steven Jay Weiss
209 South Livingston Avenue
Livingston, New Jersey 07039
973-992-4171


**ACADEMIC APPOINTMENTS:**

    College of Physicians and Surgeons
        Columbia University
        New York, New York
        Clinical Instructor – 1987 to 1996

    Mount Sinai School of Medicine
        Mount Sinai Hospital
        New York, New York
        Adjunct Clinical Instructor – 1996 to July 1999
        Assistant Clinical Professor – July 1999 to present

**HOSPITAL APPOINTMENTS:**

    Saint Barnabas Medical Center
        Livingston, New Jersey
        Attending Physician 1986 to present
        Chief – Allergy and Clinical Immunology Section
            Division of Internal Medicine – 1991 to present

    St. Luke's / Roosevelt Hospital Center
        New York, New York
        Attending Physician - 1987 to 1996

    VA New Jersey Health Care System
        East Orange, New Jersey
        Consultant (Allergy & Immunology) – 1989 to present

    Mount Sinai Hospital
        New York, New York
        Clinical Assistant – 1996 to 1999
        Assistant Attending – 1999 to present

**EDUCATION:**

Undergraduate:
    Washington University
    Saint Louis, Missouri
    June 1978: Bachelor of Arts – Biology

Medical School:
> University of Health Sciences / The Chicago Medical School
> North Chicago, Illinois
> June 1982 – Doctor of Medicine

## POSTDOCTORAL TRAINING:

Internship:
> St. Luke's / Roosevelt Hospital Center
> New York, New York
> Internal Medicine – 1982 to 1983

Residency:
> St. Luke's / Roosevelt Hospital Center
> New York, New York
> Internal Medicine – 1983 to 1985

Fellowship:
> R.A. Cooke Institute of Allergy
> St. Luke's / Roosevelt Hospital Center
> New York, New York
> Allergy and Immunology, Infectious Diseases – 1985 to 1987

## CERTIFICATION:

> National Board of Medical Examiners
>> July 1, 1983
>> Number 244141
>
> American Board of Internal Medicine
>> September 11, 1985
>> Number 101841
>
> American Board of Allergy and Immunology
>> October 5, 1987
>> Number 2978

## LICENSURE:

> New York, July 1983
>> License 154670
>
> New Jersey, June 1984
>> License 44433

## PROFESSIONAL ORGANIZATIONS AND APPOINTMENTS:

American Academy of Allergy, Asthma & Immunology – Fellow
American College of Allergy, asthma & Immunology-Fellow
American Medical Association – Member
Essex County (New Jersey) Medical Society – Member
New Jersey Medical Society - Member
The Allergy, Asthma & Immunology Society of Greater New York
    Past President
    Executive Committee
New Jersey Allergy and Asthma Society – Member

## HOSPITAL AND PUBLIC COMMITTEES:

Saint Barnabas Medical Center
Livingston, New Jersey
    Internal Medicine Sections Chief
    Medical Board
    Pharmacy and Therapeutics
    Medication Error Sub-Committee - Chairman
New Jersey Department of Health and Senior Services
    Latex Allergy Task Force

## TEACHING ACTIVITIES:

Saint Barnabas Medical Center
Livingston, New Jersey
1991 – present: internal medicine residency program; chief of allergy & immunology section – preceptorships and lecture series

VA New Jersey Health Care System
East Orange, New Jersey
1989 to present: attending physician in the allergy and immunology clinics, instructor of allergy and immunology fellows from UMDNJ training program

R.A. Cooke Institute of Allergy
St. Luke's-Roosevelt Hospital Center
New York, New York
1987-1996: allergy and immunology fellowship training program instructor, teaching service and clinic attending physician

The Mount Sinai School of Medicine
The Mount Sinai Hospital
New York, New York
1996-present: attending physician in the allergy and immunology clinics; instructor to fellows in the residency training program and housestaff

**PRIVATE PRACTICE:**
Allergy, Asthma and Immunology, P.A.
1987 to present

209 South Livingston Avenue
Livingston, New Jersey

381 Chestnut Street
Union, New Jersey

Steven J. Weiss, M.D.

Page 5

Publications

A Nurse with Anaphylaxis to Stone Fruits and Latex Sensitivity: Potential Diagnostic Difficulties to Consider. Weiss, Steven J, Halsey, John F. Annals of Allergy, Asthma and Immunology. 1996; Vol 50, Number 12:504-508.

Atlas on Mechanisms in Adverse Reactions to Food; The Joints and Muscles. Panush Richard S, Veloso Mary Lind, Weiss Steven, Bielory Leonard. European Journal of Allergy and Clinical Immunology 1995 Vol 50 Number 20 : 75-77.

An Unusual Case of Proptosis. Peltz S, Amornmarn L, Centeno L, Weiss S, Wolff A. Annals of Allergy [Abstract] 1994; Vol 72, Number 1:

HIV Antigen-Specific Lymphoproliferative Responses in HIV Infected Populations. Reddy Mohan M, Weiss Steven J, Reilingh Mary M, Grieco Michael H. Journal of Allergy and Clinical Immunology [Abstract] 1987; Vol 79. Number 1: 135

## Rates

Preparation rate of review of materials: $300.00/hr.
Trial Rate: $ 400/hr.
Preparation work with attorney: $300.00/hr.
    If office hours need to be cancelled: $400.00/hr.

## Trial/Deposition Testimony

## Steven Jay Weiss, M.D.

April 2002 – Molly Baader matter-NJ State "pension court" – Appeared in court for state of NJ DAG in a pension dispute regarding multiple chemical sensitivities and ex-state worker

September 2002 – Sloan v. American Dream Homes, Inc. Law firm Bendit Weinstock, West Orange, NJ.- Deposed as the treating physician in a case involving dust conditions at a housing development