Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3
 4
 5    * * * * * * * * * * * * * * * *
 6    CAROLYN MIREK,                  *
 7                   Plaintiff        *
 8    vs.                             *  No. 04-30166-MAP
 9                                    *
10    THE GUARDIAN LIFE INSURANCE     *
11    COMPANY OF AMERICA and          *
12    BERKSHIRE LIFE INSURANCE        *
13    COMPANY OF AMERICA,             *
14                   Defendants       *
15    * * * * * * * * * * * * * * * *
16
17         DEPOSITION OF:  DONALD O. MORGAN
18         Berkshire Life Insurance Company
19                  700 South Street
20             Pittsfield, Massachusetts
21                September 21, 2005
22
23             Tacy A. Malandrinos
24                Court Reporter
```

DONALD O. MORGAN
September 21, 2005

Page 17

1  up?
2      A.    It was sort of a progression of
3  things. Typically at the time of the merger a
4  lot of companies were looking at latex allergy
5  and attempting to cover it with an exclusion
6  provision. We were seeing more of it. And our
7  medical staff and myself and the re-insurers did
8  not feel, because the medical awareness of latex
9  allergy was becoming more of an issue I think
10 since the HIV thing and gloving and that sort of
11 thing. And so therefore there was more use of
12 latex, and we were seeing more reaction to it.
13          So it became, it was kind of a
14 progressive thing after that because of the
15 market we were working in.
16     Q.    On the second page of Exhibit 21
17 there is a section that has a heading of Latex
18 Allergy. Do you see that?
19     A.    Yes, I do.
20     Q.    And do you see where there is a
21 sentence, the first sentence says "we reiterated
22 that our current policy is to decline all cases
23 mentioning a latex allergy." And all is
24 underlined?

DONALD O. MORGAN
September 21, 2005

Page 18

1      A.     Yes.
2      Q.     Was it Berkshire's policy to
3  decline all cases mentioning a latex allergy in
4  2002?
5      A.     Yes, it was. But remembering that
6  our almost exclusive market was in the medical
7  field. That's what the all meant.
8      Q.     And for how long -- strike that.
9             You see the phrase "we reiterated"?
10     A.     Right.
11     Q.     Is it correct that even before
12 September of 2002, the date of this memo, it was
13 a policy of Berkshire to decline an application
14 in which there was a latex allergy mentioned?
15     A.     Yes, that's correct.
16     Q.     And did you participate in the
17 development of the policy to decline to insure
18 individuals with latex allergy?
19     A.     Yes, I did.
20     Q.     Was it your view that Berkshire
21 should not issue policies to individuals who had
22 a latex allergy -- strike that.
23            Was it your view at the time the
24 policy was developed that there was too great a

DONALD O. MORGAN
September 21, 2005

Page 19

1  risk for the company in insuring individuals
2  where a latex allergy was mentioned?
3       A.     Yes.
4       Q.     Why was that?
5       A.     Again, considering in the context
6  that our market was predominantly medical, and
7  the development of non-latex products was
8  relatively new at that point in time, the
9  environmental concerns were such that these
10 professionals really could not avoid contact
11 with latex in the majority of the medical
12 situations and the dentist.
13      Q.     Was it your view in developing the
14 policy regarding latex, that there was a
15 substantial risk to the company that if an
16 individual in the medical profession had a latex
17 allergy and obtained disability insurance, that
18 the individual would be filing a claim?
19             MR. KIMBALL:  Objection to the form
20      of the question.  It's compound.
21             THE WITNESS:  I'm not sure where
22      you are going.
23      Q.     (By Ms. D'Alcomo)  When you helped
24 developed the policy regarding latex allergy,

DONALD O. MORGAN
September 21, 2005

Page 20

1  you were taking into account the risk to the
2  company of accepting the policy for people who
3  had a latex allergy, correct?
4        A.    Correct.
5        Q.    Was it your position in developing
6  the policy regarding the insuring individuals
7  with latex allergy, that the company would be
8  taking too great a risk in issuing disability
9  policies to individuals with latex allergy?
10       A.    Yes.
11       Q.    During the time that you were
12 working actively in the underwriting area at
13 Berkshire, did your position ever change?
14       A.    My job?
15       Q.    I'm sorry.  That's an ambiguous
16 question.
17             You stopped working actively in the
18 underwriting area in May 2004, correct?
19       A.    Right.
20       Q.    As of May 2004 had your position
21 regarding what the company should do as to
22 issuing policies to individuals with latex
23 allergy ever change?
24       A.    I think I explained earlier, it was

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

Page 22

```
 1        A.    Yes.
 2        Q.    "We do not consider applications
 3   from individuals indicating latex allergies."
 4   Correct?
 5        A.    Yes.
 6        Q.    Was that discussed at an
 7   underwriting management meeting on August 7,
 8   2003?
 9        A.    Yes.
10        Q.    In parenthesis you refer to "bad
11   claim experiences."  Do you see that?
12        A.    Yes.
13        Q.    What did you mean by the reference
14   to "bad claim experiences" in the section of the
15   memo that refers to latex?
16        A.    It was my understanding that
17   industry-wide, latex allergies were presenting
18   more and more often in a negative claims
19   situation.
20        Q.    By that do you mean that more and
21   more often individuals were filing claims on
22   their disability policies claiming they were
23   unable to work?
24        A.    Right.  Correct.
```