# Exhibit 1

**BRIAN M. DONNELLY**
**April 10, 2006**

 ORIGINAL

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3           Civil Action No.:   04-30166-MAP

4

5     *****************************

6     CAROLYN MIREK                    *

7              Plaintiff              *

8        vs.                          *

9     THE GUARDIAN LIFE INSURANCE  *

10    COMPANY OF AMERICA and        *

11    BERKSHIRE LIFE INSURANCE      *

12    COMPANY OF AMERICA,           *

13           Defendants             *

14    *****************************

15

16        DEPOSITION OF:  BRIAN M. DONNELLY

17           BERKSHIRE LIFE INSURANCE

18             700 South Street

19           Pittsfield, Massachusetts

20          April 10, 2006  10:00 A.M.

21

22

23             Kelly M. Bruce

24             Court Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 4

1        MR. NESIN:  Ed, before we start,

2    should we do the same stipulations we've

3    had in the other case?

4        MR. KIMBALL:  Yes.

5        MR. NESIN:  All objections except

6    as to form are reserved until time of

7    trial, motions to strike reserved until

8    time of trial, and the witness will have

9    30 days to read and sign the deposition

10    transcript, signing need not be in front

11    of a notary, and if it's not returned

12    then it's deemed waived.

13        MR. KIMBALL:  Let me -- for the

14    purposes of making the record, we're

15    producing this witness pursuant to

16    Topics 1, 4, 5, 17, and 26, which are, I

17    believe, the topics that relate to the

18    plaintiff's claim, specifically, and I

19    think we had agreed to a -- generally, a

20    schedule on that order.

21        MR. NESIN:  Right.

22

23

24

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 37

1      disability.

2          Q.      (By Mr. Nesin)   Would there be any

3      further research that a claims consultant would

4      typically do to get a better understanding of

5      the claimant's occupation?

6                  MR. KIMBALL:  Objection.  Calls

7          for speculation as to his claim.

8                  THE WITNESS:   I can answer that

9          generally, that we would typically get

10         verification of employment from their

11         last employer in the form of an

12         employer's statement.

13         Q.      (By Mr. Nesin)   Do you know if -- in

14     Carolyn Mirek's claim if Kevin Kvederas got a

15     verification of -- from her employer?

16         A.      My recollection is there was a -- an

17     employer's statement completed by her last

18     employer.

19         Q.      Other than the information that

20     Carolyn Mirek filled out on her claim form and

21     the information from the employer verification

22     form, did Kevin Kvederas do any other -- look at

23     any other documents to get an understanding of

24     Carolyn Mirek's occupation?

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 48

```
 1    any other substance?

 2        A.      I do not know.

 3        Q.      If he had consulted medical

 4    literature, would that typically be represented

 5    in the claims file?

 6            MR. KIMBALL:  Objection.

 7            THE WITNESS:  Typically, it would

 8        be.  He did, apparently, if I read this

 9        correctly, Ms. Mirek sent him some

10        articles that she felt were informative.

11        So it would appear that he would have

12        read those and certainly documented the

13        file with them.

14        Q.      (By Mr. Nesin)  Those are the

15    articles from the Naples newspaper that you

16    referred to earlier?

17        A.      Those were the only ones I saw, yes.

18        Q.      But if he had consulted any medical

19    literature, that would most likely be

20    represented in the claims file?

21            MR. KIMBALL:  Objection.  Calls

22        for speculation.

23            THE WITNESS:  Again, I don't know

24        whether he did or not.
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 57

1    Objection.  Calls for speculation.  It's

2    not to the topic this witness has been

3    designated to testify to.

4              You may answer, if you know the

5    answer.

6              THE WITNESS:  I don't know her

7    exact date of termination.

8       Q.     (By Mr. Nesin)  You mentioned that

9    the field inspector was Joseph Champigny.  Is he

10   employed by Berkshire?

11      A.     Yes.

12      Q.     Do you know whether at the time he

13   did his field review -- I forgot what it's

14   called.

15      A.     Field visit.

16      Q.     -- field visit, he had any knowledge

17   about latex allergy?

18      A.     I don't know the answer to that.

19      Q.     So is it your testimony that the

20   people who -- strike that.

21             Would Kevin Kvederas have needed any

22   authority from someone higher up in the

23   corporate structure to send a letter like the

24   June 10, 2002 letter?

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 60

1     that sentence is one that would

2     typically or might be used by people to

3     express the idea that they hadn't gotten

4     to a point where they felt they could

5     make a liability decision.

6         Q.     (By Mr. Nesin)  Right.  Is that sort

7     of sentence typically written in status reports

8     by claims consultants?

9             MR. KIMBALL:  I object to the

10    question as calling for speculation.

11            THE WITNESS:  There's no way I

12    can generalize about that; people have

13    their own writing styles when it comes

14    to matters like this.

15        Q.     (By Mr. Nesin)  This is an exhibit

16    marked Exhibit 34 from a previous deposition.

17            MR. KIMBALL:  Can we go off the

18    record for one second?

19            MR. NESIN:  Sure.

20

21            (Off-record discussion)

22

23        Q.     (By Mr. Nesin)  Have you seen this

24    letter before?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 64

1    either an open claim or a closed claim?

2           MR. KIMBALL:  Objection.  Calls

3       for speculation.  Vague.  It's not a

4       question geared toward the topic this

5       witness has been designated to testify

6       to at this time.

7           You can answer if you understand.

8           THE WITNESS:  I guess I have to

9       ask you to be more specific.

10      Q.      (By Mr. Nesin)   Have you ever used

11   the term a "closed file" or a "closed claim

12   file"?

13      A.      Sure.

14      Q.      And have you used the term an "open

15   claim file"?

16      A.      Yes.

17      Q.      Okay.  How do you distinguish between

18   an open claim file and a closed claim file?

19      A.      Well, again, we're going back four

20   years approximately.  As managers, we're

21   provided with reports that would tell us what

22   claims are open and which claims are closed.

23      Q.      Would it be possible by looking at a

24   claims file to determine whether it was open or

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 67

1    claim for a particular condition in 2002, three

2    years later they could file additional

3    information about that condition without

4    reinitiating the entire claims process?

5              MR. KIMBALL:  Objection.  Calls

6        for speculation.

7              THE WITNESS:  I can't give a

8        categorical answer to that.  First of

9        all, in my experience, that is very

10       highly unlikely.  In my memory I cannot

11       remember a closed file being appealed,

12       if you were, two or three years later.

13       It also brings into question other

14       provisions of the policy that would come

15       into play.

16       Q.    (By Mr. Nesin)  I guess what I'm

17   trying to understand is whether there's any

18   functional difference between the way Berkshire

19   treats closed files and the way Berkshire treats

20   open files.

21             MR. KIMBALL:  Objection.

22       Question pending.

23             THE WITNESS:  Again, I need you

24       to be more specific.

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 71

1    reviewed by an allergist.  Do you know if

2    Dr. Axe reviewed only the latex test results or

3    if he reviewed more issues related to Carolyn

4    Mirek's claim?

5            MR. KIMBALL:  I'm going to

6        object.  It calls for speculation.

7            THE WITNESS:  I don't have any

8        personal knowledge of what Dr. Axe would

9        have reviewed.

10    Q.    (By Mr. Nesin)  Do you know what

11   questions were asked of Dr. Axe?

12    A.    I know that there was a letter to MLS

13   that, I believe, asked specific questions.

14    Q.    I can give you a copy of, I think the

15   letter you're referring to, and this would be

16   Exhibit 2, Plaintiff's Exhibit 2.  Is that the

17   letter you're referring to?

18    A.    Yes.

19    Q.    Do you have any idea why Mr. Kvederas

20   would say that he was in the process of having

21   the latex tests results reviewed by an allergist

22   but then ask a number of questions unrelated to

23   the test results in his letter to MLS?

24            MR. KIMBALL:  Objection to the

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 73

1      Q.      But whatever was provided to MLS,

2  were there more documents provided than just

3  Carolyn Mirek's latex test results?

4              MR. KIMBALL:  Objection.  Calls

5          for speculation.

6              THE WITNESS:  Again, I can only

7          speak to what our practice would be, and

8          that would be to have one of our

9          administrative assistants photocopy any

10          and all the medical information

11          contained in the file.

12      Q.      (By Mr. Nesin)  Okay.  Based upon the

13  practice and your knowledge of this particular

14  case, do you think it was misleading of

15  Mr. Kvederas to say that he was in the process

16  of "having the latex test results reviewed by an

17  allergist," rather than "have your files

18  reviewed by an allergist"?

19      A.      Again, he's perhaps being too

20  specific, but beyond that, I can't address what

21  he said.  I do know what our practice was,

22  though.

23      Q.      Right.  We've discussed how the

24  letter that Mr. Kvederas sent was directed to an

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 75

1    efficient way for us to direct file reviews to

2    somebody providing that service.

3         Q.    Now, are there any other companies

4    that perform the same sorts of functions as MLS?

5              MR. KIMBALL:  Objection.  Calls

6         for speculation.

7              THE WITNESS:  Yes.

8         Q.    (By Mr. Nesin)  Do you know why MLS

9    was chosen as the vendor in this particular

10   case, rather than any of the other companies

11   that may perform similar functions?

12        A.    Well, to the best of my recollection,

13   they were the only vendor we were using at that

14   point in time.

15        Q.    Why had Berkshire chosen to use --

16   exclusively use MLS as a vendor at that point in

17   time?

18        A.    Now you're really testing my memory

19   again, because that was a decision that we made

20   quite a few years ago.  My recollection is that

21   we had the president of the company visit our

22   home office; we met with him; he made a

23   presentation.  Presumably, we must have liked

24   what we heard or saw and elected to give them an

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 77

1    being used exclusively during that period of

2    time?

3            MR. KIMBALL:  Objection.  Calls

4        for speculation.

5            THE WITNESS:  I don't have any

6        knowledge about that.

7        Q.    (By Mr. Nesin)  Okay.  Do you have

8    any knowledge as to why Berkshire decided to

9    stop using Protocol?

10           MR. KIMBALL:  Objection, again.

11       The question does not go to the Topics

12       1, 4, 5, 17, or 26.

13           THE WITNESS:  To the best of my

14       memory, Protocol had decided to drop

15       that service from the services that they

16       offered to us and other companies.

17       Q.    (By Mr. Nesin)  Are independent

18   medical reviews done in all claims

19   determinations?

20       A.    No.

21       Q.    Why would an independent medical

22   evaluation be done in a particular claim?

23           MR. KIMBALL:  Objection.

24       Question does not go to the topics which

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 81

1   simply send the request to MLS and I believe

2   they, in turn, would pick the doctor they felt

3   was most appropriate for the assignment.

4        Q.      Does Berkshire think it's important

5   to have doctors with particular qualifications

6   do their independent medical reviews?

7             MR. KIMBALL:  Objection.  Scope

8        of the deposition topics.

9             THE WITNESS:  To the best of my

10       knowledge, we've never set particular

11       standards as to what qualifications a

12       doctor might have, other than that the

13       doctor be appropriate for whatever the

14       condition or the diagnosis might be.

15       Q.      (By Mr. Nesin)  Did -- would

16   Berkshire know -- in this case, did Berkshire

17   know that MLS was referring the claim to Dr. Axe

18   prior to the time when they received the report

19   back?

20       A.      I don't believe so.

21       Q.      What if Berkshire had thought that

22   Dr. Axe was not an appropriate doctor to have

23   done this review, would that have gone back to

24   MLS to get another review?

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 82

```
 1              MR. KIMBALL:   Objection.   Calls
 2      for speculation.
 3              THE WITNESS:   I don't know the
 4      answer to that.   And in my personal
 5      experience, I don't remember ever having
 6      to do that.
 7          Q.      (By Mr. Nesin)   How did Berkshire
 8      know that MLS would choose appropriate doctors?
 9          A.      We would have relied on their
10      expertise.
11          Q.      And what is MLS's expertise?
12          A.      They were in the business of
13      providing specialists in -- across the country.
14      What their expertise was was probably discussed
15      with them during that Mr. Schimizzi's visit, but
16      I don't have any recollection of what that
17      entailed.
18          Q.      Do you know if Harold Axe is
19      board-certified in allergy?
20          A.      I don't believe he is.
21          Q.      Do you know if he's board-certified
22      in any field?
23          A.      Not to my knowledge.
24          Q.      Is board certification something that
```

**BRIAN M. DONNELLY**
**April 10, 2006**

1    qualifications; is that correct?

2        A.      We did not independently look at his

3    qualifications, no.

4        Q.      Okay.  Then following that August 7th

5    letter, the claimant provided a letter from her

6    personal physician, Dr. Bedard, and that letter

7    was forwarded to Dr. Axe.  Dr. Axe then wrote a

8    supplemental report in which he continued to

9    believe that the claim should be denied, and

10    Kevin Kvederas sent this third letter, this

11    November 21, 2002 letter, reflecting that.  Is

12    that accurate?

13            MR. KIMBALL:  I want to interject

14        an objection again to what I believe is

15        a misstatement as to the testimony and

16        the facts which are established in this

17        case, in this claim.

18            THE WITNESS:  The one part of

19        what you said that sort of jumped out at

20        me as a mischaracterization is I think

21        you said something like Dr. Axe opined

22        that the claim should be denied.  We

23        don't ask our consulting physician to

24        make claim decisions.  We make the claim

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 93

1     referred to and calls for speculation by

2     this witness.

3         Q.    (By Mr. Nesin)  Do you know if Ms.

4     Mirek's policy was given to Dr. Axe at any

5     point?

6         A.    That would not typically happen.

7         Q.    Okay.  Is it true that different

8     policies may have different definitions of what

9     "permanent disability" means?

10                MR. KIMBALL:  Objection.  Calls

11        for speculation.

12                THE WITNESS:  The vast majority

13        of our policies speak to total

14        disability rather than to permanent

15        disability.  And without looking at

16        every policy form that the company has

17        issued, I don't think I can answer that

18        question.

19        Q.    (By Mr. Nesin)  Right.  But Carolyn

20     Mirek's policy was an own occupation policy; is

21     that correct?

22                THE WITNESS:  That's my

23        recollection, yes.

24        Q.    (By Mr. Nesin)  And so what it means

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 94

1   to be totally disabled under an own occupation

2   policy is very different from what it means to

3   be totally disabled under some other general

4   disability policy; is that correct?

5       A.      Generally speaking, yes.

6       Q.      Okay.  When Dr. Axe wrote that he

7   does not see how Carolyn Mirek can be considered

8   permanently disabled, would you -- how would

9   Berkshire interpret that language?  Would it be

10  interpreted as Dr. Axe saying that Ms. Mirek

11  could not perform her own occupation or that she

12  could not work at all?

13              MR. KIMBALL:  Objection.  Calls

14          for speculation.

15              THE WITNESS:  The response that I

16          would have to that is that we are

17          focussing on taking a phrase out of

18          context.  This is the second report from

19          the same physician and it would be our

20          practice to take the report and his

21          opinion in its totality.

22      Q.      (By Mr. Nesin)  Right.

23      A.      What he means by "permanently

24  disabled," I wouldn't know.

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 106

1      A.      Well, then, typically, when a claim

2   results in litigation, it would be our practice

3   to assign the file to a claim consultant.

4      **Q.      Was -- on March 3, 2005, was Kevin**

5   **Kvederas still working for Berkshire?**

6            MR. KIMBALL:  Objection.  Calls

7      for speculation.

8            You may answer, if you know the

9      answer.

10           THE WITNESS:  My best

11     recollection is no.

12     **Q.      (By Mr. Nesin)  If he had been**

13  **working, would -- the case still would be his**

14  **responsibility?**

15           MR. KIMBALL:  Objection to the

16     form of the question.  I'm sorry.

17           Go ahead.

18           MR. NESIN:  Yeah, if he had --

19           MR. KIMBALL:  Objection.

20           MR. NESIN:  I'll strike that.

21     **Q.      (By Mr. Nesin)  If Kevin Kvederas had**

22  **been working on March 3, 2005, would he have**

23  **been responsible for Carolyn Mirek's claim?**

24           MR. KIMBALL:  Objection to the

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 107

1     form of the question.  The phrase "had

2     been working" is vague and ambiguous.

3     Also the question calls for speculation

4     by the witness.

5              THE WITNESS:  Not necessarily.

6         Q.      (By Mr. Nesin)  What would cause a

7    new claim consultant to be put on a particular

8    claim?

9              MR. KIMBALL:  Objection.  Calls

10     for speculation.

11              THE WITNESS:  Again, it might be

12     driven by the size of a person's

13     caseload.  In my case, it's not unusual

14     for me to assign it to somebody new just

15     to have a fresh set of eyes look at the

16     file.

17         Q.      (By Mr. Nesin)   Is Samuel Haupt an

18    experienced claim consultant?

19         A.      I cannot remember Sam's start date.

20         Q.      You had mentioned a long time ago in

21    this deposition that there was a -- there were

22    certain matters or certain claims that you would

23    generally prefer to direct towards experienced

24    claims consultants; is that accurate?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 115

1    other physicians and practitioners.

2        Q.      Do you have a sense as to whether the

3    current system using Dr. Holbrook works better

4    than, for lack of a -- well, that's a little

5    too -- let me start over.

6               What were the factors -- you

7    mentioned that you looked at your competitors

8    and saw how they were finding -- getting

9    independent medical evaluations, and based on

10   that research and your own beliefs as to what

11   worked, you chose to modify this system.  Is

12   that an accurate reflection of your testimony?

13              MR. KIMBALL:  Objection.

14        Testimony previously speaks for itself,

15        but you can answer it.

16              THE WITNESS:  I think I said I'd

17        be hard-pressed to remember all of my

18        thought processes that went into that.

19        I think if I can stretch my memory a

20        bit, the model this most closely

21        resembled was that used by one of our

22        competitors.  And I had gotten feedback

23        from them that -- that it was working

24        well; they were getting the right doctor

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 121

1    This is a different report, I believe.

2    　　　MR. KIMBALL:  I'm just going

3    to -- for the record, I want to preserve

4    the objection that we object to this

5    document being used in connection with

6    the topics in which this witness was

7    designated to testify about.  We further

8    object to the use of this document to

9    the extent that it is not relevant nor

10   go to the scope of Count 1 in this

11   action, which is the only count in this

12   action.

13   　　　THE WITNESS:  To the best of my

14   memory, I believe I've seen this report

15   in one of the other files I reviewed in

16   preparation for my deposition.

17   Q.　　(By Mr. Nesin)  Okay.  This report is

18   dated February 22, 2005; is that correct?

19   A.　　Yes.

20   Q.　　And this is an independent medical

21   evaluation conducted by Dr. Garb; is that

22   correct?

23   A.　　It appears to be.

24   Q.　　Okay.  And is the conclusion -- is

**BRIAN M. DONNELLY**
**April 10, 2006**

1    despite what may be the age of the

2    claim.  And most typically, that's being

3    done to see if there's been any change

4    in the person's condition.

5    Q.    **(By Mr. Nesin)  Do you know -- are**

6  **you familiar with this particular claim, having**

7  **reviewed the claims file for a different part of**

8  **the deposition?**

9    A.    Yes.  And I was prepared to talk

10  about that tomorrow.

11    Q.    **I'm limiting this to a very narrow**

12  **area.  You can talk at greater length tomorrow.**

13  **But do you know who the claims consultant was**

14  **that forwarded this request to Dr. Garb?**

15      **I don't believe it's in the document,**

16  **so if you don't know independently, then ...**

17    A.    No, I don't know independently.

18    Q.    **Okay.  Do you know whether**

19  **Dr. Holbrook reviews independent medical**

20  **evaluations after they are conducted and**

21  **received by Berkshire?**

22      MR. KIMBALL:  Same objection as

23    to the scope of that question and the

24    relevance to these topics in this case.

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 126

1    facts not in evidence.

2         THE WITNESS:  I don't know the

3    answer to that.

4    Q.    (By Mr. Nesin)  Had there ever been a

5    doctor on the panel that is no longer being

6    used?

7    A.    I believe there may have been one.

8    Q.    And why was that doctor not being

9    used anymore by Berkshire?

10   A.    Service time issues.

11   Q.    If you can refer to Page 3 of

12   Dr. Garb's report in the unidentified redacted

13   case.  Section 3, Dr. Garb is asked how the

14   restrictions impact on the claimant's ability to

15   perform his or her occupation; is that correct?

16   A.    That's the question.

17   Q.    Now, when we testified about --

18   strike that.

19        Dr. Garb, in his second sentence

20   concludes, "In fact, most healthcare workers

21   with latex allergy are able to continue working

22   in their jobs if certain modifications to the

23   work environment are made."  Is that correct?

24   A.    That's what he says.

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 127

1      Q.      Do you think that that statement

2   could have led Berkshire to refer Carolyn

3   Mirek's claim to Dr. Garb for an independent

4   medical evaluation?

5              MR. KIMBALL:  Objection.  That

6         calls for speculation and assumes a

7         variety of factors, but you can answer

8         it.

9              THE WITNESS:  The only answer I

10        can give is a general one, and that is

11        we rely on Dr. Holbrook to pick what he

12        feels is the appropriate specialist.  To

13        the best of my memory, Dr. Garb is the

14        only person on the panel -- that I can

15        recall at least -- that would fall under

16        the area of being an occupational

17        specialist.

18     Q.      (By Mr. Nesin)  Do you know whether

19   Dr. Garb has ever found that a claimant was

20   disabled from working, based on latex allergy?

21     A.      Do I know of an actual case?

22     Q.      Yes.

23     A.      No.  I don't know where he's come

24   down on other cases, period.

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 129

1    question.  Calls for speculation as to

2    anything to do with the litigation

3    specifically.

4         If you know the answer, you

5    certainly can provide it.

6         THE WITNESS:  Well, I don't know

7    the answer, but I can tell you that it's

8    not unusual for me to want to take

9    another look at any file.  And whatever

10   the catalyst is for that, that's okay,

11   too.

12   Q.    (By Mr. Nesin)  But is there ever a

13   point at which -- strike that.

14        Do you have any concerns that any

15   members of the panel may have biases based upon

16   the fact that they want to continue being

17   members of the panel?

18   A.    If I thought that was the case, they

19   would be quickly an ex-panel member.

20   Q.    How are you able to evaluate whether

21   a particular doctor has a bias or not?

22   A.    Because I read a lot of the reports

23   myself and I count on Dr. Holbrook to read a lot

24   of the reports, and both of us are well aware of

**BRIAN M. DONNELLY**
**April 10, 2006**

Page 130

1    the philosophy of this company, which is to

2    treat people fairly.  And if we ever got the

3    sense that any panel member was showing signs of

4    the kind of characteristics you just described,

5    they'd be gone; he'd be gone.

6        Q.    **Do you have any expertise in latex**

7    **allergy?**

8            MR. KIMBALL:  Objection.  Asked

9        and answered.

10       Q.    **(By Mr. Nesin)  Does Dr. Holbrook**

11   **have any expertise in latex allergy?**

12           MR. KIMBALL:  Objection.  Calls

13       for speculation.

14           THE WITNESS:  I don't know the

15       answer to that.  I do know that he's a

16       person of wide experience, but I can't

17       speak to his knowledge of latex.

18       Q.    **(By Mr. Nesin)  Okay.  So I'm just**

19   **having trouble understanding how you would even**

20   **know if there was a doctor with a bias with**

21   **respect to latex allergy if you don't know -- if**

22   **you don't have independent information about**

23   **latex allergy.**

24           **Am I characterizing that wrong, or --**