# Exhibit 2

**BRIAN DONNELLY**
**April 11, 2006**

 **ORIGINAL**

Page 1

1                UNITED STATES DISTRICT COURT

2                   District of Massachusetts

3                Civil Action No. 04-30166-MAP

4

5

6       ******************************

7       CAROLYN MIREK,                    *

8                    Plaintiff           *

9       vs.                               *

10      THE GUARDIAN LIFE INSURANCE       *

11      COMPANY OF AMERICA and            *

12      BERKSHIRE LIFE INSURANCE          *

13      COMPANY OF AMERICA,               *

14                   Defendants          *

15      ******************************

16

17            DEPOSITION OF:  BRIAN DONNELLY

18          BERKSHIRE LIFE INSURANCE COMPANY

19                  700 South Street

20             Pittsfield, Massachusetts

21             April 11, 2006   1:30 P.M.

22

23               Sharon Waskiewicz

24                 Court Reporter

**BRIAN DONNELLY**
**April 11, 2006**

Page 13

1   disabled in 1995 and didn't file a claim until

2   1996 and the determination was made in 1997, what

3   date would appear on this chart?

4        A.    The date we determined they met the

5   policy requirement of the disability.

6        Q.    If someone files a late claim, do they

7   get reimbursed for premiums that they paid while

8   they had been disabled?

9             MR. KIMBALL:  Objection to the form of

10            the question.  It calls for speculation and

11            is a little bit ambiguous.  You can answer if

12            you understand.

13            THE WITNESS:  I can answer it

14            generally.  Once we determine that somebody

15            is disabled under the terms of the policy, at

16            that point they would, under normal

17            circumstances, be entitled to have their

18            premiums waived beginning at any point where

19            the disability began and as long as the claim

20            continued.

21        Q.    (By Mr. Nesin)  Would they also

22   receive retroactive benefits for the period of

23   time in which they were disabled but hadn't filed

24   a claim yet?

**BRIAN DONNELLY**
**April 11, 2006**

Page 22

1      inquiries and topics that relate to the seven

2      other claims, I have a standing and ongoing

3      objection as to this entire line of

4      questioning, as to the relevancy as to this

5      case in Count 1.  I am not going to interrupt

6      Counsel and object every time, so I want a

7      standing objection on the record.  Thank you.

8           MR. NESIN:  I appreciate that.

9      Q.    (By Mr. Nesin)  If Registered Nurse

10   1995 had not acknowledged that she was capable of

11   returning back to work, would she still be

12   receiving disability benefits today?

13          MR. KIMBALL:  Objection.  It calls for

14      speculation.

15          THE WITNESS:  I really can't say to

16      that, but my reading of the files seem to

17      indicate that we were moving at least in the

18      direction of a determination that she was

19      probably capable at this point of going back

20      to work.

21      Q.    (By Mr. Nesin)  Why weren't

22   independent medical evaluations done in 2004 and

23   2005 related to this claim from at least five

24   years earlier?

**BRIAN DONNELLY**
**April 11, 2006**

Page 25

1    fact that the environment changed rather than any

2    improvement in her condition?

3                MR. KIMBALL:  Objection.  The question

4          calls for speculation. You can answer if you

5          can provide an answer.

6                THE WITNESS:  I don't think I am

7          qualified to answer that.

8          Q.    (By Mr. Nesin)  Is anyone else at

9    Berkshire qualified to answer that question?

10         A.    I wouldn't know.

11         Q.    Do you believe that the changes in

12   Registered Nurse 1995's hospital are similar to

13   changes that other hospitals have taken during

14   this similar time period?

15               MR. KIMBALL:  Objection to the form of

16         the question.  It calls for speculation.

17               THE WITNESS:  I don't have personal

18         knowledge of that.  I do know that Dr. Garb

19         says in his report that most hospitals in the

20         U.S. have become latex safe.

21         Q.    (By Mr. Nesin)  Do you know whether

22   Berkshire initiated these additional reviews in

23   2004 and 2005 because of a belief that most

24   hospitals are now latex safe?

**BRIAN DONNELLY**
**April 11, 2006**

Page 26

1      A.     I don't know the answer to that.

2      **Q.     Do you know why Dr. Noodleman was**

3   **chosen to draft or to do an evaluation that led**

4   **to the report of May 8, 2004?**

5      A.     Presumably only because he was our

6   primary resource at that point in time.

7      **Q.     If you would refer to Page 1 of**

8   **Dr. Noodleman's report, it indicates that he**

9   **considered the medical records and consulted with**

10  **a board certified allergist and immunologist.**

11          **Do you know who that board certified**

12  **allergist and immunologist was that Dr. Noodleman**

13  **consulted with?**

14     A.     Not that I can recall from the file.

15     **Q.     Would that be a question that a claims**

16  **consultant would want to ask Dr. Noodleman?**

17          MR. KIMBALL:  Objection.  That calls

18          for speculation beyond the scope of this

19          topic.

20          THE WITNESS:  That arrangement with

21          Dr. Noodleman was that when we were sent his

22          reports, he would typically, on a fax cover

23          sheet, identify the name of the physician

24          that had been used for that particular

**BRIAN DONNELLY**
**April 11, 2006**

Page 27

1      evaluation.

2          Q.     (By Mr. Nesin)   Is there any reason

3   why Dr. Noodleman wrote the report rather than

4   the board certified allergist or immunologist?

5              MR. KIMBALL:  Objection.  It calls for

6          speculation beyond the scope of the topic.

7              THE WITNESS:  That was the method by

8          which Dr. Noodleman conducted his business.

9          Q.     (By Mr. Nesin)   Did Berkshire express

10  any complaints to Dr. Noodleman about this

11  particular practice?

12             MR. KIMBALL:  Objection to the form of

13         the question as beyond the scope of this

14         topic.

15             THE WITNESS:  To the best of my memory,

16         we did, and that was what led to his

17         identifying the name of the doctor, by

18         facsimile, typically, when the reports came

19         in.

20         Q.     (By Mr. Nesin)   Was the suggestion

21  ever made to Dr. Noodleman that he should have

22  his consultants draft the reports themselves?

23             MR. KIMBALL:  Objection.  It is beyond

24         the scope of the topic.

**BRIAN DONNELLY**
**April 11, 2006**

Page 28

1              THE WITNESS:  I don't recall.

2        Q.    (By Mr. Nesin)  If I can direct your

3    attention to the third paragraph on that same

4    page, Page 1 of Dr. Noodleman's report, it

5    states:  It should be noted that the claimant's

6    doctor -- that part is redacted -- is not the

7    board certified allergist and immunologist, one

8    of the 24 specialities approved by ABMS, and

9    continues on.

10              Do you know why Dr. Noodleman would

11    include that sentence in his report?

12              MR. KIMBALL:  Objection.  That calls

13         for speculation.

14              THE WITNESS:  I don't know why he would

15         do that.

16        Q.    (By Mr. Nesin)  Do you think that

17    Dr. Noodleman thought that Berkshire would be

18    interested in whether or not the claimant's

19    doctor was board certified?

20              MR. KIMBALL:  Objection.  It calls for

21         speculation.

22              THE WITNESS:  Again, I would have to

23         speculate that that would appear to be the

24         inference, but I can't say that with any

**BRIAN DONNELLY**
**April 11, 2006**

Page 29

1    certainty.

2        A.     (By Mr. Nesin)  Do you see later on in

3    that same paragraph, it talks about the

4    claimant's doctor being part of an organization

5    that is in disrepute with the main stream medical

6    community?  Does Berkshire discount the opinions

7    of doctors who are outside the main stream

8    community?

9            MR. KIMBALL:  Objection.  It calls for

10           speculation.  You can answer, to the extent

11           that you understand and can answer.

12           THE WITNESS:   In my experience, I

13           never ran into that issue.

14       **Q.     (By Mr. Nesin)  When you say, "I never**

15   **run into that issue," have you ever run into an**

16   **issue where two doctors have given a report in**

17   **the same claim and come to conflicting**

18   **conclusions?**

19       A.     Yes.

20       **Q.     In that instance, how would a**

21   **determination be made which doctor Berkshire**

22   **should listen to?**

23       A.     There is really no way to generalize

24   or give a specific answer to that.  Again, it

**BRIAN DONNELLY**
**April 11, 2006**

Page 31

1      MR. KIMBALL:  Objection.  I object to

2   the question.  I think his prior testimony

3   speaks for itself.  I think that the question

4   restates his prior testimony.  You can

5   certainly answer to the extent you can do so.

6      THE WITNESS:  There are instances where

7   -- let me start over.

8      I was speaking of generally.  There are

9   instances of, for example, where we are

10  thinking of doing an independent medical

11  examination of a claimant, where we might ask

12  our IME provider or vendor to provide us with

13  the CV or curriculum vitae of the doctors

14  that are available in a geographical area to

15  do a particular examination of a patient.

16  **Q.    (By Mr. Nesin)  But with respect to**

17  **paper reviews, is there any attention paid to the**

18  **qualifications or credentials for a doctor that**

19  **performs that function?**

20     A.    Currently, I can speak to our panel,

21  that I mentioned yesterday, of physicians.  We

22  have the curriculum vitae of each and every one

23  of them.  If I were to generalize, they are all

24  very qualified and educated people.

**BRIAN DONNELLY**
**April 11, 2006**

Page 32

1      Q.    Does the fact that they are highly

2    qualified and well-educated a factor in including

3    them in your panel?

4          MR. KIMBALL:  I am going to object to

5          the question.  It is beyond the scope of the

6          topics that this witness is to testify to.

7          You can answer.

8          THE WITNESS:    I would say certainly

9          that it would be a factor.  Personally, I

10         know that I would rely heavily on

11         Dr. Holbrook's opinion as to people's

12         qualifications.

13     Q.    (By Mr. Nesin)  Do you know why

14   Registered Nurse 1995's claim file was given to

15   Dr. Garb for review?

16         MR. KIMBALL:  Objection to the form of

17         the question.  I believe it assumes facts

18         that are not established.  However, the

19         witness has Dr. Garb's report and can refer

20         to it for clarification for answers thereon.

21         THE WITNESS:  Well, the person who

22         referred it is redacted, so I'm not sure what

23         you are asking me.

24     Q.    (By Mr. Nesin)  Do you believe that

**BRIAN DONNELLY**
**April 11, 2006**

Page 33

1  Dr. Garb was asked to render an opinion because

2  he is a member of the panel, that you discussed

3  yesterday, of doctor's that Berkshire relies upon

4  for expert opinions?

5         MR. KIMBALL:  Objection. It calls for

6     speculation. You may answer, if you

7     understand.

8         THE WITNESS:  Again, that is the likely

9     scenario.

10     Q.    (By Mr. Nesin)  Do you have any idea

11  why it was thought important to get an opinion

12  from Dr. Garb after just a few months earlier an

13  opinion was obtained by Dr. Noodleman in a

14  consultation with an unnamed allergist?

15     A.    I don't know the answer to that.

16     Q.    Would that be a normal protocol or

17  would that be unusual that the fact that a claim

18  that has been around for five to ten years would,

19  within a six month or eight-month period, be sent

20  out for two independent medical reviews?

21         MR. KIMBALL:  Objection to the form of

22     the question.  I believe it misstates the

23     duration, but you can answer if -- I think

24     that it is also vague and ambiguous as to the

**BRIAN DONNELLY**
**April 11, 2006**

Page 36

1    as it calls for speculation.  And where the

2    question is somewhat vague and ambiguous, you

3    can certainly answer, if you can provide an

4    answer, if you understand.

5        THE WITNESS:  There was a point in time

6    when we utilized Barbara Masketti to provide

7    us with medical input on claim files.  The

8    only objection I would have to your question

9    is, her role was not to make claim decisions.

10   It is the claim consultant's role to make the

11   claim decisions.

12       Q.    (By Mr. Nesin)   On October 9, 2003,

13   was Barbara Masketti still being used in the role

14   you described earlier of assisting claims

15   consultants with respect to claims

16   determinations?

17       A.    Given the date of her memo, I would

18   have to say, in all likelihood, yes.

19       Q.    What would make a claims consultant go

20   to Barbara Masketti during the time period in

21   which she was performing that role, rather than

22   Dr. Newman, who we discussed yesterday, or an

23   outside consultant?

24       MR. KIMBALL:  I am objecting to the

**BRIAN DONNELLY**
**April 11, 2006**

Page 37

1    question on the basis it calls for

2    speculation.

3         THE WITNESS:  Again, because I didn't

4    handle the file, I can't speak as to why the

5    claim consultant chose to refer the file to

6    her.

7    Q.    (By Mr. Nesin)  Are there certain

8    areas in which Barbara Masketti had greater

9    expertise than say, Dr. Newman, and that would be

10   a reason why a claims consultant would rely on

11   her opinion?

12        MR. KIMBALL:  I am going to object to

13   the question as being asked and answered and

14   it also calls for speculation.

15        THE WITNESS:  I don't know the answer

16   to that.

17   Q.    (By Mr. Nesin)  Now, the report from

18   Barbara Masketti, does it mention latex anywhere?

19   A.    No.

20   Q.    Do you know why this report is

21   included as involving a claim that relates to

22   latex?

23   A.    In my review of this particular file,

24   it was clearly his attending physician's position

**BRIAN DONNELLY**
**April 11, 2006**

Page 39

1          THE WITNESS:  Again, I am not a

2     physician.  I can only tell you, in my review

3     of the file, a chronic, severe lung disease

4     was listed, among other conditions.

5          Q.    (By Mr. Nesin)  What do you consider

6     to be a chronic, severe lung disease?

7          MR. KIMBALL:  Objection to the form

8     of the question.  I think this is beyond the

9     witness's scope of expertise.  You can answer

10    if you can.

11         THE WITNESS:  Again, I'm not a

12    physician, but from a layman's standpoint,

13    the doctor seems to be sending the message

14    that this man is in pretty tough shape.

15         Q.    (By Mr. Nesin)  Based on your review

16    of the claims file, do you believe that there

17    were independent causes of Physician 1998's

18    disability that were unrelated to latex?

19         A.    Again, not speaking as a doctor, all I

20    can say is that the claim is one that involves a

21    multitude of conditions.

22         Q.    Based on your review of the claims

23    file, do you believe that any of the conditions

24    or all of the conditions, with the exception of

**BRIAN DONNELLY**
**April 11, 2006**

Page 40

1    the latex allergy, would be sufficient to make

2    Physician 1998 disabled under the terms of the

3    policy?

4              MR. KIMBALL:  Objection to the form of

5         the question.  It is compound and confusing

6         and calls for speculation from this witness

7         as to the person's medical condition.

8              THE WITNESS:  I don't believe I am

9         qualified to answer that question.

10        Q.    (By Mr. Nesin)  Can a person be

11   disabled based solely from having chronic, severe

12   lung disease?

13             MR. KIMBALL:  Objection to the form of

14        the question.  It calls for speculation

15        beyond the scope of the topic.

16             THE WITNESS:   I am not qualified to

17        answer that question.

18        Q.    (By Mr. Nesin)  Have you ever

19   encountered someone who was considered to be

20   disabled or a claim where somebody was found to

21   be disabled based on chronic lung disease?

22        A.    Not that I can recall.

23        Q.    Do you think that there is a

24   possibility that Physician 1998 was found to be

**BRIAN DONNELLY**
**April 11, 2006**

1    disabled irrespective of whether or not he had a

2    latex allergy?

3           MR. KIMBALL:  I just want to interject

4       my standing objection once as to this

5       individual, the policy holder at large, as to

6       the scope of the relevance of this topic and

7       also to this individual's confidentiality

8       rights.  With those objections on the record,

9       you can answer if you are able to.

10          THE WITNESS:  I don't think that I am

11      qualified to answer that question.

12      Q.     (By Mr. Nesin)  Do you think that the

13   fact that Barbara Masketti did refer to this

14   individual's chronic, severe lung disease and did

15   not refer to his latex allergy, can give any

16   indication as to the primary reason why Berkshire

17   considered him to be disabled?

18   A.     I don't think I can speak to what

19   Barbara's intentions were here.

20      Q.     Reading this document and having read

21   the entire claims file, with the exception of

22   some administerial information therein, would you

23   be under the impression that chronic, severe lung

24   disease was the primary ailment on which this

**BRIAN DONNELLY**
**April 11, 2006**

1    individual, Physician 1998, was considered to be

2    disabled?

3        A.    That was not the way that I read the

4    file at the outset.

5        Q.    When you say "at the outset," did you

6    come to a different conclusion later?

7        A.    No.  I am saying that when I reviewed

8    the file, the earlier part of the file seemed to

9    indicate to me that he had an allergy to latex

10   and formaldehyde, and it was characterized as

11   severe.  It wasn't until, I think, later in the

12   file that some of these other comorbid conditions

13   came to light.

14            MR. KIMBALL:  I just want it on the

15        record, and to remind the witness, that we

16        want to protect, at all times, the confidentiality,

17        integrity, and people's privacy rights, and

18        that we object to this entire procedure of

19        even referring to the gender of the

20        individual.  That would be something that we

21        would like to avoid at this time.

22        Q.    (By Mr. Nesin)  Do you think that if

23   Barbara Masketti had thought that one of the

24   reasons this Physician 1998 was thought to be

**BRIAN DONNELLY**
**April 11, 2006**

Page 43

1    disabled was due to latex allergy that she would

2    be likely to put it in her report?

3                    MR. KIMBALL:  Objection.  It calls

4         for speculation.

5                    THE WITNESS:  Again, as I stated

6         earlier, I cannot speak to what her

7         intentions were.

8         Q.    (By Mr. Nesin)  Do you think that

9    Barbara Masketti would remember this case as a

10   latex claim in which she had provided a medical

11   opinion?

12                   MR. KIMBALL:  I think I'm going to

13        object to the question as it calls for

14        speculation.

15                   THE WITNESS:  I don't know the answer

16        to that.

17        Q.    (By Mr. Nesin)  Let's move on to the

18   next individual on the chart which is Registered

19   Nurse 2003.  Do you see that?

20                   MR. KIMBALL:  Again, at the outset, as

21        to this person's confidentiality, we reserve

22        all our objections as to this individual's

23        employer, health circumstances, insurance

24        circumstances, financial circumstances.  We

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BRIAN DONNELLY**
**April 11, 2006**

Page 44

1       also object completely to the relevancy of

2       any inquires to the individuals' claim.

3               MR. NESIN:  Can you make that objection

4       as to all of these?

5               MR. KIMBALL:  I want to do it as for

6       each individual.  We need to respect the

7       individual rights of each one of the

8       policyholders.  I am not trying to interrupt

9       your deposition.  I am just trying to respond

10      and respect the rights of the individuals,

11      just as I would your client if she were part

12      of the chart.

13          Q.    (By Mr. Nesin)  Registered Nurse 2003,

14      do you know whether Registered Nurse 2003 stopped

15      working at any time?

16          A.    No.

17          Q.    Do you know when Registered Nurse 2003

18      filed a claim?

19          A.    No.

20          Q.    Do you think it is likely that the two

21      reports provided about Registered Nurse's 2003

22      claim, which are dated June 22, 2004 and December

23      1, 2004, were part of the initial review of

24      Registered Nurse's 2003 claim?

**BRIAN DONNELLY**
**April 11, 2006**

Page 46

1      Q.      This report was also conducted by

2    Dr. Noodleman in consultation with a Physician

3    board certified in allergies and immunology.  Do

4    you know who the board certified physician was

5    that Dr. Noodleman consulted with?

6      A.      No.

7      Q.      Do you know if it was the same

8    Physician that he consulted with respect to the

9    earlier claim.

10              MR. KIMBALL:  It is beyond the scope

11       of the topic.

12              THE WITNESS:  I don't know the answer.

13      Q.      (By Mr. Nesin)  Do you know whether

14    the doctors that Dr. Noodleman generally

15    consulted with were from the panel you described

16    of consultants that Dr. Noodleman used?

17              MR. KIMBALL:  Objection.  It calls

18       for speculation.

19              THE WITNESS:  I think that the only

20       response I can make to that is that

21       Dr. Noodleman represented to me, more than

22       once, that his panel members were university

23       based, highly qualified physicians.

24      Q.      (By Mr. Nesin)  Based on Dr. Noodleman's

**BRIAN DONNELLY**
**April 11, 2006**

Page 48

1    would be appropriate to get another opinion, did

2    it have anything to do with your perception of

3    the quality of Dr. Noodleman's opinion?

4              MR. KIMBALL:  Objection.  It is

5         beyond the scope of the topic.

6              THE WITNESS:  The primary recollection

7         that I have relates to the fact that the

8         focus of many of Dr. Noodleman's opinions

9         relied heavily on the absence of objective

10        evidence.

11        Q.    (By Mr. Nesin)  Do you consider that

12   to be a flaw in Dr. Noodleman's reports?

13        A.    I don't know that I characterize it as

14   a flaw.  I do feel, however, that there are

15   claims that don't lend themselves to subjective

16   evidence, or are subjective in nature, and could

17   very well mean that a person is disabled.

18        Q.    Was any directive ever given to claims

19   consultants to say if you have a claim in which

20   Dr. Noodleman provided an opinion, you might

21   consider sending it out for another review?

22        A.    I don't remember ever doing that in

23   any formal way, no.

24        Q.    Was it done in an informal way?

**BRIAN DONNELLY**
**April 11, 2006**

Page 52

1    speculation.

2         THE WITNESS:    Again, I don't feel

3    qualified  to answer that.

4              Can we take a break?

5         MR. NESIN:    Sure.

6

7         (A recess was taken)

8

9         MR. NESIN:    Back on the record.

10    Q.    (By Mr. Nesin)    We have been talking

11    about Dr. Boxer's report with respect to

12    Registered Nurse 2003, and I have been asking

13    about the portion of the report where only vinyl

14    gloves would be used and that most hospitals have

15    switched to vinyl gloves, would you believe that

16    this claimant was disabled by virtue of her latex

17    allergy?

18         MR. KIMBALL:    Objection.    It calls for

19    speculation.

20         THE WITNESS:    Again, I don't remember

21    all of the facts and circumstances of the

22    file that might have led to the decision that

23    she was disabled.    Clearly though, if you

24    take what you quoted of this doctor, he

**BRIAN DONNELLY**
**April 11, 2006**

Page 54

1   Berkshire made the determination to pay benefits

2   on this policy?

3           MR. KIMBALL:  Objection to the form of

4       the question.  I think that it misstates the

5       facts that are established and misstates the

6       facts that are not yet established.  If you

7       can answer, please do so.

8           THE WITNESS:  Again, I do not pretend

9       to remember all the details of this file.

10      Medical opinions are one factor or input

11      information that goes into making a claims

12      determination.  There may have been other

13      factors that folks considered before they

14      made this determination.  I'm just not

15      recalling what they may have --

16      Q.    (By Mr. Nesin)  What would those other

17   factors be, that a claims consultant or other

18   claims representatives would use to make a

19   determination, other than the medical

20   information?

21          MR. KIMBALL:  Objection.  It calls

22   for speculation.  You can answer.

23          THE WITNESS:  Again, I cannot speak to

24   that without remembering the details of this

**BRIAN DONNELLY**
**April 11, 2006**

Page 55

1    particular claim.

2        Q.    (By Mr. Nesin)  Do you think that

3    there is a possibility that the claim was paid

4    based upon an ailment other than latex allergy?

5        A.    Again, that calls for speculation on

6    my part.  It is possible.

7        Q.    Nothing in your review of the claim

8    file leads you to believe that this claim was

9    paid definitely because of latex allergy?

10           MR. KIMBALL:  Objection to the form of

11       the question.  You can answer if you are able

12       to.

13           THE WITNESS:  Can I ask you to restate

14       that?

15       Q.    (By Mr. Nesin)  Sure.  You stated that

16   you reviewed this claims file, and you also

17   testified that you can't rule out the possibility

18   that the claimant, known as Registered Nurse

19   2003, was paid based upon ailments other than

20   latex allergy; is that true?

21       A.    I think my best recollection, based

22   upon my notes, is there were other diagnoses in

23   addition to latex that may have produced the

24   outcome.

**BRIAN DONNELLY**
**April 11, 2006**

1    Q.    But when you say "in addition to

2    latex," is there a possibility that the other

3    diagnoses were responsible for Berkshire's

4    decision to pay the claim, independent of latex?

5         MR. KIMBALL:  Objection to the form of

6         the question.  It assumes facts that have not

7         been established.  If you can answer, feel

8         free to do so.

9         THE WITNESS:  All I can say is:  It is

10        possible.

11    Q.    (By Mr. Nesin)  Let's move on to the

12    next individual on this chart, part of Exhibit

13    72, which is Dentist 1994.  Do you see that

14    person?

15    A.    Yes.

16        MR. KIMBALL:  I just want to reiterate

17        my prior objection as to this individual's

18        privacy and confidentiality rights and

19        instruct the witness to keep those in mind

20        when answering any questions regarding this

21        claimant and policyholder and also generally

22        to the relevance of this claimant's file and

23        all the other claimant files that we are

24        talking about in this section of the

**BRIAN DONNELLY**
**April 11, 2006**

Page 57

1    deposition.

2       Q.    (By Mr. Nesin)   There were no medical

3    reports produced with respect to this claimant.

4    Do you know what the reason for that is?

5       A.    No.

6       Q.    Were there medical reports in the

7    claims file with respect to Dentist 1994?

8           MR. KIMBALL:   I am going to object to

9       that as somewhat vague and ambiguous.   You

10      can certainly answer if you can do so.

11          THE WITNESS:   Can you define what you

12      mean by "medical reports"?

13      Q.    Sure.

14          Other than the opinion of Dentist

15   1994s attending physician, were there any other

16   doctors consulted with respect to Dentist 1994s

17   claim?

18      A.    To the best of my memory, the file

19   contained attending physician statements, which

20   of course, would have been ordered by his

21   attending Physician, and medical records that we

22   would have obtained.

23      Q.    That was the entirety of the medical

24   information in the claims form?

**BRIAN DONNELLY**
**April 11, 2006**

Page 58

1      A.     I do not recall that, but I do not

2    recall any referrals to an outside consultant.

3      Q.     So the distinction that you are making

4    is that there may have been a review by a medical

5    employee of Berkshire like Dr. Newman or

6    Ms. Masketti, but you don't believe that there

7    was an outside medical review done?

8            MR. KIMBALL:  I would object.  I don't

9         believe that he is making that distinction.

10           THE WITNESS:  No.  That is not the

11        distinction that I am making.  I don't recall

12        seeing a referral to either an internal or

13        external consultant.

14     Q.     Do you know why there was no referral

15    made in the claim of Dentist 1994?

16           MR. KIMBALL:  Objection.  It calls

17        for speculation.

18           THE WITNESS:  I don't know the answer.

19     Q.     (By Mr. Nesin)  Do you know if Dentist

20    1994 is still receiving benefits under his policy

21    that is described here?

22     A.     Yes.

23     Q.     Do you know whether dental practices

24    can be made safe for someone that has a latex

**BRIAN DONNELLY**
**April 11, 2006**

Page 59

1    allergy?

2           MR. KIMBALL:  Objection to the scope

3        of the topic.  This witness has not been

4        designated to discuss dental practices and

5        whether or not they can be made safe for

6        someone that has latex allergies.

7           THE WITNESS:  I don't feel I have the

8        expertise to answer that medical question,

9        actually.

10       Q.    (By Mr. Nesin)  Let's skip, at least

11    momentarily, to lower in the chart to Dental

12    Hygienist 1996.  Do you see that person?

13       A.    Yes.

14           MR. KIMBALL:  I would just like to

15        reiterate my objection as to this entire

16        inquiry as to Dental Hygienist 1996 and

17        object to this infringement to her privacy

18        and confidentiality rights with respect to

19        her insurance information, her financial

20        information, and her medical treatment.  And

21        I also object and continue to object to the

22        relevancy of any of this inquiry as it

23        relates to this case.

24       Q.    (By Mr. Nesin)  There is a report that

**BRIAN DONNELLY**
**April 11, 2006**

Page 61

1    would Berkshire ever consider someone who worked

2    at a dental office, to be disabled because they

3    had a latex allergy?

4              MR. KIMBALL:  Objection.  The question

5         is beyond the scope of the topic which the

6         witness has been designated to testify at

7         this time, and also calling for speculation.

8         The witness can answer if he is able to

9         formulate an answer.

10             THE WITNESS:  Well, I think, generally

11        speaking, if the sole cause of a claim is a

12        latex allergy, and we learned that our

13        claimant was employable in that kind of latex

14        free environment, that would certainly lead

15        us to wonder whether the person would still

16        qualify for disability benefits.

17        Q.    (By Mr. Nesin)  When you say

18   "employable," what are you referring to?

19        A.    Again, we are generalizing.  I would

20   want to know that employment in that kind of

21   environment was available in the area where the

22   person resided.

23        Q.    With respect to Dentist 1994, and

24   there are two other dentists listed on the chart,

**BRIAN DONNELLY**
**April 11, 2006**

Page 62

1    do you think a Dentist is restricted by who could

2    employ him, or could a Dentist open his own

3    office?

4              MR. KIMBALL:  I object to the form of

5         the question as, I think, somewhat beyond the

6         scope of the topic that this witness has been

7         designated to testify to, and it is calling

8         for speculation.

9              THE WITNESS:   Well, if you are asking

10        me to speculate, I guess that it is plausible

11        that a Dentist could open up his own office

12        and make it latex free.

13    Q.    (By Mr. Nesin)  So if that is true,

14    would Berkshire ever consider a Dentist to be

15    disabled based solely on a latex allergy?

16              MR. KIMBALL:  Objection.

17              THE WITNESS:  Again, this is

18        hypothetical; this is not an actual claim.  I

19        don't pay hypothetical claims; I pay real

20        claims.  Limited to the facts that you just

21        gave me, if that were the case in this

22        hypothetical claim, I would probably view

23        that person as not disabled.

24    Q.    (By Mr. Nesin)  Because the response

**BRIAN DONNELLY**
**April 11, 2006**

Page 64

1    seems to be the primary cause of his disability.

2        Q.    So with respect to Dentist 1994, is it

3    your view that even if he didn't have a latex

4    allergy, Berkshire would continue to find him

5    disabled based upon his allergy to acrylic

6    materials?

7            MR. KIMBALL:  Objection.  It calls

8        for speculation.

9            THE WITNESS:    Again, that is

10       speculative.  I am telling you that my review

11       of the file did give me the impression that

12       the acrylic materials played a significant

13       role in the decision that he was disabled.

14   Q.    (By Mr. Nesin)  Let's move on to the

15   next person on the chart, who is Dentist 1997.

16           MR. KIMBALL: I would like to reiterate

17       the same objection as to Dentist 1997's

18       privacy and confidentiality concerns with

19       respect to his insurance, financial, and

20       medical information and also reiterate the

21       standing objection to the relevancy of

22       Dentist 1997s claim file to this case.

23   Q.    (By Mr. Nesin)  Do you know whether

24   Dentist 1997 is currently receiving benefits

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BRIAN DONNELLY**
**April 11, 2006**

Page 70

1    methods by which Berkshire was obtaining reports

2    from outside physicians?

3              MR. KIMBALL: I object to the form of

4         the question in that it goes beyond the scope

5         of topics that this witness has been

6         designated to discuss.  However, since this

7         witness has been designated to generally

8         discuss practices and procedures, feel free

9         to answer the question.

10             THE WITNESS: I don't think I can be

11        precise relative to that time frame, simply

12        because it is so many years ago.

13        Q.    (By MR. Nesin) I would like to show

14   you what has been marked previously as Exhibit 3.

15   This is a report produced with respect to Carolyn

16   Mirek's claim.  It happened to be produced the

17   day before Dr. Stadenmyer's report and Dental

18   Hygienist's 1996s claim.  Do you see that that is

19   the case?

20        A.    Yes.

21        Q.    The report obtained in Carolyn Mirek's

22   claim was obtained by using MLS; is that correct?

23        A.    Yes.

24        Q.    The report obtained with respect to

**BRIAN DONNELLY**
**April 11, 2006**

Page 72

1    Q.    The chart that is part of Exhibit 72

2    indicates that Dental Hygienist 1996 is unable to

3    perform her occupation due to immunological latex

4    sensitivity and latex anaphylaxis; is that

5    correct?

6    A.    That is correct.

7    Q.    Were there any other conditions in the

8    claims file other than those two conditions that

9    contributed to Berkshire's decision that Dental

10   Hygienist 1996 was disabled?

11   A.    I don't believe so.

12   Q.    Given our discussion previously about

13   whether dental offices can be made safe for latex

14   allergic people to work, would it be your

15   impression that Dental Hygienist 1996 is no

16   longer disabled?

17        MR. KIMBALL:  Objection.  It calls for

18        speculation.

19        THE WITNESS:  I can't really be sure

20   of that because I don't know enough about latex

21   anaphylaxis.

22   Q.    (By Mr. Nesin)  Do you believe latex

23   anaphylaxis could be a different condition than a

24   latex allergy?

**BRIAN DONNELLY**
**April 11, 2006**

Page 73

1      A.    My general understanding, again, as a

2   layperson is that if somebody with that condition

3   that is not treated, could die within a matter of

4   minutes.

5      Q.    So if someone had latex anaphylaxis,

6   they might still be unable to work even in an

7   environment in which a latex allergic person

8   could work?

9             MR. KIMBALL:  Objection.  It calls for

10        speculation beyond the scope of this topic.

11             THE WITNESS:   I don't know the answer

12        to that.

13      Q.    (By Mr. Nesin)  Dr. Stadenmyer's

14   report indicates on Page 5 that there is abundant

15   research and clinical experience that shows that

16   elimination of powdered latex products is all

17   that is necessary to produce a latex safe

18   environment.  Do you see that sentence?  It is at

19   the bottom of the top paragraph.

20      A.    I see the sentence, yes.

21      Q.    Do you believe that Dr. Stadenmyer was

22   referring to both latex allergic people and

23   people with latex anaphylaxis when he indicated

24   that removing powdered latex products is enough

**BRIAN DONNELLY**
**April 11, 2006**

Page 75

1  reason for a physician, who knew that a claimant

2  had a latex anaphylaxis, to indicate that a

3  certain environment was latex safe without

4  specifying whether that referred to latex

5  allergic people or people with latex anaphylaxis?

6          MR. KIMBALL:  Objection, calls for

7      speculation.

8          THE WITNESS:   Again, I don't know what

9      the good doctor was thinking, but that would

10     be a logical inference.

11     Q.    (By Mr. Nesin)  What would be a

12  logical inference?

13     A.     That if he had the entire medical

14  record located in this individual's claims file,

15  he would have had the knowledge of a diagnosis of

16  latex anaphylaxis.

17     Q.    Was there ever a time at Berkshire

18  where management gives a directive to claims

19  consultants to review an entire set of claims

20  files?

21          MR. KIMBALL:  Objection.  This witness

22      has not been designated to discuss that topic

23      at this time.  To the extent that you

24      understand the question, you can answer.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**BRIAN DONNELLY**
**April 11, 2006**

Page 76

1        THE WITNESS:    I would just ask you to

2        restate or clarify.

3        **Q.     (By Mr. Nesin)  Let's say,**

4    **hypothetically speaking, that there are a number**

5    **of claimants receiving benefits because of skin**

6    **cancer, and it turns that out that a cure for**

7    **skin cancer is developed.  Would Berkshire direct**

8    **claims consultants to rereview all active claims**

9    **in which there is a claim of skin cancer?**

10        MR. KIMBALL:  The same objection.

11        THE WITNESS:  The only answer that I

12        can give you is that in my experience here,

13        that has never happened.

14        **Q.     (By Mr. Nesin)  Let's move to the last**

15    **person on the chart that is listed as Dentist**

16    **1997.**

17        MR. KIMBALL:  I am going to reiterate

18        the defendant's objection as to the intrusion

19        into this individual's privacy and

20        confidentiality as to his or her medical

21        records, medical history, insurance and

22        financial history.  I am also restating

23        defendant's overriding objection to this

24        entire line of inquiry as to all seven of

**BRIAN DONNELLY**
**April 11, 2006**

Page 77

1    these claims as not being relevant,

2    whatsoever, to this cause of action.

3        Q.    (By Mr. Nesin)  Do you know if Dentist

4    1999 is still receiving benefits?

5        A.    Did you say '99?  I am sorry.  Is it

6    '97 or '99?

7        Q.    '99.

8            MR. KIMBALL:  The last row?

9            THE WITNESS:  The last row.  Okay.  He

10   is not receiving benefits under one of his

11   policies any longer, but he is still

12   receiving benefits under a second policy.

13       Q.    (By Mr. Nesin)  Let's take each policy

14   one at a time.  You indicated that there was one

15   policy in which he was previously receiving

16   benefits and he is no longer receiving benefits;

17   is that correct?

18       A.    Yes.

19       Q.    What type of policy is that?

20       A.    It is a policy where after five years

21   of a compensable disability claim, if it turns

22   out he is working in any other occupation, he

23   would no longer be entitled to benefits under

24   that policy.

**BRIAN DONNELLY**
**April 11, 2006**

Page 82

1    allergic to latex, or sensitive to latex, and

2    some other chemical?

3         A.    That is my understanding, yes.

4         Q.    Do you remember whether Dentist 1999s

5    conditions were listed in any particular order by

6    the attending Physician?

7         A.    Not that I recall, no.

8         Q.    Do you have any sense as to what the

9    primary condition was on which Dentist 1999 was

10   considered to be disabled?

11             MR. KIMBALL:  I object to the form of

12        the question as to the phrase "the primary

13        condition".  To the extent that you

14        understand it, you can provide the answer.

15             THE WITNESS:  Not that I recall.

16        Q.    (By Mr. Nesin)  Is it possible, based

17   on having reviewed the claims file and your

18   general experience, that Dentist 1999 could be

19   receiving benefits irrespective of his latex

20   allergy?

21             MR. KIMBALL:  Objection.  It calls for

22        speculation.

23             THE WITNESS:  I really don't know the

24        answer to that.  I do know that he is still

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BRIAN DONNELLY**
**April 11, 2006**

Page 83

1     on claim because the provisions of the second

2     policy were different.  The diagnoses that

3     are listed there, or the conditions that I

4     found, are listed in that file.

5     Q.    **(By Mr. Nesin)  Do you know why**

6    **Dentist 1999 changed his occupation to become a**

7    **Dental Hygienist?**

8     MR. KIMBALL:  Objection.  It calls for

9     speculation.

10    THE WITNESS:  I don't specifically

11    recall whether he shared that rationale.  I

12    do know that the file was well documented

13    that he had changed to that occupation.

14    Q.    **(By Mr. Nesin)  Given our previous**

15   **discussions as to whether dental offices can be**

16   **made latex safe for latex allergic people, do you**

17   **believe that Dentist 1999 could still potentially**

18   **be disabled based on latex allergy?**

19    MR. KIMBALL:  Objection.  It calls for

20    speculation.

21    THE WITNESS:  Again, limited to those

22    facts, that might be a true statement.  I

23    don't know enough about chemical sensitivity

24    to know whether that might still play a role

**BRIAN DONNELLY**
**April 11, 2006**

Page 87

1    considered to be disabled by Berkshire due to

2    latex allergy?

3              MR. KIMBALL:    Objection.  It calls

4         for speculation.

5              THE WITNESS:  The only answer I can

6         give, because I am not a medical expert, is

7         that the other claims seem to be further

8         complicated by the fact that they have

9         comorbid features.

10    Q.    (By Mr. Nesin)  When you say, "further

11    complicated," that means that you can't make a

12    determination at this time as to why these

13    particular individuals were found to be disabled?

14              MR. KIMBALL:  Objection.  It misstates

15         the prior testimony completely.

16              THE WITNESS:  I do not understand that

17         question.

18    Q.    (By Mr. Nesin)  Okay.  Let me try one

19    more time.  With respect to the six claims, the

20    six of the seven claims other than the Dental

21    Hygienist 1996, is there any possibility that all

22    six of those claims and all six of those

23    claimants would still be considered disabled by

24    Berkshire even if they did not have a latex

**BRIAN DONNELLY**
**April 11, 2006**

Page 88

1   **allergy?**

2        MR. KIMBALL:  Objection to the form of

3     the question.  It is a hypothetical that

4     calls for speculation, arguably not even

5     within the scope of the topic.

6        THE WITNESS:  You asked me this

7     question three or four times, and I still am

8     struggling, quite honestly, with what you are

9     trying to elicit.  I have answered it the

10    best way that I know how, and I am really

11    befuddled as to what you are trying to

12    elicit.

13    **Q.   (By Mr. Nesin)  Well, I don't feel as**

14  **though you have answered the question directly.**

15  **Maybe it is an impossible question to answer.  Is**

16  **that your testimony?**

17    A.   I think that it is impossible to

18  generalize in the fashion that you have asked me

19  to generalize on these claims.  I have just

20  learned from my years of experience that each

21  case is truly different and really driven by

22  their own set of facts.  Anytime somebody in your

23  position attempts to make me go down the road of

24  hypothetical situations, my training and

**BRIAN DONNELLY**
**April 11, 2006**

Page 90

1  to remember every detail about these individual

2  claims files, which is why I am asking you a

3  question as to whether you can rule something out

4  rather than whether you actually have knowledge

5  of the specific information in those claim files.

6  My question is whether you can rule out the

7  possibility that six of these seven claims might

8  have been paid even if the person didn't have

9  latex allergies?

10        MR. KIMBALL:  Objection to the form of

11     the question.  You are asking a hypothetical

12     that calls for speculation as to facts and

13     circumstances that may or may not exist with

14     respect to the files that this person had

15     reviewed extensively.

16        THE WITNESS:  I only thing that I would

17     add to --

18        MR. KIMBALL:  Excuse me.  I also want

19     to reiterate that this question has now been

20     asked approximately two or three times and

21     has been answered two or three times.

22        THE WITNESS:  What I can acknowledge is

23     that six of the seven files did involve other

24     conditions.  However, I am not qualified

**BRIAN DONNELLY**
**April 11, 2006**

Page 91

1    medically to tell you that these people would

2    have been determined to be disabled on the

3    basis of the diagnoses or the conditions that

4    are listed here exclusive of their latex

5    allergy.

6        Q.    (By Mr. Nesin)  I understand that you

7    can't say that they would be, but can you rule

8    out the possibility that they would be considered

9    to be disabled even exclusive of their latex

10   allergy?

11       MR. KIMBALL:  Objection to the form of

12   the question.  It is hypothetical and calls

13   for speculation.  It has been asked and

14   answered three times now, for sure.

15       THE WITNESS:  Let me try it another

16   way.  Are you trying to ask me if these other

17   conditions by themselves would have led to a

18   determination that the person was disabled?

19       Q.    (By Mr. Nesin)  I'm asking you whether

20   these conditions by themselves could have led to

21   the determination that these individuals were

22   disabled?

23       MR. KIMBALL:  I'm objecting to the

24   form of the question.  It is vague and

**BRIAN DONNELLY**
**April 11, 2006**

Page 92

1   ambiguous to the extent that it is also a

2   hypothetical and calls for speculation.  To

3   the extent that you are able to answer a

4   question that has already been asked and

5   answered -- which is my other objection --

6   then you can do so.

7   THE WITNESS:  Subject to my knowing

8   more about these comorbid conditions and the

9   nature of them, the severity of them, it is

10   difficult for me to answer that question.  If

11   I were informed that they could be

12   independently disabling because of their

13   severity, hypothetically, they could be

14   compensable claims even in the absence of

15   latex allergy.

16   MR. NESIN:  I have no further

17   questions.

18   MR. KIMBALL:  Let the record reflect

19   that we have completed all the renumerated

20   topics in the 30B6 deposition and that this

21   deposition has taken approximately 12 hours,

22   which is approximately five hours longer than

23   Rule 30, and with that in mind, we are done.

24   MR. NESIN:  We take a mini and an ASCII.