# Exhibit 3

**SAMUEL P. HAUPT**
**September 21, 2005**

 **ORIGINAL**

Page 1

1                 UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3

4

5       * * * * * * * * * * * * * * *

6       CAROLYN MIREK,                  *

7                      Plaintiff  *

8       vs.                             * No. 04-30166-MAP

9                                       *

10      THE GUARDIAN LIFE INSURANCE     *

11      COMPANY OF AMERICA and          *

12      BERKSHIRE LIFE INSURANCE        *

13      COMPANY OF AMERICA,             *

14                     Defendants *

15      * * * * * * * * * * * * * * *

16

17          DEPOSITION OF:  SAMUEL P. HAUPT

18          Berkshire Life Insurance Company

19                700 South Street

20          Pittsfield, Massachusetts

21            September 21, 2005

22

23            Tacy A. Malandrinos

24              Court Reporter

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 17

1  **Dr. Holbrook?**

2       A.      I met with him briefly here at

3  Berkshire.

4       **Q.      So he came to the office?**

5       A.      Yes.

6       **Q.      Did you give him any material?**

7       A.      No.

8       **Q.      In advance of the meeting?**

9       A.      No, I did not give him any

10  material.

11      **Q.      Did you have any reason to believe**

12  **that he knew anything about latex allergy when**

13  **you contacted him?**

14      A.      Not -- did I recognize him as a

15  latex allergy specialist?

16      **Q.      Yes.**

17      A.      No.

18      **Q.      Had he ever treated anybody for**

19  **latex allergy?**

20              MR. KIMBALL:  Objection.  Calls for

21          speculation.

22              THE WITNESS:  I'm not aware of who

23          he treated for what reasons.

24      **Q.      (By Ms. D'Alcomo)  Now how long did**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 23

1    that is correct.

2        Q.    Did the name of Dr. Garb come up

3    during your meeting with Dr. Holbrook?

4        A.    When I obtained the questions?

5        Q.    Yes.

6        A.    Yes.

7        Q.    When you say it wasn't your

8    decision to have it looked at by Dr. Garb, was

9    it, do you mean that --

10        A.    It wasn't my --

11            MR. KIMBALL:  Please let her ask

12        the question.

13        Q.    (By Ms. D'Alcomo)  When you say it

14    wasn't your decision to have Dr. Garb look at

15    the file, are you saying it was not you who

16    chose that Dr. Garb be the one to look at the

17    file?

18        A.    Right.  Correct.

19        Q.    Who chose Dr. Garb to look at the

20    file?

21            MR. KIMBALL:  Objection.  Calls for

22        speculation.

23            THE WITNESS:  I can't answer that

24        question.

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 25

1          A.       I don't recall if it specifically

2     came up in the preliminary meeting or not.

3     It may have been it was suggested that we have

4     another review and there was a physician who was

5     qualified to perform such a review.

6          **Q.       How did you learn that the person**

7     **that was going to be reviewing the claim was Dr.**

8     **Garb, the man Dr. Garb?**

9          A.       Well, his information was probably

10    provided to me by Dr. Holbrook.

11         **Q.       How did you learn that Dr. Garb**

12    **was the person that was going to be doing the**

13    **review as opposed to some other physician?**

14         A.       Well, I was provided with one

15    physician.  We do engage other independent

16    medical consultants.  This one was identified to

17    me as the appropriate consultant, presumably by

18    Dr. Holbrook.

19         **Q.       Was it Dr. Holbrook who selected**

20    **Dr. Garb?**

21              MR. KIMBALL:  Objection.  Calls for

22         speculation.

23              THE WITNESS:  I can't answer that

24         question.

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 27

1  several occasions since you have been at

2  Berkshire?

3          MR. KIMBALL:  Objection to the form

4      of the question.  Ambiguous.  And calls

5      for speculation.

6          THE WITNESS:  I can't speak to

7      that.

8      Q.    (By Ms. D'Alcomo)  Have you used

9  him on more than one occasion?

10         MR. KIMBALL:  Objection to the form

11     of the question.  Ambiguous.

12         THE WITNESS:  Him meaning Dr.

13     Holbrook?

14     Q.    (By Ms. D'Alcomo)  Yes.

15     A.    Have I asked him questions?

16     Q.    Have you used services from Dr.

17  Holbrook on more than one occasion?

18     A.    Yes.

19     Q.    On how many occasion?

20     A.    I can't answer that question.

21     Q.    More than a dozen?

22     A.    Yes.

23     Q.    More than two dozen?

24     A.    If the question covers the range

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 33

1       Q.      Did you tell him where to submit an

2    invoice?

3       A.      No.

4       Q.      Had Dr. Garb done work for

5    Berkshire before?

6               MR. KIMBALL:  Objection.  Calls for

7           speculation.

8               THE WITNESS:  I don't know.

9       Q.      (By Ms. D'Alcomo)  Well, was it

10   your belief that Dr. Garb was going to be

11   working for no pay?

12      A.      I didn't have any opinion as to the

13   arrangement between Dr. Garb and Berkshire Life.

14      Q.      Do you know whether or not Dr. Garb

15   has received any payments from Berkshire?

16      A.      No, I do not.

17      Q.      Did you check to see whether

18   whatever rate Dr. Garb would charge would be

19   something that Berkshire would be willing to

20   pay?

21      A.      No.  I had no involvement with that

22   process.

23      Q.      Do you know who did?

24      A.      No, I do not.

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 41

1       A.      Not specifically.  Every claim is

2   handled on a case by case basis, and doesn't

3   really fall into a specific regimen in terms of

4   what is suppose to be done at a certain time or

5   what specific article of documentation should be

6   maintained in the file.

7       Q.      **Did you ever participate in any**

8   **training where the subject of what records of**

9   **telephone conversations to keep was discussed?**

10      A.      Yes.

11      Q.      **And what did you learn -- strike**

12  **that.**

13              **What has been Berkshire's practices**

14  **about what notes of telephone conversations to**

15  **keep?**

16              MR. KIMBALL:  Objection.  Calls for

17          speculation.

18              THE WITNESS:  I can't speak that

19          generically, but specifically I keep

20          conversations that I have with insureds

21          electronically.

22      Q.      **(By Ms. D'Alcomo)  You keep them**

23  **electronically?**

24      A.      Yes.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 50

1    field if in fact we were arranging for a medical

2    examination.

3             Q.       **What service do you utilize?**

4             A.      I don't have the name of the

5    company off the top of my head.

6                     I am sure Mr. Kimball can provide

7    that.

8             Q.       **Have you heard of MLS Medical**

9    **Evaluation?**

10            A.      Yes.

11            Q.       **Is that the company you utilize?**

12            A.      No.

13            Q.       **Have you ever used MLS?**

14            A.      No.

15            Q.       **What number -- strike that.**

16                    **What area is the company located in**

17   **that you contact for physicians for medical**

18   **examinations?**

19                    MR. KIMBALL:  Objection.  Calls for

20          speculation.

21                    THE WITNESS:  My memory is the

22          name of the company is Independent Medical

23          Consultants.  I believe they are located

24          in Florida or North Carolina.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 56

1    Q.    Wouldn't the restrictions and

2  limitations depend on what the duties of the

3  person were in their occupation?

4         MR. KIMBALL:  Objection.  Calls for

5      speculation.

6         THE WITNESS:  Not specifically.

7      That's more of a vocational analysis,

8      which is really the role of the claims

9      consultant.

10    Q.    (By Ms. D'Alcomo)  Well, when the

11  medical reviewers are doing reviews, do they

12  contact the claimant to determine what their

13  duties are in their occupation?

14    A.    The medical reviewers have written

15  documentation prepared by the claimant which

16  outline their occupation.

17    Q.    So you typically do provide to the

18  medical reviewers the claimant's description of

19  what their duties are and their occupation,

20  is that right?

21         MR. KIMBALL:  Objection to the form

22      of the question.  Misstates prior

23      testimony.

24         THE WITNESS:  We don't provide an

**SAMUEL P. HAUPT**
**September 21, 2005**

1  claimant's file?

2       A.      To perform a medical review?

3       Q.      **Yes.**

4       A.      Have I used other physicians?

5       Q.      **Have you used -- well, what methods**

6  **have you used to find physicians to conduct**

7  **medical reviews, other than asking Dr. Holbrook**

8  **for recommendations?**

9       A.      We have a list of suggested

10 independent medical consultants that are

11 available to us.

12      Q.      **How long is the list?**

13      A.      At the present time I would guess

14 that it consists of between ten and

15 fifteen physicians of varying specialties.

16      Q.      **And is it in hard copy or**

17 **electronic or both?**

18      A.      It was an electronic list that gets

19 updated periodically.

20      Q.      **Are the physicians divided up by**

21 **specialty?**

22              MR. KIMBALL:  Objection.  Calls for

23          speculation.

24              THE WITNESS:  Yes.  I don't know

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 59

1      what you mean by divided, other than they

2      are identified to us by specialty.

3          Q.      (By Ms. D'Alcomo)  And do you know

4  how many, if any, are board certified?

5              MR. KIMBALL:  Objection.  Calls for

6      speculation.

7              THE WITNESS:  No, I do not.

8          Q.      (By Ms. D'Alcomo)  Do you know if

9  you have used anyone other than a board

10  certified physician to review a claim?

11             MR. KIMBALL:  Objection.  Calls for

12      speculation.  Ambiguous.

13             THE WITNESS:  No, I do not.

14         Q.      (By Ms. D'Alcomo)  Has anyone ever

15  told you at Berkshire about what the

16  significance is of board certification for a

17  physician?

18         A.      No.

19         Q.      Have you ever been told -- strike

20  that.

21             In any training or meetings that

22  you have attended at Berkshire, has there ever

23  been a discussion about what weight, if any, to

24  give a treating physician's view of a claimant's

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 61

1            MR. KIMBALL:  Objection to the form

2      of the question.  Ambiguous.

3            THE WITNESS:  No, I don't recall

4      any specific training in that regard.

5        Q.     (By Ms. D'Alcomo)  **Do you recall**

6  **any discussion in that regard?**

7        A.     No, I do not.

8        Q.     **Is it fair to say that in --**

9  **strike that.**

10            **Do you, after reviewing the claim,**

11  **make a recommendation on the claim?**

12            MR. KIMBALL:  Objection to the form

13      of the question.  Ambiguous.  This witness

14      isn't here as a 30(b)(6) witness.

15            THE WITNESS:  Are you asking if

16      there is a specific process after

17      receiving a medical review?

18        Q.     (By Ms. D'Alcomo)  **No.  After**

19  **receiving a claim, at some point after receiving**

20  **such claim, do you make a recommendation as to**

21  **whether the claim should be accepted or denied?**

22            MR. KIMBALL:  Objection to the form

23      of the question as ambiguous.  This

24      witness is not here as a 30(b)(6) witness.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 64

1      A.      Essentially the documentation is

2  contained in our electronic file which is our

3  computer system, and I would process an initial

4  payment.  And the initial payment then would

5  appear in the in-box of whoever needs to review

6  the claim decision.

7            There is no meeting.  It's

8  basically an electronic action that signals that

9  I believe that this claim should be paid.

10  Conversely, if I believe the claim should not be

11  paid, I draft a denial letter.

12      Q.      And how does either the claims team

13  leader, claims manager or claims director become

14  aware that your position is to deny the claim?

15            MR. KIMBALL:  Objection.  Calls for

16        speculation.

17            THE WITNESS:  During my practice

18        at Berkshire the claims team leader would

19        get a copy of the proposed denial and

20        that's how they would learn of my

21        position.

22      Q.      (By Ms. D'Alcomo)  How would you

23  learn that you could send the letter out?

24      A.      That's either approved, approved

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 65

1    and amended or it's suggested by the team leader

2    that maybe there is some other avenues or areas

3    of investigation or evaluation that should be

4    explored prior to indicating that if the

5    appropriate decision, perhaps the decision is

6    premature.

7          Q.    How do you receive those

8    communications from the claims team leader,

9    claims manager or claims director?

10          MR. KIMBALL:  Objection.

11          Ambiguous.  This witness is not a 30(b)(6)

12          witness.

13          THE WITNESS:  Typically verbally.

14          Q.    (By Ms. D'Alcomo)  Do you ever

15    receive them electronically?

16          A.    No.

17          Q.    Are there records kept of

18    whether --  strike that.

19          Are there records kept of your

20    denial of a claim other than the fact that you

21    sent out a denial letter?

22          MR. KIMBALL:  Objection.  Calls for

23          speculation.  Ambiguous.  Witness is not

24          here for 30(b)(6) purposes.

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 66

1              THE WITNESS:  No.

2         Q.     (By Ms. D'Alcomo)  For example, if

3    you send out a denial letter to a claimant, what

4    proof do you have that you ever requested that a

5    supervisor had approved that letter?

6              MR. KIMBALL:  Objection.  Calls for

7         speculation.

8              THE WITNESS:  I don't know that I

9         can answer that question.

10        Q.     (By Ms. D'Alcomo)  Well, you don't

11   send out a denial letter unless someone else has

12   approved such a denial, correct?

13        A.     That's my practice.  That's all I

14   can speak to.

15        Q.     I take it that that's the practice

16   that you follow because you believe that's the

17   practice that Berkshire wants you to follow, is

18   that right?

19        A.     Yes.

20        Q.     And how do you learn from a claims

21   leader, claims manager, claims director that you

22   may now send out a denial letter?

23        A.     They tell me.

24        Q.     Orally?

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 67

```
 1        A.      Yes.
 2        Q.      And is there a mechanism for you if
 3   you were ever questioned about the denial letter
 4   to show that you had approval from a manager
 5   before sending out that denial letter?
 6                MR. KIMBALL:  Objection.  Calls for
 7          speculation.  This witness is not a
 8          30(b)(6) witness.  It's also ambiguous.
 9                THE WITNESS:  I don't know that I
10          understand the question.
11                It's generally the letters are
12          signed by the claims consultant.  They
13          don't go under anyone else's signature.
14                I think it's just a matter of
15          internal control.
16        Q.      (By Ms. D'Alcomo)  Well, if
17   someone, let's say next week, criticized you for
18   sending out a denial of a claim saying it should
19   not have been sent out, how could you prove that
20   you had the approval of the manager to send out
21   that denial?
22                MR. KIMBALL:  Objection to the form
23          of the question.  Calls for speculation.
24                THE WITNESS:  I can't answer that
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 68

1    question.

2    Q.    (By Ms. D'Alcomo)  Is there a way

3    for you to prove that you had the approval of a

4    manager before sending out a denial letter based

5    on the record keeping system that you are

6    familiar with?

7                MR. KIMBALL:  Objection to the form

8         of the question.  Calls for speculation.

9         This witness is not a 30(b)(6) witness.

10               THE WITNESS:  I don't know.

11   Q.    (By Ms. D'Alcomo)  Do you know of

12   any way that you could prove that you had the

13   approval of a manager before sending out a

14   denial letter?

15   A.    I don't know.

16   Q.    I'm sorry.  I'm not making this

17   clear.

18               Do you know of any way that you

19   could prove through records that you had the

20   approval of a manager before sending out a

21   denial letter?

22               MR. KIMBALL:  Objection to the

23        question.  Again it's ambiguous.  Calls

24        for speculation.  You can certainly answer

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 70

1      A.      Denials are pretty rare.

2      Q.      **What would the old files tell you?**

3      A.      I might see something that would

4  help me answer the question.

5      Q.      **Such as what?**

6      A.      Well, I don't know.  I didn't set

7  up the procedure.

8      Q.      **What would you be looking for?**

9          MR. KIMBALL:  Objection.  Calls for

10         speculation.  We are now talking about

11         imagined old files that we don't even know

12         what we are looking for.

13         MS. D'ALCOMO:  I ask you not to

14         comment on the question.  The rules

15         provide that you just state an objection.

16         MR. KIMBALL:  The rules do not say

17         that, but in any event I'm going to make

18         an objection where I feel appropriate.

19     Q.      **(By Ms. D'Alcomo)  What would you**

20  **be looking for?**

21     A.      I don't know exactly.

22     Q.      **Well, when you decide to accept a**

23  **claim, you cause a check to be generated, is**

24  **that right?**

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 71

1            MR. KIMBALL:  Objection.  Calls

2        for speculation.  This witness is not a

3        30(b)(6) witness.

4            THE WITNESS:  Yes.  I prepare

5        initial payment.

6        Q.      (By Ms. D'Alcomo)  And does a cover

7    letter go with that?

8        A.     Yes.  Not with it.  Separately.

9        Q.     And you cause the cover letter to

10   be prepared?

11       A.     Yes.

12       Q.     And you don't send the cover letter

13   out until you receive approval from upper

14   management, is that right?

15       A.     Well, the payment is approved

16   electronically.

17       Q.     And you received notification that

18   the payment has been approved electronically?

19       A.     Yes.

20       Q.     That's when you send the separate

21   letter out, is that right?

22       A.     Yes.

23       Q.     And there is an electronic record

24   that reflects that the payment has been

**SAMUEL P. HAUPT**
**September 21, 2005**

```
                                        Page 72

 1   approved?

 2        A.    Yes.

 3        Q.      Is there an electronic record that

 4   a letter that you have sent out to notify a

 5   claimant that the claim has been denied has been

 6   approved by upper management?

 7              MR. KIMBALL:  Objection.  Calls for

 8         speculation.

 9              THE WITNESS:  Not that I'm aware

10         of.  I'm not intimately familiar with the

11         intricacies of our computer management

12         system.

13        Q.     (By Ms. D'Alcomo)  Before you send

14   out a letter of denial of a claim, a member of

15   upper management comes over to you physically

16   and tells you they have approved your position?

17              MR. KIMBALL:  Objection.  Misstates

18         prior testimony.

19              THE WITNESS:  Not specifically.  I

20         usually communicate with my team leader.

21        Q.     (By Ms. D'Alcomo)  How does that

22   occur?

23        A.    Verbally.

24        Q.    What does that mean, verbally?
```

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 82

1    position.  I based my opinion on the medical

2    documentation that was provided by her doctor,

3    together with the other documentation and

4    medical record reviews that we have provided.

5            Q.      Well, would you agree that Dr.

6    Garb's report concludes that Carolyn Mirek could

7    go to work in a dental office where there was no

8    latex?

9            A.      Yes.

10           Q.      And Dr. Garb didn't recommend that

11   Carolyn Mirek return to work as a dental

12   hygienist in a practice where there was latex,

13   did he?

14           A.      No, he did not.

15                   I don't believe it was our

16   interpretation of any medical record that she

17   does not have some allergic response to latex

18   proteins.

19           Q.      Dr. Garb concludes that Carolyn

20   Mirek could return to work in a dental practice

21   that had no latex products, right?

22                   MR. KIMBALL:  Objection.  Misstates

23           the evidence in the record.

24                   THE WITNESS:  Well, his report

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**SAMUEL P. HAUPT**
**September 21, 2005**

Page 85

1  **that used latex, correct?**

2      A.      I concluded that she has a mild

3  latex allergy, which would not preclude her from

4  returning to her occupation in a non-latex

5  environment.

6  *    Q.      You did not conclude after reading

7  Dr. Garb's report that Carolyn Mirek could

8  return to work as a dental hygienist in a dental

9  office that used latex, correct?

10           MR. KIMBALL:  Objection.  Asked and

11       answered.  Could we go off the record for

12       a second please?

13           MS. D'ALCOMO:  No.  I would like my

14       question answered first.

15           MR. KIMBALL:  I think it was asked

16       and answered was my objection.

17           MR. D'ALCOMO:  Would you like the

18       question read back to you?

19           THE WITNESS:  Sure.

20

21           *  (Question read)

22

23           THE WITNESS:  I didn't have to

24       reach that conclusion.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**