# Exhibit 5

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

 **ORIGINAL**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3

 4

 5   * * * * * * * * * * * * * * *

 6   CAROLYN MIREK,                    *

 7                       Plaintiff   *

 8   vs.                             * No. 04-30166-MAP

 9                                    *

10   THE GUARDIAN LIFE INSURANCE      *

11   COMPANY OF AMERICA and           *

12   BERKSHIRE LIFE INSURANCE         *

13   COMPANY OF AMERICA,              *

14                       Defendants *

15   * * * * * * * * * * * * * * *

16

17      DEPOSITION OF:  TIMOTHY A. NEWMAN, M.D.

18          Berkshire Life Insurance Company

19               700 South Street

20          Pittsfield, Massachusetts

21             September 20, 2005

22

23             Tacy A. Malandrinos

24               Court Reporter
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 4

1           MS. D'ALCOMO:  It is stipulated

2      and agreed between the parties that all

3      objections except as to form are reserved

4      until the time of trial, and motions to

5      strike are reserved until the time of

6      trial, and the witness will have thirty

7      days to read and sign, and signing need

8      not be in front of a notary.

9

10

11      TIMOTHY NEWMAN, M.D., Deponent, having

12   first been duly sworn, deposes and states as

13   follows:

14

15

16           EXAMINATION BY MS. D'ALCOMO:

17

18      Q.      **Please identify yourself for the**

19   **record.**

20      A.      My name is Timothy A. Newman, M.D.

21      Q.      **What is your address?**

22      A.      Well, my home address is 47

23   Pinecrest Drive, Dalton, Mass.

24      Q.      **What is your date of birth?**

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 25

1    has always been a vendor that comes in here.

2         Q.      **When you say that the company**

3    **became a latex-free environment because of a**

4    **worker in the mail room, did you investigate**

5    **whether latex gloves were being used in food**

6    **preparation in the cafeteria?**

7         A.      I don't remember.  I would have to

8    ask Marty who is the clinic nurse.  It's a

9    detail I can't answer.

10        Q.      **Is Berkshire latex-free today?**

11             MR. KIMBALL:  Objection to the form

12        of the question.  Calls for speculation.

13        Ambiguous.

14             THE WITNESS:  As it concerns

15        employee exposure to latex, the only thing

16        I'm hesitating about is we do flu shots

17        and tetanus shots, and I'm not sure about

18        what Marty buys for syringes.

19             That's her job, so I couldn't

20        answer.  I could ask her or find out the

21        answer, but I don't know right now.

22        Q.      **(By Ms. D'Alcomo)  Are latex gloves**

23    **used in cleaning the restrooms?**

24        A.      Again, I'm not sure.

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 29

1      Q.      Well, what kind of latex test did

2  you consider reliable in 2002?

3      A.      Since I am not an expert on latex

4  testing, I can only look at the test that he

5  did, and essentially look at it and say what

6  does this test show me, what are my impressions

7  of the test and this record.

8              So I have no knowledge of what was

9  reliable, what was useful, who was doing testing

10 and how good they were.  So what I did was look

11 at his test and say from this record how severe

12 is this problem.

13     Q.      What kind of test would have caused

14 you to believe that a patient in 2002 had a more

15 severe latex allergy than Carolyn Mirek?

16             MR. KIMBALL:  Objection to the form

17         of the question.  Calls for speculation.

18             THE WITNESS:  Should I answer

19         that?

20             MR. KIMBALL:  You may answer the

21         question if you understand it obviously.

22             THE WITNESS:  Again, a very

23         simplistic way or a very simplistic severe

24         reaction would be for this patient to have

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 36

1      A.      Am I aware of that?  Well, I feel

2   like I'm aware of that.

3      Q.      Were you aware in 2002, when you

4   wrote your comments, that a person with a

5   certain type of latex allergy can go from being

6   totally without symptoms to having an

7   anaphylactic reaction with no symptoms in

8   between?

9              MR. KIMBALL:  Objection to the form

10         of the question.  Calls for speculation

11         and is compound.

12             THE WITNESS:  Was I aware of that?

13             It's an interesting question.  I

14         don't know that it matters if I was aware

15         of that or not.

16     Q.      (By Ms. D'Alcomo)  Since I'm asking

17   the questions in the deposition, it matters to

18   me to know.

19             Can you tell me, Doctor, were you

20   aware in 2002, when you were answering the

21   questions from Kevin Kvederas, that a person

22   with a certain type of latex allergy can go from

23   being asymptomatic to having an anaphylactic

24   reaction with no warning?

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 40

1    in '99 for a wheezing flare up.  Those are the

2    medicines that I recall.

3        Q.    **Isn't it true that when the source**

4    **of one's allergy is in the workplace, that a**

5    **patient generally feels better outside of the**

6    **workplace?**

7        A.    Yes, I think --

8            MR. KIMBALL:  I want to object to

9            the form of the question before you

10           answer, Doctor.  Calls for speculation and

11           is ambiguous.

12           THE WITNESS:  Well, my answer

13           would be we are talking about general

14           principles of avoidance.  So my answer

15           would be yes.

16       Q.    **(By Ms. D'Alcomo)  How many years**

17   **did you treat patients?  Was it four?**

18       A.    No.  I worked as an HMO physician

19   for seven years.

20       Q.    **During the time that you treated**

21   **patients over that seven year period, isn't it**

22   **fair to say that you relied to a great extent on**

23   **patient history, and patient relating of history**

24   **to provide treatment?**

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 41

1      A.      Yes.   The basic premise of the

2  doctor patient relationship is to take a good

3  history.

4      Q.      And isn't it true that with allergy

5  a lot of the time when patients come to a doctor

6  to complain about allergy they don't have the

7  symptoms about which they are complaining

8  because they are not currently expose to the

9  allergin?

10          MR. KIMBALL:  Object to the form of

11       the question.  Calls for speculation.

12          THE WITNESS:  My answer would be

13       that as a physician you would hope to see

14       the reaction, and you often don't at the

15       time of the office visit.

16      Q.      (By Ms. D'Alcomo)   That would be

17  true for food allergies often, correct?

18          MR. KIMBALL:  Objection to the form

19       of the question.  Calls for speculation.

20          THE WITNESS:  Yes, it would be

21       true for food allergies.

22      Q.      (By Ms. D'Alcomo)   And it would be

23  true for other types of allergies as well,

24  correct?

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 42

1        MR. KIMBALL:  Objection to the form

2    of the question.  Calls for speculation.

3        THE WITNESS:  In a general sense

4    it would be true for any patient's

5    history.  You would rely on your patient

6    to guide your interaction.  You can't work

7    from nothing, so you have to listen and

8    usually believe your patient.

9        Q.    (By Ms. D'Alcomo)  Isn't it true

10   that an allergic reaction to latex may not last

11   for hours or days?

12        MR. KIMBALL:  Objection to the form

13   of the question.  Calls for speculation.

14        THE WITNESS:  Well, again, we are

15   talking generally here.  Latex or any

16   other allergy can be mild, moderate,

17   severe, time limited over a great period.

18   The variability is part of the -- when

19   you see a patient there is a great deal of

20   variability.

21        Q.    (By Ms. D'Alcomo)  Well, do you

22   believe that a person can have a latex allergic

23   reaction to food that has been prepared with

24   latex gloves?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 43

1          MR. KIMBALL:  Objection to the form

2     of the question.  Calls for speculation.

3          THE WITNESS:  Well, I believe that

4     because it's reported.

5     Q.     (By Ms. D'Alcomo)  It's widely

6  reported in the literature, is it not?

7     A.     Yes.

8     Q.     Is that one reason why latex gloves

9  are no longer used at Berkshire in the

10 cafeteria?

11          MR. KIMBALL:  Objection to the form

12     of the question.  Misstates testimony.

13     Calls for speculation.

14          THE WITNESS:  Well, yes.

15     Q.     (By Ms. D'Alcomo)  You are aware

16  that latex gloves are not used in the cafeteria?

17     A.     I assume they were not.  I couldn't

18 say I ordered it and it was done because of me.

19 It's something that -- I assume the people would

20 do the best thing that they can do.

21     Q.     (By Ms. D'Alcomo)  Now you are

22  aware that Carolyn Mirek had reactions after

23  eating at a number of places, correct?

24          MR. KIMBALL:  Objection to the form

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 44

1    of the question.  Calls for speculation.

2    Misstates prior testimony.

3        THE WITNESS:  As part of what I

4    reviewed she does complain about that in

5    the record.

6    Q.    (By Ms. D'Alcomo)  **Was that**

7 **significant to you?**

8    A.    Well, let me see.  Was it

9 significant?  I guess it's only significant

10 because I wrote down subjective complaints are

11 severe, so I included that in that statement.

12    Q.    **Is it fair to say that if you**

13 **believed the symptoms that Carolyn Mirek**

14 **described as contained in Berkshire's file, you**

15 **would have believed she had a severe latex**

16 **allergy?**

17        MR. KIMBALL:  Objection to the form

18    of the question.  I think it's a little

19    bit confusing and ambiguous and

20    speculative.

21        THE WITNESS:  Well, let me see.

22    Did the fact that her complaints are

23    severe make me conclude that her allergy

24    was severe?  Well, no, because I didn't

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 45

1       conclude that.

2           Q.      (By Ms. D'Alcomo)  Was that because

3    you didn't believe her?

4           A.      No, it wasn't because I didn't

5    believe her.  It was because of the mismatch

6    between subjective objective.

7           Q.      What does that mean?

8           A.      It only means what I said here.

9           Q.      Well, you said that the subjective

10   complaints that Carolyn Mirek described were

11   severe, correct?

12          A.      She did have severe complaints that

13   were in the record.

14          Q.      Well, if you believed the

15   subjective complaints, isn't it fair to say you

16   would have concluded that her reactions were

17   severe?

18                  MR. KIMBALL:  Objection to the form

19          of the question.  Calls for speculation.

20                  THE WITNESS:  What can I say?  I

21          didn't conclude that.

22          Q.      (By Ms. D'Alcomo)  Isn't it fair to

23   say that if you had believed Carolyn Mirek you

24   would have concluded that her reactions were

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 46

1    severe?

2              MR. KIMBALL:  Objection to the form

3         of the question.  Calls for speculation.

4         Asked and answered.

5              THE WITNESS:  No, I don't think

6         that's what I would have said.  Or I don't

7         think I didn't believe the patient, or I

8         don't think that one thing leads to the

9         other.

10             I'm only saying what I said here.

11        Q.      (By Ms. D'Alcomo)  Well, if her

12   subjective complaints were severe, what made you

13   think -- strike that.

14             Did you conclude that Carolyn Mirek

15   did not have a severe latex allergy?

16        A.      Is there a conclusion on this?

17   I don't want to conclude now.  I want to

18   conclude what I concluded here.

19             2B.  My conclusion is it's unclear

20   how severe this person's latex allergy is at

21   this time.  So this is from 5 of 2002.

22        Q.      So you didn't know one way or the

23   other whether Carolyn Mirek's latex allergy was

24   severe?  Is that fair to say in 2002?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 47

1        A.      I would say that my answer in 2B is

2   what I answered.

3        Q.      Since you are in front of me, Dr.

4   Newman, and I'm asking the questions, I'm going

5   to ask you to answer my question.

6                Is it fair to say that in 2002 you

7   didn't know one way or the other whether Carolyn

8   Mirek's latex allergy was severe?

9                MR. KIMBALL:  Objection to the form

10       of the question.  I think he did answer

11       the question.

12               THE WITNESS:  My answer to that

13       would be, yes, it's unclear.

14       Q.      (By Ms. D'Alcomo)  You knew --

15   strike that.

16               You are aware that Dr. Bedard had

17   been treating Carolyn Mirek for a number of

18   years?

19               MR. KIMBALL:  Objection to the form

20       of the question.  Calls for speculation.

21       Misstates testimony.

22               THE WITNESS:  I recollect there

23       was records from '99, starting about '99

24       and going through -- let me see.  I can't

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 48

1    remember now.  May of 2001.  It would be

2    easier to answer your question if I could

3    just review the dates.

4         Q.    (By Ms. D'Alcomo)  You don't

5    remember one way or the other whether Dr.

6    Bedard had been treating Miss Mirek for a number

7    of years?

8         A.    I can't recall how many years he

9    treated her.

10        Q.    Is it fair to say, Dr. Newman, that

11   a board certified allergist who had been

12   treating Miss Mirek for a number years would be

13   more familiar with her condition than you in

14   2002?

15        A.    I think it's fair to say that any

16   treating physician knows his patient better than

17   I would ever know her.

18        Q.    And is it fair to say that a

19   physician who was board certified in allergy in

20   2002 was more qualified than you to render an

21   opinion about a patient's latex allergy?

22             MR. KIMBALL:  Objection to the form

23        of the question.  Calls for speculation

24        and ambiguous.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 50

1    again.

2        Q.    (By Ms. D'Alcomo)   Sure.

3        When you were involved in providing

4    advice on the handling of disability claims, did

5    you have occasion to view reports by physicians

6    hired by the company to opine on claims?

7        A.    Yes, I did.   I was asked to review

8    independent medical exams.

9        Q.    And was it the company's practice

10    during the time that you worked on consulting in

11    terms of claims, to hire board certified

12    physicians?

13            MR. KIMBALL:   Objection to the form

14        of the question.   Calls for speculation.

15            THE WITNESS:   My recollection is

16        that a claims person would -- it would go

17        like this.   The claims person would

18        present me with the file, and he would say

19        who do you think would be a better choice

20        for an IME.   Would it be a pain specialist

21        or orthopedic surgeon or neurosurgeon?

22            So I would review the claim and I

23        would say the complaint seems to center

24        around this type of expertise which is

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 52

1      Q.      Are you aware that the physician

2    hired to review Carolyn Mirek's claim was not

3    board certified in allergy or any other subject?

4      A.      No, I didn't know that.

5      Q.      And do you recognize the existence

6    of a condition called latex allergy?

7      A.      Yes, I do.  It's obvious I do.

8      Q.      Are you aware that the physician

9    who was hired to render an opinion on Carolyn

10   Mirek's claim does not believe in the existence

11   of an entity called latex allergy?

12     A.      No.

13     Q.      Is it fair to say that the

14   recognition of a condition called latex allergy

15   is in the mainstream of American medicine and

16   has been for a number of years?

17          MR. KIMBALL:  Objection to the form

18       of the question.  It calls for

19       speculation.  Ambiguous.

20          THE WITNESS:  I think that answer

21       is yes.

22     Q.      (By Ms. D'Alcomo)  And have you

23   ever heard of something calling chronic

24   inflammatory airway disease?

TIMOTHY NEWMAN, M.D.
September 20, 2005

Page 54

1      Q.     And in your view, is asthma ever a

2   condition that interferes with a person's

3   ability to do their job?

4              MR. KIMBALL:  Objection to the form

5         of the question.  Calls for speculation.

6              THE WITNESS:  Well, you know, we

7         are talking about asthma.  You could put

8         any diagnosis in there.  But asthma, mild,

9         moderate, severe can interfere with the

10        job mildly, moderately or severely.

11     Q.     (By Ms. D'Alcomo)  Are you aware of

12  asthma as being identified by the United States

13  government as a serious health problem?

14     A.     I never heard it expressed that

15  way, so I would say I wouldn't disbelieve that

16  statement.  But I was not aware that the

17  government made that statement.

18     Q.     Do you consider asthma as a serious

19  medical problem?

20     A.     Let me see.  What should I say

21  about that?

22             Asthma is a medical problem which

23  is increasing in incidents and severity in the

24  United States population.

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 55

1      Q.      You are aware it's led to many

2   deaths?

3      A.      Yes.

4      Q.      Do you -- strike that.

5              Are you aware of reports of the --

6   withdraw that.

7              Is it fair to say that with some

8   people who have asthma, it's not possible to

9   keep the asthma under control?

10             MR. KIMBALL:  Objection to the form

11        of the question.  It's ambiguous and calls

12        for speculation.

13             THE WITNESS:  Again, in a general

14        way, there are rare and serious asthma

15        patients who have very difficult, a lot of

16        difficulty with their disease, and those

17        are the high mortality, the high morbidity

18        patients, the most difficult patients.

19     Q.      (By Ms. D'Alcomo)  Now you are

20   aware that asthma can have certain triggers?

21     A.      Yes.

22     Q.      And isn't the first, or one of the

23   first lines of treating asthma is to encourage

24   patients to avoid the triggers?

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 57

1      of the question.  Latex is not a food.

2          Q.      (By Ms. D'Alcomo)  Let me ask it

3   differently.

4              Is it fair to say that it's widely

5   known that individuals who are allergic to latex

6   also tend to be allergic to certain foods?

7          A.      I think it's widely known there is

8   a cross reactivity.

9          Q.      What are the foods that you are

10  aware of there is a cross reactivity for?

11         A.      I'm aware that you can be allergic

12  to, a cross reactivity to a banana.  It's fairly

13  common to have a kiwi allergy.  What is the

14  other tropical fruit?  Mango.

15         Q.      How about avocado?

16         A.      Avocado?  I don't know that one.

17         Q.      Now is it true that individuals

18  who are atopic are at a higher risk of becoming

19  latex allergic?

20              MR. KIMBALL:  Objection to the form

21         of the question.  Calls for speculation.

22              THE WITNESS:  I don't know that.

23         I don't know.

24         Q.      (By Ms. D'Alcomo)  Do you know if

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 60

1    Q.    Since you have been working at

2    Berkshire, is there something that's called an

3    All Underwriter Meeting?

4    A.    To be honest, I don't pay

5    attention, but obviously there is.  I'm joking.

6    I'm sorry.

7    Q.    In 2002, how many underwriters were

8    there in Pittsfield?

9         MR. KIMBALL:  Objection to the form

10        of the question.  Calls for speculation.

11        THE WITNESS:  Let me see if I can

12        estimate.  Must have been about eight.

13    Q.    (By Ms. D'Alcomo)  How about

14    Spokane?

15    A.    Seven or eight up there.

16    Q.    How about Bethlehem, Pennsylvania?

17    A.    Must have been about eight or nine.

18    Q.    Who is the Lorraine Skapeen?

19    A.    She is one of the managers in the

20    new business area.

21    Q.    Where is she?  Does she currently

22    work for the company?

23    A.    Yes.  She works here in Pittsfield.

24    Q.    Is she still in the new business

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 63

1          A.      No.

2          Q.      **So that has no meaning to you?**

3          A.      Actually it has no meaning to me.

4          Q.      **Does bold mean the level of**

5     **significance?**

6                  MR. KIMBALL:  Objection to the form

7          of the question.  Asked and answered.

8          Speculative.

9                  THE WITNESS:  What was your

10         question?

11         Q.      (By Ms. D'Alcomo)  **Does bold mean**

12    **the level of significance?**

13         A.      I'm not sure what it means.

14         Q.      **Now on the next page of this**

15    **document there is an arrow.  Do you see that?**

16    **It says medical department.**

17         A.      Yes.

18         Q.      **What does that mean?  What is the**

19    **medical department?**

20         A.      It says medical department.  There

21    is only two of us in the medical department.

22    Actually three of us.  Barbara, Marty and

23    myself.  I would assume it means Barbara and

24    myself.

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 64

1      Q.      Did you call the group of yourself,

2   your nurse and Barbara Smachetti the medical

3   department?

4      A.      That is the medical department?

5      Q.      Does Barbara Smachetti work along

6   side you physically?

7      A.      Yes, she works in the department.

8      Q.      Underneath medical department there

9   is a bullet and it says latex allergies.  Do you

10   see that?

11      A.      Yes.

12      Q.      Why is the term latex allergies in

13   this section with the arrow that has medical

14   department?

15          MR. KIMBALL:  Objection to the form

16      of the question.  Calls for speculation.

17      He didn't write this document.

18          MS. D'ALCOMO:  I'm going to ask you

19      not to testify.  Make your objections but

20      don't testify.

21          MR. KIMBALL:  I'm not testifying.

22          THE WITNESS:  Well, this one --

23      what should I say?  What was your question

24      again?

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 66

1    of Exhibit 15 that says "we reiterated that our

2    current policy is to decline all cases

3    mentioning a latex allergy." Do you see that?

4          A.    Yes.

5          Q.    Is it fair to say reiteration means

6    repeating?

7          A.    Reiteration would be to restate, so

8    well, it's pretty obvious what it says there.

9          Q.    Was it the policy before September

10   2002 that coverage would not be issued for

11   disability policies to an applicant where there

12   was a latex allergy mentioned?

13                MR. KIMBALL:  Objection to the form

14         of the question.  Calls for speculation.

15                THE WITNESS:  Ask your question

16         again please.

17         Q.    (By Ms. D'Alcomo)  Do you see where

18   it says "we reiterate that our current policy

19   is." Do you see that?

20         A.    Yes.

21   *    Q.    And is it true that before

22   September 18, 2002 it was the policy of

23   Berkshire to decline to issue disability

24   coverage to an applicant where a latex allergy

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 71

1          We underwrite to put business on

2     the books which will be persistent,

3     profitable and put us in the position

4     where only unexpected or unanticipated

5     losses will result from our underwriting.

6          Well, it's obvious that a latex

7     allergy pre-existing a policy is not an

8     unknown and unanticipated medical

9     condition.  So you would not accept that

10    risk.  I guess that is the way we

11    underwrite.

12         Q.    (By Ms. D'Alcomo)  **You also**

13    **underwrite with known pre-existing conditions by**

14    **using riders, correct, in some cases?**

15         A.    Yes, we do.

16         Q.    **And you also underwrite**

17    **pre-existing conditions by rating them?**

18         A.    Yes, we do.

19         Q.    **And what do you mean by rating, by**

20    **the way?**

21              MR. KIMBALL:  Objection to the form

22         of the question.  Calls for speculation.

23              THE WITNESS:  My understanding of

24         rating is that the person is acceptable

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 74

1          reiterate that the Berkshire policy would

2          be the policy going forward.

3              Q.      (By Ms. D'Alcomo)  **What was it**

4    **about latex allergy that caused you to believe**

5    **it was a good decision for the company to not**

6    **issue disability coverage to applicants who had**

7    **latex allergy?**

8                  MR. KIMBALL:  Objection to the form

9              of the question.  Misstates prior

10             testimony.  Calls for speculation.

11                 THE WITNESS:  The easiest way to

12             answer that is to use this memo.

13             Q.      (By Ms. D'Alcomo)  **Since we are at**

14   **a deposition which is oral, can you tell me what**

15   **it was about latex allergy that caused you to**

16   **believe in September 2002 it was a good decision**

17   **for the company not to issue disability policies**

18   **to applicants that had latex allergy?**

19                 MR. KIMBALL:  Objection to the form

20             of the question.  Misstates prior

21             testimony.  Calls for speculation.

22                 THE WITNESS:  Why would it be a

23             good idea?  It would be a good idea for us

24             not to issue these clients at all because

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 79

1    You would say, your argument is species, but we

2    are not.  We are underwriting.  We are trying to

3    make good sense of who we can accept for a risk.

4    You don't underwrite anticipating claims.  You

5    underwrite to put business on the books for

6    agents selling your business.

7         Q.     **Well, whether someone has a latex**

8    **allergy doesn't affect whether they are**

9    **interested in buying a policy, does it?**

10                MR. KIMBALL:  Objection to the form

11         of the question.  Calls for speculation.

12                THE WITNESS:  Yes.

13         Q.     **(By Ms. D'Alcomo)  Your policy was**

14    **aimed at whether the company would sell a policy**

15    **to someone with a latex allergy, isn't that**

16    **right?**

17         A.     Yes.

18         Q.     **In determining the profitability of**

19    **a particular line of business, you consider**

20    **whether an individual is going to continue to**

21    **pay premiums, right?**

22                MR. KIMBALL:  Objection to the form

23         of the question.  It calls for speculation

24         by this witness.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

1    Q.    Is there today?

2    A.    I don't know.

3    Q.    Who does the audit of the Medical

4  Information Bureau?

5         MR. KIMBALL:  Objection to the form

6         of the question.  Calls for speculation.

7         THE WITNESS:  I think the MIB

8         sends out an auditor.  A person that

9         comes out from the company.

10        But the audit I'm talking about is

11        a self-audit done under the auspices of

12        the medical director to ensure these rules

13        are followed.

14   Q.    (By Ms. D'Alcomo)  Do you see that

15  reference "the auditor will discuss further with

16  MIB"?

17   A.    Yes.  I don't know who that is.

18   Q.    Do they have an outside auditor, do

19  you know?

20   A.    I don't know.

21   Q.    Who is the, if there is such a

22  person, the point person for dealing with the

23  MIB on codes?

24   A.    Who is the point person?  I don't

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 89

1    know who that would be right now.  There is a

2    person, but I don't know who it is.

3                 MS. D'ALCOMO:  Off the record.

4

5                 (A break was taken)

6

7                 MS. D'ALCOMO:  Back on the record.

8         Q.      (By Ms. D'Alcomo)  **Do you know who**

9    **Kevin Kvederas' manager was in 2002?**

10        A.      No.

11        Q.      **Did he have a manager, do you know?**

12                 MR. KIMBALL:  Objection to the form

13        of the question.  Calls for speculation.

14                 THE WITNESS:  No.  I don't know.

15        Q.      (By Ms. D'Alcomo)  **Now do you have**

16    **to send codes to MIB?**

17        A.      Myself?  No.

18        Q.      **Who does?**

19        A.      There is an MIB code person.

20                 MR. KIMBALL:  Objection.

21                 THE WITNESS:  I don't know who it

22        is now.  Personnel changes in new

23        business, so I don't know.

24        Q.      (By Ms. D'Alcomo)  **Is there some**

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 90

1    person called the MIB code person?

2        A.      I think so.

3        Q.      **How do they get their information,**

4    **do you know?**

5            MR. KIMBALL:  Objection to the form

6        of the question.  Calls for speculation.

7            THE WITNESS:  I think you have to

8        find the person and ask them.  But codes

9        come over a teletype.  Not a teletype.  I

10       think they come on-line now.  So these

11       codes show up and now they are all matched

12       electronically to each file.

13       Q.      **(By Ms. D'Alcomo)  Now in 2002 when**

14   **you were working on the issue of underwriting of**

15   **individuals with latex allergy, did you take the**

16   **material from Guardian and the material from**

17   **Berkshire and try to come up with a common**

18   **position?**

19           MR. KIMBALL:  Objection to the form

20       of the question.  It misstates prior

21       testimony.  And also ambiguous.

22           THE WITNESS:  I'm trying to recall

23       what that process was, and I can't exactly

24       recall.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 94

```
 1                MS. D'ALCOMO:  Please mark this.
 2                (Exhibit 18, Guardian Probable
 3                Underwriting Action Guide, 2005,
 4                marked)
 5
 6        Q.      (By Ms. D'Alcomo)  What year did
 7   you make your revisions to Exhibit 17, the
 8   Probable Underwriting Action Guide?
 9                MR. KIMBALL:  Objection to the form
10        of the question.  Calls for speculation.
11                THE WITNESS:  I don't know.  I
12        could find out, but I don't know.
13        Q.      (By Ms. D'Alcomo)  And how would
14   you go about finding out?
15        A.      I would have to ask Barbara.  I
16   would think she might remember more than I would
17   remember.
18        Q.      After you made changes to the
19   Probable Underwriting Action Guide, were they
20   incorporated into some document?
21        A.      I think they were incorporated into
22   this, the publication that this is a copy of.
23        Q.      And this has a date at the back of
24   2002?
```

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 95

```
 1        A.      Yes, it does.

 2        Q.      And is that the one you made

 3   changes to?

 4        A.      Well, I assume it was.

 5        Q.      Now does that stand for September

 6   2002 on the last page?

 7              MR. KIMBALL:  Objection.  Calls for

 8        speculation.

 9              THE WITNESS:  It appears to, but I

10        don't know.

11              MS. D'ALCOMO:  Please mark this.

12

13              (Exhibit 19, Chapter 7, Probable

14               Underwriting Action, marked)

15

16        Q.      (By Ms. D'Alcomo)  Dr. Newman, I'm

17   providing you with an excerpt of a document

18   because I don't have the whole thing.  But do

19   you recognize what has been marked as Exhibit

20   19?

21              MR. KIMBALL:  For purposes of the

22        record, I think the document is labeled

23        Probable Underwriting Action.

24              MS. D'ALCOMO:  No, it's labeled
```

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 101

1      A.      I can't say I did that but --

2      Q.      **There is a section underneath it**

3  **that says medical requirements.  Do you see**

4  **that?**

5      A.      Yes.

6      Q.      **And it says none.**

7              **What does that mean?**

8              MR. KIMBALL:  Objection.  Calls for

9          speculation.

10             THE WITNESS:  Medical requirements

11         include getting a physician statement, an

12         attending physician statement or APS.  And

13         sometimes the medical requirement includes

14         labs or a cardiogram.  But in most of

15         these you get an APS.  It appears we

16         changed the medical requirement for latex

17         allergy.

18     Q.      **(By Ms. D'Alcomo)  After this**

19  **Exhibit 17?**

20     A.      Yes.  From 17 to 18.

21     Q.      **Now it says on Exhibit 17, the**

22  **Probable Action, it says "decline."  Do you see**

23  **that?**

24     A.      Yes.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 102

1    Q.    M.Ds, dentists?

2    A.    Yes.

3    Q.    **And then the initials "IC others"**

4  **with an asterisk. What does that mean?**

5    A.    It means individual consideration.

6  See the asterisk below that?  So IC is the same

7  as the asterisk, individual consideration.

8    Q.    **What does decline next to probable**

9  **action mean?**

10    A.    Well, for the field for us, if they

11  had an applicant who stated they had this

12  impairment, you would look down here and it

13  would say decline, so essentially telling the

14  agent to stop that application.

15    Q.    **The words M.Ds. and dentists is**

16  **after the word decline. What does that mean?**

17          MR. KIMBALL:  Objection.  Calls for

18      speculation.

19          THE WITNESS:  I think it means M.D.

20      and dentists.  Two occupation classes

21      there.

22    Q.    (By Ms. D'Alcomo)  In September

23  2002 it was not Berkshire's position that only

24  M.Ds. and dentists would be declined coverage if

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 103

1    they had a latex allergy, was it?

2              MR. KIMBALL:  Objection.  Calls for

3         speculation.

4              THE WITNESS:  Well, what was our

5         position?

6              This is September of '02 this one.

7         Q.    (By Ms. D'Alcomo)  17?

8         A.    Then we already looked at the memo

9    from that All Underwriting Meeting which was

10   dated -- do you recall when that was dated?

11        Q.    You are referring to Exhibit 15?

12        A.    Yes.

13        Q.    9/18.

14        A.    So it's the same month, isn't it?

15              So I don't know what that means,

16   but all I can say it appears that we were

17   re-evaluating this position under latex.

18   Document 17.  It appears we were re-evaluating

19   that during the same month it had been issued.

20        Q.    As of 9/18/2002 according to the

21   minutes in Exhibit 15, the company was

22   reiterating its position that disability

23   coverage not be issued to individuals with latex

24   allergy, right?

**TIMOTHY NEWMAN, M.D.**
**September 20, 2005**

Page 108

1  records, that you could not assure her that she

2  would not have an anaphylactic reaction if she

3  went back to work as a dental hygienist?

4  MR. KIMBALL:  Objection to the form

5  of the question.  Calls for speculation.

6  Ambiguous.

7  THE WITNESS:  It's a very difficult

8  question.  I never treated her.  I never

9  saw her as a patient.  The records that I

10  was asked to review never -- there was no

11  indication that her own treating physician

12  was worried about that. And yet you are

13  asking me if I would be worried about

14  that.

15  I suppose in a general way I would

16  always worry about that.

17  Q.  (By Ms. D'Alcomo)  You do know that

18  Carolyn Mirek's own treating physician advised

19  her to stop working as a dental hygienist, don't

20  you?

21  MR. KIMBALL:  Objection to the form

22  of the question.

23  THE WITNESS:  I may have

24  mis-interpreted the records, but I recall